1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3    CARDIAQ VALVE TECHNOLOGIES, INC.,  )
                                        )
4                    Plaintiff          )
                                        )
5          -VS-                         )  CA No. 14-12405-ADB
                                        )  Pages 1 - 220
6    NEOVASC INC., et al,               )
                                        )
7                    Defendants         )

8

9                      **JURY TRIAL - DAY 3**

10         BEFORE THE HONORABLE ALLISON D. BURROUGHS
                  UNITED STATES DISTRICT JUDGE
11

12

13

14

15                            United States District Court
                              1 Courthouse Way, Courtroom 17
16                            Boston, Massachusetts  02210
                              May 4, 2016, 9:34 a.m.
17

18

19

20

21
                         DEBRA M. JOYCE
22                      KELLY MORTELLITE
                        LEE A. MARZILLI
23                   OFFICIAL COURT REPORTERS
                   United States District Court
24                 1 Courthouse Way, Room 7200
                        Boston, MA  02210
25                      (617)345-6787

A P P E A R A N C E S:

    JOHN B. SGANGA, JR., ESQ., CHRISTY G. LEA, ESQ.,
JOSHUA STOWELL, ESQ., and MARK A. SPEEGLE, ESQ.,
Knobbe, Martens, Olson & Bear, LLP, 2040 Main Street,
14th Floor, Irvine, California, 92614, for the Plaintiff.

    BRIAN C. HORNE, ESQ., Knobbe, Martens, Olson & Bear, LLP,
1901 Avenue of the Stars, Suite 1500, Los Angeles, California,
90067, for the Plaintiff.

    ROBERT J. KALER, ESQ., Holland & Knight, LLP,
10 Saint James Avenue, Boston, Massachusetts, 02116,
for the Plaintiff.

    VERONICA ASCARRUNZ, ESQ. and DOUGLAS H. CARSTEN, ESQ.,
Wilson, Sonsini, Goodrich & Rosati, P.C., 1700 K Street, NW,
5th Floor, Washington, D.C., 20006, for the Defendants.

    CHARLES TAIT GRAVES, ESQ., JOHN FLYNN, ESQ., and
JOSHUA A. BASKIN, ESQ., Wilson, Sonsini, Goodrich & Rosati, P.C.,
One Market Spear Tower, Suite 3300, San Francisco, California,
94105, for the Defendants.

    COLLEEN BAL, ESQ., Wilson, Sonsini, Goodrich & Rosati, P.C.,
650 Page Mill Road, Palo Alto, California, 94304, for the
Defendants.

    JOEL C. BOEHM, ESQ., Wilson, Sonsini, Goodrich & Rosati,
P.C., 900 South Capital of Texas Highway Las Cimas IV, Austin,
Texas, 78746, for the Defendants.

    MICHAEL L. CHINITZ, ESQ., Rose, Chintz & Rose,
One Beacon Street, 4th Floor, Boston, Massachusetts, 02108,
for the Defendants.

1                        I N D E X

2     WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

3     ARSHAD QUADRI, M.D.

4     By Ms. Lea                13               149
      By Mr. Graves                      77

5

6     JEREMY BRENT RATZ

7     By Mr. Sganga           156

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                       P R O C E E D I N G S

3          THE COURT:  Okay.

4          I got -- I have the two -- I don't know when these

5    were filed, but they were here this morning, last night or this

6    morning, doesn't make any difference.

7          The JenaValve motion I'm going to have to take some

8    time to look back at my notes and just spend some time on.

9          The other one, which is Docket 426, CardiAQ bench memo

09:37 10    seeking an instruction following Neovasc's opening.  I'm happy

11    to hear you on this.  But I sat here and listened to the

12    openings.  I guess the distinction I would make is they can't

13    argue ability to pay, but I think they can argue competitive

14    forces.  And I didn't hear yesterday, when I went back and

15    looked at this with the excerpts this morning, what they said

16    may come close, but I don't think that what they said crossed

17    the line about what we were talking about during our motions in

18    limine.  I'm happy to hear you on it.  As I say, in my mind,

19    the distinction is the ability to pay, which your damage award

09:38 20    should be affected by our size and shape and ability to pay and

21    all that, versus they are doing this for competitive advantage.

22    I don't see those things to be the same.

23          MR. SGANGA:  Your Honor, the concern we've got is they

24    did talk about shutting down the program, and the motion in

25    limine that was granted was to preclude any argument about the

 1    injunction or its potential impacts.  So talking about shutting

 2    down Neovasc is in layman's terms for injunctive relief.

 3            THE COURT:  I didn't hear it that way.  I really heard

 4    them to be talking about, you know, this is in lieu of

 5    competing in the marketplace.  That sort of argument comes

 6    along with filing a lawsuit, right, they are filing this

 7    lawsuit for all these reasons.

 8            MR. SGANGA:  It's a hot-button defense issue in every

 9    IP case, your Honor.  That's why we brought the motion in

09:39 10    limine, your Honor granted it.  The concern is the jury

 11    shouldn't be put in the role of being policymakers about

 12    whether intellectual policy law is itself anti-competitive.

 13            I agree with your Honor, to some extent, some

 14    discussion about competition is part of what we're doing, but

 15    to now talk about what the effect of plaintiff winning the case

 16    is, that's where they crossed the line.

 17            THE COURT:  I don't actually think that's what they

 18    did.  I think what they did is they want to shut us down, which

 19    I'm sure is accurate.

09:40 20            MR. SGANGA:  We want the jury to find liability on the

 21    causes of action and to enter a damage award.

 22            Now, the point of what that -- what the consequence of

 23    that is, we're entitled to those remedies if the IP rights have

 24    been violated.  But to now go the next step and suggest you're

 25    not going to get proper care from your physician because of

```
 1    what we asked the jury to do --
 2              THE COURT:  I don't think they went that far, right.
 3              The closest they came is you're going to put us out of
 4    business and patients won't be able to get our products.
 5    That's not even that, that's from the motion.
 6              We're here because CardiAQ doesn't -- we're here
 7    because CardiAQ does not want to face competition from Neovasc.
 8              MR. SGANGA:  Your Honor, at page 91 of the transcript,
 9    quote, seeking to shut down Neovasc development through
09:40 10  litigation rather than to let the doctors decide which is right
11    for their patients.
12              THE COURT:  I really think that's talking about
13    competition, not about patient care.
14              I will caution you not -- you've heard their concern,
15    you've heard my view on it.  The competitive part is okay.
16    Talking about patients going to be deprived of critical care is
17    not okay.
18              I'm not going to give a curative instruction on it.
19    To the extent there's a problem, and I don't think there is,
09:41 20  but I think it would just make it worse.
21              MR. SGANGA:  We do have a concern that on
22    cross-examination of our witnesses we are going to go down,
23    spiral into this motivation for filing the lawsuit and aren't
24    you really trying to prevent patients from getting whatever
25    treatment --
```

```
 1              THE COURT:  So you can do the first part.
 2              MR. FLYNN:  Not the second.  We hear you, your Honor.
 3    That has always been our intention.
 4              THE COURT:  Okay.
 5              MR. SGANGA:  Thank you, your Honor.
 6              THE COURT:  And I have to look at the other one.
 7              MR. GRAVES:  Your Honor, would it be possible for us
 8    to make a few remarks about the other one --
 9              THE COURT:  You can make a few remarks about it, but
09:42 10    I've only -- I think I got -- I think I read through page 3 and
11    realized that it wasn't relevant to today, and I -- I wanted to
12    be out here at 9:30, and I couldn't get through it.  So I guess
13    there's a page and a little bit of text I haven't read.  Either
14    I can read it during one of the breaks and we can talk about it
15    later on today or you can make your comments now.  It probably
16    would be better if I finished reading it.
17              MR. GRAVES:  Sure.  Thank you, your Honor.
18              THE COURT:  Anything else for this morning?
19              MR. CARSTEN:  Yes, your Honor.  There's one issue
09:42 20    we've had with some demonstratives that were shared with us.
21    This harkens back to an issue we addressed with you on Monday.
22              Your Honor, CardiAQ's counsel provided to us several
23    demonstratives, 28 demonstrates to use with Mr. Ratz, who
24    presumably might be going on the stand today.  Seventeen of
25    those demonstratives sound directly on the inventorship
```

1    questions, more than half of them.  Moreover, your Honor, we

2    first raised this issue with you in the context of slides that

3    Mr. Sganga may be using in his openings.  Your Honor heard the

4    argument and said, Look, guys, I'm not going to preclude you

5    from doing this.  I understand you want to get some facts in

6    the record about inventorship, but I'm not going to let the

7    tail start wagging the dog.

8         This slide is entitled, Dr. Quadri and Mr. Ratz's

9    Design Compared to the Claimed Invention of the '964 Patent.

09:43 10   The slides we got last night, 17 -- we can have that -- what

11   they intend for Mr. Ratz to get up and say to the jury today is

12   Dr. Quadri and Mr. Ratz contributed claim 1 of the '964 patent.

13        Your Honor, we're concerned this is now the tail

14   beginning to wag the dog.

15        THE COURT:  I don't think so.  You're free to keep

16   raising it, but they're trying to say that their intellectual

17   property showed up in the '964 patent, and I think this is a

18   fair way of doing it.

19        You can keep reminding me of it, you can keep raising

09:44 20   it, but this still seems fairly dog-like to me.

21        MR. CARSTEN:  Your Honor, your Honor, we will continue

22   to bark.

23        THE COURT:  Or wag, whatever.

24        MR. FLYNN:  One last issue.  The Astrid photographs,

25   the picture of the patient surrounded by Dr. Quadri and Mr.

1  Ratz, that's back in the lineup today.  This is opposite of

2  what they're seeking to preclude us to do.  They think every in

3  limine is a one-way street.  This goes directly to the treating

4  of patients.

5       THE COURT:  I think from the motions they filed this

6  morning they think every motion you filed is a one-way street.

7       MR. FLYNN:  We probably each -- but with respect to

8  Astrid, we think it's not.

9       MS. LEA:  Astrid is in the deck for rebuttal, if

09:45 10  necessary, if they go down that road on cross-examination.

11       THE COURT:  You're not using Astrid.

12       MS. LEA:  In direct.

13       MR. FLYNN:  Fair enough.

14       MS. LEA:  Your Honor, one other issue we wanted to

15  raise was moving exhibits into evidence.

16       The parties have agreed to move unobjected-to exhibits

17  into evidence at the end of the day.  After the jury leaves we

18  can read them into the record, if that's okay with your Honor.

19       THE COURT:  I'm concerned about if we -- let's just

09:45 20  say he's done and gone, by the time you're ready to move them

21  in and there's a dispute over an exhibit involving him and he's

22  no longer here.

23       MS. LEA:  Then it should have been raised before he

24  took the stand or if there is some unforeseen foundational

25  issue, then that would draw an objection.  And if it doesn't,

```
 1    then they'll be moved in.
 2              THE COURT:  Okay.
 3              So what I could do is either just trust you all that
 4    this is going to run smoothly or I could, for the record, for
 5    example, when Dr. Quadri gets off the stand, say, Are there any
 6    issues with any exhibits concerning Dr. Quadri that we should
 7    address before he gets off, and give you one more quite of bite
 8    at it.
 9              MS. LEA:  That sounds reasonable, your Honor.
10              THE COURT:  Is that all right?
11              MR. GRAVES:  It is, your Honor.  What we've discussed
12    for each witness, there aren't objected-to exhibits the night
13    before, some sort of foundational question will be asked to
14    show the person does have knowledge, that will be pretty
15    obvious with most persons on both sides of the case.
16              I don't think either side anticipates a huge number of
17    objections about these things.  The procedure would be at the
18    end of the day, those documents that were shown to the person
19    will be read into the record.
20              THE COURT:  That's fine with me.  I was thinking -- I
21    was wondering after our discussion about the exhibits last
22    night if we should give the jury an instruction so they don't
23    differentiate between exhibits that are discussed and exhibits
24    that they never hear actually moved in.  But exhibits are
25    exhibits, we've already given them that instruction so it may
```

```
 1    not be necessary, so I leave that to you.
 2           MR. GRAVES:  I think the procedure we're talking about
 3    now would mean that every exhibit we'd be reading into the
 4    record at the end of the day would be one that the witness had
 5    actually talked about.  So there won't be a disconnect between
 6    stuff that isn't going through a witness.
 7           I think the parties are discussing potential
 8    stipulations on a block admission of certain documents, but
 9    we're not quite there yet.  So this would just be things that
09:47 10   actually went through a witness.
11           MS. LEA:  I think we could reserve on any instruction,
12    your Honor, and see when it comes up.
13           THE COURT:  Okay.  That's fine.
14           You want me to give them any -- do you want me to say
15    anything to them about the fact that -- what I would say is
16    that the parties are cooperating and rather than using their
17    time to move individual exhibits in during testimony, that for
18    the most part exhibits will be moved in at the end of the day
19    for efficiency.
09:48 20          I'm just wondering -- I don't know what these people
21    know if they don't -- I'm wondering if it's going to raise a
22    question in their mind if we don't address it.  But I leave
23    that to you.
24           (Discussion off the record.)
25           MS. LEA:  We don't have an objection to that
```

 1  instruction.

 2          MR. FLYNN:  Your Honor, our only thought is that the

 3  instruction might be more meaningful when we can put it in

 4  context and we know what kind of information and what size,

 5  what body of information we're talking about.  We think the

 6  instruction is appropriate.

 7          THE COURT:  So you want me to hold off on it until --

 8  okay.

 9          All right.  Anything else for this morning?

09:48 10          MR. GRAVES:  I think we have issues with some other

11  exhibits for witnesses who probably aren't going to come up

12  today, such as Dr. Hillstead who is coming up tomorrow.  So we

13  can discuss those later.

14          THE COURT:  I'm concerned about the schedule.  On

15  Friday we can't sit before 10:00 because of this ABA thing, so

16  we could sit from 10:00 to 2:00 which I think -- then we'd have

17  to take a lunch break, that gives us three and a half hours of

18  testimony on Friday.

19          The alternative would be if we went until 1:15 and

09:49 20  just took a 15-minute break.  That would give us, like, a

21  little bit less testimony but get them out of here

22  significantly earlier.  You all have a feeling how long they

23  can sit or do you want me to leave it to them?

24          MR. FLYNN:  Your Honor, I would leave it to the jurors

25  to decide what's most convenient for them.

```
 1              THE COURT:  Let me see how we're going because I feel
 2    we absolutely need that extra half an hour.  It seems crazy to
 3    have them have lunch when we could get them out of here quicker
 4    on a Friday.
 5              Okay.
 6              All right.  I'm just going to be on and off the bench
 7    and get organized up here for the day, don't let me bother you.
 8              (Recess taken.)
 9              (Jury entered the courtroom.)
10:03 10         THE CLERK:  Court is in session, please be seated.
11              THE COURT:  Good morning everyone.  Thank you for
12    being on time.  We'll get started.
13              We're going to continue the direct examination of
14    Dr. Quadri.
15              Dr. Quadri, I remind you that you're still under oath.
16              Go ahead, Ms. Lea.
17              ARSHAD QUADRI, M.D., having previously been duly sworn
18    by the Clerk, was further examined and testified as follows:
19                       CONTINUED DIRECT EXAMINATION
10:03 20    BY MS. LEA:
21    Q.   Good morning, Dr. Quadri.
22    A.   Good morning.
23    Q.   Yesterday we were talking about and you were shown a
24    picture of the transcatheter mitral valve device?
25    A.   Yes.
```

1    Q.   Why did you want to develop a transcatheter mitral valve

2    device?

3    A.   The part I wanted to -- it was an unmet clinical need, and

4    there was an opportunity for me to take that challenge on and

5    give something new to the -- new for patients that they didn't

6    have any other options at this point.

7    Q.   And when did CardiAQ first start pursuing a transcatheter

8    mitral valve device?

9    A.   In 2008.

10:04 10   Q.   Was it easy to develop a transcatheter mitral valve

11   device?

12   A.   It was extremely difficult and challenging for several

13   reasons.  And one of the reasons was the mitral anatomy itself,

14   and the environment of the mitral valve is such that it has to

15   be a completely different approach to it.  The major challenge

16   was that how do you put a valve there and not have it move

17   during the cardiac cycle, during all the pressure changes.  So,

18   yes, it is -- it was a very challenging road.

19   Q.   And what is it about the mitral anatomy that makes it

10:04 20   challenging?

21   A.   There are two elements to it.  First, the mitral annulus

22   itself is a softer, much more pliable tissue than other lining

23   of the heart.

24   Q.   And the annulus is what?

25   A.   Annulus is the ring that supports the fiber structure that

1    supports the leaflet of the mitral valve.

2    Q.   So the ring around the mitral valve is soft?

3    A.   Yes.

4         Also, the systolic pressure is going to be felt by the

5    implant you put there, and it's just a complex scenario.

6    Q.   The high pressure is going to be felt?

7         And how important is anchoring the device in a

8    transcatheter replacement mitral valve?

9    A.   I think -- in my opinion, that is the most important part

10:05 10   to figure out before you do any transcatheter valve

11   replacement.  Because you need to have a valve that stays in

12   that position.  And so the fixation of an implant in the

13   anatomic location in the valve is critical, and that's what

14   determines the entire success or failure of the technology.

15   Q.   The fixation is critical?

16   A.   Critical.

17   Q.   Now, I'd like to go back and talk about your early mitral

18   valve prototypes.

19        Who helped you make your early prototypes?

10:06 20   A.   We basically had three -- there were three elements to the

21   prototypes.  There was the frame element, there was the

22   delivery catheter element, and there was the tissue valve

23   element.

24        So the first was the frame element.  We had a vendor,

25   and so did we for the tissue and the delivery catheter element.

1    Q.    And who was the vendor for the tissue valve?

2    A.    Neovasc.

3    Q.    And how did CardiAQ select Neovasc to be its vendor for

4    the tissue valve?

5    A.    Neovasc had approached us, a small company.  They -- we --

6    they basically said that there were -- had experience in tissue

7    management, tissue valves, preparations.  We had known that

8    they had made some tissue valves, surgically implantable tissue

9    valves, for other companies.  So it looked like it was a

10   perfect fit.

11   Q.    And when did Neovasc approach CardiAQ to sell its tissue

12   valves to CardiAQ?

13   A.    That would be in the early part of 2009.  My research was

14   probably before summer of 2009.

15   Q.    And how many employees did CardiAQ have in the summer of

16   2009?

17   A.    Just one.

18   Q.    And who was that employee?

19   A.    Mr. Brent Ratz.

20   Q.    Were you yourself an employee of CardiAQ?

21   A.    No.  I was a consultant to the company.

22   Q.    And were you receiving any pay from the company at that

23   time?

24   A.    No, I was not.

25   Q.    And where was CardiAQ located in the summer of 2009?

```
 1   A.   The official office was Mr. Ratz's residence in Boston,
 2   Winchester, Boston.
 3   Q.   Mr. Ratz's home here in Boston?
 4   A.   Yes.
 5   Q.   Now, did you ever meet with anyone from Neovasc?
 6   A.   Yes, I did.
 7   Q.   And when was that?
 8   A.   It was on June 23rd of 2009.
 9   Q.   And had Neovasc and CardiAQ entered into any agreement
10   prior to that meeting?
11   A.   Yes.
12   Q.   What type of agreement?
13   A.   They had non-disclosure signed between the two parties.
14   Q.   Who did you meet with from Neovasc?
15   A.   I met -- when I visit -- I actually visited them at the
16   facility.  I met Mr. McPherson, Mr. Randy Lane, Kulwant Lall
17   was the valve technician, and also I had a brief meeting with
18   the CEO.
19   Q.   When you say you met with them at their facility, where
20   was that?
21   A.   In Vancouver.
22   Q.   Vancouver, Canada?
23   A.   Yes.
24   Q.   Now, how long was your meeting with the people at Neovasc?
25   A.   It was over two hours.
```

1    Q.    And who did you meet with for two hours?

2    A.    The majority of the time was spent with Mr. Lane, Randy

3    Lane, and we basically spent the time discussing what I wanted

4    him to do for us.  I did have a short meeting with -- short

5    tour with Mr. McPherson and with the CEO, but these were very

6    short meetings.

7    Q.    And what did you tell -- sorry.  What did you and Mr. Lane

8    discuss regarding your mitral valve?

9    A.    We had -- the discussion ranged in three different areas.

10:10  10    We discussed the anatomy of the mitral valve.  We discussed the

11    tissue valve construct of the mitral valve.  The majority of

12    the discussion was around the tissue, how do we make that, and

13    also the fixation mechanism of mitral prosthesis in that mitral

14    location.

15         The discussion ranged quite a lot about the tissue

16    valve construct.  My concern was that every valve that I had

17    seen at that point -- and also my belief was that even Neovasc

18    did not have -- I didn't know if they had any experience with

19    mounting a valve onto a frame, a stent frame, which was

10:11  20    entirely different from the surgical frames.  So I had a

21    pattern of a valve that I wanted them to construct called

22    origami, take a flat piece of paper and you cut it into shapes

23    and if you fold it around, that will become a valve.  The idea

24    there was how can we -- the main discussion was how do we mount

25    pericardial tissue onto a collapsible stent that can go from

            1    small to large and not have any disruption of sutures that

            2    holds it there or not have any disruption of the valve tissue

            3    itself.  So we talked, we talked about that.  And then the

            4    discussion also ranged into --

            5    Q.   Let me stop you there for just one minute.

            6         So focusing on your origami tissue valve idea, did you

            7    bring with you a tool to help make that tissue valve?

            8    A.   Yes.

            9    Q.   And what type of tool was that?

10:11    10    A.   We had designed a mandrel, which is a 3-D print, a printed

           11    structure.

           12         The theory was that to have a constant production of

           13    the same valve every time and take the humor errors out of it,

           14    if you have a mandrel, you wrap the pericardium around it and

           15    just follow the curves of -- the bends in that mandrel, you

           16    will have a single valve every time.  So I took that with me to

           17    demonstrate that to them.

           18    Q.   I'd like to show you Trial Exhibit 328.

           19         MS. LEA:  May I approach the witness, your Honor?

10:12    20         THE COURT:  You may.

           21    BY MS. LEA:

           22    Q.   Do you recognize Exhibit 328?

           23    A.   Yes.  This is the mandrel.

           24    Q.   That's the assembly mandrel?

           25    A.   Yes.

1    Q.    Is it the mandrel that you provided to Neovasc?

2    A.    Yes.

3    Q.    And did you have that mandrel 3-D printed?

4    A.    Yes.

5          MS. LEA:  Your Honor, may I publish the mandrel to the

6    jury, pass it to the jury?

7          THE COURT:  Any objection?

8          MR. FLYNN:  No objection.

9          THE COURT:  Go ahead.

10:13 10        (Exhibit passed to the jury.)

11         (Pause.)

12   BY MS. LEA:

13   Q.    Now, you also said you discussed the fixation mechanism --

14   A.    Yes.

15   Q.    -- with Mr. Lane?

16   A.    We did.

17   Q.    And what did you talk about the fixation mechanism?

18   A.    I had -- the impetus to go into this field was that I had

19   a mechanism of fixing a prosthesis to an anatomic location and

10:14 20   that was with shortening and prongs that came off of the

21   shortening, and it was a type of stent that I had developed

22   that was an invention of mine.  So that's what I felt that --

23   the discussion was, How are we going to fix it?  So I said I

24   have this method, so we went over that whole concept of

25   pinching the leaflets and the annulus so the valve could be

1   stationed in that location.

2   Q.   Did you talk about your earlier frame designs with

3   Neovasc?

4   A.   That we did.

5   Q.   And did you have a frame with you?

6   A.   We showed them a frame, yes.

7   Q.   And which one was it?

8   A.   It was the Rev. B.

9   Q.   Did you also talk about the differences between the

10:15 10   transcatheter mitral valve technology and the transcatheter

11   aortic valve technology?

12   A.   Yes.

13   Q.   What was that discussion?

14   A.   That discussion ranged -- was focused on fixation again.

15   Subcutaneous technology, you rely on the calcium that is

16   deposited in the valve, and that is why the stenosis happens.

17   So what we do is we put a stent in there.  We make the stent

18   larger by a balloon, and that -- the calcium around and the

19   mechanism of force that is generated by taking a small stent

10:15 20   and making it into a large one by increasing the diameter, it

21   just stays.

22        But that's not the case with a mitral, and mitral has

23   to have an active mechanism of fixation.  That was the whole

24   point of me being confident that the technology that I had

25   developed was going to be taken forward into the mitral.

```
 1    Q.   So the technology that was used in transcatheter aortic
 2    valves would not work for transcatheter mitral valves?
 3    A.   No.
 4              MR. GRAVES:  Objection, leading.
 5              THE COURT:  Reask the question, please.
 6    BY MS. LEA:
 7    Q.   Doctor, would the technology that was used in a
 8    transcatheter aortic valve work for a transcatheter mitral
 9    valve?
10    A.   No, it would not.
11    Q.   Now, what were the first devices that Neovasc assembled
12    for CardiAQ?
13    A.   The Rev. C of the Generation 1, and then we had some Rev.
14    D assembled by them, and Rev. E assembled.
15    Q.   And did you bring a large model of your Rev. C prototype
16    today?
17    A.   Yes.
18    Q.   Is this that model?
19    A.   That is the one.
20    Q.   And is this a fair and accurate representation of Rev. C?
21    A.   That would be correct.
22              MS. LEA:  May I approach the witness, your Honor?
23              THE COURT:  You may.
24    BY MS. LEA:
25    Q.   Can you please use the Rev. C model to describe the Rev. C
```

1  device to the jury and explain what Neovasc did in regards to

2  that device?

3  A.   So this is the mitral valve implant.  So let's go from

4  outside to inside.

5       So, first of all, let's discuss the way -- the layout

6  of the stent frame is, which is this metallic.

7       So there are two sets of projections coming out.  This

8  would be on the top and that would be the atrial side, and this

9  would be on the bottom.  There is a skirt that is surrounding

10:18 10  the entire bottom of the -- of the -- of this implant.

11  Q.   You're calling that fabric a skirt?

12  A.   This is a skirt.

13       So if you can notice, all of the angles are covered on

14  this skirt.  And this part is going to stay inside the

15  ventricle.

16  Q.   The lower chamber?

17  A.   The lower chamber, the pumping chamber of the heart.

18       So let's go -- on the inside, this yellow material is

19  basically the plastic that is protecting the pericardial

10:18 20  tissue, and this is a triatrial valve.

21  Q.   What does "pericardial" mean, doctor?

22  A.   It's a covering of the heart with a membrane, that the

23  heart is enclosed in a sack, and that is called the

24  pericardium.

25  Q.   And where did the pericardial tissue come from that

1   Neovasc put into the frame?

2   A.   This pericardium was a porcine pericardium.  So usually

3   that's what we use for heart valves.

4   Q.   It's animal tissue?

5   A.   It's animal tissue.  It's taken from pigs, and it is very

6   well-known.  And also bovine pericardium is also known, you may

7   be familiar with, that comes from a cow, and these are used in

8   heart valve constructions.

9        So they use the tissue to make this valve.  It's

10:19 10   triatrial valve, symmetrical to open and close with systole and

11   diastole.

12   Q.   With the pumping of the heart?

13   A.   With the pumping of the heart.

14        So this would be the way this is going to sit.  And

15   every systole, the leaflet is going to shut, with every

16   diastole, the leaflet is going to open with contraction.

17        Another thing to differentiate is the diameter of

18   this.  So it's like a cylinder at this point.  This is like --

19   this is about 30 millimeters in diameter.  So this is the

10:20 20   geometry of the implant that we had in the first sample from

21   them.

22   Q.   Thank you, Dr. Quadri.

23        Now, what part of the Rev. C device did Neovasc

24   assemble?

25   A.   They assembled the entire tissue part, and they assembled

1    the fabric skirt part.  So this was -- so we gave them the

2    frame, and they assembled it.

3    Q.    Now, once you received the assembled Rev. C prototypes

4    from Neovasc, what did you do?

5    A.    We went to -- we applied for some animal testing in

6    University of Minneapolis, and by their protocol and approvals

7    from their IACUC committees, they permitted us to go have these

8    devices tested in sheep.  So that was our first animal

9    experimentation that we did in Minneapolis.

10:21 10    Q.    And so for this animal study you submitted a written

11    protocol?

12    A.    Yes.

13    Q.    And that was approved -- I'm sorry, what was the name of

14    the approving board?

15    A.    It's called IACUC.

16    Q.    Was there a veterinarian involved?

17    A.    Yes.  It's Institutional Committee for Care of Animals,

18    and so that reviews the protocol very careful, sees that the

19    animal is going to be of value to the development of

10:21 20    technology.  So they evaluate all of that, and then they give

21    you permission to do the animal work.  So they allowed us to do

22    some sheep, use some sheep for this.

23    Q.    And what was the goal of the early animal studies?

24    A.    The goal was to demonstrate that the concept of fixation

25    of this valve really works, and that was the first thing that

                1   me and my partner, Mr. Ratz -- basically our focus was we need
                2   to have an implant that really works before we go forward in
                3   anything, and so that's what we decided to do.
                4   Q.   And what was the fixation technique for the Rev. C
                5   prototype with the fabric skirt?
                6   A.   It was pinching the leaflet and the ledge of the annulus,
                7   pinches the leaflet.
                8   Q.   So pinching or clamping the leaflet to the annulus?
                9   A.   That would be correct.
    10:22  10   Q.   And was this anchoring approach successful?
               11   A.   No, it was not successful.  The implant was rejected,
               12   dislodged immediately.
               13        I just want to also say the implant was doing -- using
               14   excellent surgical techniques with the animal taking -- just
               15   you would do an open heart surgery valve replacement.  So
               16   surgically implanted, because the goal was to just study the
               17   fixation of the device.
               18   Q.   You didn't sew any stitches or sutures around this valve?
               19   A.   No sutures were used.
    10:23  20   Q.   Could you tell why the pinching was not working?
               21   A.   Because the tissue -- there's not enough tissue to grab
               22   hold of things, of the implant.  The pressures are very high.
               23   And one thing that I really hadn't figured before going was
               24   that the part that I am trying to placate, pinch with this
               25   implant, pinch with this implant is the going to the mitral

1    valve leaflets.  So the mitral valve leaflet is like that, I'm

2    pinching around it.  When you think about it, every time a

3    systole occurred, that leaflet got pulled.

4    Q.   Every time a contraction occurred?

5    A.   Every time a contraction occurred that leaflet got pulled,

6    and once it got pulled, it shifted the device into the left

7    atrium.  So those were the issues that we were facing at that

8    point.

9    Q.   And what did you do when you realized the pinching

10:24 10   approach was not working?

11   A.   So I had my engineer, Mr. Ratz, with me.  So we discussed

12   that we need to make some changes and continue the

13   experimentation.  So what we did was to divide the fabric

14   between this and free up the anchors.  So what that did was the

15   anchors became independent elements of the implant and also

16   they could expand.  This was restraining, so they could not

17   expand out.  And so, well, if you do those changes, let's see

18   what we -- how we can make this work.

19   Q.   When you say "divide," what does that mean?

10:25 20   A.   Just cutting.

21   Q.   So you cut through the fabric skirt between the anchors?

22   A.   Yes.

23   Q.   Did freeing the anchors help?

24   A.   Yes, it did.  We had success, and we went back and did

25   more animals and for the first time we had some success.  You

         1   could see it was stable all the time.  It was very encouraging.

         2   Q.   Now, did anyone record your study once you cut through the

         3   Rev. C skirt and free the anchors?

         4   A.   Yes.

         5   Q.   Who did?

         6   A.   We were a small company, it was me and Mr. Ratz, and

         7   Mr. Ratz was doing all the recording and engineering and

         8   putting it all together.  Both of us were working together on

         9   that.

10:25   10   Q.   Did he record it by video?

        11   A.   Yes.

        12   Q.   I'd like to show you a portion of the video today as Trial

        13   Exhibit Number 1442.

        14        (Played recording.)

        15   A.   So if you can see, these ones have cuts on them.  This is

        16   intact, this is the intact skirt.

        17   Q.   Meaning it hasn't been cut?

        18   A.   Hasn't been cut.  And this one has been cut.  You can see

        19   that.  It's not clear, but you can see the fraying of the

10:26   20   edges, the anchors are freed up.  So cut these, and they became

        21   independent anchors.

        22   Q.   So the record is clear, Trial Exhibit Number 1442, which

        23   revision is shown in that video?

        24   A.   This is Rev. C.

        25   Q.   We have a Rev. C with an uncut skirt and a Rev. C with a

1   cut skirt?

2   A.   Yes.

3   Q.   After these August 2009 animal studies, what did you do

4   next?

5   A.   The next -- the next thing we did was we came back home,

6   and we basically modified the stent.  There were two things

7   that was happening here.  Number one also was -- there was a

8   lot of breakage that was happening to the portion of this, this

9   portion of the stent, because there was a lot of contraction

10:27 10   and pressure on it.  So what I did was take an extra layer of

11   stent from top, let's say here, and we transposed it down there

12   to make it more robust.  And we did that, and we twisted some

13   wires and fixed that very well.  And you freed the entire edges

14   up.  And then we decided to go back to get some more permission

15   and resubmit the protocol with the changes, and we were allowed

16   to go back and do the experiment another time.

17   Q.   I'm sorry, one more question on the video.

18        When was that video taken?  What month and year?

19   A.   That was in July of -- August of 2009.

10:28 20   Q.   Is it August 2009?

21   A.   If memory serves me right, probably.  I may get my dates

22   wrong, but it was in that time frame.

23   Q.   You took the video at the animal study?

24   A.   At the study.

25   Q.   In August of 2009?

```
 1   A.   Yes.

 2   Q.   Okay.

 3           So focusing on the modified Rev. C, that Rev. C did

 4   not have a skirt?

 5   A.   That Rev. C did not have a skirt.

 6   Q.   You had taken the skirt off.

 7           I'd like to show you Trial Exhibit 1374.

 8           MS. LEA:  May I approach the witness, your Honor?

 9           THE COURT:  You may.

10   BY MS. LEA:

11   Q.   Doctor, do you recognize Trial Exhibit 1364?

12   A.   Yes.

13   Q.   What is it?

14   A.   It's a modified Rev. C frame.

15   Q.   Does it have a skirt on it?

16   A.   No.

17   Q.   And what type of material is the frame in?

18   A.   It's formaldehyde.

19   Q.   Formaldehyde?

20   A.   Yes.

21   Q.   So we'll keep it in the jar.

22           MS. LEA:  Your Honor, may I publish Exhibit 1374 to

23   the jury?

24           THE COURT:  Any objection?

25           MR. FLYNN:  No, your Honor.
```

```
 1              THE COURT:  Go ahead.
 2              (Exhibit published to the jury.)
 3    BY MS. LEA:
 4    Q.    Okay.
 5              I believe you were telling me about implanting the
 6    modified Rev. C?
 7    A.    Yes.
 8    Q.    And when was this animal study conducted?
 9    A.    It was September.
10    Q.    September 2009?
11    A.    Yes.
12    Q.    And was this implant successful?
13    A.    Yes.
14              This was -- this was the implant.  This was the animal
15    experiment that convinced me and Mr. Ratz that we could go
16    forward with our technology.  It was the moment, aha moment,
17    that we had.
18    Q.    And what did you observe as far as the anchoring?
19    A.    It worked.  The implant was stable in position.  It did
20    not migrate.  We had good hemodynamics.  We could gather that
21    data, the animal was alive at the end of the experimentation.
22    Q.    And what did you observe as far as the anchors?
23    A.    Then we -- according to protocol, we euthanized the animal
24    and we studied the implant, how it was fixed, and it
25    demonstrated what we had done when implanting at this time.
```

1    Since I had no more cover, when I put the implant in, I made
2    sure that I would take the leaflets and go over the anchors.
3    So this is open heart surgery, the heart is still, it doesn't
4    move.  So when we put the implant in, I had to lift the leaflet
5    and put it over the anchors.  And we did that, and basically it
6    worked.
7              So what happened -- what we did was to demonstrate
8    that if you go -- if the anchors go within the chords and go
9    and touch the annulus and the leaflet falls between the anchor
10:31 10   and the stent, the main body of the stent, that would be the
11   key to a stable fixation.
12   Q.   So capturing the leaflet is the key to fixation?
13   A.   Yes.  Capturing the leaflet, going behind.  I want you to
14   understand that.  Just capturing the leaflet -- if the chords
15   are all cut, you can still catch the leaflets.  That would be
16   half of the story.  That would not really work well.  So you
17   have to have the chords intact so you can go around it and then
18   capture the leaflets.
19   Q.   So you're going between the chords, around the leaflet --
10:32 20   A.   Yes.
21   Q.   -- capturing it --
22   A.   Yes.
23   Q.   -- and anchoring on the annulus?
24   A.   Yes.
25   Q.   Did anyone record the September 2009 animal study?

```
 1    A.    Yes.

 2    Q.    Who did?

 3    A.    Mr. Ratz.

 4    Q.    I'd like to play Trial Exhibit 1445.

 5          (Played recording.)

 6    Q.    Let's start that again, Trial Exhibit 1445, with audio.

 7          Let me first ask, did you recognize Trial Exhibit

 8    1445?

 9    A.    Yes.

10    Q.    What was it?

11    A.    This is the animal after euthanasia and we had taken the

12    implant, the heart out, expanded the heart.

13    Q.    And why did you do that?

14    A.    To study, to see exactly what the fixation was like.

15    Q.    So let's watch the video again, this time with audio.

16          (Played recording.)

17    Q.    So whose voices were those on the video?

18    A.    That was mine and Mr. Ratz's voice.

19    Q.    And what did you mean when you said it went under the

20    leaflet?

21    A.    Well, that's -- the point is that we went under the

22    leaflet between the chords.  And so the leaflet fell between

23    the implant and the anchors.

24    Q.    So are you still pinching or clamping the annulus now?

25    A.    No.  We are engaging the annulus, but they're not pinching
```

10:33 (at line 10)

10:35 (at line 20)

 1    or clamping there.

 2    Q.   And what did you learn from the September 2009 animal

 3    study?

 4    A.   It was a great moment, aha moment, as I describe it, and

 5    we said we can go forward and do more studies.  And we looked

 6    at other options of improving the -- the stent and the implant

 7    so we could continue the study forward.

 8    Q.   And did you further modify your device after the September

 9    2009 animal studies?

10:35 10    A.   Yeah, that was very encouraging result, and we modified

11    based on the potential anatomies that we were going to deal

12    with in animals.  So we made changes in the implant, and

13    basically we're getting ready to do more animal work.

14    Q.   And what was the next revision that you implanted in an

15    animal?

16    A.   The next revision in an animal was Rev. E.

17    Q.   I'd like to show you Trial Exhibit 1007.

18         (Pause.)

19    Q.   Do you recognize Trial Exhibit 1007?

10:36 20    A.   Yes.

21    Q.   What is it?

22    A.   This is Rev. E.

23    Q.   Is that a complete Rev. E with both the frame and the

24    tissue valve?

25    A.   This is both the Rev. E with frame and tissue valve.

```
 1   Q.   And who put that tissue valve on Rev. E?

 2   A.   Neovasc.

 3           MS. LEA:  Your Honor, may I publish that to the jury?

 4           THE COURT:  Any objection?

 5           MR. FLYNN:  No objection.

 6           THE COURT:  You may.

 7           (Exhibit published to the jury.)

 8   BY MS. LEA:

 9   Q.   And what are some of the differences between Rev. C and

10   Rev. E?

11   A.   The basic concept is the same.  I just want to point out a

12   few things here.

13           The diameter from here to here is different than the

14   diameter from here to here.  That is basically because we want

15   to put in a 40 millimeter annulus, the size of the animal's

16   mitral valve.  And then these are the anchors, basically the

17   ventricular anchors and atrial anchors.  And the pericardial

18   valve is sewn onto this.  So those are the changes that I could

19   point out.

20   Q.   Now, did you share the features of Rev. E with Mr. Lane?

21   A.   Yes, I shared the features with Mr. Ratz who was in

22   communication with Mr. Lane and me.

23   Q.   Did you have any phone calls with Mr. Lane about Rev. E?

24   A.   I personally didn't have any phone calls with Mr. Lane at

25   this point, but later, in December of 2009, we had -- so what
```

1   had happened here is we've changed the dimensions of these --

2   this implant.  This used to be a cylinder, and now it's a cone.

3   So we had a conference call with Mr. Lane, we were making this

4   change, that we needed to modify the leaflet, the leaflet

5   geometry, because now it's -- from a cylinder it's easy to cut

6   the leaflets out of as three pieces in the cylinder rather than

7   the cone.  So basically a bell-bottom design was discussed, and

8   we had a good, healthy discussion at a conference call.

9   Q.   And so you told Mr. Lane you were changing to a two-level

10:39 10   design?

11   A.   Yes.

12   Q.   Now, did you perform any animal studies with the Rev. E

13   devices that Neovasc assembled?

14   A.   Yes.

15   Q.   When were these studies performed?

16   A.   They were performed in 2010.  We did study in March of

17   2010.

18   Q.   And where was the March 2010 animal study performed?

19   A.   At this point we had found a nice animal lab facility here

10:39 20   in Massachusetts, in Boston called CBSET, and that's where we

21   did the animal work.

22   Q.   And who performed the March 2010 animal study?

23   A.   With the help of the veterinarian scientists.

24   Q.   And did you submit protocol for this study itself?

25   A.   Protocol were submitted and reasons for the study were

1    submitted and they approved it.

2    Q.   And what type of animals did you use in the March 2010

3    study?

4    A.   At this point we had gone to -- we had gone to pigs.

5    Q.   And why did you use pigs for this animal study?

6    A.   We didn't need sheep because pigs have a very similar

7    anatomy to the human heart.  In fact, pig valves are used in

8    humans.

9            So -- and also, the -- the main reason for the sheep

10:40 10  is being castigation study, which is not the focus of our

11   study.  So it was just easy, procurable, and it fit the purpose

12   really well.

13   Q.   And do the pigs have chordae tendineae similar to humans?

14   A.   Yes, similar anatomy to human beings.

15   Q.   And the pigs have leaflets similar to humans?

16   A.   Yes.

17   Q.   And do the pigs have an annulus similar to humans?

18   A.   Yes.

19   Q.   And do the pigs have fibrous trigones similar to human

10:41 20  fibrous trigones?

21   A.   Yes.

22   Q.   I'd like to show Trial Exhibit 1395, and this is a series

23   of 8 photographs.

24            Dr. Quadri, do you recognize Trial Exhibit 1395?

25   A.   Yes, I do.

1    Q.    And what is it?

2    A.    This is an implant in a porcine heart, pig heart.  You can

3    see these anchors, the ventricle anchors, of the leaflets.

4    Q.    Before we talk about the heart, are these photos from the

5    March 2010 animal study?

6    A.    Yes.

7    Q.    Please tell me what you see in the photo?

8    A.    The ventricle had been opened.  First of all, this is the

9    necropsy picture of the porcine heart.  And here is the opening

10:42 10   into the left ventricle, and they're trying to see from the

11   lift-up to see exactly how the engagement of these anchors has

12   occurred.  So here we can clearly see that these anchors have

13   gone over.  This whitish portion is the leaflet of the animal,

14   and this yellowish portion is the native artery.

15         So we can see that quite clearly in that picture.

16   Q.    Let's go to page 3, please.

17   A.    Here shows the same.  I want to explain this a little bit.

18         You're looking, again, from the ventricle and the

19   valve like that.

10:43 20         So what we see here is inside here will go from inside

21   out.  This is the prosthetic valve, the leaflets.  Outside here

22   you see the anchors that wrap around these chords and basically

23   go around.

24         So you can say this is between the chords.  This one

25   is between this chord and that chord, and you can just see.

1    What we don't see here clearly is the annul contact, but you

2    can imagine that up north of that is the annulus.  So systolic

3    pressure is going to put it there.

4    Q.   Does this photo show the anchors going between the chordae

5    tendineae?

6    A.   Yes, I just explained that.

7    Q.   And does this photo show the anchors capturing the

8    leaflet?

9    A.   Yes.

10:43 10   Q.   If we could go to page 5, please.

11            And what is shown on this photo on page 5?

12   A.   This is a great demonstration of capture here, of going

13   around the leaflet, and then the tips of these anchors are

14   touching the annulus, this whitish portion.  And this would

15   be -- since white and glistening, that would be the trigonal

16   area.

17   Q.   So did these anchors go between the chords?

18   A.   I will have to presume they do, but I really can't -- the

19   chords are not seen here, but to get there, because the chords

10:44 20   are now plastered onto the implant, but to get there, they'd

21   have to because we see a little bit of the chords here.  But

22   it's not as clear as the last picture.

23   Q.   The last picture and this picture, page 3 and page 5,

24   they're from the same heart?

25   A.   Yes.

```
 1    Q.    The same implant.

 2          And did the anchors in this photo -- we've already

 3    talked about the anchors capturing the leaflets.  The anchors

 4    engaged on the annulus?

 5    A.    Yes.

 6    Q.    And what part of the annulus did the anchors anchor on?

 7    A.    This is the trigone.

 8    Q.    The fibrous trigone?

 9    A.    Yes.

10    Q.    Now, were these March 2010 animal studies the only studies

11    you performed with the Rev. E devices?

12    A.    No.  This was not, just to say this, we followed this up,

13    of course, with studies, same lab.

14          MS. LEA:  And you can take that photo down.

15    Q.    So when did you perform the next animal studies with Rev.

16    E?

17    A.    In April of 2010.

18    Q.    Now, in April of 2010 did you surgically implant the Rev.

19    E into a pig heart?

20    A.    No.  In April we did the whole procedure percutaneously.

21    So we had the lab load it into --

22    Q.    Let me just ask.

23          So you had a living pig?

24    A.    Yes.  So the pig was living, it was not on bypass.  The

25    heart was beating, fully anesthetized, and so that was asleep
```

|        |    |                                                                        |
|--------|----|------------------------------------------------------------------------|
|        | 1  | and so the access so the heart was gained from the groin.              |
|        | 2  | Now, the pig's groin -- the veins to pigs are really                   |
|        | 3  | small, so we had to do some maneuvers to dilate them up, for            |
|        | 4  | that a small incision was necessary, very small.  And then             |
|        | 5  | after that, we inserted the entire line through that vein to            |
|        | 6  | the heart.                                                             |
|        | 7  | Q.   So you performed a transcatheter procedure implanting the         |
|        | 8  | Rev. E in a living pig?                                                |
|        | 9  | A.   Correct.                                                          |
| 10:46  | 10 | Q.   And which type of transcatheter procedure did you do?             |
|        | 11 | A.   Transseptal transcatheter, transfemoral transcatheter,            |
|        | 12 | transcatheter implantation.                                           |
|        | 13 | Q.   So let's go over that.                                            |
|        | 14 | "Transfemoral," what does that mean?                                   |
|        | 15 | A.   It's through the femoral vein in the groin.                       |
|        | 16 | Q.   So you make a small incision in the groin?                        |
|        | 17 | A.   We made a small incision.  We were just forced to because,        |
|        | 18 | as I explained, the vessel is small in an animal, and you can          |
|        | 19 | see their legs are little, so they don't have a big vein.  And         |
| 10:47  | 20 | then you dilate it up so that we can get this device in.  And          |
|        | 21 | then we go up into the heart and then cross over to the left           |
|        | 22 | side of the heart across the septum.                                   |
|        | 23 | Q.   The septum is the wall --                                         |
|        | 24 | A.   The wall that separates the left atrium from the right            |
|        | 25 | atrium.  And position it in the mitral annulus and deployed it.        |

1    Q.    Now, Doctor, are you aware of anyone else who has

2    successfully implanted a prosthetic mitral valve into an animal

3    transfemorally?

4    A.    No.    That was -- that was -- this was another breakthrough

5    in our technology.    Nobody had ever done it.    We were the first

6    ones to demonstrate.    People talked about it, but never

7    demonstrated in an animal.    So we were pretty excited.    This

8    was like the eureka moment.    So we are going forward with our

9    technology, the fixation works, and it was great.    Nobody had

10:48 10    done it then, and even now I haven't seen anybody come forward

11    and do it.

12    Q.    No one has reported today that they have done it.

13             Now, I'd like to show you Trial Exhibit 2634.

14             What is this photo?

15    A.    So this is the necropsy of the same animal that it had

16    been implanted in, and basically shows really clearly how the

17    anchors have gone between the chords and resting on the

18    annulus.    And this is the trigone valve.    This is the aorta

19    that had been cut this way, otherwise it just rests on that

10:49 20    portion.    And this is another between the chords and touching

21    the trigone.    It's just through this leaflet, which is

22    basically covering it over, and I can see all these anchors are

23    between the chords.    And what I've done here is to divide the

24    muscles and sort of take back the muscle and dunk it into the

25    body of the valve so we can study the engagement.    So this was

1    the image.

2    Q.    This is a photo of the animal heart with the valve

3    implanted in it and you're studying the fixation.

4    A.    Yes.

5    Q.    Now, after the Rev. E prototypes, did CardiAQ order any

6    other set of prototypes from Neovasc?

7    A.    No.  After that we basically severed our business contact

8    with Neovasc by about a couple of weeks after that.

9    Q.    And did CardiAQ continue to conduct animal studies in

10:50 10    Boston throughout 2010?

11    A.    Yes.

12    Q.    Now, after the animal studies in Boston, what did you do

13    next as far as the animal studies go?

14    A.    After that, we basically -- after this -- after this

15    study --

16    Q.    So you just testified that you had conducted more animal

17    studies in Boston, and then did there come a time when you

18    changed locations for your animal studies?

19    A.    Correct.  The location for animal studies -- after this

10:50 20    study was very key moment, and there was a surgeon that --

21    interventional cardiologist approached us after our meeting,

22    Dr. Lars Sondergaard, and he offered his animal lab.  We had to

23    do more studies.  So we started doing animal studies in

24    Denmark, in Copenhagen and at their facility.  So we did quite

25    a few animals in that facility, just to streamline, the

1    delivery catheter, the whole developmental process.

2    Q.   And did you attend those studies?

3    A.   Yes.

4    Q.   So you flew to Denmark?

5    A.   Every month.  I was going to Denmark month every two

6    weeks.

7    Q.   And about how many animals did you and Dr. Sondergaard do

8    in Denmark?

9    A.   By the time we were ready to go and do a case, we were

10:51 10   about 60 animals or so in.

11   Q.   And was CardiAQ continuing to improve the device during

12   this time?

13   A.   Yes.

14   Q.   Now, I'd like to show a demonstrative, PDX 2.116.

15        And what is shown in this demonstrative?

16   A.   This demonstrative shows the evolution and changes in the

17   valve of Gen. 1.  So we go -- we started, we discussed D, then

18   we go E, and we go all the way to Rev. J.  These are all based

19   on engineering and what would engineering permit and what would

10:52 20   be the width and diameter and detailed tissue designs as well.

21   Q.   Now, are you able to identify the changes between the Gen

22   1 devices?

23   A.   Yes.  So we can -- basically you see there are a lot of

24   dimensional changes here that I can see.

25        The change from here to here, these are basically the

           1   same, but I can't tell them here from the pictures.

           2   Q.   Let me just ask you, Doctor.  Did the anchoring concepts

           3   behind the Gen 1 devices change over time?

           4   A.   No.

           5   Q.   Now, there was a change, right, from Rev. C to Rev. D?

           6   A.   Yes.

           7   Q.   And then were there any changes to the anchoring concept

           8   after Rev. D?

           9   A.   No.

10:53  10   Q.   So the concept of going between the chords and around the

          11   leaflets and anchoring on the annulus, that remained?

          12   A.   That remained.  That has not changed.

          13   Q.   From Rev. D on?

          14   A.   On, yes.

          15   Q.   Now, at some point did CardiAQ have the opportunity to

          16   allow its device to be implanted into a human?

          17   A.   Yes.

          18   Q.   And when was that?

          19   A.   That would be June of 2012, we did our first human

10:53  20   implantation in Copenhagen.

          21   Q.   And Copenhagen is where?

          22   A.   Denmark.

          23   Q.   And Denmark is in Europe?

          24   A.   Yes.

          25   Q.   And who was to be the implanting doctor for that?

A.    The team of doctors there, Dr. Lars Sondergaard, the head

of the team, the cardiologist.

Q.    And that's the doctor you mentioned that you performed the

animal studies with?

A.    Yes.

Q.    Now, what type of case was this?  Was this -- had you

attained regulatory approval for the device?

A.    No.  We were in the process of doing regulatory approval,

but this was a compassionate patient that didn't have any other

option.

Q.    What does that mean, to be a "compassionate patient"?

A.    There is no options, and he is basically going -- the

patient is going to die within six months to a year, a

miserable quality of life.  So that was the patient.  And

Dr. Sondergaard, while we were going and trying to arrange some

studies with them, had asked us -- requested CardiAQ to give

them the device so they can have -- this patient made the

request and we discussed it and we said we should try and help.

Q.    And so this patient had severe mitral regurgitation?

A.    Severe mitral regurgitation, heart failure.  He was not

having any quality of life, he couldn't do anything, and he was

just in bad shape.

Q.    How old was he?

A.    He was 87 years old.

Q.    Now, were you personally involved in the first

 1    implantation in that human patient?

 2    A.    Yes, I was.

 3    Q.    So you flew to Denmark?

 4    A.    I was in Denmark.  We went there before we transitioned

 5    from human to animals.  We had a lot of discussion with the

 6    team there, talked to the doctor's team.  These consisted of

 7    cardiologists and their surgeons and their specialists and

 8    their anesthesiologists and everybody, and perfusionists, sat

 9    together and we had a plan to go ahead and do it as safely as

10:56 10    possible for the patient.

11            I presented some slides to them and basically

12    explained to them how it should be done, and I felt comfortable

13    with the team would be able to perform the operation,

14    procedure.

15    Q.    And was the CardiAQ device successfully implanted in the

16    patient?

17    A.    It was successfully implanted, transfemorally,

18    transseptally, successfully implanted the device.

19    Q.    Transfemorally, so it came in from the groin?

10:56 20    A.    From the groin we implanted it.  Once we implanted the

21    device, we took the mitral valve liters down from four plus to

22    one.

23    Q.    So you improved the mitral regurgitation from level

24    four --

25    A.    -- down to one.  And that's the grading of mitral

1  regurgitation.  You can say a mild, moderate, severe or you say

2  one plus, two plus, three plus, four.

3  Q.   So you took it from severe to mild?

4  A.   Yes.

5  Q.   And did the patient regain consciousness after the

6  procedure?

7  A.   He did wake up, and he did wake up and had a meaningful

8  interaction with his family.

9  Q.   And how was the patient's ultimate outcome?

10:57 10  A.   It was unfortunate.  We lost the patient in 24 to 36

11  hours.  The night of surgery he was looking really good, and we

12  were all very encouraged.  He took all of the parameters to

13  create the human into shock in the middle of the night, and

14  they -- there were options to intervene and save, but there was

15  discussion with the family, and the family said they didn't

16  want any other heroic measures on him, so he passed.

17  Q.   And what was the cause of his death?

18  A.   It was an acute systemic inflammatory ischemic response.

19  Q.   And was the cause of death in any way related to the

10:58 20  heart?

21  A.   No.

22  Q.   And was it in any way related to the CardiAQ device?

23          MR. GRAVES:  Objection, speculation.

24          THE COURT:  Can you lay a better foundation, please?

25          MS. LEA:  Sure.

```
     1    BY MS. LEA:

     2    Q.   After the patient passed away, was an autopsy performed?

     3    A.   Yes.

     4    Q.   And did you attend that autopsy?

     5    A.   I did.

     6    Q.   Who else attended the autopsy?

     7    A.   Dr. Sondergaard, their pathologist, and chief of

     8    cardiology was also in, and personnel.

     9    Q.   And what was the determination made at the autopsy?

10:58 10         MR. GRAVES:  Same objection, your Honor.

    11         THE COURT:  Foundation.

    12         MS. LEA:  Present for the autopsy.

    13         THE COURT:  Is he aware of the results of the autopsy?

    14    BY MS. LEA:

    15    Q.   Are you aware of the results from the autopsy, Doctor?

    16    A.   Yes.

    17    Q.   And did the autopsy report any type of -- that the death

    18    was in any way due to CardiAQ's device?

    19    A.   No.  This was issued by the hospital records, and they

10:59 20    determined the cause of death was non-implant related,

    21    non-valve related, due to, as I said, the cause of death was --

    22    was acute systemic ischemic response and leading to bowel

    23    ischemia, leading to irreversible shock.

    24    Q.   So I don't know if I know what all that means, but it

    25    sounds like -- is there any way to relate it to the heart?
```

A.   No.

Q.   Now, after the patient passed away, were you able to verify that the implant had deployed correctly in the patient?

A.   Yes.

Q.   And how did you do that?

A.   We looked at the -- the -- after the patient passed way?

Q.   Yes.

A.   So we looked at the autopsy and that demonstrated the implant was in the intended location and it was stable and fixation was great.

Q.   And in the autopsy, could you see the anchors on the device?

A.   Yes.

Q.   And how -- where were the anchors in the heart, the ventricular anchors?

A.   There were anchors around the chords trapping, engaging the annulus.  The leaflet was captured and anchors also had contact with the annulus and the trigone.

Q.   So the anchors went between the chordae tendineae?

A.   Yes.

Q.   And the anchors went around the leaflets?

A.   Yes.

Q.   And captured them?

A.   Yes.

Q.   And the anchors anchored on the annulus?

1    A.    Yes.

2    Q.    Including the fibrous trigones?

3    A.    Yes.

4    Q.    Now, did you later make changes to the CardiAQ device?

5    A.    We did.

6    Q.    And if I could bring up demonstrative 2.17, please.

7          And what changes did you make to the CardiAQ device?

8    A.    The -- what we did was -- so here it bothered me that

9    there was this portion of the implant, we talked with the

11:01 10   engineers, there was a lot of expansion there and it was sort

11   of abutting the myocardium.  So we took that distance in, so we

12   sort of made it -- we made it slanted in, tapered.  We used to

13   call it a pumpkin shape.  We did that.  And the anchors, we

14   basically just flattened them out a little bit, and made them

15   such that we could cover them in fabric.

16   Q.    So you put fabric over the anchors?

17   A.    Yes, these exposed anchors were covered in fabric.

18   Q.    Was that a skirt like we saw with Rev. C?

19   A.    No.

11:01 20   Q.    What was it like?

21   A.    Each leg had its own -- own sleeve.

22   Q.    More like pants?

23   A.    More like pants.

24         And also we put -- what we did was to use specialized

25   material for that, yes.

```
 1   Q.   Now, did the Gen 2 device have the same anchoring approach
 2   as Gen 1?
 3   A.   Yes.
 4   Q.   And what approach is that?
 5   A.   The anchors go behind the -- between the chords, behind
 6   the leaflets, and contact the annulus, circumferentially on the
 7   annulus.
 8   Q.   Now, did you ever implant the Gen 2 device -- or did
 9   CardiAQ ever implant the Gen 2 device in a human patient?
10   A.   Yes.
11   Q.   And when was the first one?
12   A.   The first one we did in the summer of 2014, and we did
13   that case in Denmark, again at the same hospital with -- all of
14   the same physicians that were involved in the first
15   participated in the second one.  The first Gen 2, that would be
16   the first Gen 2.
17   Q.   And was this another compassionate use case?
18   A.   Yes.  These patients that we did in Europe were all
19   compassionate cases.
20   Q.   And how old was this patient?
21   A.   At that point she was 88 years old.  In fact, we just sent
22   her a birthday cake for her 90th birthday.
23   Q.   She's still alive today?
24   A.   Yes.  She's alive and well, she's 90 years old.
25   Q.   And she's had the device implanted in her for two years
```

                1  now?

                2  A.   Yes.

                3          MR. GRAVES:  Your Honor, may we approach?

                4          THE COURT:  Yes.

                5          Members of the jury, we're going to have a quick

                6  conversation over here.  If you want to stand up, stretch, move

                7  around a little bit, if you want to take advantage of the

                8  break.

                9          (At sidebar on the record.)

11:04  10          THE COURT:  Before you speak, they can talk about the

               11  88 or 90-year-old.  It was the pictures that we can't elicit

               12  testimony about it.

               13          Did you have anything other than that?

               14          MR. GRAVES:  I think that what they're doing right now

               15  is opening the door to the very things we're not supposed to be

               16  talking about.  It didn't have anything to do with merits

               17  issues.  It was just a gratuitous description that this person

               18  is still doing well two years later with the intention of

               19  telling the jury that everything is perfectly well with this,

11:04  20  and I thought that's what we weren't supposed to be doing.

               21          THE COURT:  How many patients have gotten -- how many

               22  live patients have gotten the implant?

               23          MS. LEA:  That are still alive today?

               24          THE COURT:  No, how many altogether?

               25          MS. LEA:  Sixteen.

1          THE COURT:  How many of them are alive today?

2          MS. LEA:  Six.

3          THE COURT:  If you want to elicit that 10 of them are

4     dead, that's fine.

5          MR. GRAVES:  I think we should have a limiting on this

6     kind of stuff going forward, because I thought that was the

7     ground rules --

8          THE COURT:  The ground rules, I don't want it to be

9     about patient outcomes.  But there's a certain amount of

11:05 10   narrative that is necessary to sort of explain to them what's

11    happened.  She did elicit that, it was gratuitous, having an

12    instruction makes it worse.  I don't think this will be much

13    beyond the scope of my ruling.

14          I'm not going to give you too much latitude on any

15    individual patient circumstances.

16          To the extent that you elicited some of them are

17    alive, you can elicited some of them are dead.

18          MS. LEA:  And we had just done that.  We had elicited

19    one that died.

11:05 20   MR. FLYNN:  I only suggest that given the feature of

21    the exam, to keep things moving we've not objected to.

22          The idea that that was inadvertent is at least subject

23    to some skepticism, particularly in light of the pictures of

24    this woman and the picture of the birthday cake.

25          THE COURT:  It's hard to know.  He's very excited

1    about the fact that he's got an 88-year-old that's alive.

2         So but I don't want this to be too much about patient

3    outcomes, but to the extent it's part of the overall startup

4    development of the device, it's inevitable to a certain amount.

5         MR. GRAVES:  Thank you, your Honor.

6         THE COURT:  We can talk about it further when the jury

7    is gone.

8         MR. GRAVES:  Thank you.

9         (End of discussion at sidebar.)

11:06 10  BY MS. LEA:

11   Q.   Dr. Quadri, have there been any additional implants of the

12   CardiAQ device?

13   A.   Yes.

14   Q.   And has CardiAQ had any occasion to perform any cases in

15   the United States?

16   A.   We have.

17   Q.   And how is it that CardiAQ is able to perform cases in the

18   United States?

19   A.   We applied to the FDA and got an early feasibility trial

11:07 20  approved.  They gave us permission to do 20 cases in the U.S.,

21   10 transseptal, that would be femoral approach, groin approach;

22   and 10 transapical.

23   Q.   And transapical is --

24   A.   Is through the left chest through a small incision.

25   Q.   Now, Dr. Quadri, you've described CardiAQ's clinical

1    success.  Has CardiAQ had business success as well?

2    A.    Yes.

3    Q.    And what happened last year?

4    A.    Well, CardiAQ, it's a success story.  It's an American

5    success story we're getting at.  The world's most reputable and

6    biggest heart valve company bought CardiAQ outright for $400

7    million.

8    Q.    What's the name of that company?

9    A.    Edwards Lifesciences.

11:08 10   Q.    When you say Edwards purchased CardiAQ for $400 million,

11   where did that money go?  Did it go to you?

12   A.    Not all of it.  The money went to all the investors that

13   had put faith and money to it, and over the years they have

14   invested a lot of money into it.  So all of those particularly

15   invested money gain from it.

16   Q.    And just in general, who were some of the investors?

17   A.    We had very great reputation, surgeons, the world's best

18   surgeons and doctors that invested in the company.  But what

19   really comes to mind is that my staff who was working with me

11:08 20   in my hospital.  They wanted to invest, and we talked about it,

21   but they -- I told them that, you know, the regulations are

22   such that I can't take your money, because the cutoff was too

23   much.  So they said --

24   Q.    The minimum amount of investment was too much?

25   A.    The minimum amount was at least $100,000.  So they -- so

1   walk in, one of the members said, Hey, it would be nice to have

2   Rose, her two-year-old at that time, send her to college, so

3   Dr. Q., can we do something?  So that sparked an idea.  I said

4   why don't you guys get together and form an LLC, a small

5   company, pool in the money and invest, and they did.  Actually,

6   they did -- they invested twice, and 25 -- 10 to 25 thousand in

7   the range each one of them pitched in.  And I tell you, they're

8   very happy people today.

9   Q.   And what was the name of that LLC?

11:09 10   A.   Rose LLC.

11   Q.   And who is Rose?

12   A.   Rose is that little two-year-old girl of my -- my office

13   staff.

14        So, I mean, that's the heartwarming part of this,

15   really that.

16   Q.   Doctor, did you receive any of the money?

17   A.   Yes, I did.

18   Q.   And how much did you receive?

19   A.   Total take for me would be about $20 million.

11:10 20   Q.   And why did you receive that much?

21   A.   For my efforts for the last decade in developing this

22   technology.  I had invested a lot of my own money in it earlier

23   on, over $300,000.  And also over the years I had gain in

24   equity because of the work I was doing because it was me and

25   Mr. Ratz for a long time, and then it was all the time, I was

1    working with the company all the time.

2           So all of the founders' shares and the options and

3    gathered up and that's how -- that's how much my take would be.

4    Q.   And what did Edwards' purchase of CardiAQ mean to you?

5    A.   It's a great success for me.  It was phenomenal.  Barring

6    the money -- this company bought my technology.  Now I see a

7    future for the valve.  I see that some day the patients that

8    are basically not being helped today will get what they need, a

9    transcatheter mitral valve, a transseptal mitral valve

11:11 10   replacement.  That's huge for me, barring -- the money is good

11   obviously, benefitted from that.  I couldn't be happier because

12   this is just a phenomenal achievement for my team, and also

13   people trusted me, and I could deliver.  So all that coming to

14   me successfully.

15   Q.   Now, Doctor, are you aware that the defendant, Neovasc,

16   claims you disclosed your trade secrets and confidential

17   information to the public through presentations and patent

18   publications?

19   A.   No.

11:11 20   Q.   Are you aware that they make that claim?

21   A.   They probably do, yes.

22   Q.   Now, did you ever share the physical prototypes of Rev. C,

23   D, or E with the public?

24   A.   No.

25   Q.   Who did you share the Rev. C, D, and E physical prototypes

```
 1   with?
 2   A.    Obviously Mr. Ratz, we shared it with Neovasc.
 3   Q.    Did you ever share the development history of Rev. C, D,
 4   and E with the public?
 5   A.    No.
 6   Q.    Who did you share the development history of Rev. C, D,
 7   and E with?
 8   A.    With Neovasc.
 9   Q.    I'd like to show Trial Exhibit 615, please.
10           Do you recognize Exhibit 615?
11   A.    Yes.
12   Q.    What is it?
13   A.    This is a presentation I made to the TCT, transcatheter
14   therapy.  This comes from a panel in Washington, D.C.
15   Q.    And if we can quickly flip through and you can just tell
16   us real general quickly what you presented at this conference.
17           I'm sorry, what months was this conference, TCT?
18   A.    It was in the fall, September of 2010.
19   Q.    September of 2010.
20   A.    So these were my disclosures.  This is an important slide.
21   You have to disclose, that's what I was doing for the company
22   at that point.
23           If you have the next slide, please.
24           This here shows -- I was trying to impress upon my
25   colleagues, my peers that this is the problem with mitral
```

1    regurgitation.  It's such a dramatic, bad disease that here is

2    they all die at the end of five years from the start.  You see

3    how the heart failure progresses.  There's no fix for this.

4    That was the whole impetus for me going after this disease

5    process.

6              So I made that point.  You know, this is great

7    discussion we had.

8              And here we go, this is another area that we wanted to

9    concentrate on, 9.3 percent to 75 percent of patients is

11:14 10   increasing at that rate.  If you look at the data, it's really

11   alarming how many patients are turned back with mitral

12   regurgitation and cannot be helped.  It's over 60 percent of

13   patients that turn up in the office with mitral regurgitation

14   will be turned back without any therapy.  Medical therapy, but

15   nothing else.

16   Q.   Can we go to the next slide, please?

17   A.   This is what happens.  If you fix it, as I spoke before,

18   fewer than 20 percent recover, 13 percent operative mortality,

19   77 survive at one year, and 55 at five years.  So you see how

11:15 20   dramatic that drop is.  So 50 percent of patients die.

21   Q.   If we can go to the next slide, please.

22   A.   So I was trying to show that we developed a transcatheter

23   mitral valve implantation technique, it's a new approach.

24   Q.   And the next slide please, page 6.

25   A.   So this what was claim was provide chordal sparing mitral

1    valve repair with a competent, bioprosthetic mitral valve.

2    "Chordal sparing" means we don't use divide the chords, they're

3    not divided, they're maintained, the vital anatomy is

4    maintained.

5         Eliminates the risk associated with cardiopulmonary in

6    the heart/lung machine.

7    Q.   That's the open heart surgery?

8    A.   Open heart surgery.  And those are elements of that

9    procedure.

11:15 10        High-risk patients, those who are not candidates for

11   surgery, could receive definitive therapy.  You give them a

12   competent value or at least reduce it to one plus.

13   Q.   If we could go to the next slide.

14        And generally what is shown on this slide?

15   A.   So this is like -- it should have secure anchoring,

16   optimal hemodynamics, avoid systolic anterior motion.  It's a

17   technical term in medicine, cardiology that we use.  It is

18   avoid left ventricle outflow tract obstruction, preserve mitral

19   valve apparatus, eliminate MR.

11:16 20   Q.   And these are your must-have guidelines?

21   A.   These are the goals we set out to basically establish.

22        And then we have to have a catheter delivery system,

23   deploy the mitral annulus; and then, of course, we have to have

24   a loading system.  So this is a general overview of what we

25   were trying to do at that point.

```
 1   Q.    Let's go to slide 8, please.

 2   A.    And this is what we showed.  As this demonstrative shows,

 3   catheter comes up, goes across the septum, there you go, and

 4   releases these anchors, and they will go between the chords and

 5   they will affix to it.

 6   Q.    Now, which revision is shown in this drawing on slide 8?

 7   A.    This will be Revision B.

 8   Q.    Revision B?

 9   A.    Yes.

10   Q.    So the one before C?

11   A.    Yes.

12   Q.    Before D?

13   A.    You can see the pinching going on here.

14   Q.    So this uses the old method of anchoring, the pinching?

15   A.    Yes.

16         The main purpose of this demonstration was, okay, this

17   is the route and this is what we are trying to do.

18   Q.    And why are you still showing your old method of anchoring

19   in September of 2010?

20   A.    Well, we're certainly not going to disclose our new

21   method.  That was a very fair question asked in the meeting,

22   how does it fix, how does it fix.  This was one of the major

23   questions in my presentation, and I told them, Well, that's the

24   secret I cannot share with you.  So this question was asked

25   several times, several locations.  People are amazed, why is it
```

1    not moving.  We never discussed that part.

2    Q.   If we could go to page 9, please.

3         Now, what's shown on page 9?

4    A.   This here is the Rev. E design of the valve, prosthetic

5    valve with these anchors.  And on here is an animation, how it

6    works.

7         Even this animation, if you play it, it's just

8    foreshortening, shows the clamping, the foreshortening.

9    Q.   Did you tell the audience how the Rev. E device anchored?

11:18 10  A.   No, not in any detail at all.  It was just that it

11   anchors, foreshortening happens.

12        This is what this video shows, that it comes together

13   like that, and that was enough for the big crowd to understand.

14   Because this was not a technology meeting, I was not discussing

15   technology here.

16   Q.   Did you disclose going between the chords and around the

17   leaflets and anchoring and the annulus?

18   A.   No.

19   Q.   And if we could go to the next slide, please.

11:19 20       And what's shown in this slide?

21   A.   This one here is the video that showed the entire

22   procedure.  Coming up and going across, so this catheter comes

23   up and across the left side and goes into the left ventricle.

24   And basically, you know, this is just showing the early part of

25   the procedure, on the video that would be very interesting.

1           So that's -- this is the video.  I call -- this is the

2       video that -- I call it the inception.  So this is where it all

3       shows how it works.

4       Q.   But now when you say that, Doctor, does it show the

5       anchoring method?

6       A.   It shows the anchors come out and affix, but it doesn't

7       show the method.

8       Q.   Can you see the chordae tendineae?

9       A.   No.

11:20 10  Q.   Can you see the leaflets?

11      A.   No.

12      Q.   Now just quickly go through, if we could show the next

13      slides, slide 11 and slide 12 and 13 and 14 and 15 and 16 and

14      17 and 18 and 19.

15           Now, did any of those slides show the method of

16      anchoring?

17      A.   No.

18      Q.   How long did you present for at TCT in September of 2010?

19      A.   This would be a max ten minutes, seven- to ten-minute

11:20 20  rotation.

21      Q.   And you didn't hand out any prototypes --

22      A.   No.

23      Q.   -- at the presentation?

24      A.   No, in fact, we always tell the meetings not to publish,

25      just the presentation, slides back.  So they didn't even have

```
 1   this material to put in their deck.
 2   Q.   Now, if we could take that down, please.
 3            Now, did the U.S. Patent Office grant CardiAQ any
 4   patents on its TMVI devices and methods?
 5   A.   Yes.
 6   Q.   How many patents have you received?
 7   A.   Currently about nine.
 8   Q.   And are you a named inventor on all of CardiAQ's patents
 9   related to TMVI?
10   A.   Yes.
11   Q.   And did CardiAQ file a patent describing the way the Rev.
12   D and E devices were anchoring in the mitral valve?
13   A.   Yes.
14   Q.   If you could please show Trial Exhibit 2173.
15            Is this the patent that discloses --
16   A.   This is the patent that discloses it.
17   Q.   Now, let's look at when this patent was filed, if we can.
18   Actually bring up the provisional filing date.
19            And do you see the entry number 60 there?
20   A.   Yes.
21   Q.   What is that?
22   A.   September 23, 2010.
23   Q.   Is that when you first filed your anchoring method with
24   the Patent Office?
25   A.   That would be the official application date, yes.
```

1    Q.   Was your patent application public on that date?

2    A.   No.

3    Q.   And when did your patent on that method publish?

4    A.   About 18 months later.

5    Q.   Eighteen months later?

6    A.   Yes.

7    Q.   I think it actually shows the date on the front, if we can

8    show the publication date.  Is that it right there?  I'm sorry,

9    it was up.

11:22 10           Read number 65.

11   A.   Yes, publication date.

12   Q.   And what's that date?

13   A.   March 29, 2012.

14   Q.   Let's read into the record the patent number, if we can.

15   A.   U.S. Patent 8,652,203.

16   Q.   If we could turn to column 16, line 17.

17   A.   So this just describes the anchors capturing the mitral

18   leaflet and going around the mitral leaflet.

19   Q.   And I believe we can highlight that.  If we could

11:23 20   highlight the first sentence there.  What does that sentence

21   say?

22   A.   Replacing the heart valve can be deployed at a patient

23   native mitral valve annulus with reference to Fig. 8.

24   Q.   Let's skip down.  I believe we had some more highlighted

25   text.

1   A.    Yes.  With the downstream side of the native mitral valve

2   annulus.  In this motion, preferably the downstream anchors

3   will engage and capture the native leaflets.  So that's -- the

4   native leaflets are engaged and captured, and then can be

5   deployed to allow expansion of the replacement valve.

6   Q.    If we could highlight the sentence that starts at line 23.

7   A.    That's -- describes the chordae tendineae, the anchors

8   going between the chordae tendineae.  So we describe how we are

9   going to achieve this.

11:24 10   Q.    And so it says the heart valve to be partially deployed so

11   that the downstream portion of the replacement heart valve can

12   be allowed to self-expand, thus urging the downstream anchor

13   between the chordae tendineae and radially outward of the

14   native mitral valve leaflets.

15   A.    That's correct.

16   Q.    Was that your invention, of going between the chords,

17   around the leaflets, and engaging in?

18   A.    Yes.

19   Q.    Now, are CardiAQ's inventions disclosed in its patents?

11:25 20   A.    The -- when patent issues, but not when they're

21   provisional applications.

22   Q.    Now, did CardiAQ disclose its development history in its

23   patents?

24   A.    No.

25   Q.    Are you aware of defendant Neovasc's TMVI program?

```
 1   A.   Yes.
 2   Q.   How did you find out that Neovasc was developing a
 3   transcatheter mitral valve device?
 4   A.   This information came to us through -- I was informed by
 5   one of my colleagues, my neighbor, actually.  And he says, Have
 6   you heard about the TMVI valve?  This is a competition that's
 7   coming up, did you know about it?  Because my neighbor was very
 8   involved, he's a good friend of mine.  I said, No, I haven't
 9   heard about it.  So that evening, me and Mr. Ratz, as per
11:26 10 routine, we usually discuss the company business a lot.  So I
11   brought up this, you know, that I heard this from this Mr. Such
12   and Such.  So we talked about it.  He hadn't really heard about
13   it either.  So we said why don't we just look it up.  And we
14   were on the phone and we just went to USPTO.gov, the Patent
15   Office.
16   Q.   The Patent Office website?
17   A.   Yeah, website and typed in "Tiara," boom.  Tiara valve,
18   Neovasc, and the inventor was Mr. Randy Lane.
19   Q.   And when was this?
11:26 20 A.   This would be around December of -- later on in early two
21   thousand -- actually, it will be end of 2010, early 2011.
22   Q.   So could it have been December 2011?
23   A.   Yes.
24   Q.   All right.
25        And did you say that Randy Lane was named as the
```

1    inventor on the Neovasc patent?

2    A.   Yes.

3    Q.   And that's the man you had met with at Neovasc?

4    A.   Yes.

5    Q.   How did you react to seeing this information?

6    A.   I was furious.  I mean, we were like shocked and furious

7    and say, What is this?  We have not -- we never expected this

8    off a vendor that was basically trusted.  We trusted all our

9    technology, we gave them all the information.  They never told

11:27 10   us.  And so it was -- it was not -- it was not a good day for

11   me.  We were very upset about the whole thing.

12   Q.   Did you find Neovasc's actions to be unfair?

13   A.   Very unfair.  It was sort of betrayal.  You know, you

14   trust somebody with all this information, and they just go

15   ahead and make their own device and compete directly with you.

16   I don't mind competition, competition is great, but, you know,

17   not this -- stealing.  So that was -- that was pretty bad.

18   Q.   Now, do you know if the patent application you saw

19   published in December 2011 has issued into a patent?

11:28 20   A.   Yes.

21   Q.   It has; is that right?

22   A.   Yes.

23   Q.   If we could show Trial Exhibit 565.

24   A.   Yes.  So this is -- this is the Neovasc patent.

25   Q.   And it's U.S. Patent 8,579,964?

1    A.    That is correct.

2    Q.    And can we see the original filing date for the original

3    application in number 60 there?

4          So when was Neovasc's first application filed on -- if

5    we could highlight the first one at the bottom.

6    A.    Filed on May 5.

7    Q.    May 5, 2010?

8    A.    Yes.

9    Q.    And when did CardiAQ stop working with Neovasc?

11:29 10   A.    That would be about a couple of weeks before this.

11   Q.    Maybe even a week before it?

12   A.    Yes.

13   Q.    Now, do you believe that you should be named as an

14   inventor on the '964 patent?

15   A.    Yes.

16   Q.    If we could turn to claim 1.

17   A.    Yes.  So these claims, as you read all the way down, it's

18   like you go in around the leaflets, the engage the trigone,

19   which is a portion of the annulus, you capture the leaflet.

11:29 20   That's all described in this patent.

21   Q.    I'd like to start at the top, Dr. Quadri.  If you can go

22   paragraph by paragraph and what your contributions were to this

23   invention.

24   A.    So providing a prosthetic -- comprises an anchor having an

25   atrial skirt, an annular region, ventricular skirt and

1    plurality of valve leaflets.  The ventricular skirt comprises

2    of first trigonal anchoring tab disposed on an anterior portion

3    of the ventricular skirt, wherein the anchor has a collapsed

4    configuration for delivery to the heart and an expanded

5    configuration for anchoring with the heart.  This is the

6    description of the left ventricle anchor.

7    Q.   That's a description of your devices that you showed

8    Neovasc?

9    A.   Yes.  And then positioning the prosthetic valve in the

11:30 10   patient's heart, expanding at atrial skirt radially outward so

11   as to lie over a superior surface of the patient's native

12   mitral valve.

13   Q.   Let me ask you about the highlighted part.  Is that

14   something you contributed?

15   A.   Yes.

16   Q.   And if we could go down to the next paragraph, "radially"?

17   A.   Radially expanding the annular region of the anchor to

18   conform with and to engage the native mitral valve annulus.

19   That's engaging the mitral annulus, that's what we do.

11:31 20   Q.   And the next paragraph.

21   A.   Anchoring the first trigonal tab against a first fibrous

22   trigone on a first side of an anterior leaflet of the native

23   mitral valve, such that the anterior leaflet and the adjacent

24   chordae tendineae are captured between trigonal anchoring tab

25   and an anterior surface of the anchor.

1        So that physically describes that you go behind the

2    leaflet and engage, capture the leaflet, go up and touch the

3    annulus, in being in contact with the annulus, and it also goes

4    for the adjacent chords, which means the chords could also be

5    of the posterior leaflet.  "Adjacent" means next to each other.

6    So there could be anterior chords, posterior chords.  So there

7    could be both.  So this is what that is.

8    Q.   Okay.

9        So when it talks about anchoring the first trigonal

11:32 10   anchoring tab, that's one anchor, right?

11   A.   That is one anchor.

12   Q.   And that's like your ventricular anchor?

13   A.   That is like my ventricular anchor going to the annulus,

14   and that's key, is the annulus, it has -- it goes to the

15   annulus, and it gets there, it just, you know, by capturing the

16   leaflet.

17   Q.   And then the next paragraph?

18   A.   And then radially expanding the ventricular skirt, thereby

19   displacing the native mitral valve radially.  That's like when

11:32 20   you expand the mitral valve, it's now is going to get pushed

21   out to make room for the new valve.  So that's what that says.

22   Q.   And this is the -- the highlighted portions of the method

23   were the portions that your Rev. E device performed?

24   A.   Yes.

25   Q.   Now, if we could turn to claim 14.

```
       1              Did you contribute to claim 14 as well?
       2   A.   Yes.
       3              So now if I can describe the way this patent is
       4   applied for, the way it's working is like -- so describe one
       5   tab that goes against one, then they describe another tab, a
       6   second that's opposite to the first tab that is in claim 13.
       7   That goes opposite the first tab.  So now we've got two tabs
       8   going around the leaflet, capturing the leaflet, and getting up
       9   on the top.  But that's not going to work, because it's too --
11:34 10   it's like two legs to a stool, it's not going to stand, you
      11   need a third leg, at least three legs for a stool to stand.  So
      12   to get the third leg, they describe this third anchor, which is
      13   as it's read here --
      14   Q.   Dr. Quadri, I just want to verify.  We talked about claim
      15   1 that required one anchor?
      16   A.   Yes.
      17   Q.   Now we're talking about another claim that's adding a
      18   second anchor?
      19   A.   Yes.
11:34 20   Q.   Where would this anchor anchor on the annulus?
      21   A.   14 would be in the posterior part.
      22   Q.   And the "posterior part" means where?
      23   A.   Posterior part of the annulus.  And this --
      24   Q.   "Posterior" means the back of the annulus?
      25   A.   The back, yes.
```

```
 1    Q.    The softer portion in the back?

 2    A.    Yes.

 3    Q.    Not the front where the trigones are.

 4    A.    No.

 5    Q.    That was in claim 1?

 6    A.    Right.

 7    Q.    And is there anything else included in this patent that

 8    you shared with Neovasc?

 9    A.    So this is the third anchor, this describes the whole

10    anchoring method.

11          The other thing that I shared in this patent is the

12    approach, the transseptal approach that goes --

13    Q.    If we could go to claim 3.

14    A.    Transseptally delivering the prosthetic valve from the

15    right atrium to the left.

16    Q.    And that's the same as your transfemoral approach?

17    A.    Yes.

18    Q.    To your knowledge, has Neovasc even performed the

19    transseptal approach?

20    A.    No.

21    Q.    But they put it in their patent?

22    A.    Yes.

23    Q.    If we could see Fig. 23 A.

24          And what is shown in Fig. 23 A?

25    A.    That's a replica we've been discussing goes from here.
```

```
 1   This is the vein.  The vein all the way going across into the
 2   right atrium and then going across the septum into the mitral
 3   valve.
 4   Q.   So this is the method that you use that goes through the
 5   groin, up the femoral vein, across the wall of the heart, and
 6   down into the mitral valve?
 7   A.   Yes.
 8   Q.   And that's not what Neovasc does today, right?
 9   A.   No.
10   Q.   But they put it in their patent?
11   A.   Yes.
12   Q.   Now, how did it make you feel to see your contributions in
13   Neovasc's patent?
14   A.   I was extremely angry and basically felt that, you know,
15   very, very cheated and betrayed, that how -- there has to be a
16   discussion about this.  They had to talk to me, me and
17   Mr. Ratz, before they go forward and make a claims that we
18   have -- we basically taught them.  We experimentally proved
19   them, we gave them the information, we gave them the history,
20   and one week later, they come up with a publication -- an
21   application that's completely stolen from our technology.  It
22   was not a good day.  I felt very betrayed and angry at that
23   point.
24        MS. LEA:  Thank you, Dr. Quadri.  I have no further
25   questions at this time.
```

```
 1              THE COURT:  While they're switching places, why
 2     doesn't everybody stand up, stretch, move around a little bit,
 3     if you want to.
 4              (Discussion off the record.)
 5                        CROSS-EXAMINATION
 6     BY MR. GRAVES:
 7     Q.   Good morning, Dr. Quadri.
 8     A.   Good morning.
 9     Q.   Let's start with Exhibit 2634, which was already marked
11:37 10    this morning.
11              Dr. Quadri, if I understand you correctly, this is a
12     photograph from an animal study in April of 2010, and it shows
13     one of your devices, in your words, going behind the leaflets
14     in through the chordae; is that correct?
15     A.   That is correct.
16     Q.   And you testified this morning in response to this
17     photograph this was huge, correct?
18     A.   Yes.
19     Q.   You told us that this was the sort of thing that your
11:37 20    company didn't publish or make public at industry conferences;
21     is that correct?
22     A.   That is not entirely correct.  We published the picture,
23     that was shown.
24     Q.   This picture was published in May 2010, one month later,
25     at a conference called Euro PCR, correct?
```

```
     1   A.   I'm not aware of that.  I wasn't at that meeting.
     2   Q.   You're aware that Dr. Carlos Ruiz at Euro PCR in May 2010
     3   gave a presentation that included information from your
     4   company, CardiAQ, correct?
     5   A.   Yes.
     6   Q.   And your company gave him this photograph for materials
     7   for the conference presentation, correct?
     8   A.   I did not hand the presentation to him.  I would have to
     9   check, but that may -- you may be right.  I just didn't go
11:38 10  through the presentation that was sent to him.
    11   Q.   And you're aware that there's more than one conference in
    12   2010 where this very photograph, this is huge photograph, was
    13   published at an industry conference, correct?
    14   A.   That is correct.
    15   Q.   So when you testified earlier that you didn't go and tell
    16   people and your company didn't go and tell people at
    17   conferences about this anchoring fixation method, that wasn't
    18   entirely correct, was it?
    19   A.   It was entirely correct in my description, it just showed
11:39 20  a picture of how the engagement happens, but it doesn't
    21   describe to a medical community that it was presented to, it
    22   just gives the evidence that valve in a stable location and
    23   that cannot be displaced.  That was the message going out.
    24   Q.   We can look at this picture and see anchors, in your
    25   words, behind the leaflets, correct?
```

```
 1    A.    That is correct.

 2    Q.    You mentioned you spoke to Mr. Randy Lane of Neovasc

 3    around June 23rd of the year 2009; is that right?

 4    A.    That is correct.

 5    Q.    Now, when you met Mr. Lane, you didn't say, Hey, Mr. Lane

 6    give me a list of any devices you've ever seen before that have

 7    anchoring structures that go behind the leaflets?  You didn't

 8    do that, did you, sir?

 9    A.    Well, that was not entirely in the question, no, but that

11:40 10   was presumed, that all the disclosures would have had to have

11    happened.

12    Q.    You didn't ask him for a list of devices he knew about

13    before he met you that went behind the leaflet, correct?

14    A.    Correct.

15    Q.    Now, you testified --

16    A.    Excuse me, mitral.

17    Q.    Dr. Quadri, you testified about your device this morning.

18    So I'm going to ask you some further questions about it.

19          In your CardiAQ device, there are 12 anchors on the

11:40 20   bottom ventricular side of the device, correct?

21    A.    That is correct.

22    Q.    In fact, there is a complete circle of 12 anchors on the

23    bottom ventricular side of the device, correct?

24    A.    That is correct.

25    Q.    There is also a complete circle of 12 anchors around the
```

1    circumference of the top or atrial side of the device; is that

2    correct?

3    A.    That is right.

4    Q.    Total of 24 anchors, correct?

5    A.    Yes.

6    Q.    And if we compare the circle, that circumference, to the

7    face of a clock, your 12 anchors are spread around the

8    circumference like numbers on a clock 12 midnight to 12 noon,

9    correct?

11:41 10   A.    Right.

11    Q.    Those anchors are each about 30 degrees apart from each

12    other around that circle, correct?

13    A.    That is correct.

14    Q.    During any procedure in which your device has been

15    implanted in a human, no doctor performing that procedure has

16    ever tried to put a particular anchor on that clock face on a

17    particular part of the mitral annulus, correct?

18    A.    No, we don't do that.

19    Q.    And it doesn't matter, because all the anchors are the

11:41 20   same in your device, correct?

21    A.    They are.

22    Q.    You don't have a clocking that you need to do in anchoring

23    your device, correct?

24    A.    Correct.

25    Q.    By "clocking," you understand that I mean picking a

1    specific number on the clock, like 6:00, and intentionally

2    sticking a specific anchor on 6:00, correct?

3    A.    Yes.

4    Q.    All right.

5          Now, if we look at your device, any particular anchor

6    can go into any particular place around the mitral annulus

7    because they're all the same, correct?

8    A.    That is correct.

9    Q.    CardiAQ didn't give any of the 12 anchors on the bottom

11:42 10   ventricular side of its device special individual names,

11   correct?

12   A.    No.

13   Q.    You never named any of the 12 anchors on the bottom

14   ventricular side of your device trigonal tab, correct?

15   A.    No.

16   Q.    You never named any of the 12 anchors on the bottom

17   ventricular side of your device posterior tab, correct?

18   A.    Correct.

19   Q.    You didn't give your anchors special names that correspond

11:42 20   to prenamed anchoring spots, correct?

21   A.    Correct.

22   Q.    And you didn't give names to your anchors that way because

23   you don't have a unique preplanned anchoring spot for each

24   particular anchor, correct?

25   A.    We do.

```
 1   Q.   You don't actually take anchors and deliberately place
 2   them in preplanned locations that are unique to each anchor,
 3   correct?
 4   A.   Correct.
 5         Actually, that would not be correct.  We do.  We place
 6   them on the annulus.
 7   Q.   And anyplace around the annulus is good enough for you,
 8   correct?
 9   A.   Correct.
10   Q.   It's like that old TV game, the Wheel of Fortune.  We can
11   spin the wheel, wherever it lands is wherever it lands, and
12   that's okay, but as long as it's on annulus, correct?
13   A.   The Wheel of Fortune -- it will land with one, the whole
14   wheel.  You have to imagine the whole in time, the numbers, but
15   they can be 12:00, 3:00, 4:00 or the wheel can end at some
16   other number.  So it's not a good analogy, sir.
17   Q.   Let's try another one.
18         In a baseball game, you understand the person who's
19   called the third base coach, they need to stand next to third
20   base?
21   A.   All right.
22   Q.   Further questions about intentional anchor placement.
23   Until this lawsuit was filed you never heard the term "fibrous
24   trigones" used internally at CardiAQ, correct?
25   A.   You don't do justice to what I do for a living.
```

11:43 (line 10)

11:44 (line 20)

        1              MR. GRAVES:  Your Honor.

        2    A.   I am a cardiac surgeon.

        3              MR. GRAVES:  Your Honor, I would like to play Volume I

        4    of Dr. Quadri's transcript under 32(a)(2), pages 287-2 to

        5    287-5, and we will bring that transcript up for your review.

        6              THE COURT:  287-2 to --

        7              MR. GRAVES:  287-5.

        8              THE COURT:  Volume I.

        9              MR. GRAVES:  Volume I, yes, your Honor.

11:45  10              THE COURT:  Objection?

       11              MS. LEA:  Just for completeness, your Honor, we'd like

       12    to add 6 through 12.

       13              MR. GRAVES:  That's not the question, your Honor.

       14              The question is covered by 287-2 to 287-5.

       15              MS. LEA:  It's the same question, your Honor.

       16              THE COURT:  You want to add --

       17              (Pause.)

       18              THE COURT:  All right.  You can play 287-2 to 287-5.

       19    I think the question is basically the same, and the most

11:46  20    efficient way to do this would be to play through 12.  Are you

       21    set up to do that?

       22              MR. GRAVES:  I don't know if we are, your Honor.

       23              MS. LEA:  Then they can read it, your Honor.

       24              MR. GRAVES:  If it's the same question, I'd ask it

       25    word for word, I think should we should just play the one what

       1    we've got.

       2                MS. LEA:  It gives the witness' full answer.

       3                MR. GRAVES:  They can do redirect later.

       4                THE COURT:  I understand the point, they can do

       5    redirect later, but it seems, for the sake of efficiency, to

       6    give it now given the similarity of the two questions.

       7                So we can discuss how we're going to handle this

       8    later, but for the time being let's play or read 2 through 12,

       9    please.

11:47 10                (Pause.)

      11                THE COURT:  If you're only set up for 2 through 5, we

      12    can either read it or play it right after lunch break.  I don't

      13    mean to put the technology people on the spot.

      14                MR. GRAVES:  Your Honor, do you mind if one of my

      15    colleagues simply reads it so we can move on?

      16                THE COURT:  Yes, that's fine.

      17                MR. GRAVES:  Mr. Baskin, can you read the pages,

      18    please?

      19                MR. BASKIN:  "Q.  Until this lawsuit was filed had you

11:47 20    ever heard the term 'fibrous trigones' used internally at CVT?

      21                "A.  No.

      22                "Q.  Is the term 'fibrous trigone' -- leaving aside

      23    any conversations you've had with lawyers -- used internally at

      24    CVT today?

      25                "A.  Not particularly.  We consider that clarified

1    before.  Fibrous trigone to me is part of the annulus, and we

2    talk about the annulus all the time."

3    BY MR. GRAVES:

4    Q.    Dr. Quadri, CardiAQ has never instructed a physician who

5    will be implanting the CardiAQ device to specifically target

6    the fibrous trigones with a specific anchor, correct?

7    A.    Yes.

8    Q.    And when you did your first in-human implantation, which

9    you spoke about this morning, and in deciding that was a

11:48 10    success, you didn't consider whether one or more of the 12

11    bottom ventricular anchors had attached to a fibrous trigone in

12    the patient's heart, correct?

13    A.    Excuse me, please repeat that question.  You said "bottom

14    anchors."

15    Q.    When you did your first human implantation and deciding

16    that that was a success, you didn't consider whether one or

17    more of the 12 ventricular anchors had attached to a fibrous

18    trigone in a patient's heart, correct?

19    A.    Yes, that is correct.

11:49 20    Q.    And in your communications within CardiAQ and your

21    investor group at Organ Net in connection with that

22    implantation, you never discussed whether one or more of the 12

23    ventricular anchors had attached to a fibrous trigone in a

24    patient's heart, correct?

25    A.    To the annulus.

1   Q.   You didn't discuss whether the 12 ventricular anchors had

2   attached to a fibrous trigone in a patient's heart, correct?

3   A.   No.  But to the trigone annulus, because a trigone is part

4   of the fibrous or the annulus.

5   Q.   You didn't discuss whether they attached to the fibrous

6   trigones, correct?

7   A.   Correct.

8   Q.   For before this lawsuit started you never told anyone that

9   your Revision C of your device was intended to target or hit

11:49 10   upon a fibrous trigone, correct?

11   A.   Yes.

12   Q.   "Yes" means correct, right?

13   A.   Correct.

14   Q.   Before this lawsuit started you personally never told

15   anyone that Revision D of your device was intended to land upon

16   fibrous trigone, right?

17   A.   Correct.

18   Q.   Before this lawsuit started you never told anyone that

19   Revision E of your device was intended to land upon a fibrous

11:50 20   trigone, correct?

21   A.   That is correct.

22   Q.   Because you didn't tell anybody that Revisions C through E

23   were intended to anchor on a fibrous trigone, that includes

24   Neovasc, too, as well, correct?

25   A.   That would -- yes.

1    Q.   For example, when you visited Neovasc in Vancouver in June

2    of 2009, you didn't mention the fibrous trigones, correct?

3    A.   That is not entirely true.  We talked about the mitral

4    anatomy.  And if I'm talking about mitral anatomy, we are

5    talking about the fibrous trigones.

6    Q.   You didn't mention the fibrous trigones, did you?

7    A.   I have no recollection.

8         MR. GRAVES:  Your Honor, I would like to play Volume

9    I, this time from 188-20 to 23.

11:51 10         THE COURT:  188-20 to 23.

11        (Pause.)

12        THE COURT:  Go ahead.

13        (Played recording.)

14   BY MR. GRAVES:

15   Q.   And the answer is the same for the posterior shelf.  You

16   never told anybody at Neovasc that Revisions C through E of

17   your device were intended to have one designated anchor always

18   land on the posterior shelf, correct?

19   A.   That's correct.

11:51 20   Q.   Your Revisions C through E were not rotationally oriented

21   so that each anchor needed to land in a unique preselected

22   location every time, correct?

23   A.   That's correct.

24   Q.   In fact, you've said that you think Neovasc Tiara would be

25   a better device if it didn't have rotational alignment to place

1   specific anchors to hit certain points, correct?

2   A.    I don't remember that.

3          MR. GRAVES:  Your Honor, I'd like to play Dr. Quadri's

4   deposition, Volume I, pages 150-3 to 151-7.

5          THE COURT:  I'm sorry, 153 --

6          MR. GRAVES:  150, line 3 to 151, line 7.

7          THE COURT:  Any objection?

8          MS. LEA:  Just a moment, your Honor.

9          (Pause.)

11:53 10        MS. LEA:  Your Honor, if we could go through 151-11.

11          MR. GRAVES:  That's okay with me, your Honor, if we've

12   got it.

13          THE COURT:  That's fine.

14          MS. LEA:  And I'd like to also add the first question

15   in this series, page 149-16.  So going from 149-16 through

16   151-11.

17          MR. GRAVES:  We disagree with that, your Honor.

18          (Discussion off the record.)

19          MR. GRAVES:  Your Honor, we don't agree with that.

11:54 20   That's an unrelated question.

21          MS. LEA:  It is related, your Honor.

22          THE COURT:  Hold on.

23          (Pause.)

24          THE COURT:  No, not going to allow that at this point.

25   You can get it on redirect if you want.

 1            150-3 through 151-11.

 2            (Played recording.)

 3            MR. BASKIN:  Your Honor, we'd read the next lines into

 4    the record.

 5            THE COURT:  That's fine.

 6            MR. BASKIN:  "Q.  So looking at the device, do you

 7    have an idea in mind on how it could be improved?

 8            "A.  Just adapt the CardiAQ valve technology fully,

 9    and you will be there."

11:56 10    BY MR. GRAVES:

 11    Q.   Dr. Quadri, just to be clear, you think that Neovasc's

 12    device would be improved if it just adopted your technology

 13    instead of doing clocking and rotational alignment and having a

 14    D shape, correct?

 15    A.   That's the conversation that went on there.  And they did

 16    adopt some of it, so --

 17    Q.   All right.

 18            Well, you add more anchors to it as well, not just the

 19    through anchors that Tiara has on the ventricular side,

11:57 20    correct?

 21    A.   Bottom ventricle left side.

 22    Q.   You think it needs more anchors, don't you?

 23    A.   The device itself?

 24    Q.   Yes.

 25    A.   Yeah, I have 12 anchors with my device.

```
 1    Q.   And you think Tiara's three are not enough, correct?

 2    A.   As I said, three-legged stool is stable, you just have to

 3    balance them correctly.

 4         MR. GRAVES:  You know, I think we're going to be here

 5    for a while Dr. Quadri, because I want to play Volume I now,

 6    151-16 to 17.

 7         (Pause.)

 8         MS. LEA:  Your Honor, the transcript's not

 9    inconsistent with his testimony.

11:58 10         THE COURT:  I agree.

11    BY MR. GRAVES:

12    Q.   Well, let's be clear here, sir.

13         You think the Neovasc device would be better if it had

14    the same number of anchors as your device, correct?

15    A.   Correct.

16    Q.   Let's look in your binder, sir, in front of you, Trial

17    Exhibit 5024.

18         You see that in your binder, Dr. Quadri?

19         (Pause.)

11:58 20    A.   Yes, I see.

21    Q.   You have 5024 in front of you, sir?

22    A.   Yes.

23    Q.   You see it on the screen in front of you?

24    A.   I see it.

25    Q.   This is a report, a summary, that you were involved in at
```

        1   your company that was created around March 25 of 2016, correct?
        2   A.   Yes.
        3   Q.   This was something that you were personally involved with,
        4   correct?
        5   A.   That summary?  I was there at that point.
        6   Q.   And this was a summary following an implantation procedure
        7   of your device, correct?
        8   A.   That is correct.
        9   Q.   If we look down the bottom of this March 25, 2016
11:59  10   document, the very bottom of the document on the first page, it
       11   says, "position of anchors relative to the trigones."  Do you
       12   see that?
       13   A.   Yes.
       14   Q.   Before this lawsuit started CardiAQ never purported to
       15   measure or document the position of its ventricular anchors
       16   relative to trigones, correct?
       17   A.   That is correct.
       18   Q.   There are no words even in this document from March 2016
       19   stating that CardiAQ intentionally places each specific anchor
12:00  20   in a unique and exclusive preplanned anchoring location,
       21   correct?
       22   A.   Yes, that is correct.
       23   Q.   You talked about the leaflets, and I want to start with
       24   some nomenclature.
       25        In a situation like this one, there are fabric

1    leaflets as well as natural leaflets, correct?  Leaflets that

2    are made that are artificial that go into a valve; is that

3    right?

4    A.   I am not aware of any fabric leaflets.

5    Q.   There's tissue that's made to put into the valve assembly

6    for a prototype, correct?  And you can sometimes refer to those

7    as leaflets, correct?

8    A.   You can call them, but they really -- are you talking

9    about just rough prototype to get the geometry right?  You can

12:01 10   cut it out of paper, yes, but it's not a leaflet.

11   Q.   There's natural leaflets that are inside the valve,

12   correct?

13   A.   They're natural, yes.

14   Q.   And there's also artificial leaflets, correct?

15   A.   Prosthetic leaflets with tissue, tissue leaflets.

16   Q.   Yes.  So when you talked about prosthetic leaflets earlier

17   when you were discussing a phone call with Neovasc in December

18   2009, prosthetic leaflets are distinct from the leaflets you

19   were talking about when we were talking about going behind the

12:01 20   natural leaflets, correct?

21   A.   The prosthetic leaflets used in a prosthetic valve are

22   different than the native leaflet, yes.

23          THE COURT:  Mr. Carsten (sic.), are you coming to a

24   good stopping point for lunch?

25          MR. GRAVES:  Let's do it now.

         1          THE COURT:  Are you sure?  I don't want to disrupt

         2    your train of thought.

         3          We're going to take a lunch break, 45 minutes if you

         4    can.  If that turns out to be too long or too short, we'll

         5    adjust, just try 45 minutes.  Just remember everybody eats in

         6    the same cafeteria.  Talk to each other, try not to interact

         7    with any of these lawyers, I know there's a lot of them.  So

         8    you all stay way from them, too.

         9          We'll see you back in about 45 minutes.

12:02   10          (Jury left the courtroom.)

        11          THE COURT:  Sorry, the court reporter just told me I

        12    called you by the wrong name.  My apologies, there's a lot of

        13    you.

        14          MR. GRAVES:  That's okay, your Honor.

        15          Can we get an order sequestering Dr. Quadri during

        16    lunch because we're still in the middle of questioning?

        17          THE COURT:  You want them not to be able to eat with

        18    him or not to be able to talk to him about his testimony?

        19          MR. GRAVES:  The latter, your Honor.

12:03   20          THE COURT:  That's fine.

        21          So no conversation about his testimony.

        22          Their point is you finished direct, you're on

        23    cross-examination now.  Your cross-examination should not be

        24    influenced by any conversations with anybody else.  So you may

        25    have lunch with them and you may discuss the quality of the

1      food, but you may not discuss this case or your testimony in

2      the case.  Do you understand?

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  If you think that will be too difficult,

5      you can go and each lunch by yourself.

6              THE WITNESS:  No, I will not discuss it.

7              THE COURT:  He says he'd rather eat with you.

8              I don't know, reasonable minds can differ on that.

9      But he can do as he chooses.

12:03  10           We'll see everyone back about quarter of.

11             MS. LEA:  Yes.

12             (Court recessed at 12:03 p.m.)

13             (Resumed, 12:45 p.m.)

14             MR. GRAVES:  Your Honor, there's an issue I'd like to

15      discuss before the jury comes in.

16             THE COURT:  Talk fast.

17             MR. GRAVES:  It has to do with FRCP 32(a)(2) versus

18      32(a)(6), during the colloquy.  The question is whether the

19      opposing party is able to suggest additional designations on

12:46  20      impeachment clips.  And we checked all this during the break.

21      And if it were a deposition playing to put into evidence under

22      (a)(6), you can certainly do that, but under (a)(2) for

23      impeachment, you can't.  So I don't believe we should continue

24      with the additional requests for further video.  It's either

25      impeaching or it's not.

```
 1              THE COURT:  So in some of the questions where you've
 2       asked him -- and I can't -- I didn't realize you were going to
 3       raise this so I can't put it together exactly now.  You were
 4       asking to play deposition testimony where I don't think it's
 5       strict impeachment, right?  You didn't ask the same question,
 6       or he gave an answer that was equivocal but not contradictory.
 7       And in those circumstances, just as a matter of efficiency, I
 8       would rather have them play it all, but if you want to hold to
 9       a strict impeachment standard, I'll give you that, but if they
12:47 10 object because the response from the stand is not inconsistent
11       with the transcript, I'm going to interpret that strictly, too.
12              MR. FLYNN:  My only point on that is I think the
13       standard is inconsistent, so it doesn't need to be
14       contradictory.  Equivocal suffices.
15              THE COURT:  Well, I take your point.  But on that
16       first one where I gave them the extra, I felt that that was --
17       the answer wasn't exactly inconsistent, and, you know, it made
18       sense.  The other one I actually would have sustained the
19       objection, but you all agreed to have it played.  I would have
12:47 20 sustained that one.  I think I did sustain it on the third one,
21       right?
22              MR. GRAVES:  I don't believe so.  Yes, Your Honor.
23       Thank you.
24              THE COURT:  So give me -- what are the two rule
25       numbers again?  I'll go back and look at them.
```

1          MR. GRAVES:  FRCP 32(a)(2) versus FRCP 32(a)(6).

2          THE COURT:  For efficiency, I don't know.  I just --

3          MR. FLYNN:  May I say half a sentence on efficiency?

4          THE COURT:  Yes.

5          MR. FLYNN:  I really do think we'll save much more

6     time to leave that kind of stuff for redirect if they choose,

7     provided the clips are truly impeachment.  If they pass that

8     standard, I think the railroad will run more smoothly if we

9     just get to play them.

12:48 10          THE COURT:  That's what I would expect someone sitting

11     in the chair that you're sitting in to say.

12          MR. FLYNN:  Thank you, Your Honor.

13          THE COURT:  Someone very wise once told me that where

14     you stand depends on where you sit.

15     (Jury enters.)

16          THE COURT:  So at the end of the day, I hope -- or

17     during the break, I hope you guys will take a few minutes to

18     talk to Karen about whether you think the lunch break is too

19     long, not long enough.  Some jurors like a little less time,

12:50 20     some like more time.  Obviously, a two-hour lunch would extend

21     the length of the trial, so it's sort of a balance.

22          The other thing is that I know everybody is doing

23     their best, but there's a lot of people involved in this trial.

24     I'm concerned about sort of the congestion in the cafeteria and

25     the elevators, and there may more be commingling than I'm

 1   really comfortable with.  So I spoke to the clerk of the court

 2   yesterday.  And during jury deliberations it's routine that the

 3   court will bring lunch up to the room and you don't have to

 4   leave the room.  They've given me permission to have lunch sent

 5   up every day and you can eat in that room.

 6         And I'm going to leave it to you.  The upside is you

 7   get a free lunch every day, and you may not feel rushed.  The

 8   downside is I also don't want you to feel like prisoners in

 9   that room and we're not letting you out for a whole day.  So

12:51 10   another thing to discuss amongst yourselves during the break.

11   Maybe if we're bringing you lunch, the 45 minutes is okay.

12   Whatever you guys come to is fine with me.  The idea is to keep

13   you comfortable.

14         You also get -- I'm sure you figured this out.  You

15   get a snack a day.  When we're sitting full days I usually do

16   the snack in the afternoon.  I do it that way because at least

17   me, I need a little more of a break in the afternoon than in

18   the morning when I start a little fresher.  But all of that can

19   be adjusted.  Like maybe if you're getting lunch -- I don't

12:52 20   know.  I'm trying to keep the breaks during the day to an hour,

21   45 minutes for lunch and a 15-minute break, but however you

22   guys decide you want to break that up, we have some flexibility

23   in that.  So again, we're working our way up to the bigger

24   decisions, but there's a smaller one -- two smaller ones for

25   you to start with.

 1              You can resume your cross.

 2              MR. GRAVES:  Thank you, Your Honor.

 3    BY MR. GRAVES:

 4    Q.   Dr. Quadri, you spoke this morning about going behind the

 5    leaflets.  And what that means is the anchors on your device

 6    hold the leaflets up toward the annulus by gathering them or

 7    plicating them, to use a more technical term, correct?

 8    A.   The gathering and plication is a result of that movement,

 9    yes.

12:53 10   Q.   And you've also referred to that, Dr. Quadri, as folding,

11    correct?

12    A.   Yes.

13    Q.   You've described that as folding like a curtain or like an

14    accordion, correct?

15    A.   Bottom up, yes, accordion.

16    Q.   And because the leaflets in your design are folded like a

17    curtain or like an accordion, they're not left unfolded,

18    correct?

19    A.   They're not left unfolded.

12:53 20        MR. GRAVES:  Bill, if we can show Exhibit 2634, which

21    was used in the direct testimony again this morning.

22    Q.   Dr. Quadri, if we focus again on this photograph, the

23    white around the edges shows us the folding of the leaflets; is

24    that correct?

25    A.   The white around the edges are more chords than leaflets.

1    Q.   So the chords are the string-like tissue; is that correct?

2    A.   Right.

3    Q.   We also see some folded leaflets in there, in that

4    photograph, correct?

5    A.   Yes, between the chords.

6    Q.   Just for the record, to be clear, this photograph was not

7    shown to Neovasc to your knowledge, correct?

8    A.   To my knowledge, no.

9    Q.   And to be even more clear, Neovasc didn't attend any of

12:54 10   the animal studies, the animal implantations that you described

11   this morning, correct?

12   A.   They did not attend.

13   Q.   And the same is true for the human implantations, the

14   human surgeries you've also described this morning.  Neovasc

15   wasn't there also for those either, correct?

16   A.   No.

17   Q.   Now, you testified this morning about both of the devices,

18   your device and Neovasc's.  To begin with your device, your

19   early development for your device was primarily for the heart's

12:55 20   aortic valve up until about August of 2008, correct?

21   A.   Yes.

22   Q.   And it was around August 2008 that you and Mr. Ratz

23   decided to switch your focus to a mitral device, correct?

24   A.   Yes.

25   Q.   The aortic version of your device, the earlier version, it

1    was circular, wasn't it?

2    A.    The -- yes.

3    Q.    And the subsequent mitral versions of your device, they're

4    also circular, right?

5    A.    They are.

6    Q.    The CardiAQ device is circular, but the Neovasc Tiara

7    device, to your knowledge, is D-shaped, correct?

8    A.    The atrial portion is D-shaped.

9    Q.    The atrial portion of the Neovasc device is D-shaped,

10   correct?

11   A.    Yes.

12   Q.    Now, the idea of opposing anchors designed to capture

13   tissue, that was used in your early thinking for your aortic

14   designs, correct?

15   A.    That is correct.

16   Q.    That was an idea that you carried forward from your aortic

17   work to your mitral work, correct?

18   A.    That's correct.

19   Q.    Now, your device, the CardiAQ device, it has a number of

20   equidistant anchors on both the top atrial side and the bottom

21   ventricular side, correct?

22   A.    Yes.

23   Q.    Having equidistance anchors on both sides, the atrial side

24   on the top and ventricular side on the bottom, that's also

25   something that carried forward from your early thinking on an

1    aortic design, correct?

2    A.   Yes.

3    Q.   Your valve, your design has 12 identical anchors on the

4    top and 12 identical anchors on the bottom, correct?

5    A.   They're not identical anchors.

6    Q.   Well, the shape and size of the 12 ventricular anchors on

7    the circle, each of those is shaped and sized identically,

8    correct?

9    A.   They're not identical.  There are shapes and sizes.  They

12:57 10   have different shapes and different sizes.

11   Q.   Well, in Rev. C through Rev. E, do you remember those

12   revisions?

13   A.   Yes.

14   Q.   The different revisions there for those designs, those

15   anchors were equally spaced between them, correct?

16   A.   Those anchors were.

17   Q.   And they had equal lengths, correct?

18   A.   Which anchors are we talking about, the atrial or

19   ventricular?

12:57 20   Q.   Ventricular.

21   A.   Yes.

22   Q.   Now, the Tiara device, it's got three anchors on the

23   bottom, ventricular side, correct?

24   A.   Yes.  You're calling them anchors.  That's good.  They're

25   tabs, as described by -- anchoring tabs, by your patent.

```
 1   Q.   Either way, either way.  Tabs, anchors, there's three of
 2   them, right?
 3   A.   Yes.
 4   Q.   To your knowledge, their diameters, their exact sizing at
 5   an engineering machine level, they're not the same for your
 6   device, are they?
 7   A.   No.
 8   Q.   Your device doesn't have radio-opaque markers, does it?
 9   A.   The whole device is radio-opaque.
10   Q.   You don't have radio-opaque markers, correct?
11   A.   Not specifically designated.
12   Q.   Thank you.  Your device doesn't rely on what's called
13   radial force, sometimes called friction, correct?
14   A.   It exerts radial force, but it would be wrong to
15   understand that radial force is a fixation force.
16   Q.   In other words, there's no friction fit that you intend to
17   hold the device in place, correct?
18   A.   Friction and radial force is not intended to maintain the
19   device in mitral position.
20   Q.   That's something that you've been advertising since 2009,
21   that you think using radial force is something that you want to
22   avoid in your device, correct?
23   A.   It's unavoidable, but it is not forced to rely upon
24   fixation.  I have always said that, that you can't do it with
25   radial force alone.
```

1  Q.   That's something that you've been publicly advertising

2  about your device since at least the middle of 2009, correct?

3  A.   I've spoken about it.

4  Q.   Publicly, correct?

5  A.   Yes.

6  Q.   Now, although some features carry forward from your

7  original aortic design work to your mitral designs, the CardiAQ

8  device that you have today, what you called Generation 2 this

9  morning, that's not the same version that your company showed

01:00 10  Neovasc back in 2009 or 2010, correct?

11  A.   Generation 2 has the same elements, but it's shaped

12  differently.

13  Q.   It's got some differences, doesn't it, sir?

14  A.   Dimensional.

15  Q.   More than just dimensional, correct?

16  A.   Not -- it has the atrial anchors.  It has the ventricular

17  anchors.  It's just not cylindrical-shaped.  It's basically

18  covered with cloth.  But the basic elements of the two, the

19  concepts are the same.

01:00 20  Q.   All right.  Let's go through this in more detail then.

21  The device that you first implanted in a human being, Revision

22  J in 2012, Revision J wasn't shown to Neovasc, correct?

23  A.   Yes, that is correct.

24  Q.   And by the way, the person who actually does that human

25  implantation, that's an interventional cardiologist, correct?

A.    In this case, it's interventional cardiologist.

Q.    Revision J had some design changes compared to the versions that were shown to Neovasc previously, correct?

A.    There were changes made to it, yes.

Q.    As one example, after your first human implantation in 2012, you changed the design by covering the metallic portion of those anchors with some fabric, correct?

A.    In Gen. 1 and Gen. 2, yes.

Q.    During that implantation in 2012, all of the metal tips on those ventricular anchors were uncovered, correct?

A.    Yes.

Q.    And after that implantation, you studied the tissue, and the tissue showed that some blood had formed in channels of blood vessels in the tissue that you looked at, correct?

A.    I'm not quite understanding your question.  Please repeat it.

Q.    After that first implantation, the study of the tissue showed that blood in channels of blood vessels had formed stripes, correct?

A.    The stripes were not formed in channels of blood vessels.

        MR. GRAVES:  Your Honor, I'd like to play Volume 3 of Dr. Quadri's deposition, pages 627, 21 to 628, 16.

        THE COURT:  Give me those again.

        MR. GRAVES:  Volume 3, page 627, line 21, and page 628, line 16.

```
 1              THE COURT:  627, line 23 or 27?

 2              MR. GRAVES:  Sorry.  Line 21 to 628, 16.

 3              THE COURT:  I thought you said 27.  It only goes up to

 4   25.  Any objection?

 5              MS. LEA:  Your Honor, I don't believe it's --

 6              THE COURT:  So I think the issue is the terminology

 7   used in line -- can I see you quickly at sidebar for a second.

 8   SIDEBAR:

 9              THE COURT:  Tell me what the problem is, using the

10   stripes?  Is that the gist of the --

11              MS. LEA:  I think so.  I'm not sure --

12              THE COURT:  He's talking about stripes now.

13              MR. GRAVES:  This is really the question.  "Have you

14   participated -- channels that had been disrupted during the

15   procedure?  What do you mean by channels?  Channels of blood

16   vessels, veins."  So I kind of combined the question.

17              THE COURT:  Just to clarify what he's talking about,

18   he's talking about stripes.  I think you can have it.  He was

19   just talking about stripes, right, the way he answered it?

20              MR. GRAVES:  He did, I think so.

21              THE COURT:  I think that's the issue.  I'm not sure

22   stripes correlate to anything he's talking about there.

23              MR. GRAVES:  All right.

24   (End sidebar.)

25   BY MR.  GRAVES:
```

```
  1   Q.   Dr. Quadri, when I asked you that question a moment ago --
  2   I'm going to rephrase it.  After this implantation, when you
  3   studied the tissue, you found that blood had gathered in
  4   channels, correct?
  5   A.   From what I remember from the testimony, I said blood has
  6   gathered in tissue due to disruption of channels.
  7   Q.   And you've referred to the channels, that blood there, as
  8   tiger stripes or zebra stripes, correct?
  9   A.   That's descriptive.
01:06 10   Q.   If you can look at 5004 in your binder.
 11        MR. GRAVES:  Bill, let's hold that for a moment.
 12   Q.   Dr. Quadri, is that a true and correct copy of a
 13   photograph from the study of the tissue showing your device
 14   surrounded by tissue with the blood stripes that you've just
 15   described?
 16        MS. LEA:  Your Honor, I'd like to object to this
 17   exhibit based on the MIL.
 18        MR. GRAVES:  Your Honor, I've done everything as
 19   strictly as we've discussed.
01:07 20        THE COURT:  I'm not sure I understand the basis for
 21   the objection.  I mean, do you want to talk about it at sidebar
 22   quickly?
 23        MS. LEA:  I think so.
 24   SIDEBAR:
 25        MS. LEA:  It was established during examination that
```

1    the staining had nothing to do with the device or the heart,

2    and now we're going to look at the heart and start talking

3    about the bruising and staining or the channels in the heart

4    for no purpose.  I didn't show any pictures of the heart from

5    this patient.

6              THE COURT:  So I didn't realize it was the same

7    patient.

8              MR. GRAVES:  A couple of background pointers.  I

9    haven't even mentioned this is a human or that the person died.

01:08 10   I've referred to it as a study of tissue, to be very sensitive

11   here.  The anchors here, you can see the type of structure

12   here, I'm going to use that to establish why the changes were

13   made.  I'm not going to say it was a human.  I'm not going to

14   say the patient died.

15             THE COURT:  I think that's all right.

16   (End sidebar.)

17   Q.   All right.  Dr. Quadri, that is a true and correct copy of

18   a photograph from the implantation study that we've been

19   discussing; is that correct?

01:09 20   A.   That is correct.

21   Q.   And that's a photograph that you're personally familiar

22   with, correct?

23   A.   I've seen this, yes.

24   Q.   And if we look at that photograph, and we'll put it up in

25   a moment, but I want to confirm first, that's your device and

1   some tissue.  And the photograph shows the anchors of your

2   device in the tissue that you studied, correct?

3   A.   Yes.  I would like to comment on that.

4   Q.   Let's put this tissue up on the screen, sir.  Now, if we

5   look at this photograph, sir, this is your device in the

6   middle; is that correct?

7   A.   That is correct.

8   Q.   These are your anchors on the bottom of your device here,

9   correct?

01:10 10   A.   That is correct.

11   Q.   And in the tissue we see the striping here that you've

12   referred to as tiger stripes or zebra stripes, correct?

13   A.   Correct.

14   Q.   Now, you personally yourself didn't believe that the

15   bruising, the tiger stripes was caused by the metallic tips of

16   the anchors, correct?

17   A.   Yes.

18   Q.   You believe that it was caused by staining through the

19   gravitation of blood, correct?

01:10 20   A.   Correct.

21   Q.   And just last Wednesday, one week ago, you testified that

22   you had not heard anyone express a contrary view, correct?

23   A.   I qualified that answer.

24   Q.   You testified that so far as you knew, nobody directly or

25   indirectly had expressed any doubt about your conclusion,

1    correct?

2    A.    That is correct.

3    Q.    And you gave that testimony under oath, didn't you, sir?

4    A.    Yes.

5    Q.    That testimony was false, wasn't it, sir?

6    A.    It's -- I said nobody agreed or disagreed.  There was

7    discussion about it.  I mean, you can have an opinion and other

8    people can disagree with what you're saying.

9    Q.    So the testimony you gave under oath that you had never

01:11 10   heard anyone express a contrary view just one week ago, that

11   testimony wasn't correct, was it?

12   A.    Actually, for that particular part of staining, the

13   explanation was accepted.

14   Q.    Sir, respectfully, my client has the same right as yours

15   to get clear answers to clear questions in this courthouse.

16        When you testified just one week ago that no one had

17   expressed a contrary view, that testimony wasn't correct, was

18   it?

19   A.    In my opinion, it was correct.

01:12 20   Q.    Well, in fact, your investors hired a renowned pathologist

21   to look at what caused that zebra striping, correct?

22   A.    They were doing due diligence.

23   Q.    They did that, didn't they?

24   A.    They hired -- yes, they did.

25   Q.    And it turns out that that pathologist, Dr. Renu Virmani,

```
  1    she felt, among other things, that there might be too much

  2    exposed metal and too many anchors, correct?

  3    A.   She did comment on that.

  4    Q.   She suggested the possibility that exposed anchors or

  5    metal might have caused that tiger striping we just saw in the

  6    photograph, correct?

  7    A.   That is -- that is a deduction.

  8    Q.   You disagreed with her, didn't you?

  9    A.   She didn't say that.

01:12 10    Q.   You disagreed with her, didn't you?

 11    A.   She didn't say that.

 12    Q.   I'm going to ask you one more time.  You disagreed with

 13    her, didn't you?

 14    A.   I disagreed with her on other issues, but this was not an

 15    issue of disagreement.

 16    Q.   Your investors, Oribmed and Dr. Virmani, both disagreed

 17    with you on this issue, correct?

 18         MS. LEA:  Objection, Your Honor.  Hearsay.

 19    A.   That is not on record.

01:13 20    Q.   I'm sorry?

 21    A.   That is not correct.

 22    Q.   Okay.  Let's play Quadri Volume 3.

 23         MS. LEA:  Objection.

 24         THE COURT:  I'll sustain it on asked and answered.

 25         MR. GRAVES:  The question was about the investors
```

1    Orbimed and Dr. Virmani both disagreeing with him.  That was

2    the first time I asked it, Your Honor, respectfully.

3              THE COURT:  I'm sorry.  I didn't realize you added in

4    the second doctor.  I'm going to overrule it on hearsay.  Go

5    ahead.

6    Q.   Your investors, Orbimed and Dr. Virmani, both disagreed

7    with you on this issue, correct?

8    A.   They disagreed -- they wanted to do due diligence because

9    they wanted to -- Orbimed was investing in our company.  They

01:14 10   wanted an opinion of an outside pathologist.  The discussion

11   was held, and it was -- she pointed out some improvement or

12   some concerns that she had, but she did not outright disagree

13   with me that these stripes, what we're calling zebra stripes,

14   were staining and lividity.  That is the best of my

15   recollection.

16              MR. GRAVES:  Let's play Dr. Quadri's deposition -- or

17   may I play, Your Honor, Volume 3, page 663, lines 9 through 18.

18              THE COURT:  If you look at page 663, line 19, that's

19   unresolved, I take it?

01:15 20              MS. LEA:  That's right, Your Honor.

21              MR. GRAVES:  Hold on one moment.  That's correct, Your

22   Honor.

23              THE COURT:  I'm sorry.  I need to see you at sidebar

24   about this one.

25   SIDEBAR:

            1          THE COURT:  She starts objecting in the record pages

            2    before.  So I can't quickly make a ruling on this without

            3    figuring out what she's already objecting to three pages back.

            4    So this is why I tell you to sort it out before this, right?

            5          MR GRAVES:  Well, the question here seems pretty

            6    easily framed.  "We have two categories of people who disagreed

            7    with your opinion, Orbimed, who you indicated were not a

            8    medical professional" --

            9          THE COURT:  He says, "Uh-Huh."

    01:17  10          MR. GRAVES:  "And Dr. Virmani."

           11          THE COURT:  She has an objection.  I can't figure

           12    out --

           13          MS. LEA:  There are a lot of opinions, Your Honor, and

           14    there were some that were disagreed with and some that weren't.

           15    That was the whole problem with this line of testimony.

           16          MR. GRAVES:  The original question, this is all

           17    credibility, I said, "You testified that no one disagreed with

           18    you," and he admitted that he did --

           19          MS. LEA:  About the channels.

    01:17  20          THE COURT:  Right.

           21          MR. GRAVES:  Later on he admitted there was --

           22          MR. FLYNN:  If I may, that objection was misstated.

           23    That objection was made repeatedly throughout the day.  If you

           24    study the transcript, you will find it's unfounded --

           25          THE COURT:  I understand that, but I'm trying to

```
 1   follow it back to make a ruling on this.
 2           MR. GRAVES:  It seems there's not a record or mistake
 3   in two people --
 4           THE COURT:  You have in this question -- she's
 5   indicated he or she is a well qualified, respected medical
 6   professional --
 7           MR. GRAVES:  I don't think Ms. Lea objected to that.
 8           MS. LEA:  First of all, here's the objection, Your
 9   Honor, the doctor --
10           THE COURT:  Whether I agree to them or disagree is not
11   hearsay.
12           MR. GRAVES:  I'm not offering it for the truth.
13           THE COURT:  He's also not asking what they said.
14           MS. LEA:  If you go back, you can see where they
15   talked about it.  And other issues besides the channels -- that
16   was the problem with this, trying to get this little sound bite
17   here at the end to make it look like there's a disagreement
18   about the metal in the channels.
19           THE COURT:  I just can't resolve this standing here
20   without taking the time to go back and read however many pages
21   there are.  If you want to try and elicit this part again, I'll
22   let you have it --
23           MR. GRAVES:  Okay.
24           THE COURT:  -- if you want to make the record on that.
25           MR. GRAVES:  I don't think the dispute was about the
```

1  doctor's qualifications.  I don't think that point was

2  disputed.

3        THE COURT:  The point you're disputing is whether or

4  not she disagreed with him.

5        MR. GRAVES:  Correct.  When he first said he hadn't

6  heard anybody express disagreement.

7        THE COURT:  (Reading.)

8        MS. LEA:  He's taking one opinion out of many and

9  trying to make it a disagreement about that one opinion.  There

01:19 10  are a lot of opinions made.

11        THE COURT:  That you can deal with on redirect, but if

12  you guys have this situation where there's an objection that

13  you want to play something, you have to give it to me.  This

14  one is particularly difficult when she starts making arguments

15  about the record --

16        MS. LEA:  We're still going into the safety line, Your

17  Honor.  It's all about the safety.

18        THE COURT:  He needs to stick to the impact on it

19  making change.  Now, he's entitled to impeach, and he's going

01:20 20  to be asking and answering the same questions differently.

21  That's not a motion in limine.  That's just a fact of trial.

22        MR. GRAVES:  Correct.  This is purely impeachment.

23  The guy said something under oath that wasn't true.

24        MS. LEA:  It was not impeachment, Your Honor.  I was

25  at this deposition.  It was objected to by the attorney, and it

```
 1      was one of the longest depositions I ever sat through.

 2            THE COURT:  That doesn't have anything to do with here

 3      today --

 4            MR. FLYNN:  I don't want to bicker at sidebar.  That's

 5      not true.

 6            THE COURT:  Right now he's just trying to impeach on

 7      inconsistent statement, and the way this record is in front of

 8      me, it's very hard for me to tell.

 9            MS. LEA:  There's a reason why they tried to get that

 10      sound bite going through different opinions --

 11            MR. FLYNN:  There's going to be a document where the

 12      admission is made clearly by Mr. Ratz in black and white.

 13      There's a notion there's different opinions, and if there's any

 14      merits to that objection --

 15            THE COURT:  I take it the idea that it's a new device,

 16      you have a lot of people looking at it and saying that

 17      something is brilliant and something is crazy and you have all

 18      sorts of opinions all over the map about it.  You can redirect

 19      on that.  If he wants to pick out one opinion and you want to

 20      slam it back that there were 50 people and only three disagree,

 21      that's fine.  I don't want you to be rude to the witness

 22      either.  Impeaching is fine.  He's trying to answer your

 23      questions, I think.

 24            MR. GRAVES:  Okay.

 25            THE COURT:  So you can play this, but then I want you
```

1  to give him the opportunity to explain.

2  (End sidebar.)

3        MR. GRAVES:  All right.  So we are going to play 663,

4  9 to 18, please, Bill.

5  (Video played.)

6        THE COURT:  Now, I'm going to note that the next line

7  of this is Ms. Lea objecting at the deposition, and for the

8  time being, I am overruling her deposition objection.

9  Q.   Dr. Quadri, you indicated that you wanted to say more

01:23 10  about the viewpoints of yourself and Dr. Virmani.  What

11  specifically did you want to say, sir?

12  A.   The discussion with Dr. Virmani was that the explanation

13  for the staining was -- she agreed with the explanation for the

14  staining on the heart, more described as zebra.  She raised --

15  and so that we agreed upon.  And she raised issues about the

16  exposed metal on the frame, and she also raised issues about,

17  you know, any bleeding or tamponade that could occur.  So that

18  was a discussion.

19       There was no hardline disagreement between her and me or

01:24 20  my company for that matter.  And that was my take-home message,

21  that I need to work with the device, and we were concerned

22  about the metallic exposure as well.  So that's what -- and the

23  concerns that she had raised, we had raised about the staining

24  that that was further, you know, studied by us to have more

25  proof of that.  So it was a discussion.  There was no "I agree

1   with you," or "I don't agree you."  That's what I remember from

2   that conference.

3   Q.   And regardless, we started all of this by discussing the

4   way that your devices have changed over time when compared with

5   the devices shown to Neovasc.  And what happened here after

6   this back and forth with you and Dr. Virmani and the others was

7   that you went and conducted more animal studies, correct?

8   A.   I did go back into animals.

9   Q.   And in the end, your company changed the anchors to cover

01:25 10   up those metallic tips after the episode with the tiger

11   stripes, correct?

12   A.   That is correct.

13   Q.   In addition, when we again compare your more current

14   devices to the Revisions C through E that Neovasc saw back in

15   2009 and 2010, your current devices also have changes to the

16   length of the anchors, correct?

17   A.   We have studied the length of the anchors and adjusted

18   accordingly.

19   Q.   And you have changes to the width of the anchors as well,

01:25 20   correct?

21   A.   We have done that.

22   Q.   You also have changes to the place where the anchors are

23   originating in the device, correct?

24   A.   Yes.  I have to look at a device to be positive on that.

25   Q.   Well, you've testified to that before previously, haven't

1    you?

2    A.   That is correct.

3    Q.   And in your Gen. 2 device today, it no longer has anchors

4    that are intended to anchor on the mitral annulus, correct?

5    A.   They're not intended to anchor on the mitral annulus.

6    Q.   So the clamping of tissue with the two rings of anchors

7    that Mr. Ratz and others spoke about back in 2009 as an

8    important aspect of those devices, that's no longer something

9    you do, correct?

01:26 10   A.   Well, that concept we got away from when we started.  And

11   the whole anchoring mechanism changed.  But we went -- we

12   started with clamping, and there's always foreshortening in

13   stents, and we have exaggerated that.  But it wasn't the

14   pinching that we were talking about.  So yes, we have changed.

15        And the other aspect of those anchors being raised to the

16   atrium had sound medical reasons.  And so that's what you do.

17   You make a device better.  You want to improve in your next

18   generation.  You want to make it friendlier to human body.  So

19   that's what we were doing.

01:27 20   Q.   There were sound medical reasons to prefer your current

21   devices over the original versions that Neovasc saw back in

22   2009 and 2010; is that fair?

23   A.   Yes.  If I can explain those medical reasons.

24   Q.   Well, just to go through these changes so we've got the

25   catalog, sir, your Generation 2 device also made a change by

```
  1  putting a sealing skirt around the annular middle portion of
  2  the device to better protect against leakage, correct?
  3  A.    Yes.
  4  Q.    That was to prevent a problem known as backwards flow; is
  5  that right?
  6  A.    That is to prevent mitral regurgitation.
  7  Q.    By the way, your first in-human implantation that you've
  8  described in 2012, that was actually long after your
  9  relationship with Neovasc ended, correct?
01:28 10  A.    Yes, that would be correct.
  11  Q.    And what all of this means is that Revisions C through E
  12  that Neovasc saw, those are not your current designs anymore,
  13  correct?
  14  A.    They're based on the same principles, but the design is
  15  improved and much kinder to the human body.
  16  Q.    And you're not yourself planning to implant Revisions C, D
  17  or E into an animal or a human, are you?
  18  A.    I don't see the need to.
  19  Q.    I think you even said yesterday that you're still working
01:28 20  on your device even today, correct?
  21  A.    Yes.
  22  Q.    And just to be clear, no regulatory body has approved your
  23  device for sale, correct?
  24  A.    No, nobody else's either.
  25  Q.    So there haven't been any sales; is that right?
```

```
 1    A.    No.
 2    Q.    You haven't made any sales of your product, and nobody has
 3    signed a contract telling you they will buy anything from you,
 4    correct?
 5    A.    No.
 6    Q.    So let's talk about the public domain.  You mentioned a
 7    conference called TCT.  That's a very important conference in
 8    the heart valve industry, correct?
 9    A.    That's one of them, yes, that is true.
10    Q.    Some of the others are TVT, Euro PCR, and there's others,
11    correct?
12    A.    Yes.
13    Q.    You yourself, you've attend the TCT conference more than
14    once, correct?
15    A.    I have.
16    Q.    It's open to the public, correct?
17    A.    It's open to the public.
18    Q.    You're aware in your own personal experience that lots of
19    people in the heart valve industry, surgeons and also people
20    who designed devices go to these conferences, correct?
21    A.    Yes.
22    Q.    It's common knowledge that this TCT conference is well
23    known in the industry, and it's actually a premier conference
24    in the industry, correct?
25    A.    That is correct.
```

1    Q.   And in your experience at TCT, companies will be in an

2    auditorium or a lecture hall and they'll present information

3    about their medical devices, correct?

4    A.   Well, it is correct, but I'll have to point out that it's

5    not the company presenting.

6    Q.   Okay.  Sometimes a surgeon or a physician will do the

7    presentation; is that fair?

8    A.   All the time.  This meeting is not a trade show.  It's a

9    scientific meeting.  So cardiologists, surgeons, physicians

01:30 10   present to peers.  Industry is there.  Industry has a certain

11   number of presentations designated to them in the developmental

12   slot.  But the industry is not the presenter in this meeting.

13   Q.   Fair enough.  Nobody needs to sign a non-disclosure

14   agreement to go to TCT, correct?

15   A.   No.

16   Q.   CardiAQ gave presentations at the TCT conference because

17   it was a good way for you to get the attention of the industry

18   for your device, fair?

19   A.   It was more for getting attention of my colleagues that I

01:31 20   have a solution here.  "Hey, guys.  You can treat this, and I

21   have a solution."  That was my intention.

22   Q.   You yourself have actually been a presenter --

23   A.   Yes.

24   Q.   -- at TCT involving your own device, correct?

25   A.   I have presented at TCT.

```
    1    Q.   In fact, in September of 2009, you helped to give a
    2    presentation of information about your device to a number of
    3    people in a room at the TCT conference, correct?
    4    A.   I did not present in September of 2009.
    5    Q.   That was one of your surgeons, Dr. Bavaria?
    6    A.   Yes.
    7    Q.   You did help him put together the materials and considered
    8    the materials that would be put into those slides, correct?
    9    A.   Yes.
01:31 10 Q.   And so you looked at those slides, correct?
   11    A.   I didn't look at the slides.  I was a practicing heart
   12    surgeon, so I didn't have the time.  My colleague, Mr. Ratz, he
   13    basically was very good at putting together information.  He
   14    had that -- there was a funnel of information going out, and we
   15    always had an understanding that he would look at them.
   16    Q.   You've since looked at those slides, haven't you?
   17    A.   I have looked at the slides.
   18    Q.   You've given testimony about them, correct?
   19    A.   Yes.
01:32 20 Q.   All right.  Let's pull out Exhibit 261 in your binder.
   21         MS. LEA:  Objection, Your Honor.  He just testified
   22    that he did not see the presentation, did not give the
   23    presentation and was not involved in making the presentation.
   24         MR. GRAVES:  He doesn't need to be if he's a company
   25    officer and he's read the presentation.
```

```
 1           THE COURT:  I think that's correct.  Overruled.
 2   Q.   Doctor, if you'll turn to 261, is this, sir, the document
 3   that Dr. Joseph Bavaria gave for TCT and that you subsequently
 4   looked at later and gave testimony about?
 5   A.   That is correct.
 6   Q.   Now, it says on the front, "TCT Company Overview."  Just
 7   to be clear, that is the conference that we've been discussing,
 8   correct?
 9   A.   Yes.
10   Q.   And as you just described, a surgeon, a doctor came and
11   gave information to other people in the industry about your
12   device, correct?
13   A.   Yes.
14           MR. GRAVES:  Let's turn, Bill, to slide 6 of this
15   slide presentation.
16   Q.   If we look at the wording here, there's three bullet
17   points.  Do you see that, Dr. Quadri?
18   A.   Yes.
19   Q.   And you say here in the second bullet point, "Preservation
20   of the Subvalvular Apparatus."
21   A.   Yes.
22   Q.   Those words do appear in this presentation, correct?
23   A.   Yes.
24   Q.   Your device preserves the leaflets and the chordae,
25   correct?
```

```
 1    A.    Preserves the subvalvular apparatus.  More appropriate to

 2    say it's chordal-sparing.

 3    Q.    Fair enough.  Either way, you preserve those natural

 4    structures, and that's something that you weren't shy about

 5    disclosing at TCT, correct?

 6    A.    No.  But to qualify my answer, this subvalvular apparatus

 7    preservation is a part of mitral valve replacement that we

 8    practice in cardiac surgery.  It's not a new concept.

 9    Q.    I'm sure it is.  Thank you.

10         The third bullet point says "Annular Anchoring Without

11    Relying on Radial Force."

12    A.    Right.

13    Q.    Now, radial force we talked about a bit earlier, Dr.

14    Quadri.  This is what you and Mr. Ratz -- what you strove to do

15    in 2009 was not to rely on radial force in anchoring your

16    device in the mitral annulus, fair?

17    A.    That's fair.

18    Q.    That was your goal?

19    A.    We did not want to rely on radial force, that is correct.

20    Q.    Fair enough.  You also say here, "Annular anchoring," on

21    these CardiAQ presentation slides, correct?

22    A.    Correct.

23    Q.    And annular anchoring, that means you're literally

24    anchoring on the mitral annulus, correct?

25    A.    That is true.
```

1    Q.   And you do that by anchoring above and below that

2    structure in the middle that you described called the annulus,

3    correct?

4    A.   Yes.

5    Q.   Annular anchoring, as of September 2009 at least, that's

6    just not secret, is it?

7    A.   No.  Annular anchoring is never secret.  The question is

8    how do you do it.  That's the secret.

9    Q.   And anybody can try to do it in any different way because

01:35 10   the basic concept was known and wasn't new, correct?

11   A.   I want to agree with you, but the problem is it cannot

12   be -- annular anchoring can be done in several ways.  CardiAQ's

13   way was a unique way, and we described that.  So some other

14   company can, and Edwards Lifesciences were doing some annular

15   anchoring as well, but they had a different method of doing it.

16   Q.   In fact, there were a lot of different methods that you

17   were personally aware of of annular anchoring out there in the

18   heart valve industry as of 2009, correct?

19   A.   There weren't many.

01:36 20   Q.   There were some that you knew of, correct?

21   A.   They were trying, without success.

22   Q.   Fair enough.  But the concept was out there, right?

23   A.   Yeah, so that's basically where you anchor a valve, into

24   the annulus.

25   Q.   I just want to be clear, regardless how you do it, no one

1    is going to be able to come in and say anchoring on both sides

2    of the annulus is some big secret, correct?

3    A.   No, that's not a secret.

4        MR. GRAVES:  All right.  Let's turn to page 7 of this

5    slide.  I'm sorry.  Let's stay on this page.  I apologize,

6    Bill.

7    Q.   The photo here is not very good, Dr. Quadri, but if I

8    understand correctly, this is an earlier version of one of your

9    frames, correct?

01:36 10  A.   Yes.  That's the aortic version.

11   Q.   Right, the aortic version that you started with.  And even

12   in that version, as we discussed earlier, we can see that there

13   are anchors around the bottom that are evenly spaced, correct?

14   A.   Yes.

15   Q.   We've got one there, you got one there, one there.  Not a

16   very clear photo, but we can see that there are equally based

17   anchors, correct?

18   A.   Yes, that is correct.

19   Q.   And the original presentation slides were color, correct?

01:37 20  A.   Yes.

21   Q.   Do you mind if I show a color version of this?

22   A.   No.  Please go ahead.

23       MR. GRAVES:  Thank you, Bill.  Let's put it up.

24   Q.   So we have a little bit of better visibility here.  Now,

25   we can see that there's anchors equally spaced on the bottom

1    side, correct?

2    A.    Right.

3    Q.    And we can see that there are anchors evenly spaced on the

4    top side, correct?

5    A.    That's correct.

6    Q.    And this was the clamping that started in the aortic

7    design and carried forward to the mitral design; is that fair?

8    A.    That is fair.

9    Q.    And more or less, the shape of these anchors is the same,

01:37 10    correct?

11    A.    Yes.  Like them to be the -- they're not the same because

12    you don't see the whole anchor.  These anchors were cut out

13    from inside the stent and kind of turned that way.  So there is

14    bends in this anchor that is not visible on this.  So if you

15    think it's taking out a prong like this, becomes an anchor.

16    But we changed this whole geometry, so it's not the same.  For

17    the mitral device, we did not have an anchor of that

18    configuration.

19    Q.    As of September 2009 at least, there was no secret in

01:38 20    placing equally spaced anchors on both sides of an annulus to

21    clamp, correct?

22    A.    That is correct.

23         MR. GRAVES:  Let's turn over, Bill, to the next slide,

24    slide 7.

25    Q.    If I understand correctly, sir, this picture here shows

```
     1    one of the versions that you described this morning of your
     2    device actually seen at the mitral annulus, correct?
     3    A.   At the annulus, yes.
     4    Q.   And that middle portion of the device that's aligned with
     5    the annulus, that's the annular portion, correct?
     6    A.   Yes.  So the circle is showing the annulus, the white
     7    circle on the side.
     8    Q.   And you've got an annular portion on the device, correct?
     9    A.   This one here.  That's about it.
01:39 10    Q.   And the top part up here, just to help everybody with the
    11    anatomy, that's the atrial portion, correct?
    12    A.   Yes.
    13    Q.   And this -- we keep saying "bottom" and "ventricular."
    14    That's the ventricular portion down here, right?
    15    A.   Right.
    16    Q.   So regardless what version of your device this is, at
    17    least as of September 2009, an annular portion, an atrial
    18    portion and a ventricular portion on both sides of the mitral
    19    annulus, that's not secret either, is it?
01:39 20    A.   No.  We show it here.
    21    Q.   Now, September 2009, that's still when you and Mr. Ratz
    22    were in the midst of your work with Neovasc, correct?
    23    A.   We were.
    24    Q.   Now, you also had a website for your company, CardiAQ,
    25    that was up and running at least by January 2010, correct?
```

```
 1    A.    Correct.
 2    Q.    And you've seen and given testimony about pages from that
 3    website from January 2010, correct?
 4    A.    Yes.
 5    Q.    Let's look at Exhibit 263 in your binder, please.
 6          Dr. Quadri, if you look at 263, is that a true and correct
 7    copy of a page from your website that was visible in January of
 8    2010?
 9    A.    Yes.
10    Q.    And we actually see here the same picture that we just saw
11    a minute ago; is that right?
12    A.    Yes.
13    Q.    If you'll turn in your binder, please, to Exhibit 265.
14    This is also a true and correct copy of a technology profile
15    document that was available on your website by January of 2010,
16    correct?
17    A.    Yes.
18    Q.    And if we look toward the bottom of this page, we see the
19    same picture with some text here.  And it says, quote,
20    "Anchoring.  With the valve in position, the sheath is
21    retracted fully.  Foreshortening of the frame creates a
22    clamping action that anchors the valve above and below the
23    annulus."  Correct?
24    A.    That is correct.
25    Q.    At least as of January 2010, that was up on your website
```

1   for anyone to look at, correct?

2   A.   Yes.

3   Q.   January 2010 was still during the time period when you and

4   Mr. Ratz were working with Neovasc; is that correct?

5   A.   That is correct.

6   Q.   Now, you described this morning that in the time of your

7   career you've been involved in a number of patent applications;

8   is that right?

9   A.   I have.

01:41  10   Q.   Some of them have been on behalf of CardiAQ, correct?

11   A.   That is true.

12   Q.   And you filed a patent application in the fall of 2010

13   that was published around April 1 of 2010, correct?

14   A.   Published -- it takes about 18 months from a provisional.

15   Q.   Let's take a look at 260 in your binder, and we can check

16   the date.

17   A.   266?

18   Q.   260.  I'm sorry.  Exhibit 260 is a true and correct copy

19   of one of your patent applications; is that correct?

01:42  20   A.   That is correct.

21   Q.   And if we see on the top right hand, it says "Pub. Date,

22   April 1, 2010."  That's the publication date, correct?

23   A.   Yes, yes.

24   Q.   So that was published on April 1 of 2010; is that right?

25   A.   This was published, yes.

```
 1   Q.   And you know in your own personal experience that if a
 2   patent application is published, someone could type in your
 3   name at the U.S. Patent Office website, and they'd be able to
 4   pull this up; is that correct?
 5   A.   Yes.
 6   Q.   Now, you actually filed this patent application several
 7   months before April 1, 2010, correct?
 8   A.   Yes.
 9   Q.   And you understood at the time you filed it that it would
10   be eventually made available to the world on the Internet,
11   correct?
12   A.   Yes.
13   Q.   And so you decided several months before April 1, 2010,
14   that every word in this patent application would eventually be
15   made public for the world to see, correct?
16   A.   That is correct.
17   Q.   Okay.  And just to set our dates again, sir, April 1,
18   2010, that's toward the tail end of your relationship with
19   Neovasc, correct?
20   A.   That is correct.
21   Q.   Let's look at figure 12 of this document.  This is a
22   drawing of Rev. C of your device, correct?
23   A.   Yes.
24   Q.   That's a yes?
25   A.   Yes.
```

1    Q.   This shows the frame of a stent for percutaneous mitral

2    valve insertion, correct?

3    A.   That is correct.

4    Q.   And if I look down at the bottom, I see these little tabs

5    here, those are mushroom-shaped tabs, aren't they?

6    A.   Yes.   The bottom ones, these.

7    Q.   Yes.   Thank you.   And those mushroom-shaped tabs, they

8    lock into the delivery device that's necessary to deliver this

9    frame into the human heart, correct?

01:44 10   A.   That is correct.

11   Q.   They kind of snap in like a button; is that fair?

12   A.   Not quite.

13   Q.   They snap in and hold it in place; fair enough?

14   A.   Yes.

15   Q.   All right.   Now, we can see in this drawing both

16   foreshortening and non-foreshortening sections, correct?

17   A.   Right.

18   Q.   We can see atrial and ventricular anchors, correct?

19   A.   Yes.

01:44 20         MR. GRAVES:   Why don't we turn over to figure 11,

21   Bill, the previous figure.

22   Q.   This is another drawing in the same patent application,

23   correct?

24   A.   Yes.

25   Q.   And we see here the two rows of anchors again, don't we?

1    A.    Yes.

2    Q.    We see here anchors formed by V-shaped support struts,

3    correct?

4    A.    Yes.

5    Q.    That's like a little bit of a letter V there in the

6    anchors at the end; is that right?

7    A.    Yes.   The little projections, these are the atrial

8    anchors.

9    Q.    Right there?

01:45 10    A.    Yeah.

11    Q.    And these are anchors that were intended to atraumatically

12    engage the atrial side of the mitral annulus, correct?

13    A.    Yes.

14    Q.    Now, if we look at figure 14 in this same document, this

15    picture shows a version of your device in a drawing or a

16    cartoon of the mitral annulus, correct?

17    A.    Yes.

18    Q.    And it shows foreshortening sections or a foreshortening

19    section with kind of diamond-shaped cells, correct?

01:46 20    A.    Yes.

21    Q.    Now, this patent application from April 1, 2010, it also

22    discloses atrial anchors in the first bend that curves the

23    anchors radially outward and a second bend that curves the

24    anchors in a second direction, correct?

25    A.    Yes.

```
 1              MR. GRAVES:  Now I want to look at figures 20 and 21,
 2    Bill, if we can, please.
 3    Q.   Sir, these are also drawings that appeared in the same
 4    April 1, 2010 patent application, correct?
 5    A.   Yes.
 6    Q.   Will you please hold up the mandrel that you showed the
 7    jury this morning, please?
 8              MR. GRAVES:  Your Honor, may I approach to get it?
 9              THE COURT:  Yes.
10    Q.   I believe, Dr. Quadri, you've testified this morning that
11    this was a mandrel that you took to Neovasc when you went and
12    met them in Vancouver in about June of 2009; is that right?
13    A.   Yes.
14    Q.   Now, this is a mandrel along the lines of the one that you
15    took with you to visit Neovasc in June 2009 shown here in
16    figures 20 and 21, correct?
17    A.   Yes.
18    Q.   So as of April 20 -- sorry, April 1, 2010, the mandrel was
19    public, correct?
20    A.   Yes.
21    Q.   And so, Dr. Quadri, even though CardiAQ today claims the
22    mandrel as trade secret claim number 5 in this lawsuit in May
23    of 2016, we see it here published on April 1, 2010; is that
24    correct?
25    A.   Yes.
```

01:46 (line 10)
01:47 (line 20)

1    Q.    All right.  This morning, you looked at Exhibit 615.  I

2    have that also marked as Exhibit 2123, but I think we can look

3    at 615 in your binder from this morning, sir.

4         Now, this is the presentation that you personally gave at

5    the TCT conference that we discussed in September of 2010,

6    correct?

7    A.    Yes.

8    Q.    I think you mentioned you got up in a room and you talked

9    for about ten minutes; is that right?

01:48 10   A.    Yeah.

11   Q.    There was a room of people kind of in a lecture hall?

12   A.    Yes.

13   Q.    But you didn't require that those people sign

14   non-disclosure agreements to come into the room and hear the

15   presentation, correct?

16   A.    That is correct.

17   Q.    In your personal experience, oftentimes slides from the

18   TCT conference become available on the Internet, correct?

19   A.    Yes.

01:48 20   Q.    Your company has not been involved in sending take-down

21   notices to anybody who has put up those slides on the Internet

22   afterwards, correct?

23   A.    I am unaware of that, and this was not my tradition in my

24   company.  We were certainly sensitive to that, and we

25   instructed the conferences to not do so.

1    Q.    Nonetheless, your company to your knowledge has not gone

2    around sending take-down notices to websites that have posted

3    these slides, correct?

4    A.    To my knowledge, no.

5    Q.    All right.  If we look at slide 9 of this presentation,

6    sir, this is one of the versions of Rev. E that we looked at

7    earlier today, correct?

8    A.    Yes.

9    Q.    And this is an engineering drawing also of that same

01:49 10   device, correct?

11    A.    Right.

12    Q.    We see here the wider portion on the ventricular side

13    compared to the narrower portion on the atrial side, correct?

14    A.    That is correct.

15    Q.    And we can see again these V-shaped anchors; is that

16    correct?

17    A.    Yes.

18    Q.    If I look closely, I can see the mushroom-shaped locking

19    tabs on this device as well, correct?

01:49 20   A.    Where do you see them?

21    Q.    It looks like I've got them right there.

22    A.    Yes.

23              MR. GRAVES:  Okay.  Thank you, Bill.

24    Q.    If we look at slide 6 of this presentation slide that you

25    gave, here is another one that mentions chordal-sparing.

1   A.   Yes.

2   Q.   And again, you do everything you can not to damage the

3   chordae when you implant your device, correct?

4   A.   Yes.

5   Q.   You personally believe there's good medical reasons not to

6   damage the chordae, and that's why you try to avoid it?

7   A.   We try to preserve them, yes, most of them.

8   Q.   And you try to preserve them because at least in your view

9   there's good medical reasons to preserve them and not tear them

01:50 10   and damage them, correct?

11   A.   Yes.  But there is mitral valve replacement where we do

12   sever them, all of them.

13   Q.   There are some types of devices in the world where you cut

14   the stuff out surgically, but in your device, you've always

15   made it your goal to preserve and not damage those tissue

16   structures called chordae?

17   A.   If I can just say that a little differently, in my device

18   we want to preserve as many chordae as possible.

19   Q.   Thank you.  Now, on slide 7, the next page, again, here we

01:51 20   see some phrasing we saw before, "Preserve the MV Apparatus."

21   That's a fancy way of saying let's be careful and not damage

22   all that tissue, the leaflets and the chordae; fair enough?

23   A.   Yes.

24   Q.   Now, you've also seen a presentation that Dr. Bavaria gave

25   on behalf of CardiAQ at a presentation in Dallas, Texas in

```
 1   October of 2010 even though you weren't there yourself,
 2   correct?
 3   A.   I do not remember seeing that presentation.
 4   Q.   Do you remember giving testimony and reviewing and
 5   speaking about a document that Dr. Bavaria presented in October
 6   of 2010?
 7   A.   I don't have a recollection of that.  If I could see the
 8   presentation, I could tell.
 9        MR. GRAVES:  Why don't we take a look at tab 266.
10   Don't put it up yet, Bill.
11   Q.   Let's just take a look.  Can you look at tab 266 in the
12   binder that I gave you.
13   A.   Yes.
14   Q.   Does that refresh your recollection that you've given
15   testimony and seen before a presentation that Dr. Joseph
16   Bavaria gave in October 2010 in Dallas --
17   A.   Yes.
18   Q.   -- about CardiAQ's device?
19   A.   Yes.
20   Q.   Let's put up the front page of Exhibit 266.  Is this a
21   true and correct copy of that presentation, sir?
22   A.   Yes.
23   Q.   Right here on the front we've got a drawing of one of your
24   versions of your device, kind of like the other ones we looked
25   at inside the mitral valve in a cartoon, correct?
```

1    A.    Yes.  It's -- closest that's come to it is Revision B.

2    Q.    Sure.  That's like an older version, just kind of a

3    cartoon; fair enough?

4    A.    Yes.

5    Q.    On the other hand, if we turn to slide 20 --

6          MR. GRAVES:  Let's do that, Bill.

7    Q.    -- this one gives us more detail than that cartoon on the

8    front page, correct?

9    A.    About the fixation that we've seen before, yeah.

01:53 10   Q.    In fact, that's that same photograph that we looked at,

11   Exhibit 2634, that was a huge, huge thing?

12   A.    Yeah.

13   Q.    This is the one you testified shows going behind the

14   leaflets and through the chordae?

15   A.    That is true.

16   Q.    As of October 2010, sir, the fixation of the CardiAQ

17   device was not secret because CardiAQ had showed it to the

18   world, correct?

19   A.    I would have to disagree with you on that.

01:53 20         MR. GRAVES:  Your Honor, I would like to play Volume 1

21   of Dr. Quadri's deposition transcript, page 261, lines 18 to

22   22.

23         THE COURT:  Any objection?

24         MS. LEA:  Yes, Your Honor.  I objected at the time of

25   the depo as well.

```
 1              THE COURT:  You object to what?
 2              MS. LEA:  I made the objection at the time of the
 3    deposition as well that the question was vague and ambiguous.
 4    He's asking a different question than what he's asking him now.
 5              MR. GRAVES:  If we look at line 13, page 261, lines 13
 6    to --
 7              THE COURT:  I don't see an objection to what he asks
 8    in 18 and 20.
 9              MS. LEA:  It's the same question that he asked at 13,
 10   Your Honor.  Then I objected and he repeated the question.
 11             THE COURT:  You objected to form.
 12             MS. LEA:  That's right.
 13             THE COURT:  And he rephrases the question.
 14             MS. LEA:  He did not rephrase the question, Your
 15   Honor.  The objection stood.  The witness answered quickly.
 16             MR. GRAVES:  There's nothing vague and ambiguous about
 17   the question.  It's about as direct as it could be.
 18             THE COURT:  I don't see the objection in this
 19   testimony, but regardless, it's overruled.
 20   Q.   You testified that you showed it to the world, correct?
 21   That was your testimony?
 22   A.   Yes.  But how I did it, I didn't show them.  Yes, we
 23   showed the video.
 24   Q.   The photographs that we just looked at in this
 25   presentation, correct, Dr. Bavaria showed the world, correct?
```

1    A.    That is correct.

2    Q.    All right.  Now, later on you had another patent

3    application, and it was published around December of 2011; is

4    that true?

5    A.    I don't remember the patent.

6    Q.    Take a look at tab 271 in your binder.  Let me know if

7    that refreshes your recollection.

8    A.    Yes.

9    Q.    All right.  That's a patent application for your device

01:56  10   that was published on December 22, 2011, true?

11   A.    Yes.

12   Q.    This is a true and correct copy of that document, correct?

13   A.    Right.

14   Q.    All right.  If we look at figures 1 and 2 in this

15   application, these are Rev. E of your device, correct?

16   A.    Yes.

17   Q.    And as of December 2011, the Rev. E frame, at least

18   through this application, was disclosed to the public through

19   the patent application, correct?

01:57  20   A.    Yes.

21   Q.    Now, I'd like you to turn back to Exhibit 615, which we

22   looked at a moment ago, and in particular at slide 9.

23   A.    615, yes.

24   Q.    You testified that that also was Rev. E, correct?

25   A.    Yes.

1    Q.   And so you didn't just publish this in December of 2011.

2    You published Rev. E in September 2010, correct?

3    A.   Yes.

4    Q.   Now, to be clear, with your December 2011 patent

5    application, the Patent Office has never actually issued you a

6    patent for that application, correct?

7    A.   No.

8    Q.   It's been rejected six times, correct?

9    A.   I don't know the number.

01:58 10   Q.   Is that a fair estimate?

11   A.   Yes, if you say so.

12   Q.   We also looked, sir, at a patent that was issued in the

13   year 2014 when you gave testimony with your counsel this

14   morning.  Do you remember that?

15   A.   Yes.

16   Q.   That patent was about the delivery system for your device,

17   correct?  That's what was covered in the claims?

18   A.   Yes.

19   Q.   That wasn't a patent that was issued for the anchoring

01:58 20   system of your device, correct?

21   A.   It was disclosed, but the claims were not anchoring.  It

22   was claimed later.

23   Q.   In other words, there are words in a patent document that

24   might be written there, but that doesn't mean that they're part

25   of the claims on which the patent is issued; is that true?

1    A.    Yes.

2    Q.    That's a yes?

3    A.    Yes.

4    Q.    Okay.  Now, you talked this morning a bit about your

5    business relationship with Neovasc, and I wanted to talk again

6    about that first contact with Neovasc that you mentioned.  Take

7    a look at Exhibit 552 in your binder, please.  This is a true

8    and correct copy of an e-mail that you received from Mr. Ratz

9    on June 4, 2009; is that correct?

01:59 10   A.    Yes.

11         MR. GRAVES:  All right.  Bill, we can put that up.

12   Let's blow up that first part.

13   Q.    It's true, sir, that Mr. Ratz wrote to you, "Forward:

14   Neovasc surgical products," on June 4, 2009, correct?

15   A.    Yes.

16   Q.    And he said, "Found our issue for tissue supply and

17   sewing.  Just spoke with these guys.  And they can do it all

18   for us from tissue to cutting to assembly.  They've been doing

19   it for 20 years.  These are the guys that Patrick Choy was

01:59 20   telling us about who are making the Sorin Mitroflow valves in

21   British Columbia."

22         You did read those words when you got this e-mail,

23   correct?

24   A.    Yes.

25   Q.    And you knew what the Sorin Mitroflow valve was?

```
 1    A.   Yes.
 2    Q.   You didn't know who at Neovasc had actually been working
 3    on it, did you?
 4    A.   I did not know the person, no.
 5    Q.   You mentioned this morning that you went to a meeting with
 6    Neovasc up in Vancouver in June of 2009.
 7    A.   I did.
 8    Q.   When you were there, you learned that they had another --
 9    or they had a stent product of their own, a metal stent
02:00 10   product, a medical device that was called Reducer, correct?
11    A.   Yes.
12    Q.   And at that time you didn't ask Neovasc if they had any
13    other products of their own that they were working on in
14    addition to the Reducer, correct?
15    A.   I did not -- I don't remember asking that question.
16    Q.   All right.  You described yesterday and this morning, sir,
17    some of your background, your many years in working as a
18    surgeon.  I believe you told us that covering a portion of a
19    prosthetic valve with tissue, that's something that you knew
02:00 20   about for a long time before you met Neovasc, correct?
21    A.   Covering the portion of the valve?
22    Q.   Covering a portion of a prosthetic valve, a replacement
23    valve --
24    A.   Yes.
25    Q.   -- with tissue, that's something that had been out in the
```

1   industry to your knowledge for a long time, right?

2   A.   Yes.

3   Q.   And more generally, the concept or the idea, the desire to

4   reduce or eliminate mitral regurgitation, that's also something

5   that in your personal experience had been out there in the

6   industry for a long time?

7   A.   Yes.

8   Q.   As you said yesterday, there are some things in the

9   industry that are old standard techniques, correct?

02:01 10   A.   Yes.

11   Q.   Now, you didn't actually work with anybody at Neovasc

12   while they were developing the Tiara device, correct?

13   A.   That is correct, I did not.

14   Q.   And you understand, because you've been involved in filing

15   patent applications, that when you file a patent application to

16   the U.S. Patent Office, the U.S. Patent Office is in charge of

17   deciding what's an invention and what's not an invention,

18   correct?

19   A.   That is correct.

02:02 20   Q.   And you understand that Neovasc was issued a patent by the

21   U.S. Patent Office and it was an issued patent that you were

22   giving testimony about earlier, correct?

23   A.   That is correct.

24   Q.   And you understand that that means that the United States

25   Patent Office found that something in the claims of that patent

```
 1   was inventive over old standard techniques, correct?
 2   A.   That's the basis of a patent issuance, but there are
 3   places where there's an overlap.
 4   Q.   Well, you understand that not everything that's written in
 5   a patent document is an invention, correct?
 6   A.   That is correct.
 7   Q.   In fact, a patent document, whether it's a patent
 8   application or an issued patent, it has a whole lot of words
 9   and mentions a lot of things that aren't inventive, correct?
10   A.   Yes.
11   Q.   In fact, if we look at the Neovasc patent that you had on
12   the screen earlier with your own counsel, Exhibit 565.
13        MR. GRAVES:  If we can look on page 46 of this
14   document, Bill, please.
15   Q.   There's something called the "Background of the
16   Invention."  Do you see that?
17   A.   Yes.
18   Q.   And you've seen that "Background of the Invention" in your
19   own patent applications that you've worked on as well, correct?
20   A.   Yes.
21   Q.   And what's written in the background of the invention, you
22   understand that that's not an invention, correct?
23   A.   No.  That is a description of the background.
24   Q.   Sure enough.  Let's go back to the first page, the very
25   first page, the cover page of the patent.  It has something
```

1    called "References Cited."  Do you see that?

2    A.    I do see that.

3    Q.    If you look over on the second page of this document --

4              MR. GRAVES:  Let's go to page 2, Bill.

5    Q.    You see "References Cited" continuing, and there's a whole

6    bunch of things listed here?

7    A.    Right.

8    Q.    And you've seen "References Cited" in your own patent

9    applications that you've worked on, correct?

02:04 10   A.    Yes.

11   Q.    And you've heard that called "prior art"?

12   A.    Right.

13   Q.    People who submit patent applications will give the U.S.

14   Patent Office documents and patent applications and slide

15   presentations that other companies have done in the process of

16   applying for a patent, correct?

17   A.    That is correct.

18   Q.    And if we look here, sir, at this document, we see your

19   name in here, don't we?

02:04 20   A.    Yes.

21   Q.    We see your name several times, "Quadri, et al.,"

22   "Quadri," "Quadri, et al."  That's you, correct?

23   A.    Yes.

24   Q.    Those are your patent applications, aren't they?

25   A.    Yes.

         1    Q.    In fact, two of those are patent applications that we've

         2    just been talking about?

         3    A.    Yes.

         4    Q.    One of them disclosed Rev. C?

         5    A.    Right.

         6    Q.    One of them disclosed Rev. E?

         7    A.    Yes.

         8    Q.    And if we look over on the right side of the page, it

         9    says, "Other Publications."  Do you see that?

02:05   10    A.    Yes.

        11    Q.    There's one about CardiAQ.  Do you see it up at the top?

        12    A.    Yes.

        13    Q.    There's another one, "June 2009, CardiAQ."  Do you see

        14    that one?

        15    A.    Yes.

        16    Q.    There's another one -- where is it?  "CardiAQ

        17    Technologies," looks like that's your website.  Dr. Ruiz, he's

        18    the one who disclosed on your behalf at Euro PCR in May 2010,

        19    correct?

02:05   20    A.    Correct.

        21    Q.    In other words, the references cited here that were sent

        22    to the Patent Office, that had a whole bunch of stuff about

        23    your device, correct?

        24    A.    Correct.

        25    Q.    Let's look at the claims in this patent toward the back of

1    the document.  You've seen patent claims before in your own

2    patent documents, haven't you?

3    A.    I have.

4    Q.    And you looked at these claims earlier today.  Let's blow

5    up claim 2 just by way of example.  The method of claim 1 where

6    at least a portion of the prosthetic valve is covered with

7    tissue or a synthetic material, that's something that's been

8    around for a long time, right?

9    A.    Yes.

02:06 10    Q.    Neovasc didn't invent that, did they?

11    A.    I don't think so.

12    Q.    You didn't invent it either, did you?

13    A.    It's a claim there.  I did not invent it.  It's there.

14    It's a prior -- it's an explanation.

15    Q.    And why don't we take another example.  Let's look at

16    claim 27 toward the bottom.

17         "The method of Claim 1 further comprising reducing or

18    eliminating mitral regurgitation."  Well, that desire to reduce

19    or eliminate mitral regurgitation, that's also something people

02:06 20    have known and wanted to do for a long time, correct?

21    A.    Yes.  Method of Claim 1, so it refers back to the claim of

22    method, how do you reduce it.

23    Q.    Not everything written in the claims of a patent is

24    something new, correct?

25    A.    No, it's not.

1    Q.   Not everything written in the claims of a patent is an

2    invention, correct?

3    A.   No.

4    Q.   You understand that anything that was already out there in

5    the world published in the industry, even if it's included in

6    the claims of a patent, that's just not an invention, correct?

7    A.   That is correct.

8         MR. GRAVES:  Thank you, Dr. Quadri.  I have no further

9    questions.

02:07 10         THE COURT:  Redirect?

11         MR. GRAVES:  Your Honor, before we do that, Your

12   Honor, I'd like to put this back up with Dr. Quadri.

13         THE COURT:  That's fine.

14   REDIRECT EXAMINATION BY MS. LEA:

15   Q.   Now, Dr. Quadri, your published patents did not include

16   your physical prototypes, did they?

17   A.   No.

18   Q.   And they didn't include your development history?

19   A.   No.

02:08 20   Q.   Now, did you disclose your method of anchoring at a

21   conference?

22   A.   No.

23   Q.   Did anyone disclose that method on your behalf at a

24   conference?

25   A.   No.

```
 1   Q.   Did people come up to you and ask you about your method of

 2   anchoring at the conference?

 3   A.   Several times.

 4   Q.   And what was your response?

 5   A.   Well, just, it fixes, and I can't tell you how.

 6   Q.   Now, earlier we looked at -- my colleague brought up a

 7   photo in Exhibit 5004.  Let's not put it up right now.  This

 8   was the photo with the tiger stripes, as he referred to it.

 9   A.   Yes.

10   Q.   Now, that photo did not actually show the CardiAQ device

11   implanted in a heart, did it?

12   A.   No.

13   Q.   What did it show, in general?  How did the device get

14   there?

15   A.   Well, if you look at that picture, it's just -- the heart

16   is opened up, and the device is on top -- a portion of that

17   picture shows outside the heart, a portion of the picture shows

18   inside the heart.  And there is a valve right on top of it, but

19   it's really not where it ought to be.

20   Q.   When was the device placed on the heart in that photo?

21   A.   Just before taking the picture.

22   Q.   Okay.  So after the heart was opened up?

23   A.   Yes.

24   Q.   When it was outside --

25   A.   Yes.
```

```
 1    Q.   -- of the study?
 2    A.   Yes.
 3    Q.   Not during the implantation?
 4    A.   No.
 5    Q.   Now, I would like to show you a photo from that same
 6    implantation.  It's Exhibit 1458.  Okay.  We'll go ahead and
 7    publish this one.  Do you recognize Exhibit 1458?
 8    A.   Yes.
 9    Q.   And is this a photo from the same implantation as Exhibit
10    5004?
11    A.   That's correct.
12    Q.   But there is a difference, right?
13    A.   Yes.
14    Q.   What's the difference?
15    A.   There's a big difference.  The implant is in the right
16    location.
17    Q.   So in Exhibit 1458 that we're showing now, the device was
18    implanted --
19    A.   Implanted in the mitral -- in the mitral annulus.  So what
20    we're seeing here is the heart is open here.  You're looking
21    from the bottom up into the ventricle, and there's a device,
22    the prosthetic, the CardiAQ valve is here, part of it is
23    visible here.
24    Q.   And the device was implanted while the heart was beating?
25    A.   Yes.
```

1  Q.   Versus the Exhibit 5004 photo where the implant was placed

2  on the heart after it had been removed?

3  A.   Right.

4  Q.   And was just simply cut open, and the device was set on

5  top?

6  A.   Right.  They were trying to take pictures of different --

7  Q.   Now, what can you tell here about the anchoring?  Are

8  there any anchors going between the chords?

9  A.   This particular anchor is going to that chord, that chord,

02:12 10  and there's a chord under there.  Slides around there, tags the

11  leaflet and sits right on the trigone.

12  Q.   So that anchor is going between the chords around the

13  leaflet and anchoring on the fibrous trigone portion of the

14  annulus?

15  A.   Yes, yes.

16        MS. LEA:  You can take that down.

17  Q.   Now, we heard testimony about a Dr. Virmani?

18  A.   Right.

19  Q.   Who hired Dr. Virmani?

02:12 20  A.   Orbimed.

21  Q.   And who is Orbimed?

22  A.   Orbimed is a venture capital company based in New York

23  City.

24  Q.   And they were an investor in CardiAQ?

25  A.   They were.

```
 1   Q.    Now, what did Orbimed do after receiving Dr. Virmani's
 2   opinions?
 3   A.    They invested in the company.
 4   Q.    How much did they invest?
 5   A.    About 20 million.
 6   Q.    $20 million?
 7   A.    Yes.
 8   Q.    Now, has there been -- other than back with Rev. C when we
 9   had the pinching and clamping, what happened after you did the
10   pinching and clamping?  You went from Rev. C and did what?
11   A.    We went from modified Rev. C, we went to Rev. D, we went
12   to Rev. E, and then we did all kinds of changes from Rev. E to
13   Rev. J, and then we implanted Rev. J in a human being.
14   Q.    So Rev. D and E had a different type of anchoring than
15   Rev. C?
16   A.    Yes.
17   Q.    What was the anchoring method for Rev. D and E?
18   A.    D and E, the method was going behind the leaflet and
19   capturing the leaflets, going between the chords and contacting
20   the annulus circumferentially.
21   Q.    Did you carry that anchoring method through the further
22   revisions?
23   A.    Yes.
24   Q.    Up to Rev. J?
25   A.    Yes.
```

1    Q.    That's all of Gen. 1?

2    A.    Yes.

3    Q.    And did you carry that anchoring method through to Gen. 2

4    as well?

5    A.    Yes.

6            MS. LEA:  I have no further questions.

7            THE COURT:  Recross?

8            MR. GRAVES:  No, Your Honor.

9            THE COURT:  The witness may be excused.  It's time for

02:14 10  your afternoon break.  We'll see you back in about 15 minutes.

11    (Jury exits.)

12            THE COURT:  Anything?

13            MR. GRAVES:  We should probably speak about

14    sequestration of witnesses after testimony is over.  We don't

15    know whether the plaintiffs are planning, for example, rebuttal

16    or things like that, and that raises some concern about

17    sequestration.

18            MS. LEA:  We don't plan to call Dr. Quadri on

19    rebuttal, Your Honor.

02:15 20          THE COURT:  Okay.  As long as the witness is not going

21    to be called on rebuttal, there's no need for continuing

22    sequestration as far as I'm concerned.

23            MS. LEA:  We agree.

24            THE COURT:  All right.

25            MS. LEA:  Would you like to do the exhibits now or at

 1   the end of the day?

 2           THE COURT:  If you guys want a break, I want to let

 3   you have the break.  But if you don't care, I'm just as happy

 4   to do it now.

 5           MS. LEA:  Why don't we do at the end of the day.

 6           MR. GRAVES:  Yes, let's get our team to get them

 7   together.

 8           THE COURT:  We need to take a little bit of break to

 9   switch reporters.  Other than that, I'm happy to use these 15

02:16 10   minutes to work or not work, whatever you all want to do.  End

11   of the day?

12           MS. LEA:  Yes.

13           THE COURT:  That's fine.

14           (Recess taken, 2:15 p.m.)

15           (Resumed, 2:32 p.m.)

16           (Jury enters the courtroom.)

17           THE COURT:  You may call your next witness.

18           MR. SGANGA:  Thank you, your Honor.  The plaintiff

19   calls Mr. Brent Ratz as its next witness.

02:32 20                          JEREMY BRENT RATZ

21   having been first duly sworn, was examined and testified as

22   follows:

23           THE CLERK:  Can you please state your name and spell

24   your last name for the record.

25           THE WITNESS:  My full name is Jeremy Brent Ratz.  Last

1    name is R-a-t-z.

2    DIRECT EXAMINATION BY MR. SGANGA:

3    Q.    Good afternoon, Mr. Ratz.

4    A.    Good afternoon.

5    Q.    Can you tell us your current profession, please.

6    A.    I'm currently Vice President of Research and Development

7    for Edwards Lifesciences in their Transcatheter Mitral Valve

8    Replacement Group.

9    Q.    And do you have any professional background as an

02:33 10   engineer?

11   A.    I do.  I went to undergrad for biomedical engineering at

12   Duke University.

13   Q.    And for how long have you been working as a medical device

14   engineer?

15   A.    I've been in the industry for I guess about fifteen years

16   now, and spent almost all that time on the engineering side.

17   Q.    You mentioned you have a degree in biomedical engineering

18   undergraduate.  Do you have any other college degrees?

19   A.    I have an MBA from the Wharton School, the University of

02:34 20   Pennsylvania.

21   Q.    Can you tell me about your work experience as a biomedical

22   engineer, starting with the first full-time job you had.

23   A.    Sure.  So while I was still in college, I did two summer

24   internships with a company called UTI Corporation.  They did

25   contract development, contract manufacturing for the medical

1      device industry.  I spent a year after graduation working in

2      Boston as a management consultant, but shortly after that went

3      back to UTI Corporation for another six and a half years to

4      work in project engineering.

5      Q.    And UTI then changed its name to Accellent at some point?

6      A.    It did.  In 2004 it acquired another company and changed

7      its name to Accellent.

8      Q.    And you mentioned that they were in the business of

9      contract manufacturing.  Can you explain what that is.

02:34 10     A.    Right, so they provided outsource services to the medical

11     device industry.  They essentially functioned as an extension

12     of -- or we functioned as an extension of our customers, so

13     from the R&D side doing design and development, all the way

14     through manufacturing of finished packaged goods and

15     subassemblies and components, so really a one-stop shop for

16     medical device companies.

17     Q.    So why would a medical device company go to Accellent and

18     use them as a contractor as opposed to just making the products

19     themselves?

02:35 20     A.    Well, there's a lot of different types of customers that

21     we had, so it ranged from small start-ups where it might be a

22     small team that didn't have the capabilities to perform those

23     resources in-house, all the way to multinational companies like

24     J&J or Boston Scientific/Medtronic that wanted to use us as an

25     extension of their own in-house resources.  Sometimes it was

1    because we had specialized skills.  Sometimes it was just

2    because they had a new program or wanted to offset resources or

3    have a way to have variable costs instead of fixed costs and

4    expanding their manufacturing themselves.

5    Q.   Can you just tell us briefly what your job

6    responsibilities were at Accellent.

7    A.   When I started there, I was a project engineer, and so I

8    was responsible for a few programs myself, mostly in the

9    development and prototyping side.  I stayed with the company

02:36 10   through the transition to Accellent when they made that

11   acquisition; and then my role grew to being responsible for a

12   number of other project managers, all of whom were kind of

13   functioning as an extension of our customers' R&D teams to take

14   either prototypes or to take whole programs through all phases

15   of design and development.  In the later portion, I was group

16   manager of program management, and then in my final year there,

17   I was a field sales engineer and kind of shifted out to selling

18   the services to our customers.

19   Q.   So what kind of medical devices did you work with while

02:36 20   you were at Accellent?

21   A.   I got to work on a little bit of everything, so ranging

22   from cardiovascular to orthopedic to endoscopy to breast biopsy

23   devices, really across the board.

24   Q.   Can you tell us how you met Dr. Quadri.

25   A.   I met Dr. Quadri through a business school classmate.  He

1  went to school with me at Wharton, but he was from Hartford,

2  Connecticut.  And he called me up in the summer of 2006 and

3  said, "Hey, my next-door neighbor is a cardiac surgeon.  He's

4  got this crazy idea for a heart valve.  Do you think you could

5  help him out?"  And that was in July of '06, and then I think I

6  first met Dr. Quadri in August, '06, face-to-face.

7  Q.   And after you met, did you start working together?

8  A.   We did.  We started working together immediately.  He

9  became a customer of Accellent.  I had just transitioned to the

02:37 10  sales side, but because it was sort of a new, you know, small

11  opportunity and I had come from the program management side, I

12  was kind of managing it myself as well on the R&D front.

13  Q.   Were you spending any of your spare time helping

14  Dr. Quadri when you first started working with him?

15  A.   I was, a lot of spare time.  So kind of nights and

16  weekends became supporting this project and sort of seeing, you

17  know, what the opportunity might look like, working with

18  Dr. Quadri to kind of put together the financial model and the

19  business plan.  I had focused on entrepreneurship at Wharton,

02:38 20  and so I was kind of excited to sort of, you know, cut my teeth

21  on this a little bit, and it was a good fit of, you know, what

22  my background was.

23  Q.   Did there come a time when you left Accellent to join

24  CardiAQ full time?

25  A.   I did.  Dr. Quadri asked me sometime during the course of

1    late 2006, early 2007 to come on as CEO, and I said, "Do we

2    need to raise some money first?"  And so he had put a lot of

3    money in himself, I put some of my own money in, and we scraped

4    enough money from friends and family that by October of '07 I

5    could quit my day job and focus on CardiAQ full time.

6    Q.   So how did you feel about leaving a steady day job.

7    A.   It was a big decision.  It was a big decision for me and

8    for my family.  I had two young kids at that time under the age

9    of two, I had a mortgage, so, you know, leaving a steady job

02:38 10   with a nice trajectory was a big choice to make.  But for me, I

11   always wanted to do something entrepreneurial.  It was sort of

12   this perfect combination of the medical side and the business

13   side, and this, you know, opportunity to kind of create

14   something new.  And really from, you know, seven years with

15   contract manufacturing, it was an opportunity for me to do

16   something that was focused on the patients and got me closer to

17   kind of what was going on, you know, in the clinical

18   environment.

19   Q.   So how many employees did CardiAQ have when you joined in

02:39 20   2007?

21   A.   Just one.  It was me.

22   Q.   And what about Dr. Quadri?

23   A.   He was a consultant, as he mentioned earlier.

24   Q.   And your title you said, was it CEO?

25   A.   President and CEO in a company of one.

| | |
|---|---|
| 1 | Q.   I'm sorry? |
| 2 | A.   I just said "in a company of one." |
| 3 | Q.   Did you make any changes to the corporate structure of |
| 4 | CardiAQ after you joined it? |
| 5 | A.   We did.  So shortly after I joined full time, in |
| 6 | mid-November, '07, we shifted from CardiAQ, LLC to CardiAQ |
| 7 | Valve Technologies, Inc.  We converted it to a C corporation, |
| 8 | really just to facilitate venture capital investment, or in the |
| 9 | hopes of attracting venture capital investment. |
| 02:40 10 | Q.   And where were the company's offices? |
| 11 | A.   At my home in Winchester, Massachusetts. |
| 12 | Q.   And from there, were you handling all the company |
| 13 | finances? |
| 14 | A.   I was doing everything. |
| 15 | Q.   And where were your lawyers located? |
| 16 | A.   We had corporate counsel just outside of Boston in |
| 17 | Waltham. |
| 18 | Q.   So if you didn't have employees, what were you planning to |
| 19 | do in order to actually make the medical devices that CardiAQ |
| 02:40 20 | was going to work on? |
| 21 | A.   So we knew that we were going to be designing ourselves |
| 22 | just between Dr. Quadri and I; but having spent basically seven |
| 23 | years in contract manufacturing, I was very comfortable with |
| 24 | the idea of outsourcing the things that we couldn't do in-house |
| 25 | to have it manufactured by, you know, other vendors that were |

1    much more capable, had many more resources than we could hope

2    to kind of build internally at the time.

3    Q.   So what made you comfortable that you could trust vendors

4    with the technology that CardiAQ was working on?

5    A.   In the same way that, you know, all of our customers at

6    Accellent had trusted us; in the same way that Accellent had

7    used subcontractors ourselves, we trusted them.  We had NDAs in

8    place.  We used those throughout our relationships at

9    Accellent, again, with our own subcontractors there, and then

02:41 10   once we were with CardiAQ, we did the same.

11   Q.   Now, who owned the technology that CardiAQ was developing

12   for its heart valve designs?

13   A.   It was all owned by the company.  Even when we first

14   started, the patents that were in Dr. Quadri's name we had

15   transferred over to the company.

16   Q.   Okay, and were there assignment agreements to that effect?

17   A.   There were.

18   Q.   Do you have in your binder Exhibit 1327?

19   A.   Yes, I do.

02:42 20   Q.   Can you tell us what that document is.

21   A.   This is a technology assignment agreement between the

22   company and Dr. Quadri that was entered into on January 9,

23   2008.

24   Q.   And the purpose of this agreement?

25   A.   The purpose of this agreement was to set the stage for

1    future assignments of technology, and also to assign over the

2    initial patents that he had in his name that were relevant to

3    what we were doing.

4    Q.   How about you, did you have an assignment agreement to

5    assign your ideas to CardiAQ?

6    A.   I did.  I had an employment agreement with an invention

7    assignment attachment to that.

8    Q.   Okay, could you turn to Exhibit 1356, please.  Can you

9    tell us what this exhibit is.

02:42 10   A.   This is my employment agreement entered into in early

11   January, '08.  If you flip to the back of that, there's a

12   Propriety Information and Inventions Agreement that governs the

13   ownership of any IP that's created during the course of the

14   employment.

15   Q.   And when you say IP, is that the initials for intellectual

16   property?

17   A.   Intellectual property, yes.

18   Q.   And so that would include any trade secrets?

19   A.   Correct.

02:43 20   Q.   And then if you turn to Exhibit 1432, can you tell us what

21   that document is.

22   A.   This is a consulting agreement with Q Ventures LLC, which

23   is the company that Dr. Quadri had set up just for managing his

24   consulting.

25   Q.   And as part of the consulting agreement, did this assign

```
 1    the intellectual property rights to the company?
 2    A.    It does, Clause No. 2 there, the ownership rights,
 3    proprietary information.
 4    Q.    When CardiAQ started hiring employees later on down the
 5    road, what did you do, if anything, to have the ideas that
 6    those employees came up with be owned by the company?
 7    A.    We took the same steps as we did in my employment
 8    agreement to have that invention assignment attachment to it,
 9    and so everyone that was hired on as an employee signed that.
10    Q.    So let's talk about the finances of the company.  How was
11    the company funded when you joined?
12    A.    As I mentioned, all friends and family investments, so
13    just small angel investors; you know, a long list of people
14    that contributed little bits at a time to kind of add up to
15    enough to get us off the ground.
16    Q.    And so there were no sales of any products yet by CardiAQ,
17    right?
18    A.    No.
19    Q.    What was the focus of the company when you joined?
20    A.    When I joined initially in 2007, we had already kind of
21    earlier that year shifted our focus to this concept for rapid
22    fixation aortic valve replacement.  The idea was, we kind of
23    knew that with what Dr. Quadri initially came to us with at
24    Accellent for this transcatheter idea for aortic valve
25    replacement, that we were going to be two or three generations
```

1    behind the leaders in that field, some of whom had already

2    gotten approval to market their devices in Europe by 2007.  And

3    we said, in order for us to kind of move forward, we need to

4    find a niche opportunity where we can, you know, be first or

5    differentiate ourselves; and this idea came up for rapid

6    fixation aortic valve replacement where you could replace a

7    person's aortic valve, again, the one that's calcified, this

8    valve here with the calcified leaflets.  And the thought was,

9    if you just pop another valve in there on top of the

02:45 10   calcification, you may get leaks, it might not be as perfect as

11   you would otherwise if you could remove that; but if you could

12   go in with a small incision, surgically excise or remove those

13   calcified leaflets, quickly pop in another valve on a frame

14   like the one that we've seen earlier, you could do that with

15   much less time on bypass and have this be much, much safer for

16   the patients, even though it still was a minimally invasive

17   surgical procedure.

18   Q.   So what kind of reaction did you get from potential

19   investors about this rapid fixation aortic valve device?

02:46 20   A.   It was a kind "Thanks but no thanks."  I think it was, you

21   know, regarded as something that might be of value but not

22   something that would warrant a stand-alone company, just too

23   small of an opportunity.  So it was kind of a, you know, sort

24   of no-man's-land in the end between the tried-and-true surgical

25   aortic valve technologies and what was kind of the hot new

1    space of transcatheter aortic valve replacement.

2    Q.   So what did you do next?

3    A.   Well, we had always kind of spoken to potential investors

4    about this being a platform technology that could apply to

5    multiple areas within the heart, even beyond maybe, but within

6    the heart, you know, we had said maybe it could also be applied

7    to mitral as well, and we started to look more at the mitral

8    opportunity.  People started to ask us to tell us more about

9    what you could do on the mitral side.  And it was around that

02:46 10   same time in the summer of 2008, we started to see what was

11   going on in the mitral space with companies that were trying to

12   repair the mitral valve via catheter, via this less-invasive

13   approach, and those companies weren't really showing any

14   clinical efficacy.  And we looked at our technology and we

15   said:  We've got a technology that can go in the mitral space

16   where nobody else can.  None of the repair technologies are

17   working particularly well.  None of the aortic technologies can

18   transfer over to the mitral, and so at that point we shifted

19   our focus.

02:47 20   Q.   So you were talking about transferring your technology

21   from the aortic to the mitral.  Did you have an expectation

22   that you could literally take rapid fixation aortic device and

23   plop it in a mitral valve?

24   A.   No.  We knew -- again, we thought it was a platform

25   technology that could be leveraged, but we knew that there was

1    going to be a lot of work to do to go from the aortic side to

2    the mitral side.  And you've heard a lot already about it's

3    just such a different animal from an anatomical standpoint, and

4    there's so many other challenges and considerations, so we knew

5    that we had a long road ahead of us.

6    Q.   Did you have any understanding as to how big the need was

7    for a minimally invasive mitral valve replacement?

8    A.   We did.  So when we took that summer to kind of go through

9    the opportunity on the mitral side and saw where, you know,

02:48 10    others weren't able to achieve what we were hoping to achieve,

11    we took a hard look at the market opportunity, the unmet

12    clinical need.  I think somebody mentioned already, but, you

13    know, there were four million people suffering from MR.  Only a

14    subset of those patients get treated every year, so there are

15    estimated about 80,000 out of four million that have severe

16    symptomatic MR that actually get definitive surgery through

17    repair replacement; and of those people that are severe

18    symptomatic, about fifty percent or more as you go into, you

19    know, older age groups are not referred for surgery because of

02:48 20    how invasive it is.  So we knew that it was a huge opportunity,

21    even bigger than the number of patients that weren't treated on

22    the aortic side.

23    Q.   So did you have an estimate of the number of patients each

24    year who had severe MR but couldn't get any kind of treatment?

25    A.   Yeah, I think at the time the estimate was that there is

```
 1    at least 80,000 additional patients that could be treated;
 2    there's another, you know, 200,000 of new patients that are
 3    diagnosed with MR each year, so it's a growing year.
 4    Q.   So were there other companies that were trying to come up
 5    with a transcatheter mitral valve replacement at this time in
 6    2008?
 7    A.   Nobody else at the time that had anything that was in
 8    humans, had anything that was approved obviously.  There were
 9    only two other companies at the time that we knew of.  One was
10    actually a company, and one was just a professor in Germany
11    that was working on kind of his own concept, Endovalve and a
12    gentleman named George Leuter, who is a cardiac surgeon in
13    Germany.
14    Q.   So you knew you'd be competing with them, right?
15    A.   We knew there were other competitors.
16    Q.   What about the big medical device companies that were
17    already successful with the transcatheter aortic valve
18    products, what was your understanding of their efforts in this
19    transcatheter mitral valve space?
20    A.   Presumably they were interested.  Some of them had
21    publicized transcatheter mitral repair programs.  Nobody at
22    that point had publicized an internal transcatheter mitral
23    replacement program, but we obviously suspected that it was
24    something that they may be working on behind closed doors, or,
25    you know, something that they may be interested in for sure.
```

1    Q.   Did you have any beliefs as to why no one had been able to

2    successfully come up with a transcatheter mitral valve device

3    yet?

4    A.   We certainly knew what the challenges were, so that much

5    was clear.  In terms of why it was different, I think, you

6    know, early on people thought that mitral repair would get to

7    market first.  It was more of a direct kind of conversion from

8    what surgery was doing as the gold standard, so less people

9    were thinking about mitral replacement transcatheter; and I

02:50 10   think everybody was really at that point focused on the rapid

11   progress that was being made for transcatheter aortic valve

12   replacement, and so they were kind of putting lot of their

13   energy in there.  But it was clear that the transcatheter

14   aortic valves were not going to work in the mitral position.

15   Otherwise, these companies that were much bigger, much further

16   ahead there, would have just taken their valve and put it on

17   the other side of the heart, the other side of the ventricle.

18   Q.   And did you have an understanding what the differences

19   were anatomically that made the mitral valve more of a

02:51 20   challenge?

21   A.   Sure.  You know, we've heard about some of it.  I'll talk

22   about it a little bit, but, you know, it's a much bigger valve

23   just by comparison.  You know, roughly, it's probably twice the

24   cross-sectional area of the aortic valve.  You've got the

25   higher pressure, so, again, the systolic pressure, which is

1    sort of the 120 in your 120 over 80, and the diastolic is the

2    80, so the 80 is closing the aortic.  The 120 or more in these

3    high blood pressure patients is closing the mitral.  So just,

4    you know, some rough engineering, if you've got higher pressure

5    and bigger area, you've got much higher forces than anything

6    that you'd see on the aortic side, and then you've got the

7    absence of this calcification, so it's smooth tissue by and

8    large that you're trying to attach to.  So as we've talked

9    about already, you can't just sort of push out on these

02:52 10    calcified leaflets and get a foothold to try to hold the valve

11    in place.  On the aortic side, you've got this cylindrical

12    conduit, so you can have a lot of surface area to push up

13    against.  On the mitral side, you've got open cavities above

14    and below, so you've really just got this thin ledge of the

15    annulus to try to use to position your device and also get it

16    to hold in place.  And then of course you've got the dynamic

17    aspects of the valve with the leaflets moving into the chordae

18    and then the papillary muscles.  And as Dr. Quadri talked about

19    already, we want to try to preserve all that; that's what keeps

02:52 20    the ventricle functioning properly.  So there's all these

21    considerations.

22        You want to make sure -- you know, he talked about SAM or

23    systolic anterior leaflet motion.  You don't want this anterior

24    leaflet to get blocked or pushed out into the way of the

25    outflow track here because that will serve to block blood

1    flowing out of the heart.  So there's a lot going on in the

2    mitral side compared to this kind of this, you know, passive

3    aspect of the aortic side.

4    Q.   So when you decided to make the shift to work on a mitral

5    valve in 2008, what, if anything, did you do to educate

6    yourself about all the anatomy that you just told us about?

7    A.   I read a lot of papers.  You know, some of the conferences

8    in the industry have come up.  We attended a lot of

9    conferences.  I attended a lot of mitral sessions at those

02:53 10   conferences.  Even sort of just after we decided to go mitral,

11   we attended the European Association of Cardiothoracic Surgery

12   Conference in Portugal that year, September of '08, I believe

13   it was.  So we're sitting in on these conferences.  And then,

14   you know, I've got the luxury of Dr. Quadri kind of as my

15   personal medical professor to educate me.  So not everybody has

16   a cardiac surgeon, you know, as a partner, but he obviously

17   taught me a lot about the mitral anatomy.

18   Q.   Did you ever learn about that part of the mitral valve

19   anatomy called the fibrous trigones?

02:54 20   A.   I did.

21   Q.   And do you remember talking with Dr. Quadri about it?

22   A.   I do.

23   Q.   And if you turn to Exhibit 1411 in your book, can you tell

24   us what this document is.

25   A.   This is a page from one of my notebooks that I, you know,

1    kept roughly daily, just kind of detailing everything that was

2    going on in the company, everything that I sort of did each day

3    or what I in this case had to do each day, and, you know, kind

4    of a checklist here.

5    Q.   And was this all entries that you made personally?

6    A.   Yes.

7    Q.   And when you filled out the notebooks, filled up all the

8    pages, what did you do with them?

9    A.   I just moved on to another one.

02:54 10   Q.   And you saved all those, obviously?

11   A.   Yes.

12   Q.   Okay.  So in Exhibit 1411, if we could turn to Page No. 41

13   of 167, which is up on the screen, there's a sketch in the

14   lower right-hand corner.  Did you draw that?

15   A.   I did.

16   Q.   And what's the word written in the bottom right corner

17   there?

18   A.   "Trigone."

19   Q.   And can you describe what that is pointing to, that arrow?

02:55 20   A.   It's pointing to the two dark spots on either side of the

21   sort of dotted line that represents the mitral annulus.  The

22   kind of dark smiley face in between there is a coaptation of

23   the mitral leaflets.

24   Q.   Do you have the laser?  Yes.  So the mitral valve is

25   which?

1   A.   So here's the Trigone 1, Trigone 2.  This is the fibrous

2   region in between.  This is the aortic valve here, mitral valve

3   here, and then you've got the coronaries here on either side.

4   And this was really just, you know, from a discussion with

5   Dr. Quadri, I think it was a sidebar at that EX conference just

6   going through this stuff but obviously noted at the time.  And

7   this is when we were first starting to think about mitral, and

8   so we were considering all the aspects of the anatomy.

9   Q.   And if you could just tell us what the date is on this

02:56 10   page where you made the sketch.

11   A.   It's not on there.  We might have to look at the page

12   before, the page before that.

13   Q.   Okay, well, we'll move ahead there.  But --

14   A.   But I believe it's from that conference.  The rest of the

15   notes are representative of notes I was taking from other

16   presentations there.

17   Q.   And that was in September of 2008?

18   A.   Correct.

19   Q.   So did you have an understanding then as to what the

02:56 20   relationship was between the trigones and the mitral annulus?

21   A.   Yes.  You know, I knew that it was part of the annulus.

22   We talked about the fact that, you know, roughly two-fifths of

23   the circumference of the mitral valve made up that fibrous

24   trigone-to-trigone region.  The other three-fifths on the

25   posterior side here on kind of the back wall was the more

1    compliant region.

2    Q.   So we've been talking a lot about trigones here and

3    talking about whether you've got other documents referring to

4    trigones.  Are there many other documents that you generated

5    working at CardiAQ referring to trigones specifically?

6    A.   No.  I think there's a couple other sketches early on here

7    where we point it out, but, no, after that, we understood it as

8    part of the annulus.  You know, I was clear on it from my

9    discussions with Dr. Quadri, and so it wasn't something that

02:57 10   continued to show up in my notes really after that.

11   Q.   Did you typically label every anatomical feature when you

12   drew a sketch of something around the mitral valve?

13   A.   No, I did not.

14   Q.   So let's talk about the design work on CardiAQ's

15   transcatheter mitral valve designs.  And TMVI, is that the

16   acronym?

17   A.   TMVI or TMVR, so replacement or implantation I guess kind

18   of started to get used interchangeably.

19   Q.   Okay, so when did you start working on your TMVI designs?

02:58 20   A.   We really started on it that fall.  You know, in August of

21   '08, I think we were already sketching some things, and then,

22   you know, kind of making that more detailed, more refined

23   throughout the next couple months.

24   Q.   Did you have a name or revision number for this design?

25   A.   We started with Revision A.

1    Q.   And prior to that, those rapid fixation aortic --

2    A.   We had been on kind of a numeric revision schedule, so we

3    went 1, 2, 3, 4 on the rapid fixation, and when we went mitral,

4    we started alphabetic.

5    Q.   So if you could look at Exhibit 1407, please.  Is this

6    another one of your lab notebooks?

7    A.   Yes.

8    Q.   And if you could turn to Page 15.  We'll pull that up on

9    the screen as well.  And can you tell us what the sketch is at

02:58 10   the bottom of the page, please.

11   A.   This is one of the original sketches of what was

12   Revision A from a brainstorming conversation with Q.  That's

13   what I called Dr. Quadri.  And you see, you know, the rough

14   idea of having this shoulder on the atrial side having these

15   curved ventricular anchors, and the concepts that are kind of

16   written down there just defining a few things about it.

17   Q.   And what were you intending as far as how this Rev. A

18   design would anchor in place inside the heart?

19   A.   As we talked about before, it was at this point still this

02:59 20   idea of clamping onto the annulus, pinching the leaflets in

21   between here so that the bulge could kind of push the leaflet

22   aside and create more of a ledge here that we could pinch onto

23   the annulus.

24   Q.   And the date on this one, is that up in the right-hand

25   corner there?

1    A.    December 30, 2008.

2    Q.    So what happened to the Rev. A design?

3    A.    You know, we continued to kind of brainstorm and think

4    about what we needed there, and, you know, I guess the biggest

5    shift from A to B was really just thinking that we needed a

6    skirt along the bottom there before we moved forward.  So we

7    never actually made any prototypes of Rev. A.  We did some, you

8    know, detailed drawings, or I did some detailed drawings of it,

9    but --

03:00 10   Q.    And did you analyze the design from an engineering

11   perspective?

12   A.    We did a little bit.  We did more of that with Rev. B, I

13   think, but, you know, we started looking at finite element

14   analysis to kind of understand how the material would behave.

15   Q.    Can you explain what that is, finite element analysis.

16   A.    Finite element analysis is where you sort of take a design

17   for a metal frame, or it could be any, you know, component

18   really, and you just understand the stresses that it might see

19   as you put a load on one side of it.  So there's various ways

03:00 20   to use it, but it basically breaks down the larger structure

21   into tiny, tiny little elements, finite elements that you can

22   look at and then analyze each one independently, and then get

23   kind of an overall idea of how much strain it may see, which

24   was really important, given the materials that we were using.

25   Q.    And that's done with computer software?

```
 1   A.    It is.
 2   Q.    So let's talk about the next revision.  I think you said
 3   that was Rev. B.  And can you explain how you were intending
 4   the Rev. B device to anchor?
 5   A.    So Rev. B was intended to anchor in the same way, by sort
 6   of pushing the native leaflets aside intra-annularly and
 7   creating this ledge to kind of pinch onto above and below the
 8   native annulus.
 9   Q.    Okay, if we could put up PDX 3.2.  Can you explain what
10   we're seeing here?
11   A.    Yes.  We're seeing the idea for the, you know, the
12   clamping action still where we've just sort of pushed the
13   native leaflets aside and created, you know, more of this ledge
14   to kind of pinch onto here.  The idea was that this extra
15   little gusset or skirt would create more leak prevention than
16   we had in the Rev. A where there was no coverage there at the
17   time.
18   Q.    And were there other changes that you made between Rev. A
19   and Rev. B?
20   A.    We experimented a little bit with the valve location in
21   Rev. B, so we looked at opportunities for it to be kind of
22   higher or lower, you know, intra-annular or sub-annular even,
23   and, you know, looked at modifications that way.
24   Q.    If we look at the two revs side by side here, can you tell
25   us, is that an accurate representation of the Rev. A and Rev. B
```

1    designs?

2    A.    It is.  Yeah, we had a number of different variations of

3    B, so this looks like what we were kind of referring to as B-1.

4    You can see we positioned it a little bit lower on the left

5    atrial side here just to try to reduce the valve height.  We

6    changed from this kind of pronounced ledge here to this, you

7    know, just transition shelf flange kind of flared-out region.

8    We actually had the fabric kind of on the outside of the frame

9    here and we had that on the inside of the frame here to be

03:03 10    consistent with where the valve was located and to kind of wrap

11    this around.  And, you know, one of the ideas behind going from

12    this sort of pronounced ledge to the transition here was just

13    to minimize the length of material it took to sort of walk that

14    path from the inside to the outside because that had

15    implications for, once you compress it, how long it is as it

16    extends out and how long it is in the delivery system.

17    Q.    And were you doing all of the design and engineering work

18    for Revs. A and B?

19    A.    I was.  So I was doing the, you know, the CAD drawings, or

03:03 20    computer assisted drafting, all the detailed designs, all the

21    sketches, all the three-dimensional designs, flat patterns.

22    Q.    And were any prototypes made of the Rev. B design?

23    A.    We made a prototype of the Rev. B frame, the one that you

24    see on the screen here right now.

25    Q.    And what did you do with that prototype frame?

A.   We evaluated it in terms of compressibility.  We evaluated
it just by hand to kind of assess.  We may have put it in sort
of a, you know, a mock kind of silicone annulus just to kind of
pull on it a little bit and see how the anchors deflected.
But, you know, we could learn a lot just from holding it in our
hands and kind of squeezing it and feeling the resistance, you
know, what it might see inside the native environment.

Q.   And how were you funding the company at the time you were
working on Rev. B?

03:04 A.   At the time we were working on Rev. B, we really didn't
have any money left.  We had raised about $650,000 when I first
joined the company and, you know, spent almost all of that.  So
the Rev. B time frame was kind of early 2009.  I had gone about
five months without a salary before we got our next round of
funding, so it was sort of a dicey time for the company.  You
know, we were kind of getting a lot of pressure to think about
contingency plans, and we had the potential to close some
funding with a Boston-based VC, but it hadn't happened yet, so
we were still kind of looking for all opportunities to raise

03:05 more funds.

Q.   So were you still working full time, though, throughout
this period?

A.   Still working full time.

Q.   Did you have a strategy to raise some more money?

A.   We did.  I mean, our objective at this point was really to

```
 1    get the message out there.  You know, we didn't have enough
 2    money.  We didn't have the design far enough along yet to do
 3    animal studies to kind of convince people.  A lot of venture
 4    capitalists want to see at least successful animals before
 5    they'll turn over a lot of money to you.  So we had to really
 6    just tell the story.  We had to sort of, you know, put the
 7    images in the presentation and, you know, kind of convince
 8    people of the promise of this.
 9    Q.   So were there details, engineering details about the
10    designs that you left out of presentations to potential
11    investors?
12    A.   We did, and we never showed detailed dimensional drawings
13    to potential investors, you know, or engineering prints or
14    anything like that.  We were showing, you know, images,
15    illustrations like this, you know, screenshots maybe or
16    pictures, but not any detailed information.
17    Q.   Were you handing out prototypes?
18    A.   No.
19    Q.   So at some point, though, did you actually post
20    information about the Rev. B design frame online?
21    A.   I did.
22    Q.   And can you explain why you did that.
23    A.   Yeah, so in the opening statements, you guys saw some of
24    the, you know, fancy animations of, you know, cartoons and
25    movies of how these devices work.  We didn't really have the
```

1     money to put one of those together at the time, but I thought

2     it would be meaningful to try to communicate to potential

3     investors how we could do that.  I took out a 30-day free trial

4     of this Autodesk software called 3ds Max and started to try to

5     make my own animation from the information that we had.  At one

6     point in that process, I was kind of hitting a wall, and so I

7     posted some information about the Rev. B design on one of their

8     advice forums to try to solicit some feedback from some

9     professionals in that area to guide my animation skills.

03:07 10     Q.    Did you ever post designs online like that for any of the

11     later revisions to your designs after Rev. B?

12     A.    No, never.

13     Q.    And how did the Rev. B compare to the later designs that

14     you ended up working on with Neovasc?

15     A.    It was really quite different, you know, from a number of

16     aspects.

17     Q.    Was the first design that you had Neovasc help assemble

18     the Rev. C prototype?

19     A.    That's correct.

03:07 20     Q.    So if we could pull up a Rev. C prototype here next, the

21     next version.  Can you tell us how the Rev. C design differed

22     from Rev. B.

23     A.    Sure.  So we made a number of changes.  Starting at the

24     top, I guess this is where we had added the mushroom-shaped

25     tabs for the locking feature connection to the delivery system.

1    We had eyelets there before.  We went from nine cells to twelve

2    cells, and by "cells," I just mean the sort of symmetric

3    section that repeats around the circumference of the frame.  So

4    this one had nine.  We went to twelve here, mainly because we

5    wanted to be able to compress it more easily.  So you can see

6    with nine trying to reach a larger diameter, you could get a

7    very wide angle here.  With twelve trying to reach a smaller

8    diameter, you get a narrower angle here.  It makes it easier to

9    compress the valve for loading into a catheter, and that was,

03:08 10   again, what we were focused on here.

11        We got rid of the shelf here.  We thought that we were

12   going to need more contact with the left atrial side of the

13   annulus, and so we substituted the shelf.  Again, this sort of

14   takes this pathway that makes it longer when you compress it

15   for these V-shaped anchors that could be cut from inside the

16   frame and wouldn't cost us anything in terms of additional

17   length of the device when we put it into the catheter.

18        And then you can see we made modifications to the base

19   here.  To cover these anchors fully, you know, as we thought

03:09 20   about it more and this idea that we were going to be inside the

21   native annulus and pushing these leaflets aside, we didn't want

22   to have a leak path around there, so we thought it was

23   important for that coverage to go all the way to the top.  It

24   also gave us a way to kind of have this clamping action sort of

25   continue even in that intra-anchor space there where we didn't

1    have one of the twelve anchors directly under it.

2    Q.    So when did you start working on that Rev. C design?

3    A.    I started sketching it in my notebook around April, 2010.

4    Q.    And when did you start working with Neovasc?  Do you

5    recall?

6    A.    It was early June, 2009.

7    Q.    So how did you come about getting in contact with Neovasc?

8    A.    We received an unsolicited e-mail from Mr. Brian

9    McPherson.

03:10 10    Q.    And what's his position at Neovasc?

11    A.    I forget the exact title.  I think he was in charge of

12    business development, though.

13    Q.    So can you look at Exhibit 349 in your notebook, please.

14    Can you identify that for us.

15    A.    This is an e-mail from Mr. McPherson to me.

16    Q.    Is this the first contact you ever had with anyone at

17    Neovasc?

18    A.    Yes, it is.

19    Q.    And can you tell us when this was sent?

03:10 20    A.    It was sent on June 4, 2009.

21    Q.    And you were working out of your home in Massachusetts

22    still when you received this?

23    A.    That's correct.

24    Q.    Okay.  And was there an attachment to the e-mail?

25    A.    There was.  He had attached an introductory PowerPoint

1    presentation of the Neovasc company and their services.

2    Q.   And did you review that attachment when you received it in

3    June, '09?

4    A.   I did.

5    Q.   So I'd like to direct you to Page 4 of 16 in Exhibit 349.

6    And what did you understand from the first bullet point listed

7    there?

8    A.   You know, mainly that they treated their customers as

9    partners, is how I understood that:  "Our customers are

03:11 10  typically industry partners who incorporate Neovasc pericardial

11   tissue materials into their own products."

12   Q.   And did you read the second bullet point as well?

13   A.   I did.  It, you know, just talked about their areas of

14   specialization, but mainly that they were tissue providers, as

15   I understood it.

16   Q.   And I also just want to point you to the fourth bullet

17   point there.  Okay, no, sorry.  If you'd turn to -- we're still

18   on Page 3 here, and there's a reference to...

19       Did you get any understanding from them as to any other

03:12 20  products besides tissue products that Neovasc was working on at

21   the time?

22   A.   Mr. McPherson mentioned in his e-mail that they had the

23   Neovasc reducer program, and I think it mentioned in the

24   presentation that it was a device for treating refractory

25   angina.

1    Q.   And if we turn to Page No. 6 of 16, is there a reference

2    to that?

3              (Witness examining document.)

4    Q.   Sorry about this.  I've got the pages off-track here.  And

5    when Neovasc contacted you, did they give you any indication

6    that they were working on developing or planning to develop any

7    of their own heart valves?

8    A.   No.

9    Q.   So let's go back to Page No. 3 of the slide deck here.  Is

03:13 10   there a reference to their core products there?

11   A.   Again, that they were focused on pericardial tissue and

12   then the reducer stent for refractory angina that we --

13   Q.   That you mentioned.  And the reducer stent, did you think

14   that had anything to do with valve technology?

15   A.   No.

16   Q.   Did you have any idea that Neovasc was planning to start

17   designing any of its own transcatheter heart valve products?

18   A.   No.

19             MR. FLYNN:  Objection, lacks foundation, calls for

03:14 20   speculation.

21             THE COURT:  Sorry.  I can't hear you.

22             MR. FLYNN:  Lacks foundation, calls for speculation.

23             THE COURT:  Overruled.

24   Q.   In addition to the e-mail that you received from

25   Mr. McPherson at Neovasc, did you speak with anyone at Neovasc

 1   as a result of this initial contact?

 2   A.   I had not spoken to anybody at that point, but we, you

 3   know, quickly exchanged e-mails, and I made an attempt to set

 4   up an initial call.

 5   Q.   If you had learned any information from Neovasc that it

 6   had planned to develop its own mitral valve product, how would

 7   that have impacted your willingness to work with Neovasc as a

 8   contract manufacturer?

 9   A.   We would have had serious concerns.  It's highly unlikely

03:14 10   that we would have proceeded to work with them.

11   Q.   How was the timing of the e-mail with respect to your need

12   to assemble prototypes?

13   A.   It was close to perfect.  We were sort of getting ready

14   with the Rev. C and wanted to head into animal studies later

15   that summer, so -- and I think we saw that e-mail to Dr. Quadri

16   earlier, but it seemed like a good fit.

17   Q.   So you said you were going without a paycheck for a while,

18   right?  How were you planning on paying Neovasc to do the

19   services?

03:15 20   A.   So thankfully we finally raised some money in May of 2009,

21   so we had just brought in about another $800,000, including

22   some money from that venture capitalist in the Boston area.

23   Q.   So you had some more money.  Why didn't you just keep

24   doing the prototyping yourself at CardiAQ?

25   A.   A couple reasons.  You know, I think we had done animal

1    studies before with valves that Dr. Quadri had hand made, and

2    so we certainly could have proceeded down that path, at least

3    to do some short-term animal studies.  But in order to

4    ultimately do chronic animal studies, we would need to be able

5    to assemble those valves in a clean room environment, in a

6    sterile environment, and have those valves sterilized; and we

7    didn't have the wherewithal to do that ourselves, so we would

8    have had to start hiring people.  But at the same time, you

9    know, Dr. Quadri is a practicing cardiac surgeon.  You know,

03:16 10   it's probably not ultimately long term the best use of his time

11   to be assembling these valves by hand.  So naturally, you know,

12   we kind of perked up when we saw that there is a contract

13   manufacturer that could do exactly that for us.

14   Q.   Now, did Neovasc have any of its own unique technology

15   relating to the tissue business that you wanted to take

16   advantage of?

17   A.   Nothing that we wanted to take advantage of.  We really

18   just needed, you know, standard glutaraldehyde-fixed

19   pericardial tissue.  They had technology that they discussed

03:17 20   with us called Geoform, which was to make sort of

21   three-dimensional fixed shapes out of tissue, but that was not

22   something that was of any value to us.

23   Q.   Now, before you started sharing any of the designs for

24   CardiAQ's TMVI products with Neovasc, did you take any steps to

25   protect the confidentiality of that information?

1    A.    I did.  So before I started sending any information to

2    them, I sent an e-mail to Mr. McPherson requesting that he sign

3    a copy of CardiAQ's NDA.

4    Q.    And what happened after you made that request?

5    A.    He replied that he would prefer to use Neovasc's own

6    template for an NDA and provided me with a copy of that for

7    review.

8    Q.    And did you end up signing the NDA that was proposed by

9    Neovasc?

03:17 10    A.    I did.  I reviewed that NDA and looked at it next to ours

11    and felt comfortable with it and signed the NDA.

12    Q.    So if you turn to Exhibit 371, is that the signed

13    nondisclosure agreement, or NDA, between CardiAQ and Neovasc?

14    A.    Yes, it is.

15    Q.    Now, you've mentioned that you thought it would help

16    protect CardiAQ's technology.  Was there anything that you saw

17    in the agreement that gave you comfort that it would protect

18    the designs that you were working on?

19    A.    I did several things, but I guess first and foremost was

03:18 20    Item 1 in the definition of confidential information, which I

21    felt broadly covered the information that we would anticipate

22    sharing with Neovasc over the course of any relationship.

23    Q.    And what kinds of things were you thinking that you would

24    disclose to Neovasc so that they could assemble prototypes for

25    you?

1    A.    Really, you know, exactly as it's listed here.  So

2    "Confidential information included, by way of example and not

3    limitation, information of a technical nature such as trade

4    secrets, manufacturing processes or devices, current products

5    or products under development, research subjects, methods and

6    results, matters of a business nature such as information about

7    costs, margins, pricing, policies, et cetera, marketing or

8    strategic plans, financial information, personal records or

9    other information of a similar nature."  So it seemed

03:19 10    sufficiently broad to me to cover anything and everything that

11    we might have reason to share with them.

12    Q.    Did the NDA include any restrictions on what Neovasc could

13    do with your confidential information that made you comfortable

14    sharing it with them?

15    A.    It did.  You know, Item 3 talks about how that

16    confidential information can be used, and specifically just the

17    last portion there, "The recipient shall not directly or

18    indirectly disclose any confidential information to any third

19    party or use the confidential information for its own benefit

03:20 20    or for the benefit of any third party."

21    Q.    And how did you think that impacted Neovasc, if at all, if

22    they were going to be working themselves on a competing TMVI

23    device?

24    A.    You know, our intent was not to prevent anybody from

25    competing, and we certainly didn't expect that this company

1   that positioned themselves as a partner would become a

2   competitor, but we weren't in the business of trying to, you

3   know, prevent anybody from entering the field.  We simply just

4   wanted to make sure that our confidential information was

5   protected.

6   Q.   So how important did you think this provision in Section 3

7   about Neovasc not using the confidential information for its

8   own benefit was?

9   A.   It's very important.  I mean, that's really, you know, the

03:20 10   primary reason for having this document in place.

11   Q.   And was there anything that you saw in the Neovasc form

12   nondisclosure agreement that mentioned licensing your

13   intellectual property to Neovasc?

14   A.   There was a clause that just made it clear that -- I think

15   No. 6 on the backside there -- that this document or furnishing

16   any confidential information shall not constitute or be

17   construed as a grant of any express or implied license or other

18   right.  So it was, you know, clear that we weren't granting

19   them any special rights to use our information just by

03:21 20   providing it.

21   Q.   Did you consider that important when you were deciding

22   whether to enter the relationship with Neovasc?

23   A.   Absolutely.  You know, our strategy as a company at that

24   point was, and always was, to develop our own device.  We

25   weren't, you know, in the business of trying to come up with

1    intellectual property that we would license off or try to get

2    royalties from, you know, other medical device players.

3    Q.   Did you see anything in the NDA mentioning how Neovasc

4    needed to take efforts to safeguard the confidentiality of your

5    technology, in Section 2 perhaps?

6    A.   I think just the idea that they would treat it as they

7    would treat their own confidential information.

8    Q.   And did you have any understanding as to what the NDA

9    would allow Neovasc to do in terms of independently developing

03:22 10   any of its own TMVI devices?

11   A.   I did.  That was covered in Section 4.  You know, so

12   certainly to the extent that any information was already known

13   or became public knowledge, was disclosed by a third party

14   without restriction, or independently developed by the

15   recipient, as long as it was without resort to the disclosure,

16   or, you know, without using our confidential information again.

17   Q.   And how important did you consider that in deciding

18   whether you were comfortable sharing CardiAQ's prototypes with

19   Neovasc?

03:23 20   A.   It was very important to us.  And, like I said, you know,

21   we did not want to prevent competition.  We just wanted to make

22   sure that our information was not misused or used for anybody

23   else's benefit.

24   Q.   Now, had you had prior experiences with nondisclosure

25   agreements at Accellent?

A.    I had.  We routinely had them in place with all of our
customers.  We had them in place with the subcontractors that
we worked with.  You know, there were a lot of things that we
couldn't do in-house at Accellent, and so we used other vendors
to make those subassemblies for us, and we would have NDAs in
place with them as well, just to make sure everything was
safeguarded.

Q.    So did you have any experience where Accellent as a
contract manufacturer decided it wanted to go into competition
with one of its customers?

A.    No.

Q.    Did you ever have an experience at CardiAQ where any other
vendors or contract manufacturers of CardiAQ's was interested
in doing something that was competing with CardiAQ?

A.    We did actually.  In the summer of 2009, the person that
was making our nitinol frames for us, the metal frames for our
implant, approached us and said he had his own idea for a
mitral valve implant and wanted to show that to us.  Really,
you know, in the interest of seeing if there was a potential
for partnership, we put an agreement in place so that we could
see that information or that he could share that information
with us, and we looked at it.  We found it to be completely
different.  We didn't think it was anything that, you know, was
appropriate for us to add into our company, and we also
respectfully declined to continue to work with that gentleman

1    while he was pursuing that.  We wished him the best, and we

2    parted ways at that point, and we ended up -- he had made our

3    Rev. C frames for us, and by the time we went to Rev. D, we had

4    switched to another vendor.

5    Q.    So after the initial communications you had with Brian

6    McPherson and reviewing the NDA, how comfortable did you feel

7    sharing your confidential information with Neovasc?

8    A.    We had no concerns.  I had no concerns about it.  You

9    know, they had a good reputation in the industry at that point.

03:25 10   We had an NDA in place.  They had presented the capabilities of

11   their company.  It seemed like a great fit.  They seemed to

12   pride themselves on service and being a partner to their

13   clients, and so everything felt really good going into it.

14   Q.    How soon after you signed the NDA did you start sharing

15   prototype designs with Neovasc?

16   A.    I think the very next day or maybe even that same day.

17   I'm not sure.

18   Q.    And how often were you communicating with Neovasc once you

19   started sharing prototype designs?

03:25 20   A.    It was pretty frequent via e-mail.  You know, I'd say we

21   had, and I guess it depended when we got closer to prototypes

22   being ready or not, but we probably had two or three calls a

23   month as things were coming together, and, you know, even more

24   e-mails than that, you know, just sharing information.

25   Q.    Now, on the prototype designs that you used Neovasc to

1    help assemble, did you hold back any of the engineering details

2    of those designs?

3    A.    No.  We were sharing everything that we had, you know,

4    basically in realtime.

5    Q.    And why were you doing that?  Why were you so open with

6    them?

7    A.    You know, we wanted to progress our design forward, so we

8    wanted to give them all the information that they needed in

9    order to effectively accurately assemble our implants for us

03:26 10   and move things along.  We were trying to move quickly and with

11   a sense of urgency, and so we didn't want anything to hold us

12   back on that.

13   Q.    So in June of 2009, now you started sending design details

14   of the prototypes that you wanted Neovasc to help you assemble,

15   right?

16   A.    That's correct.

17   Q.    And at that time, which revision were you working on?

18   A.    By the time we had asked them to start working on an

19   assembly, we were on to Rev. C.

03:27 20   Q.    And how many months had you been working on Rev. C

21   already?

22   A.    Again, we had some sketches.  I think sometime in the

23   middle of April, but, you know, we were really just starting to

24   get the detail designs ready that we could actually start to

25   have something made, so pretty early on.

1    Q.    So if you turn to Exhibit 1162, please.  That may be in

2    the other binder that you have there.

3    A.    Okay.

4    Q.    Can you identify what Exhibit 1162 is, please.

5    A.    It is an e-mail from me to Brian McPherson, Mark

6    Pace-Floridia, and Dr. Quadri.

7    Q.    And Mr. McPherson and Mr. Pace-Floridia are both at

8    Neovasc, right?

9    A.    That's correct.

03:28 10    Q.    And were they both involved in the projects that Neovasc

11    did for CardiAQ?

12    A.    Yes.

13    Q.    And is there an attachment that you sent along with this

14    e-mail?

15    A.    Yes.  In this one we had attached a PDF of the flat

16    pattern for this version of the frame.

17    Q.    And is that shown at Page 3?  So this is the frame for the

18    Rev. C prototype?

19    A.    That's correct.  This is the flat pattern that

03:28 20    communicates how it's to be laser cut or what the pattern is to

21    laser cut it from a smaller tube.  And then once it's laser

22    cut, only that scaffolding that you see there is left.  It's

23    kind of rolled up, and then it can be expanded to form.

24    Q.    So you were sending them this flat pattern.  At this point

25    had you sent them the actual metal frame that you were going to

1    have them attach the tissue to?

2    A.    Not yet.  This was ahead of that.  This particular e-mail

3    was meant to kind of share it just to get initial feedback, and

4    I think in particular we were asking about the eyelet hole size

5    here.  We wanted to make sure that the diameter was big enough

6    for their sewers to get their sewing needle through when they

7    attached the frame to it.

8    Q.    Okay, so had you actually made up the metal frames yet?

9    A.    Not yet.

03:29 10    Q.    Had anyone else gotten access to these flat patterns at

11    this time?

12    A.    Just the company that was making the actual frames for us.

13    Q.    Let's turn to Exhibit 1163.  Can you identify this,

14    please.

15    A.    This is an e-mail from me to Mark Pace-Floridia at Neovasc

16    copying Brian McPherson.

17    Q.    And did you also include an attachment with this e-mail?

18    A.    Yes, I did.

19    Q.    And what's shown in the attachment?

03:30 20    A.    This is a combination of files.  In this particular one,

21    they're SLDPRT parts or file types showing the assembly mandrel

22    tool, the actual detailed three-dimensional model for it in a

23    CAD file, along with some PDFs and other solid parts.

24    Q.    So while we're looking at the description of the

25    attachments up on the screen here, can you explain to us what

1    types of files these are and what they can be used for.

2    A.   So the SLDPRT files are the nomenclature for

3    three-dimensional models that are made in this CAD software

4    called Solidworks, but it contains all of the dimensional

5    information for a three-dimensional part, so width, thickness,

6    length, everything, all the intricacies.  So basically you

7    could 3D print it from there.  You could create a detailed

8    print.  You could essentially create whatever that product is

9    from that.

03:31 10   Q.   And you mentioned CAD.  Is that an acronym for computer --

11   A.   Computer automated drafting.

12   Q.   Okay.  And if we advance ahead to Page 5, is that an image

13   of the mandrel?

14   A.   It is.

15   Q.   So in addition to this image then, you're sending all of

16   the underlying engineering details so that Neovasc could

17   actually replicate the mandrel themselves?

18   A.   That's correct.

19   Q.   And why were you doing that?

03:32 20   A.   We had talked to them about potentially using it as an aid

21   when they assembled these prototypes for us just to speed the

22   process along.  It was something that Dr. Quadri and I had come

23   up with, and we shared that with them in hopes that it would,

24   you know, advance their efforts there.

25   Q.   And you also sent them a physical mandrel as well, right?

A.    Yes.

Q.    And there were some patent applications that Dr. Quadri

testified about that showed some drawings of the mandrel.  Did

you ever actually include these CAD files, these engineering

files, in the patent applications that you filed?

A.    No.

Q.    So the drawings were just the line drawings as opposed to

the actual --

A.    Right, just an illustration as compared to the actual

dimensions, volumetric model.

Q.    And who else besides Neovasc got these kinds of

engineering files on the mandrel design?

A.    The only company that got the mandrel design was the

company that we had sent that model to initially to 3D print

the first prototype for us.

Q.    Now, did you ever have Neovasc assemble any Rev. C

prototypes for you?

A.    We did.

Q.    And did you have a purchase order in place to set out the

terms of that relationship?

A.    Yes.

Q.    And if you turn to Exhibit 1170, which should be in your

bigger notebook.  Have you got that?

A.    Got it.

Q.    And can you identify what this is?

1    A.    This is an e-mail from me to Brian McPherson copying Randy

2    Lane and Mark Pace-Floridia.

3    Q.    And it's dated July 2, 2009?

4    A.    That's correct.

5    Q.    And attached to the e-mail, is there a purchase order?

6    A.    There is, along with a number of other attachments.

7    Q.    So if we go to Page 11 of 19 in Exhibit 1170, is this a

8    quote that Neovasc sent you to quote prices to do the work of

9    assembling the Rev. C prototypes?

03:34 10   A.    Yes.

11   Q.    And what were you expecting them to do?

12   A.    So we had talked to them about using the assembly tool.

13   We were going to have them make two more out of stainless steel

14   instead of just the 3D printing material that we had provided,

15   and then 25 hours of assembly development.  So once they got

16   the frames, we expected that there was going to be some

17   troubleshooting with the design as they were trying to put it

18   together.  Before they could make, you know, the twelve good

19   ones that we asked for here, there would be some assembly

03:35 20   effort into developing that process.

21   Q.    And after you got that quote, then on the page before it,

22   Page 9, is this the purchase order that you issued to hire

23   Neovasc to do all that work?

24   A.    Yes, it is.

25   Q.    And the "ship to" address on that is in the upper

 1  right-hand corner.  What's that address?

 2  A.    That's my home address, CardiAQ headquarters.

 3  Q.    Okay.  And this is based on the information that you had

 4  exchanged so far with Neovasc about the Rev. C design, correct?

 5  A.    That's correct.

 6  Q.    And the prototypes that they were going to assemble were

 7  going to be based on your designs for the frames, the metal

 8  frames?

 9  A.    Yes.

03:35 10  Q.    And how about the tissue portion of it that would be made

11  into the valve, where did that come?

12  A.    We were providing the concept for the tissue design for

13  this valve as well.

14  Q.    And is that also -- is there a pattern, a flat pattern

15  associated with the tissue that's going to be formed into the

16  valve?

17  A.    There is.  This is another attachment to this e-mail.

18  Q.    So if we go to Page 12 of 19 in the exhibit, can you tell

19  us what we're seeing here?

03:36 20  A.    This is an engineering print, again, one from a CAD system

21  that has all the dimensions to scale here that can be pulled

22  off and, in this case, used to laser cut this tissue pattern.

23  This was the origami valve concept that Dr. Quadri talked about

24  earlier, where the idea was that you've got all these three

25  leaflets kind of cut with the skirt from a single piece of

1    pericardial tissue.  It can be kind of folded up and stitched

2    along the seams to put this valve together.

3    Q.   So this was the pattern that you were hiring Neovasc to

4    cut the tissue to form the valves themselves?

5    A.   Correct, and we expected that there would be some tweaking

6    required.  That was the, you know, assembly development

7    engineering costs associated with it.  You know, this is always

8    a bit of engineering and art kind of combined together to

9    tailor the valve.

03:37 10   Q.   And so how did Neovasc get the frames to assemble the

11   tissue to it?

12   A.   We sent those to them.

13   Q.   You had those manufactured from another vendor?

14   A.   Correct.

15   Q.   Okay.  And do you recall any issues coming up early on

16   when Neovasc was first assembling the Rev. C prototypes?

17   A.   The first assembly that they showed us, they had just done

18   a mock-up out of cloth.  I remember the valve was positioned

19   upside down with respect to the frame, so we just pointed that

03:37 20   out to them.

21   Q.   Okay, if we turn to Exhibit 26.

22   A.   Okay.

23   Q.   And is this an e-mail from you to Mr. Pace-Floridia at

24   Neovasc?

25   A.   Yes, it is.

```
 1   Q.   And is this referring to the issue with the valve being
 2   attached to the frame upside down?
 3   A.   Yes.  So I just thanked him for the pictures and just made
 4   sure he was aware that it was upside down, the inflow was on
 5   the outflow side and vice versa, just to make sure that it was
 6   corrected for the future prototypes.
 7   Q.   And was this the first prototype assembly work that you'd
 8   seen Neovasc do?
 9   A.   Yes.
10   Q.   So after this issue, you were saying you had pretty
11   frequent communications with Neovasc by e-mail and phone,
12   right?
13   A.   Yes.
14   Q.   Did you ever have any trouble communicating with Neovasc
15   about the engineering details and designs of the CardiAQ
16   prototypes?
17   A.   No.  I think their engineers were always very competent,
18   and I think, you know, we clearly communicated with one
19   another, but there never seemed to be any need for
20   clarification.  You know, the e-mails were descriptive and well
21   understood, and, you know, we had phone calls when needed to
22   discuss things further, but everything seemed to be clear on
23   their side.
24   Q.   Were they able to work with these CAD files that you had
25   sent them and the other types of computer files relating to the
```

1    engineering design of their components?

2    A.    Yes.  All the engineers that we were working with, they

3    were well versed in CAD and these programs that we were using

4    on our side as well.

5    Q.    How about mitral valve anatomy, did you talk about these

6    anatomical terms with the Neovasc engineers?

7    A.    In some cases we did.  You know, I know Dr. Quadri spoke

8    earlier how he had met with them, you know, in late June to

9    talk about kind of our concept and the mitral anatomy; but,

03:40 10    again, you know, we knew that they had been making heart valves

11    for some time, and so we spoke freely about the anatomy to

12    them, and all those aspects were clear, what side was the left

13    atrial side, what side was the left ventricular side, you know,

14    et cetera.

15    Q.    Now, at some point did Neovasc finish assembling the

16    prototype Rev. C frames?

17    A.    They did.

18    Q.    And if you refer to Exhibit 1172, can you identify this

19    for us, please.

03:40 20    A.    This is an e-mail from Mr. Lane to me with a few others

21    that Neovasc copied.

22    Q.    And that's dated July 24, 2009?

23    A.    Yes.

24    Q.    And did Mr. Lane give you any feedback about the design

25    itself?

```
 1   A.   He did.  If you look at the end there, he just said, "In
 2   my opinion, quite an impressive design and assembly."
 3   Q.   And did you understand that to be referring to the
 4   photographs that were attached to the e-mail?
 5   A.   Yes, just the design in general.
 6   Q.   And that's the design of this Rev. C prototype?
 7   A.   That's correct.
 8   Q.   So if we go to Page 5, that's the Rev. C prototype that
 9   Neovasc helped assemble?
10   A.   Yes.
11   Q.   And then Page 6 as well, is that shown there?
12   A.   That's correct.
13   Q.   Okay, if you turn to Exhibit 1179, please.  And is this an
14   e-mail from you to Mr. Lane again in August of 2009?
15   A.   Yes.
16   Q.   And can you tell us what's shown in the attachment to this
17   e-mail.
18   A.   This is a mock-up.  So once we had received the first
19   Rev. C prototypes from them fully assembled, Dr. Quadri and I
20   had some concerns about how the skirt was attached.  It was as
21   we had directed them to, but once we got it in our hands, we
22   felt that there would be this need to have that skirt come all
23   the way up like we saw in the earlier illustration of the
24   Rev. C, to come all the way up and over those left ventricular
25   anchors.  And so in sort of the way that I was communicating to
```

        1    them here, I had sketched up a quick mock-up on the computer of
        2    what we were thinking, how we wanted to modify the future
        3    prototypes that they were still working on, just to make sure
        4    that they understood that.
        5    Q.    So the red line shown here, what's that representing?
        6    A.    Representing the fabric in that lower ventricular skirt
        7    region that would come down from the inside of the frame and
        8    that what was the diamond section behind that, wrap around to
        9    the outside of the left ventricular anchors and come up and
03:43  10    over the tip to be kind of sewn back on itself to create this
       11    full cuff.
       12    Q.    So you were making the skirt even bigger than you had
       13    described to Neovasc in the original design?
       14    A.    That's correct.
       15    Q.    And why were you looking to do that?  What did you think
       16    that would do with respect to anchoring the Rev. C prototype?
       17    A.    The desire here, and I think I may have pointed out
       18    earlier, but was to have that sort of continuous surface there
       19    around the perimeter at that left ventricular anchor tip level
03:43  20    by having that full cuff, and then also to just make it a
       21    little bit more atraumatic at the tip there, but again have
       22    that leak prevention as well, so a couple different sort of
       23    design intents of making that change.
       24    Q.    Okay, I'd like to turn next to another e-mail chain,
       25    Exhibit 1183.  Can you tell us what this is, please.

1    A.    This is an e-mail, the first one in the chain here from

2    Randy Lane to myself and to Kathleen Hung.

3    Q.    And are you discussing some modifications to the anchors

4    on the Rev. C prototype in this chain?

5    A.    We did.  When we had seen the previous ones, it was clear

6    that the left ventricular anchors were a bit too long just as

7    they had come from the frame manufacturer, and we had pointed

8    that out to Neovasc to let them know that we thought we might

9    need to have them trim that as they were making the assembly,

03:44 10    especially as it relates to having the skirt go up and over it;

11    and we were communicating that to them here, and I wanted to

12    see if they understood that and if they could make that change

13    for us.

14    Q.    So if you go to Page 9 of Exhibit 1183, can you tell us

15    what that is illustrating?

16    A.    Yeah, again, another sort of quick mock-up that I had done

17    on a computer just to communicate the level of where we wanted

18    the two tips from the left atrial side, the anchor tip to meet

19    the tips of the anchors on the left ventricular side.  So in

03:45 20    the versions that they had received, you can imagine that blue

21    line added there just to make it go up to the red line there

22    had gone beyond the tip of the left atrial anchor, so it was

23    kind of running up this way and going past it, and I just was

24    trying to make it clear that we needed to have a gap in there

25    and have them kind of meet the same line so that we could get

1    the annulus in between.

2    Q.   So what did you do with the assembled Rev. C prototypes

3    once you received them from Neovasc?

4    A.   So these were the prototypes that we ended up using in

5    that August, 2009 first mitral animal series.

6    Q.   And Dr. Quadri was mentioning some of the protocols about

7    getting approval to do that testing.  There was an acronym?

8    A.   The IACUC approval.

9    Q.   Can you explain what that means.

03:46 10   A.   So that's essentially, it's the internal animal use and

11   care or animal care and use committee that all of these labs

12   have.  It's essentially their internal ethics board that looks

13   at all the protocols that are submitted, makes sure that it's

14   an ethical use of these animals, that all the proper treatments

15   are in place before they approve the study to move forward.

16   Q.   And you attended the animal studies once they were

17   approved?

18   A.   I did.

19   Q.   And what were you doing during the course of those

03:46 20   studies?

21   A.   So I was there for the duration monitoring, taking video,

22   you know, helping to prep the valves and load the valves, and

23   then really just trying to learn as much as we could from these

24   animal studies.

25   Q.   And what did you observe as to how those Rev. C prototypes

1    with the full skirt, how did they perform in the studies?

2    A.    As Dr. Quadri pointed out, we saw that they weren't

3    effective at getting a good grip onto the annular ledge and

4    creating that sort of pinching, you know, portion to grab onto.

5    Q.    So if we go to PDX 3.5, does this represent what you

6    observed at those animal studies with the initial implantation?

7    A.    Yes, it does.  So we had seen it kind of pop up on the one

8    side there and just couldn't sort of keep it inside the mitral

9    annulus.  As it did that, you know, we saw some perforation on

03:47 10   the left atrial side as it kind of tilted, and, you know, those

11   tips went into the sidewall of the left atrium as well.

12   Q.    So did you consider that a setback?

13   A.    It was definitely a setback.  It was -- you know, sort of

14   the natural process of development is, you know, you see these

15   things, and there's all these challenges that we have to try to

16   address, and you sort of figure out -- you know, you learn from

17   it immediately, figure out kind of on the fly what you want to

18   do differently.  And that was sort of a theme that, you know,

19   progressed throughout all our development, was kind of trying

03:48 20   to solve these problems immediately on the back table, and

21   that's where a lot of the learning happened, you know,

22   throughout the history of our company.

23   Q.    So how quickly after you had this setback experience with

24   the initial study did you make any modifications to the Rev. C

25   prototypes?

A.   I think we went into the next animal the very next day
with the cut version that you saw the video of earlier, where
we had gone in between each of those anchors and cut the fabric
space so that they could move independently.

Q.   So what was the impact of these animal studies on your
design of the CardiAQ TMVI product?

A.   It changed our whole thinking really on what the sort of
effective anchoring mechanism would be.  Obviously it didn't
change the fact that we had the two sets of opposing anchors.
It didn't change the fact that we had, you know, this kind of
foreshortening action kind of bringing them together; but it
changed where we expected to have these ventricular anchors
positioned now, having, you know, gone from A to B to C
starting out where we thought they were going to be kind of
inside these leaflets, and then thinking about having to have
them operate freely so that they'd get independently between
the cords and behind, so it was a big shift.

Q.   Okay.  And how about the skirt itself, did it change your
thinking about how the skirt was going to work?

A.   It did.  I mean, it was the beginning of really
recognizing that we didn't need to have that big skirt there.
Once we could kind of engage the native leaflets, then we could
use that to help create the seal as well.

Q.   And did you inform Neovasc that you were doing these
animal studies?

1    A.   We had told them that we were having animal studies, yes.

2    Q.   And what did you tell them about the work that they were

3    doing for you after you made this change in the design during

4    the course of these initial animal studies?

5    A.   So we had had that purchase order for the twelve Rev. C

6    frames or Rev. C implants.  We had gotten a subset of those

7    before this August animal study, and they were still working on

8    the rest.  So I went back to them immediately and said, "Stop

9    what you're doing.  We've got to make some changes to this, so

03:50 10   don't proceed with the ones that you're working on."

11   Q.   Okay, if you turn to Exhibit 1187, can you identify this,

12   please.

13   A.   This is an e-mail that I had sent to Brian McPherson on

14   August 20.

15   Q.   And was this where you told him not to make any more of

16   those Rev. C prototypes?

17   A.   It is.  This is actually in the middle of the trial, so

18   when I sent this, I think we were still in Minneapolis and

19   mentioned that it was going well, "But in the meantime, don't

20   do anything more for the remaining six valves."  I didn't

21   expect the tissue valve to change, but we knew that we were

22   going to make other changes."

23   Q.   If you turn to Exhibit 1188 in your notebook, can you tell

24   us what that is, please.

25   A.   This is an e-mail that I had sent to Kathleen Hung on

1    Monday, August 31, 2009.

2    Q.   And was she asking how the animal results came out at the

3    bottom of her e-mail on Page 2 of this document?

4    A.   She did.   In her original e-mail, she said, "We all look

5    forward to hearing your animal results as well as helping with

6    prototypes in the future."

7    Q.   And did you share information with her about that?

8    A.   We did.   You know, we went back to her there and said we

9    needed to get some of the prototypes back.   Based on some of

03:52 10   the things that we learned during that August study, we wanted

11   to go back and do acute animals in September.   And we only had

12   a couple weeks in between there, and so we didn't have time to

13   go back and get more frames made.   It was too quick of a

14   turnaround in the time that it required to get back into the

15   animal lab and when they had availability.   So we asked her to

16   send some of the frames back so that Dr. Quadri and I could

17   kind of modify those in his basement, essentially, to get them

18   at a level where we thought we could address the learnings that

19   we had from the August study.

03:52 20   Q.   So in this e-mail chain, were you telling Neovasc about

21   the changes in the Rev. C frame that you were planning to make?

22   A.   In this particular one, I think we just asked them to send

23   them back to us, so we weren't telling them right here, I don't

24   think.

25   Q.   If we go to the top e-mail there, you're referring to

1    lowering the height of the frame?

2    A.   We did tell them, yes, as I see it now, so I wasn't

3    reading the whole thing, but, yeah, we wanted to lower the

4    height of the frame and lower the valve placement, and we

5    wanted to replace the fabric skirt.

6    Q.   So, now, you were not going through another design cycle

7    by going back to the stent manufacturer to make new frames, are

8    you?

9    A.   That's correct.  We wanted to sort of bypass that, this

03:53 10   cycle, and see what we could do to work with the Rev. C frames

11   that we had, but we knew that it was going to require some kind

12   of trial and error with Dr. Quadri and I sort of, again, kind

13   of learning on the fly and just trying a few things, you know,

14   together to get these Rev. Cs sort of refined so that we could

15   go back into animals and continue to learn quickly.

16   Q.   And did you think that doing those design modifications

17   yourselves on the Rev. C frames was going to affect how quickly

18   you could test these designs again?

19   A.   We did?  I mean, you know, I think we had good vendors

03:53 20   that we were working with, but, you know, we needed to be able

21   to move quickly; and as a two-person company and working, you

22   know, kind of side by side in his basement, we could, you know,

23   burn through a lot of different concepts and, you know, kind of

24   optimize quickly on the fly.

25   Q.   Okay.  And did you go back and do more animal studies with

1    those modified Rev. C frames?

2    A.    We did.  So in mid-September, 2009, we went back and did

3    more animals.

4    Q.    Is Exhibit 14-8 another one of your lab notebooks?

5    A.    I'm sorry, 14-8?

6    Q.    1408.

7    A.    Oh, 1408.  Yes.

8    Q.    And can you go to the Page No. 122, and can you tell us

9    what the notes refer to here?

03:55 10   A.    Yes.  These are just some sketches of what we had done to

11   modify the Rev. C heading into that next study.  So what you

12   see on the top left there represents the, I guess, original

13   Rev. C frame.  We knew from that first study that the valve was

14   sitting too high in the atrium, so one of the things that you

15   see on the right-hand side there is this dotted line where we

16   had intended to cut off the top of the device and make it

17   lower.  We didn't have the valve sitting in that region, and so

18   we just wanted to remove it, get the height lower.  And then we

19   had also seen that there was too much motion as well in the

03:55 20   course of the other learnings, and so we sacrificed one Rev. C

21   frame to just get that oval-only section that you see in the

22   middle there so that we could reinforce the lower portion of

23   the ventricular side because it didn't have the stiffness that

24   we needed to satisfy the dynamic forces in the mitral annulus.

25   So we sewed those together.  I think in one case we used

sutures.  In another case it was wire form that we just kind of

twisted it together on the notes there.  And then on the lower

section there, you see the bovine tissue valve but no fabric on

the skirt.  It's also made of bovine, and it's attaching to the

eyelets down at the bottom, so we're going down covering that

lower section of that new diamond area that we added just at

the lowest portion of the modified valve, and just coming up to

the very bottom of the left ventricular anchor so that that

whole top section is exposed now.

03:56 Q.   Can you point that out to us.  Where are the exposed

anchors in this sketch?

A.   All this length is exposed anchors, so this full length

would be exposed now.  Just as we add this length, the skirt is

going to come down here and come up over that, and that's what

you see kind of blown up down here.

Q.   Okay, and did you use these modified Rev. C designs in

additional animal studies in September?

A.   We did.

Q.   And how were the results there?

03:57 A.   The results were very good.  We were able to confirm, and

as you saw earlier from some of the videos, but confirm that we

were able to get that new kind of fixation action where we were

going, you know, between the cords, the leaflet, and behind to

the opposite side, that we could, you know, start to engage

better.  It had a number of advantages in terms of anchoring,

1    you know, by the annular contact, but also using the tension in

2    the cords to dissipate that load, and then also using the

3    native leaflets to seal around the perimeter instead of relying

4    on that skirt for it.

5    Q.   Did you have any discussions with anyone at Neovasc about

6    those animal studies?

7    A.   We had phone calls afterwards just describing, you know,

8    what we had done to modify the valves.  I don't recall exactly

9    what was discussed there.  And then we met with Neovasc in

03:57 10   person -- it was the first time I had met with anybody from

11   Neovasc in person -- at the TCT Conference, that Transcatheter

12   Therapies Conference in September of that year.

13   Q.   So did you change the design of the TMVI frames based on

14   the experiences that you had at those animal studies?

15   A.   We did, so, you know, as soon as we got back from that,

16   and I think the conference was immediately after, so as soon as

17   we got back from the conference, we started thinking about what

18   we were going to do for the next revision, which would be

19   Rev. D, and that started kind of in early October.

03:58 20        THE COURT:  Is this a good stopping place, Mr. Sganga?

21        MR. SGANGA:  Sure, your Honor.  We're on to a new rev,

22   and this would be a convenient place to stop before we get into

23   it.

24        THE COURT:  Okay.  So, members of the jury, thank you

25   for your attention today.  Keep an open mind.  Don't talk to

1    anyone, watch what you do on social media.  We'll see you back

2    at 10:00 o'clock tomorrow.

3            Just one more thing on the lunch topic.  I know you

4    guys have expressed an interest in having lunch in the jury

5    room.  Not every jury gets lunch.  It needs to be justified so

6    the taxpayers are buying you lunch for a sufficient reason, and

7    we call that sort of a semi-sequestration order.  That's

8    because there's so many lawyers in the courthouse, and we want

9    to make sure you're somewhat insulated from them.  So the flip

03:59 10   side of that coin is, you kind of can't have it both ways.  You

11   can't say you need to have it private to have lunch but you can

12   still roam around.  So if you decide you want to have lunch in

13   the jury room, you have to largely stay in that area during

14   lunch and your snack breaks.  If you want to run outside for a

15   phone call or if any of you smoke, that's okay, but you would

16   be largely confined to that area.  So we're going to go ahead

17   and get you lunch for tomorrow and see how that works out.  If

18   you decide you're feeling overly caged, let us know, and we can

19   revisit it.  I know there's also a scheduling request for next

03:59 20   Tuesday.  I'll bring that up with the parties tomorrow as well.

21           All right, have a good night everyone.

22           THE CLERK:  All rise for the jury.

23           (Jury excused.)

24           THE COURT:  Okay, we have the exhibits to take care

25   of.  You just heard me allude to, one of the jurors has a

1    doctor's appointment on Tuesday at 3:00, has a doctor's

2    appointment and has to leave Tuesday at 3:00, and I was

3    hoping -- I don't want to lose that hour, so I was hoping we

4    could start, go 9:00 to 3:00 that day?  Does that work for

5    everybody?

6              MR. SGANGA:  Yes, your Honor.

7              THE COURT:  All right, I'll double-check with the

8    jurors tomorrow.

9              How about the exhibits?  Do you want to do those now?

04:01 10   Or we can do them first thing tomorrow morning too.

11             MS. LEA:  I'm happy to do them now, your Honor.  The

12   plaintiffs would like to move into evidence, and I have them in

13   the order that they were called in the case, Exhibit 1360, 328,

14   1442, 1374, 1445, 1007, 1395, 2634, 615, 2173, 565, 1458.

15   That's all I have.

16             MR. BOEHM:  No objection.

17             (Exhibits 1360, 328, 1442, 1374, 1445, 1007, 1395,

18   2634, 615, 2173, 565, 1458 received in evidence.)

19             MR. BASKIN:  The defendants would like to move in

04:02 20   exhibits for cross, 5024, 5004, 263, 260, 261, 265, 266, 271,

21   and 552.

22             THE COURT:  Okay.

23             (Exhibits 5024, 5004, 263, 260, 261, 265, 266, 271,

24   and 552 received in evidence.)

25             THE COURT:  Okay, we have some technical issues to

1   take care of now, I guess, on the sound system, Phil.  I'm

2   going to put you on this.  Apparently the courtroom below us is

3   complaining about ceiling noise.  I will leave that to others

4   to work out.

5           Anything else for today?

6           MR. FLYNN:  Your Honor, may we make a suggestion on

7   lunch?

8           THE COURT:  Yes.

9           MR. FLYNN:  The last time that we have been in a

04:03 10   carnival that has lasted this long, the parties split the cost

11   of providing lunch for the jurors, which would free us of the

12   taxpayer issue.

13           THE COURT:  I have no idea what the answer to that is.

14   So you want to pay for their lunch so they can --

15           MR. FLYNN:  We'll take care of paying for it so if

16   they want to wander in the hallway.

17           THE COURT:  Okay, let me think about that and talk to

18   the lunch experts in this courthouse, which I am not one.

19           I'll be out early tomorrow.  I have a scheduling

04:03 20   conference in another case right now, so I'm happy to talk to

21   you about anything we can accomplish quickly, but other than

22   that, we can save it till the morning.

23           MR. GRAVES:  I have been informed, your Honor, by

24   local counsel that we should be standing up to make objections

25   rather than sitting down, so we'll start to do that tomorrow.

1           THE COURT:  It's not -- is Mr. Rosen here?  It's not

2    important to me.  I don't feel disrespected --

3           MR. GRAVES:  Okay, thank you.

4           THE COURT:  -- by that.

5           (Laughter.)

6           THE COURT:  All right, I'll see everyone tomorrow.

7           (Adjourned, 4:04 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5

6

7            We, Debra M. Joyce, Kelly Mortellite, and Lee A.

8   Marzilli Official Federal Court Reporters, do hereby certify

9   that the foregoing transcript was recorded by us

10  stenographically at the time and place aforesaid in Civil

11  Action No. 14-12405-ADB, CardiAQ Technologies, Inc.

12  v. Neovasc Inc., et al, and thereafter by us reduced to

13  typewriting, and is a true and accurate record of the

14  proceedings.

15           Dated this 4th day of May, 2016.

16

17

18

19                   /s/ Debra M. Joyce

20                   /s/ Kelly Mortellite

21                   /s/ Lee A. Marzilli, RPR, CRR

22

23

24

25