1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3     CARDIAQ VALVE TECHNOLOGIES, INC.,  )
                                         )
4                 Plaintiff             )
                                         )
5          -VS-                         )  CA No. 14-12405-ADB
                                         )  Pages 12-1 - 12-172
6     NEOVASC INC., et al,              )
                                         )
7                 Defendants            )

8

9                      **JURY TRIAL - DAY 12**

10          BEFORE THE HONORABLE ALLISON D. BURROUGHS
                 UNITED STATES DISTRICT JUDGE
11

12

13

14

15                           United States District Court
                             1 Courthouse Way, Courtroom 17
16                           Boston, Massachusetts  02210
                             May 17, 2016, 9:32 a.m.
17

18

19

20

21

22                           LEE A. MARZILLI
                             DEBRA M. JOYCE
23                           KELLY MORTELLITE
                          OFFICIAL COURT REPORTERS
24                       United States District Court
                         1 Courthouse Way, Room 7200
25                           Boston, MA  02210
                             (617)345-6787

1

A P P E A R A N C E S:

2

JOHN B. SGANGA, JR., ESQ., CHRISTY G. LEA, ESQ.,
3    JOSHUA STOWELL, ESQ., MARK A. SPEEGLE, ESQ., and
JENNA C. KELLEHER, ESQ., Knobbe, Martens, Olson & Bear, LLP,
4    2040 Main Street, 14th Floor, Irvine, California, 92614,
for the Plaintiff.

5

BRIAN C. HORNE, ESQ., Knobbe, Martens, Olson & Bear, LLP,
6    1901 Avenue of the Stars, Suite 1500, Los Angeles, California,
90067, for the Plaintiff.

7

ROBERT J. KALER, ESQ., Holland & Knight, LLP,
8    10 Saint James Avenue, Boston, Massachusetts, 02116,
for the Plaintiff.

9

VERONICA ASCARRUNZ, ESQ. and DOUGLAS H. CARSTEN, ESQ.,
10   Wilson, Sonsini, Goodrich & Rosati, P.C., 1700 K Street, NW,
5th Floor, Washington, D.C., 20006, for the Defendants.

11

CHARLES TAIT GRAVES, ESQ., JOHN FLYNN, ESQ., and
12   JOSHUA A. BASKIN, ESQ., Wilson, Sonsini, Goodrich & Rosati, P.C.,
One Market Spear Tower, Suite 3300, San Francisco, California,
13   94105, for the Defendants.

14   COLLEEN BAL, ESQ., Wilson, Sonsini, Goodrich & Rosati, P.C.,
650 Page Mill Road, Palo Alto, California, 94304, for the
15   Defendants.

16   JOEL C. BOEHM, ESQ., Wilson, Sonsini, Goodrich & Rosati,
P.C., 900 South Capital of Texas Highway Las Cimas IV, Austin,
17   Texas, 78746, for the Defendants.

18   MICHAEL L. CHINITZ, ESQ., Rose, Chintz & Rose,
One Beacon Street, 4th Floor, Boston, Massachusetts, 02108,
19   for the Defendants.

20

21

22

23

24

25

1                          I N D E X

2    WITNESS                 DIRECT    CROSS    REDIRECT    RECROSS

3    CARLA MULHERN

4         By Mr. Graves:     12-17
          By Mr. Horne:                12-63
5         By Mr. Graves:                          12-109

6

7

8

9    EXHIBITS                    RECEIVED IN EVIDENCE

10   178                              12-14
     358, 388, 719                    12-117
11

12
     PRELIMINARY CHARGE TO THE JURY:  Page 12-121
13
     CHARGE CONFERENCE:   12-137
14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE COURT:  Good morning, everyone.  You can sit.  I

3    think Jonathan came out and gave everybody drafts of the

4    standard part of the charge.  What we'll do is -- I mean, my

5    guess is, none of that's going to be too controversial, but I'm

6    happy to have you wordsmith it.  So I've given it to you, and

7    we'll just take a break if and when you close today and give

8    everyone a chance to read through it, and hopefully we can do

9    that.

09:33 10          We're still wrestling with some of the issues on the

11   rest of it.  We will have a draft for you sometime today.

12   We'll see when you rest, but I'm sort of hoping that you

13   rest -- at some point you rest.  I can give you an hour off to

14   go and read the charges, and then we can come back and go

15   through them.  If we don't end up with that much time, we'll

16   figure out how we're going to do it.

17          So the part that I've already given you, there's

18   usually a standard charge on stipulations, which I have taken

19   out.  I think the only stipulation is that the nondisclosure

09:33 20   agreement is a contract.  Tell me if I'm wrong about that.  So

21   what I thought we would do is, instead of saying they stipulate

22   to that and then define stipulation, just say the parties agree

23   it's a contract and skip the instruction.

24          MR. GRAVES:  Yes, your Honor.

25          THE COURT:  And then I did not add back in language,

          1    although I'm still somewhat inclined to do it, about the fact

          2    that -- just to correct what I told them in the beginning

          3    because I'm sure they've seen there are transcripts, just to

          4    say that were some transcripts that have been prepared, and if

          5    there's a discrete portion that they want to see and they ask

          6    for it, we may or may not be able to accommodate them, but just

          7    to sort of acknowledge -- I know they know there's transcripts,

          8    right?  We've all been staring at them.  So I don't want to

          9    promise them that we'd deliver a transcript because we may

09:34    10    ultimately not, but just to acknowledge the fact that some

         11    transcripts were prepared and some might be available if

         12    there's something discrete, but I leave that to you.

         13           And then in terms of the trade secrets, I'm not sure

         14    if you have an exhibit that you're going to agree on that lists

         15    out the trade secrets, or you want me to cover it in the

         16    narrative, or how we're going to do that.

         17           MR. SGANGA:  Well, we had thought that your Honor

         18    could reference the document, that trade secret disclosure

         19    document.

09:34    20           THE COURT:  Well, that's what we've done.  That's what

         21    we've done, but it seems that there's some dispute over which

         22    document that should be.

         23           MR. BOEHM:  Your Honor, there's actually a third

         24    exhibit than either of the ones in the original jury

         25    instructions.  I have the number, I think, the one that the

1    parties have been using, if you can just give me a second.

2         THE COURT:  Okay.  And then my intention at the

3    moment -- and, again, I'm happy to hear you on this, although

4    it's already been pretty well briefed -- I think on the 93A, my

5    intention is to send it to the jury for an advisory opinion.  I

6    don't think it should be a binding opinion on the one hand.  On

7    the other hand, with them sitting here, I don't see any harm in

8    getting the advisory opinion.  So that's what I'm sort of

9    thinking on that.  And I don't have anything -- we're sort of,

09:35 10   again, still working through this, but there's nothing relevant

11   to the inventorship claim that I was intending on putting into

12   a specific interrogatory at this point; but if there's

13   underlying factual issues that you think should be resolved,

14   I'm happy to hear you on that.

15        MS. LEA:  We do, your Honor.  In fact, we believe we

16   have a Seventh Amendment right to have the underlying factual

17   issues resolved.

18        THE COURT:  But what do you think is the underlying

19   factual issue?

09:36 20       MS. LEA:  Whether Dr. Quadri and Mr. Ratz

21   significantly contributed to the claimed invention.

22        MR. BOEHM:  Your Honor, that's the heart of the

23   ultimate issue.  And the first thing I would say is that

24   significance, the "significant contribution," that's a term of

25   art in inventorship law.  It's not an everyday sort of comment

1    how we think about significance.  It factors in what was known

2    in the prior art and the scope of the claims as a whole, which

3    are also questions of law for the Court to consider.  So we

4    absolutely disagree that that type of interrogatory could go to

5    the jury in language like that that the plaintiff has proposed

6    or otherwise.

7              THE COURT:  Well, let me just ask you, as a practical

8    matter, do you all think that the invention -- I mean, it seems

9    to me, as a practical matter, that you could make a pretty darn

09:37 10   good argument that the invention claim and the trade secrets

11   claim rise and fall together.  I mean, I know the law is not

12   the same, and I know the inventorship can be a broader concept.

13             MS. LEA:  We do believe that it's based on the same

14   factual issues, your Honor, as to what Dr. Quadri and Mr. Ratz

15   contributed and shared with Neovasc and what Neovasc used and

16   put into their patent.  So we definitely believe that there is

17   overlap there, and that is why we have a Seventh Amendment

18   right on the question of inventorship to go to the jury.

19             MR. BOEHM:  We absolutely disagree.  Whether something

09:37 20   is used by the defendants in its development and whether that

21   rises much further to the level of anything inventive or an

22   inventive contribution is an entirely different set of legal

23   issues, questions of law that would have to follow from whether

24   anything was used in the development process.  Whether

25   something is put into the patent claims or not is no different

1    than whether it's in the product or whether it's shown at trade

2    shows or things like that.

3              THE COURT:  I have the briefing on the inventorship

4    thing.  I haven't actually read it yet.  They're just all

5    sitting here in a pile.  So I'll go back and do that, but I

6    just wanted to sort of --

7              MR. BOEHM:  May I make one comment on the brief that

8    they filed last night?

9              THE COURT:  Yes.

09:38 10         MR. BOEHM:  It will be relatively brief.

11             THE COURT:  That's fine.

12             MR. BOEHM:  In the broad universe of patent cases,

13    there's a small subset in which inventorship issues are

14    presented to the jury.  That subset is when patent invalidity

15    is at issue because patent infringement is charged.  In other

16    words, when a plaintiff has a patent, charges the defendant

17    with infringing that patent, inventorship may be raised as a

18    particular species of defense in that type of case.  That's not

19    this case at all.  That's not anything that's been pleaded or

09:39 20    alleged.

21             THE COURT:  I have the briefs.  I just haven't read

22    them, so I'll give you a chance to argue on it again once I've

23    read them.

24             MR. BOEHM:  The cases that they added to their brief

25    last night, the cases they raised is a different species than I

1    was talking about.  It's a patent infringement action where a

2    specific defense was raised, not at all apposite to this case

3    here.  Thank you, your Honor.

4         THE COURT:  Okay, as a practical matter I get the law,

5    the legal issues, but are you envisioning any scenario under

6    which the inventorship claim and the trade secret claim go in

7    different directions?  I mean, if there's no theft of trade

8    secrets, are you still going to press the idea that they should

9    be named inventors?  I mean, I understand the law, that they

09:39 10    can be different, right, because the trade secret, you could

11    find that they haven't met one of the technical requirements of

12    the statute and that they're still -- but as a practical

13    matter, don't they sort of rise and fall together?

14         MR. SGANGA:  As with the contract, your Honor, too.  I

15    mean, it is a use of the confidential information for Neovasc's

16    benefit.  Them disclosing it to the Patent Office and them

17    trying to obtain the patent rights for themselves is a use of

18    our confidential information that was expressly prohibited, so

19    they are intertwined as a result of that.  And it may well be

09:40 20    that the information was revealed at some point.  You know,

21    that's Neovasc's defense is that at some point it became

22    revealed, and therefore it was not valuable to them as a trade

23    secret, but that doesn't preclude it from having contributed to

24    the invention.

25         THE COURT:  Again, as a legal matter, I understand

1    that, but as a practical matter, are you going to press the

2    inventorship if you lose on the trade secrets?

3         And I have the same question for you all:  Are you

4    going to concede the inventorship if you lose?

5         MR. BOEHM:  No, no.  Whether they fall and whether

6    they rise are entirely different.  If the trade secret claim

7    falls, it may very well be that the inventorship claim falls,

8    but there are so many additional legal requirements --

9         THE COURT:  So you think if one falls, they both fall,

09:41 10  but if one succeeds, then they don't both succeed?

11        MR. BOEHM:  Painting very broadly with that brush,

12   your Honor, I think that's right.

13        THE COURT:  That's a very convenient view of the

14   world.

15        MR. BOEHM:  It's how the law sets this thing up.

16        THE COURT:  It seems like the law on that actually

17   goes more their way than yours, but --

18        MS. LEA:  We do have the jury here.  These issues have

19   all been argued to the jury, and we believe it is just best to

09:41 20  submit the questions to the jury.  We have given your Honor

21   several different options for the question of inventorship,

22   underlying factual questions to go to the jury, and we can talk

23   about those later once you've had a chance to read our briefs.

24        THE COURT:  Okay, all right.

25        MR. BOEHM:  Just to circle back on the exhibit, the

1   trade secret claim identification exhibit number that I believe

2   all the parties have been using is 1157, not 1002 or 190, which

3   were the two exhibits listed in the proposed jury instructions

4   a few months ago.

5           THE COURT:  If I wanted to put my hands on 1157, what

6   would be the easiest way to do it?

7           MS. LEA:  And does that include all of the attachments?

8           MR. BOEHM:  No.

9           MS. LEA:  Okay, and so that's where we have a

09:42 10   disagreement, your Honor.

11           THE COURT:  Okay, so you're all content having this be

12   referenced and then be referenced for the jury as the trade

13   secret document?

14           MS. LEA:  So, no.  We would like for the document with

15   all of the attachments which are part of the trade secrets to

16   be the document that's referenced.

17           THE COURT:  So that's what?  That's 1157 plus what?

18           MS. LEA:  You know, your Honor, I don't have the

19   number.

09:42 20           MR. BOEHM:  It's a couple of big huge binders.

21           MS. LEA:  1219.

22           THE COURT:  They tell me that's not going to be in

23   here.

24           MS. LEA:  Your Honor, we're getting the number for the

25   complete revised trade secret disclosure.

1          THE COURT:  What I have for 1219 is --

2          MS. LEA:  It's not the right number, your Honor.

3          THE COURT:  Okay.

4          MR. BOEHM:  And our position is simple:  Those

5    communications and CAD files and things like that were charged

6    as examples of the disclosures between the parties, but the

7    trade secret claim identification itself was defined entirely

8    distinct from those, so we would go with just the Exhibit 1157.

9          MS. LEA:  And we wrote the trade secrets to include --

09:44 10          MR. BOEHM:  The other point on that, your Honor, is

11   that we would ask that any instruction like that refer to the

12   "trade secret claims" or "claimed trade secrets" or "alleged

13   trade secrets," language like that.

14          THE COURT:  I think we do that.  If we missed one, we

15   missed one, you can fill it in, but I think we have

16   conceptually done that.

17          MR. BOEHM:  Thank you, your Honor.

18          MS. LEA:  Okay, so we have it broken down into

19   multiple exhibits.  It's 1157 through 1219.

09:44 20          THE COURT:  All right, so all those exhibits, they're

21   all admitted into evidence already?

22          MS. LEA:  Yes.

23          THE COURT:  I mean, again, I'm happy to -- I need to

24   think this through a little bit, but what I'm inclined to do is

25   reference 1157, and then if you during your closing argument

1   want to explain to them what that means, it's 1157 plus all the

2   supporting documentation, that's fine, but --

3          MS. LEA:  Well, we drafted the trade secrets to

4   include -- each of those e-mails themselves is the trade

5   secret.  So, I mean, we have the revised trade secret

6   disclosure, and it incorporates all of those exhibits.

7          THE COURT:  Okay, let me think about that.

8          MR. BOEHM:  I just remind the Court that they've taken

9   the staunch position over and over that they have six trade

09:45 10   secret claims, not 120 documents.

11          THE COURT:  Right.  No, I know, I know.  And also I'm

12   worried about, it's a lot for the jury to have to kind of --

13   like, I'm not sure what they're going to do with all of that

14   other than to see that there's a lot.  You know what I mean?

15          MS. LEA:  Well, to see the specific exchanges between

16   the parties of the trade secrets --

17          THE COURT:  They are going to be able to see those,

18   but there's six trade -- I mean, I could even see sort of like

19   doing this with one page, saying that the first trade secret is

09:45 20   Rev. C, the second one is Rev. D.  I mean, I actually, sort of

21   even 1157 is more than I might have done on my own, although

22   I'm willing to give you that, and I understand why you want it.

23          MS. LEA:  I think the point is to have the exhibit

24   numbers in the jury instructions so that the jury can easily

25   find the complete trade secret disclosure, which includes the

 1    attachments.

 2         THE COURT:  I want to think about that, but, okay, now

 3    I know your positions on it.

 4         Okay, those are sort of the -- we'll have more of this

 5    because we're still working through some of these.  Anything

 6    else on your minds this morning before we bring the jury out?

 7         MR. BASKIN:  Your Honor, we have a couple of exhibits

 8    to admit, I believe just one actually.

 9         THE COURT:  Okay.

09:46 10         MR. BASKIN:  And that's Exhibit 178 which was shown

11    during Mr. Michiels' deposition yesterday.

12         (Exhibit 178 received in evidence.)

13         THE COURT:  And where are we on 2145, 161, and 2808?

14         MR. BASKIN:  I believe -- I don't know if they're

15    still entertaining their objections.

16         MS. LEA:  We are.

17         THE COURT:  Okay, I will have to go back and sort

18    those out then.

19         MR. BASKIN:  And, your Honor, I have with me a binder

09:47 20    with all of the deposition clips that were played in transcript

21    form and a CD of them as well.

22         THE COURT:  That's fine.  You can hand those to Karen.

23         Karen, have you been talking to them about how the

24    exhibits are going back to the jury, all on CD or hard copy or

25    both?  What are we doing?

1          (Discussion between the Court and Clerk.)

2          THE COURT:  So all the exhibits will go back on a CD.

3          MR. BASKIN:  Your Honor, we're preparing that CD now.

4     I have been informed that there are some issues with putting

5     Excel files on that CD, and we're working with the IT people to

6     figure that out.

7          THE COURT:  Okay, so that's going to be the agreement,

8     that everything goes back on the disk versus hard copy, or hard

9     copy is going back as well?

09:47 10        MS. LEA:  I would suggest that we do both.

11         THE COURT:  I mean, I'm happy to rule on that, but if

12    you want to see if you can all work that out --

13         MR. BASKIN:  We'll discuss it and let you know.

14         THE COURT:  I mean, I'll rule on it, but if you can

15    have some agreement what's going back to them, I think that

16    would be --

17         MS. LEA:  Sure.

18         THE COURT:  Have you all seen the setup back there?

19         MS. LEA:  No.

09:48 20        THE COURT:  Basically they have a screen like a TV

21    screen that's mounted to the wall, and there's one screen.  And

22    they can quick through and put up whatever they want, but

23    there's not any way for them to look at two things at the same

24    time unless there's hard copies back there as well.

25         MR. BASKIN:  I would just note that the binder I

```
 1    handed up with the deposition clips we've marked as
 2    Exhibits 5055 through 5060.  We don't intend for those to go
 3    back to the jury, but in case the jury requests transcripts,
 4    they'll be on the record.
 5          THE COURT:  Anything else?  All right, we'll bring the
 6    jury out in about ten minutes, so do as you will.
 7          MR. SGANGA:  Thank you, your Honor.
 8          THE COURT:  Maybe start taking a look at that
 9    preliminary charge.
09:49 10          (A recess was taken, 9:49 a.m.)
11          (Resumed, 10:02 a.m.)
12          THE CLERK:  All rise for the jury.
13          (Jury enters the courtroom.)
14          THE COURT:  Thanks for being here, everyone.
15    Mr. Graves or Mr. Flynn.
16          MR. GRAVES:  Your Honor, at this time defendants call
17    our final witness, Carla Mulhern.
18                      CARLA S. MULHERN
19    having been first duly sworn, was examined and testified as
10:03 20    follows:
21          THE CLERK:  Will you please state your name and spell
22    your last name for the record.
23          THE WITNESS:  My name is Carla S. Mulhern,
24    M-u-l-h-e-r-n.
25          THE COURT:  You have to get right up to that
```

1    microphone.

2              THE WITNESS:  Can you hear me now?

3              THE COURT:  Yes.

4    DIRECT EXAMINATION BY MR. GRAVES:

5    Q.   Well, good morning, Ms. Mulhern.  Can you introduce

6    yourself to the jury, please.

7    A.   Yes.  My name is Carla Mulhern, and I'm a managing

8    principal with Analysis Group in the Washington, D.C. office.

9    Q.   And if we can put up on the screen, Ms. Mulhern, did you

10:03 10   prepare a CV for the analysis that you've done in this case?

11   A.   Yes, I did.  This is a copy of my CV that was attached to

12   the expert report that I submitted in this case.

13   Q.   And briefly, Ms. Mulhern, what do you do as a managing

14   principal at Analysis Group?

15   A.   I'm an economist, and I specialize in the application of

16   economic principles that arise in the context of litigation,

17   cases such as these.  Also I specialize in the valuation of

18   intellectual property.

19   Q.   And can you explain in general what that involves.

10:04 20   A.   Yes.  It involves -- in many cases it involves the

21   analysis of damages, and it also involves the valuation of

22   intellectual property, which covers things like trade secrets,

23   patents, copyrights, trademarks, and it covers a variety of

24   industries, including medical devices and in the healthcare

25   field.

1    Q.   For how long have you been doing this, Ms. Mulhern?

2    A.   More than 25 years.

3    Q.   Did you prepare anything for your testimony today?

4    A.   Yes.  I prepared some demonstrative slides to assist in my

5    testimony.

6    Q.   Let's start with your background.  What is your

7    educational history, Ms. Mulhern?

8    A.   I have a bachelor's degree in mathematics from Bucknell

9    University in Lewisberg, Pennsylvania, and I have a master's

10   degree in economics from the London School of Economics and

11   Political Science.

12   Q.   Are you a member of any professional associations?

13   A.   I am.  I'm a member of the American Economic Association

14   and the Licensing Executive Society.

15   Q.   And how are you involved in those two associations?

16   A.   With respect to those associations, I attend meetings, I

17   subscribe to publications, and occasionally I speak at

18   conferences.

19   Q.   Can you summarize for us your work after you finished

20   graduate school.

21   A.   Sure.  After finishing graduate school, I came back to

22   Washington, D.C. in 1989, and I started working with National

23   Economic Research Associates, called NERA for short.  I worked

24   there for five years.  Then I moved to Putnam Hayes & Bartlett,

25   also in Washington, D.C., and then in 1997 I joined Analysis

1    Group, my present employers.

2    Q.   And what did you do over the years at those three jobs,

3    Ms. Mulhern?

4    A.   All three of these firms are economic consulting firms, so

5    that the work that I did was very similar at all three places:

6    analyzing economic issues arising in litigation, including

7    damages assessment and the valuation of intellectual property.

8    Q.   Have you published any work, Ms. Mulhern, that relates to

9    your educational and professional experience?

10:06 10   A.   Yes, I have.

11   Q.   What are some examples of your publications?

12   A.   So I've published a number of articles on analytical tools

13   used to value intellectual property.

14   Q.   Have you given any presentations that relate to your

15   education and your professional experience?

16   A.   Yes.  I'm a frequent speaker on these issues.

17   Q.   Can you explain the relationship between your education

18   and your professional experience and the work that you've done

19   in this litigation.

10:06 20   A.   For the past 25 years, I've been analyzing damages and

21   valuing intellectual property, and that's exactly what I've

22   been asked to do here in responding to the calculations set

23   forth by Mr. Michael Wagner.

24   Q.   Now, Ms. Mulhern, in this lawsuit, is your employer, the

25   Analysis Group, being compensated for your work?

1    A.    Yes, they are.

2    Q.    And how much is the Analysis Group charging?

3    A.    $600 per hour for my time.

4    Q.    Is that compensation in any way dependent upon either the

5    outcome of this case or your findings?

6    A.    No, it's not.

7    Q.    Have you served as an expert witness before in

8    litigations?

9    A.    Yes, I have.

10:07 10    Q.    About how many times?

11    A.    I've testified in court or at regulatory proceedings.  I

12    guess I've testified in deposition more than 50 times and in

13    court at trial just more than 20 times, I think, at this point.

14    Q.    And, generally speaking, what have you done when you've

15    been an expert witness in previous litigations?

16    A.    Generally speaking, my work involves the application of

17    economic principles to issues that have arisen in the

18    litigation context.  Often that involves the analysis of

19    damages or the valuation of intellectual property.

10:07 20    Q.    Ms. Mulhern, before this lawsuit started, had you ever

21    been retained by or done any work for either of the parties in

22    this case, Neovasc or CardiAQ?

23    A.    No.

24    Q.    I want to ask you a few other questions about your

25    background.  Are you claiming to be an expert in technology or

                1   device design?

                2   A.   No, I'm not.

                3   Q.   Are you claiming to be an expert in heart valves or

                4   medical issues?

                5   A.   No, I'm not.

                6   Q.   Are you claiming to be someone who went through the

                7   claimed trade secrets and analyzed them in a technical or

                8   engineering sense?

                9   A.   No.  I'm not an engineer.

    10:08  10         MR. GRAVES:  Your Honor, at this time and under

               11   Rule 703, Neovasc tenders Carla Mulhern as an expert in the

               12   field of economic and financial analysis and monetary relief

               13   assessment.

               14         THE COURT:  Any objection?

               15         MR. HORNE:  No objection.

               16         THE COURT:  Go ahead.

               17   Q.   Ms. Mulhern, to help us get situated as we get started --

               18   and, Bill, if we can turn to the next slide -- are you giving

               19   an opinion here that Neovasc in fact has done something wrong?

    10:08  20   A.   No, I'm not.  As a damages expert, I have to assume a

               21   liability finding.  I have no independent opinion on that

               22   issue.

               23   Q.   So if the finder of fact didn't find liability or legal

               24   wrongdoing in this case, what role would your opinions play?

               25   A.   So if there's no violation, then there's no claim for

1    damages, and both Mr. Wagner's opinion and mine would be

2    irrelevant.

3    Q.   Let's move on to the reason that you're here today,

4    Ms. Mulhern.  What was your assignment in your analysis for

5    this litigation?

6    A.   I was asked to respond to the damages calculations set

7    forth by Mr. Wagner.

8    Q.   And as part of that assignment, did you analyze the

9    reliability of Mr. Wagner's calculations, including the inputs

10:09 10   that went into those calculations?

11   A.   Yes, I did.

12   Q.   Did you develop your own conclusions?

13   A.   Yes, I did.

14   Q.   And what information did you rely on to develop your

15   opinions in this case?

16   A.   I relied on a variety of information, which is the type of

17   information I typically use in these kind of assignments.  That

18   includes publicly available information regarding the companies

19   in suit, CardiAQ and Neovasc, as well as the TMVI marketplace

10:09 20   generally.  I looked at information produced in discovery by

21   the parties in the case.  That's financial information and

22   product information.  I reviewed deposition transcripts of fact

23   witnesses in the case.  Those are sort of the company people

24   that we've heard from here in this trial.  I looked at

25   Mr. Wagner's expert report, of course, and his deposition

transcript.  And I also spoke with Neovasc personnel, including

Alexei Marko, Randy Lane, and Chris Clark.

Q.   Did you rely on any other experts who have given testimony

during this trial?

A.   I did.  For some of my opinions, I'm relying on Neovasc's

technical expert, Mr. Leinsing.

Q.   Now, in the course of preparing your analysis for this

lawsuit, did you create summary charts and analyses?

A.   Yes, I did.  A number of them were attached to my report.

Q.   And if we look at the screen now, are we looking at the

front page of some of the analyses and charts that you put

together and the work that you did?

A.   Yes.  This is a compilation.

Q.   So, Ms. Mulhern, do you agree with Mr. Wagner's

conclusions, his opinions that he gave during this trial?

A.   No, I do not.

Q.   Were you here in the courtroom when Mr. Wagner gave his

testimony last week?

A.   Yes, I was.

Q.   Do you agree with the statements that he made when he was

here last week?

A.   No, I do not.

Q.   Can you tell us generally, why do you disagree with

Mr. Wagner's opinions?

A.   So based on my review of the evidence, Mr. Wagner's

1    damages methodology is fundamentally flawed, meaning that his

2    $90 million royalty estimate is unreliable, excessive, and not

3    an appropriate measure of damages in this case.

4    Q.   You also say up here, you've got something about "even if

5    one assumes that Mr. Wagner's framework were appropriate."

6    What does that mean?

7    A.   So even if we were to set aside those differences of

8    opinion for a moment, if I were to use Mr. Wagner's framework,

9    it's also my opinion that some of his assumptions are

10:12 10    inappropriate and that he had made some errors in his analysis,

11    which lead to an overstatement of that $90 million; and

12    correcting for those errors results in a royalty figure of no

13    more than $2 million.

14    Q.   So a big picture, and, again, if we assume, as we must

15    here, that there is liability in order for you to have your

16    opinions, what is your opinion about damages here?

17    A.   So in general, my opinion is that even if there's a --

18    given the substantial errors in Mr. Wagner's damages approach

19    and the public disclosure of the claimed trade secrets here

10:12 20    early in the period, at least as early as 2010 and 2011, it's

21    my opinion that from an economic perspective, CardiAQ has not

22    shown financial injury, and nor do I see a financial benefit to

23    Neovasc associated with the use of the claimed trade secrets.

24    From a damages perspective, this means that even if there is a

25    liability finding in this case, that the appropriate award for

1    damages would be zero.

2    Q.   Now, Ms. Mulhern, if the jury were to disagree with you

3    and find that damages should be awarded in this case, have you

4    worked through Mr. Wagner's framework, assuming it to be the

5    right one, and provided an alternative calculation?

6    A.   Yes, I have.  As I said, even assuming that Mr. Wagner's

7    framework were appropriate, if I just correct for some of the

8    errors in that framework, it results in a revised royalty

9    figure of no more than $2 million rather than the $90 million.

10:13 10   Q.   Can you tell us about your first disagreement with

11   Mr. Wagner at a high level.  Why do you say that Mr. Wagner's

12   opinions are unreliable and excessive?

13   A.   There are several reasons for that.  I'll go through them

14   briefly here and get into them in more detail.  The first is

15   that there's no evidence of financial injury to CardiAQ.  The

16   second is that, in my view, Mr. Wagner's royalty number is

17   excessive in light of a number of economic benchmarks.  Third,

18   he used the wrong starting point for his analysis.  Fourth, his

19   eight-month head start assumption used for his *Georgia-Pacific*

10:14 20   analysis is unreliable.

21           MR. HORNE:  Your Honor, we renew our 702 objection.

22           THE COURT:  Preserved.

23   A.   And, finally, in my view, his one-size-fits-all royalty is

24   inappropriate.

25   Q.   So let's go through these, Ms. Mulhern, as you mentioned,

1    in more detail.  You mentioned that there was no financial

2    injury.  When you're considering damages calculations in a case

3    like this one, and when you're assuming for that analysis that

4    there's liability, does it matter for a case like this one that

5    the two parties don't have sales of their products?

6    A.   I think this is an important fact from an economic

7    perspective in this case, the fact that neither party has

8    received regulatory approval to sell these devices in any

9    country, so no one is making -- so neither CardiAQ nor Neovasc

10:14 10   are making sales or profits on these devices.

11   Q.   You mention here on the slide, you say "voluntary

12   publication by CardiAQ."  Just generally speaking, from an

13   economic perspective, if there were a disclosure publicly of a

14   claimed trade secret, would that have an effect on a damages

15   analysis in a case like this one?

16   A.   Yes, it would.  Because there are no sales or profits on

17   these products, CardiAQ can't claim damages in the form of lost

18   profits, nor can they claim that Neovasc has unfairly profited

19   associated with sale of these products.  So this means that

10:15 20   Mr. Wagner's approach is to use a royalty theory of damages.  A

21   royalty theory of damages asks us to place a value on the

22   claimed trade secrets; that is, what are they worth?  The

23   voluntary publication of the trade secrets, at least as early

24   as 2010 and 2011, affects that calculus in general.  A trade

25   secret that's kept secret forever is going to be worth a lot

```
 1   more than a trade secret that is kept secret only for a short
 2   period of time.
 3           MR. HORNE:  Your Honor, I'll just object, Rule 26 and
 4   702, to that last answer.
 5           THE COURT:  That's sustained.
 6   Q.   Are you relying, Ms. Mulhern, on another expert in your
 7   opinions about analyzing the effect on damages if one or more
 8   claimed trade secrets entered into the public domain?
 9   A.   Yes.
10   Q.   And who are you relying on?
11   A.   Mr. Leinsing.
12   Q.   Did you hear any testimony in trial from witnesses from
13   CardiAQ regarding disclosures of information in the years 2010
14   and 2011?
15           MR. HORNE:  Objection, your Honor.  The same
16   objections, 26 and 702.
17   Q.   And based -- I'm sorry.
18           THE COURT:  Overruled.
19   Q.   And based on your reliance as you've just described it
20   from a purely economic perspective, why would the publication
21   of one or more items claimed to be a trade secret, why would
22   that be something that would have an effect on a damages
23   analysis in a case like this one?
24   A.   Well, again, as I said, we're talking here about the value
25   of the claimed trade secrets.  That's the intellectual property
```

1   that's at issue here.  In general, intellectual property or

2   trade secrets that are kept secret forever are going to be

3   worth a lot more than trade secrets that are disclosed to the

4   public after only a short period of time.  No one would pay a

5   lot of money for a trade secret that's freely available to the

6   public.

7   Q.   Ms. Mulhern, we have had trouble all week, both parties

8   have, with the microphones and the audio.  Can I ask you to

9   move up a little bit.

10  A.   Yes.  How's that?  Is that better?

11  Q.   Yes, that's better.  Now, you mentioned that Mr. Wagner

12  calculated a royalty.  What is a royalty exactly from the

13  perspective of a damages analysis?

14  A.   So a royalty is a license fee, and a royalty is intended

15  to reflect the value to Neovasc of the use of the claimed trade

16  secrets.

17  Q.   And you say here "Hypothetical negotiation at the time of

18  alleged misappropriation."  What's a hypothetical negotiation?

19  A.   So it's a fancy way of saying, the courts have set out a

20  construct for us to use in analyzing royalty.  It's called a

21  "hypothetical negotiation construct" where we imagine that the

22  two parties, here CardiAQ on the one hand and Neovasc on the

23  other, would have sat down at a negotiating table and bargained

24  over a license to the intellectual property -- here the claimed

25  trade secrets -- in exchange for a license fee.  That's the

1    royalty.

2    Q.   Now, you also say here "At time of alleged

3    misappropriation, March, 2010."  Why would this hypothetical

4    negotiation be timed at March of 2010 rather than today in May

5    of 2016?

6    A.   Well, the courts require us to set that hypothetical

7    negotiation at the time of first -- at the first violation, so

8    first misappropriation, and here we know that is March, 2010.

9    That is the last time at which Neovasc had access to the

10:18 10   CardiAQ claimed trade secrets.  So the court requires us to

11   imagine that this negotiation had happened back in March, 2010.

12   Q.   Now, is that the same date of the hypothetical negotiation

13   that the CardiAQ expert, Mr. Wagner, used?

14   A.   Yes, it is.

15   Q.   Are there other important parts of a royalty analysis in a

16   case like this one?

17   A.   Yes.  A royalty framework also requires us to assume that

18   both parties are willing to enter into a license.  This means

19   that CardiAQ is willing to license its intellectual property

10:19 20   and Neovasc would be willing to make a license fee.  This means

21   that the license fee we arrive at or the royalty must be

22   acceptable to both parties.

23   Q.   Why in this analysis does the willingness of the parties

24   in the hypothetical negotiation matter?

25   A.   This means that that royalty amount that we arrive at has

1    to be acceptable to both parties at the time of the hypothetical

2    negotiation, here March 2010.

3    Q.   Now, in the framework for a hypothetical negotiation,

4    after making the royalty payment to the plaintiff in this

5    negotiation framework, is the defendant to be left with a

6    profit or with a loss?

7    A.   Typically a defendant is left with a profit after

8    royalties, so that they enjoy some of the benefit of the

9    license.

10:20 10   Q.   Now, in this case, what exactly is the royalty trying to

11   calculate?

12   A.   So in this particular case, the royalty then is going to

13   try to capture the value to Neovasc of access to and use of the

14   claimed trade secrets in that period prior to the public

15   disclosure in 2010 and 2011.

16   Q.   And when you say "value to Neovasc," in economic terms,

17   what are you getting at there?

18   A.   There are two potential forms of economic benefit to

19   Neovasc in this case, and those can be thought of broadly as

10:20 20   avoided costs:  Did Neovasc save money as a result of its

21   ability to use the claimed trade secrets, or did it save time

22   associated with its use of the claimed trade secrets.

23   Q.   Now, when you talk about avoided cost or avoided time, and

24   from an economic perspective, does it make any difference in

25   that analysis if it were found that information claimed to be a

1    secret had subsequently become publicly available?

2    A.    Yes.  I think that's an important point because then what

3    we're looking at here is the narrower question of, how much

4    money did Neovasc save or how much time did it save relative to

5    just waiting until that information became freely available to

6    the public?

7    Q.    So now I want to, with this background, walk through the

8    points that you mentioned, that, in your opinion, the royalty

9    from Mr. Wagner is excessive, that the starting point for his

10:21 10   analysis was wrong, that the 18-month assumption is unreliable

11   from an economic perspective, and that there's a problem with a

12   one-size-fits-all royalty.  Let's start, Ms. Mulhern, with your

13   opinion that Mr. Wagner's royalty is excessive.  When you say

14   that his $90 million number is excessive, excessive relative to

15   what?

16   A.    In my view, that $90 million is excessive relative to a

17   number of economic benchmarks.

18   Q.    And specifically what are they?

19   A.    So if we look in the second bar there, I've compared

10:22 20   Mr. Wagner's $90 million royalty number to CardiAQ's total

21   spending on research and development from the period August,

22   2008, when they began to develop their TMVI device, to April,

23   2010, which is the last date at which Neovasc had access to

24   CardiAQ confidential information.

25   Q.    Is that the second bar here, this first blue bar on your

1    screen here, 0.5 or $500,000?

2    A.    Right.   This is the $500,000 number that appears in the

3    second bar.

4    Q.    Now, what about that caused you to conclude that

5    Mr. Wagner's $90 million number is excessive?

6    A.    Well, in analyzing the value of a license to Neovasc to

7    the claimed trade secrets, as I mentioned, one relevant

8    consideration is, did Neovasc save money by using CardiAQ's

9    claimed trade secrets, as opposed to developing that technology

10:23 10   on its own, spending its own money to develop the technology?

11   To inform the amount of potential cost savings then to Neovasc,

12   I looked at how much CardiAQ spent to develop the technology in

13   this relevant period, and they spent $500,000.

14   Q.    Now, just for clarity, is the $500,000 that CardiAQ spent

15   during that period on R&D, is that money that was specifically

16   attributed by CardiAQ in their financials to the claimed trade

17   secrets in this case and not to other things?

18   A.    No, it wasn't.   Unfortunately, CardiAQ did not produce its

19   financial information in such granular detail.   There wasn't

10:23 20   enough information from CardiAQ records for me to assess how

21   much time they spent just on the claimed trade secrets.   This

22   is a total figure for all of their spending starting back in

23   August, 2008, which is when they first began development on the

24   device.

25   Q.    Now, in this opinion that you're giving where you look

        1    from the point of view of the hypothetical negotiation, you

        2    look at the price that's being asked or the payment price

        3    that's being asked, and then you look at how much the offering

        4    party or the licensor spent to develop what's being offered for

        5    license.  Is there a name in economics for that type of

        6    analysis?

        7    A.    This kind of approach is generally referred to as a "cost

        8    approach."

        9    Q.    Okay.  And what is a cost approach, Ms. Mulhern?

10:24  10    A.    A cost approach is a well-accepted valuation methodology

       11    which essentially values intellectual property based on the

       12    costs associated with developing it.

       13    Q.    Now, were you here in court last week when Mr. Wagner

       14    testified that this cost approach is, quote, "usually does not

       15    give you a very good indication of value"?

       16    A.    Yes, I was.

       17    Q.    And in your own career, have you ever criticized a cost

       18    approach in particular contexts?

       19    A.    I have.  Depending on the particular facts and

10:24  20    circumstances of a case, a cost approach can either overvalue

       21    or undervalue a technology.

       22    Q.    So in this case and in this particular context, do you

       23    agree with Mr. Wagner that the cost approach isn't a good way

       24    to go about this?

       25    A.    No, I don't.  In this case, I think the cost approach

1    provides useful guidance as a reasonableness check on

2    Mr. Wagner's overall methodology, which is how I've used it.

3    Mr. Wagner's methodology relies solely upon an income-based

4    approach, which is problematic here because that relies on an

5    assessment of profits, revenues and profits associated with the

6    sale of a product, and we have no revenues and profits yet in

7    this case.  So in my view, his reliance solely on the income

8    approach is problematic here.

9    Q.   So just to play out this cost approach a little bit

10   further, if you're using a cost approach and CardiAQ is

11   spending money to develop the thing that's going to be

12   licensed, is that like they're making an investment?

13   A.   Yes, it is.

14   Q.   And when you think about this cost approach typically from

15   an economic perspective, do you consider not just the costs

16   that they would spend but a reasonable rate of return for the

17   licensor on the things that are being licensed?

18   A.   Yes, you would.  So in thinking about the cost approach,

19   one would think not only about the $500,000 spent but also

20   allowing CardiAQ a reasonable return on that investment.

21   Q.   Did you do that calculation yourself, Ms. Mulhern?

22   A.   I didn't do the formal calculation here because I don't

23   have access to the particular financial records associated with

24   the costs, the costs associated with just the claimed trade

25   secrets.  Here I'm just using this as a reasonableness check.

 1  In my view, even allowing for a reasonable rate of return,

 2  there's a lot of difference between the $90 million and the

 3  $500,000.

 4  Q.   Now, you've mentioned here that CardiAQ spent half a

 5  million dollars during a particular time period on R&D.  When

 6  you did your analysis, did you also take note of how much

 7  CardiAQ spent -- how much they've spent in total to develop

 8  their device?

 9  A.   Yes.  In total, for the last date which I had data, when I

10:27 10  put my report together, so that's through 2014, CardiAQ had

11  spent $11.5 million in developing the TMVI device.

12  Q.   And did your analysis in this case also mention how much

13  Neovasc has spent to develop its Tiara device?

14  A.   Yes.  Over this same period or through this same period,

15  Neovasc had spent $14.9 million.

16  Q.   Now, of those two companies, which spent more to develop

17  their device?

18  A.   Neovasc.

19  Q.   Now, you also here are comparing the $90 million number in

10:27 20  red to something else.  What else are you comparing it to?

21  A.   So this last bar here, the $12.8 million, I'm comparing

22  the $90 million to the overall company value, the value of

23  Neovasc as a company just prior to the hypothetical negotiation

24  in 2010.

25  Q.   Now, Mr. Wagner testified that in early 2010, February,

1    2010, this market value for Neovasc of $12.8 million really

2    isn't the right number because nobody knew then that Neovasc

3    was contemplating or starting an idea for a mitral device.  Do

4    you agree with his point?

5    A.   I do agree that as of that time, Neovasc had not told the

6    market it was developing the Tiara, so the value of Tiara

7    cannot be reflected in the $12.8 million.  But I also note that

8    at that time the Tiara project was in its infancy, and it's

9    unlikely as a result that the market would have placed

10   substantial value on the project at that time.

11   Q.   Let's discuss your next opinion, that Mr. Wagner's

12   starting point is flawed or erroneous.  Can you explain for us

13   what that means.

14   A.   Sure.  As a starting point for Mr. Wagner's royalty

15   analysis, he uses a 2015 valuation for Tiara.  So this

16   implicitly assumes that Neovasc's access to and purported use

17   of the claimed trade secrets affected the overall development

18   timeline and then the valuation of Tiara several years later in

19   2015.  Given the public disclosure of the claimed trade secrets

20   early in this period, in 2010 and 2011, this assumption fails

21   to account for the possibility that Neovasc could have just

22   waited to use the claimed trade secrets until they became in

23   the public domain without affecting its overall development

24   timeline.  So this is a critical error on the part of

25   Mr. Wagner.

```
 1   Q.   Now, before we get further, and understanding that you
 2   yourself are not a technical expert, can you remind us again if
 3   you relied on other expert testimony in considering potential
 4   public disclosures of information that's claimed as a trade
 5   secret in the years 2010 and 2011?
 6   A.   Yes, I did.  As I said, I relied on Mr. Leinsing for his
 7   technical opinions in this regard.  As I understand
 8   Mr. Leinsing's testimony yesterday, it's Neovasc's view that
 9   all of the claimed trade secrets were in the public domain
10   prior to the hypothetical negotiation; but as a damages expert,
11   I have to assume liability, so I'm going to set that aside.
12   But even setting that aside, the evidence shows, according to
13   Mr. Leinsing, the claimed trade secrets were in the public
14   domain at least as early as April, 2010, and December, 2011.
15   Q.   And, again, did you hear any testimony from people from
16   CardiAQ along the same lines regarding disclosures in April,
17   2010, and December, 2011?
18   A.   Yes.  I reviewed the trial transcripts of Dr. Quadri and
19   Mr. Ratz which were consistent with this.
20            MR. HORNE:  Objection, 702.
21            THE COURT:  Overruled.
22   Q.   Now, based on your reliance on Mr. Leinsing regarding the
23   trade secret issues on which you yourself are not a technology
24   expert, from an economic perspective, and when you assess
25   whether access to that information affected Neovasc overall
```

1    development timeline, did you also consider Mr. Ratz's point in

2    his testimony that Neovasc got access to the claimed trade

3    secrets before April, 2010, as early as June or July of 2009,

4    about ten months earlier?

5    A.   Yes, I did.

6    Q.   And from an economic perspective, wouldn't earlier access

7    to this information be expected to accelerate Neovasc's overall

8    development timeline, even based on your reliance on

9    Mr. Leinsing, if the information became public later?

10:31 10   A.   Not necessarily.  It depends critically on how much work

11   Neovasc was doing in that time frame.

12   Q.   And based on your analysis in this case, are you aware

13   of -- exactly how much work had Neovasc been doing on the Tiara

14   project as of April, 2010?

15   A.   Very little.  So as of April, 2010, as Mr. Marko

16   testified, the Tiara wasn't even an official project at

17   Neovasc, and I think just one person, Randy Lane, had been

18   authorized to spend some time on his lunch hour or evenings and

19   weekends to investigate the feasibility of the concept.  In

10:32 20   fact, based on my research, Mr. Lane had spent only about 44.5

21   hours on the project in the time from October, 2009, when they

22   began to April, 2010, so about a week's worth of work until

23   this first disclosure.

24   Q.   From an economic perspective, what does that tell you

25   about the impact if Neovasc just waited until April, 2010, to

 1    begin development on Tiara?

 2            MR. SGANGA:  Objection, your Honor, 702, and this

 3    might be worth a sidebar.

 4            THE COURT:  Okay, that's fine.

 5    SIDEBAR CONFERENCE:

 6            MR. HORNE:  So I'm just concerned that we're getting

 7    close, and I'm anticipating a comment that from an economic

 8    perspective, this is really a proxy for common sense, and it's

 9    really not an expert opinion.  She's going to say, from an

09:36 10   economic perspective, it would make sense that he didn't spend

 11   a lot of time, sort of ended up relying on the timeline.  And

 12   my concern and my objection is, economic perspective just means

 13   common sense as a layperson, that there's no economic

 14   perspective on how long it takes Neovasc to develop a product.

 15           MR. GRAVES:  As set forth in her report issued back

 16   November-December and her deposition, she's analyzing the

 17   overall calculation for a royalty, which really depends on the

 18   timing of certain events, and pointing out that the calculation

 19   would differ if you considered the actual development timeline

09:36 20   facts from an economic perspective.  So she's bringing to bear

 21   financial tools to each input into Mr. Wagner's calculations.

 22   Again, this is the subject of her report.  It's a big part of

 23   it.  We're well past the deadline in the case for this sort of

 24   thing, and all of this was fully at issue in her report.

 25           THE COURT:  I hear the objection.

```
 1              MR. HORNE:  My response to that is, when she's talking
 2       about the timeline, it has to be from the perspective of a
 3       technical person.  For a layperson, I don't see how an economic
 4       perspective adds anything.
 5              THE COURT:  Well, I view the time value of money to be
 6       an economic concept.
 7              MR. HORNE:  That's not what she's saying about the
 8       timeline.
 9              THE COURT:  No, it's not, but I'm just saying, there
09:37 10     are things that are not technical, so we'll see where she goes
11       with that.
12              MR. HORNE:  Thank you, your Honor.
13              (End of sidebar conference.)
14       BY MR. GRAVES:
15       Q.   Ms. Mulhern, let me ask that question again.  From an
16       economic perspective, what does all of this tell you about the
17       impact on Neovasc if they were to wait until April, 2010, to
18       begin the development of their Tiara project?
19       A.   Given that as of April, 2010, Neovasc had only spent about
10:35 20     a week in development of the Tiara, Mr. Wagner's failure to
21       consider the possibility that Neovasc could have made up that
22       week of time over the ensuing several years is a critical
23       omission in his analysis.
24       Q.   And how does that relate to his use of the 2015 valuation
25       of Tiara in your critique of that?
```

1    A.    So if Neovasc had been able to make up that development

2    time, then there would be no impact on the 2015 valuation,

3    meaning Mr. Wagner's starting point is fundamentally flawed.

4    Q.    Did you investigate in your analysis in this case how much

5    work Neovasc had done on the Tiara project prior to the second

6    date that we've heard about from Mr. Leinsing, the December,

7    2011 patent publication date?

8    A.    Yes, I did.  To analyze this, I looked at time records

9    that Neovasc produced for its R&D personnel.

10:36 10    Q.    And based on your analysis, approximately when did the

11    Tiara project at Neovasc become a fully fledged formal project?

12    A.    I think, as Mr. Marko testified, that project, it became a

13    fully official project within Neovasc as of June, 2011.

14    Q.    And so when you looked at the Neovasc time entry records

15    for your analysis, what did you learn?

16    A.    Looking at the time entry records for Neovasc over the

17    period April, 2010, to December, 2011, showed me that the

18    project wasn't a high -- Neovasc personnel spent relatively

19    limited time on R&D on that project during that period.  About

10:37 20    16 percent of their time was spent on the Tiara relative to

21    other projects, so it looks as though Neovasc was pursuing

22    other priorities at that time.

23    Q.    Now, to summarize, over the years or the period from

24    April, 2010, to 2011, and looking again at your analysis of the

25    time records, how much total time did Neovasc spend in

1    developing the Tiara project?

2    A.    So this slide shows my calculations here.  If I look at

3    the total time from the prior slide and recognize that Neovasc

4    had about eleven employees working on the project, this means

5    that it translates to about 2.8 months of full-time work.

6    Q.    Did you analyze anything else in terms of financial

7    records in determining how far along Neovasc was in developing

8    the Tiara project, again, as of that date, December, 2011, that

9    Mr. Leinsing spoke about with respect to that patent publication?

10:38 10   A.    Yes.  I also looked at the intensity of Neovasc's

11   development efforts in this period from a financial

12   perspective.

13   Q.    And what did you learn when you did that?

14   A.    I have a slide here, yeah.  As I mentioned, Neovasc's

15   total R&D spending on the Tiara was $14.9 million.  In this

16   early period, though, up through 2011, they'd only spent about

17   $1 million.  So less than 7 percent of the R&D spending was

18   spent in this early period, which is consistent with the time

19   records in telling the story that this wasn't -- they weren't

10:38 20   investing a lot of effort in the project at this point in time.

21   Q.    So from an economic perspective, and in relation to your

22   critique of Mr. Wagner's use of the 2015 valuation as his

23   starting point, what did you conclude from your analysis of the

24   time records and the financial records?

25   A.    So, again, given the public disclosure of the trade

       1    secrets in 2010 and 2011, in conjunction with the relatively

       2    limited amount of effort Neovasc had put into the project at

       3    that point, it was unreasonable for Mr. Wagner to assume that

       4    the purported use of the claimed trade secrets affected the

       5    overall Tiara valuation several years later in 2015.

       6    Q.   Now, if the development timeline weren't affected by the

       7    wrongdoing that we're assuming for your analysis, what

       8    implications would that have for Mr. Wagner's royalty

       9    calculations?

10:39 10    A.   Well, then the 2015 valuation wouldn't have been affected,

      11    and he's used the wrong starting point.

      12    Q.   Are there other problems, in your view, Ms. Mulhern, with

      13    Mr. Wagner's use of the 2015 valuation of Tiara as a starting

      14    point in his own analysis?

      15    A.   Yes.  As I mentioned earlier, the hypothetical negotiation

      16    here occurs in March, 2010.  So Mr. Wagner's use of the 2015

      17    valuation several years later, in my view, is inappropriate.

      18    Q.   Now, I want to move now to your point where you mentioned

      19    Mr. Wagner's assumption of a head start.  To begin with, is

10:40 20    there a reason from an economic perspective why you would ask

      21    whether Mr. Wagner's assumption of an 18-month head start was

      22    reliable?

      23    A.   Yes.  As I understand it, the assumption of an 18-month

      24    head start is an important input into Mr. Wagner's analysis.

      25    So in analyzing the reliability of his overall damages

1  calculation, it's important to analyze the reliability of the

2  inputs.

3  Q.   Now, to get started and when you're thinking about damages

4  calculations, what exactly do we mean by the phrase

5  "head start"?

6  A.   So I think "head start" here just refers to the

7  possibility that Neovasc could have cheated by skipping steps

8  as a result of having access to the CardiAQ claimed trade

9  secrets.

10:41 10  Q.   And in the framework of Mr. Wagner's calculations in

11  getting to his $90 million number, what role did that

12  assumption of an 18-month head start play?

13  A.   So as Mr. Wagner testified, his 18-month head start

14  assumption was -- I think he referred to it as a fulcrum point

15  for his *Georgia-Pacific* analysis.

16  Q.   And, generally speaking, what was the basis of where that

17  18-month head start number came from that he inputted into his

18  calculations?

19  A.   Mr. Wagner testified that he relied on Mr. Ratz for that

10:41 20  assumption.

21       MR. HORNE:   Your Honor, we renew our 403 objections.

22       THE COURT:   Preserved.

23  Q.   In your analysis and your review of Mr. Wagner's opinions,

24  did Mr. Wagner cite to any other evidence in support of that

25  point?

A.    No, he didn't.

      MR. HORNE:  Also Rule 702.  I apologize.

      THE COURT:  Preserved.

Q.    In your reliance on Mr. Leinsing and your review of
Mr. Leinsing's testimony, did he provide any evidence for a
wrongful head start?

A.    He did.  As I understand Mr. Leinsing's testimony, he
opined that there was no head start as a result of the
purported use of the claimed trade secrets.

Q.    In your analysis, in your own work here, and from an
economic perspective, did you consider any information about
the time that it did or didn't take Neovasc to develop its
Tiara device?

A.    So in analyzing the reliability of this assumption, I also
examined evidence that was available to me regarding the
development timelines for the two parties, CardiAQ and Neovasc.

Q.    And if we look over to the next slide, Bill.  What are we
looking at here, Ms. Mulhern?  What is the information on this
slide?

A.    So this is a somewhat complicated exhibit.  For that, I
apologize.  It shows the two development timelines for the two
parties up until the date of the first in-human implantation,
the first successful in-human implantation.  CardiAQ's timeline
is on the top and Neovasc is on the bottom.  These are
timelines that were provided by Mr. Wagner in his expert

1    report, although it was slightly different.  He used the actual

2    dates, which reflect the fact that CardiAQ started work earlier

3    than Neovasc on these devices.  Here what I've done is to, in

4    order to put the timelines side by side and compare them, I've

5    normalized them so each begins with month one.

6    Q.   And what milestones did you compare when you looked at

7    these charts or these pieces of information from Mr. Wagner's

8    own analysis?

9    A.   In comparing these charts, I looked at a few milestones:

10:43 10   the initial in vivo animal testing, regulatory testing, and

11   first successful in-human implantation.

12   Q.   And, Ms. Mulhern, why did you look at those milestones in

13   particular?

14   A.   Mr. Wagner characterized those as major milestones in his

15   expert report.

16   Q.   So if we turn over to the next slide, Bill.  What did you

17   find, Ms. Mulhern, when you looked at this information that

18   came from Mr. Wagner?

19   A.   For some of these milestones, Neovasc actually took longer

10:44 20   to get there.

21   Q.   How so?

22   A.   If I look at the animal studies milestone, it looks as

23   though Neovasc took one month longer to get there, and for

24   first in human, it looks as though Neovasc took five months

25   longer to get there.

```
 1    Q.   Is this type of comparison economically relevant when

 2    you're considering damages calculations?

 3    A.   Yes, I think it is.

 4         MR. HORNE:  The same objection as at sidebar.

 5    A.   Sorry.  Yes, I think it is.  While it's not dispositive --

 6    Q.   Sorry, Ms. Mulhern.

 7    A.   Oh, I'm sorry, I'm sorry.

 8         THE COURT:  Overruled.

 9    Q.   Let me just ask it again so we have a clean question.

10:44 10   Sorry about that.  From an economic perspective, does this sort

11    of comparison, is it meaningful when you're thinking about

12    damages calculations in a case like this one?

13    A.   Yes, it is.  While it's not dispositive, it certainly is

14    inconsistent with an opinion of an 18-month head start.

15    Q.   Now, with respect to the source or the origin of

16    Mr. Wagner's assumption that there was an 18-month head start,

17    do you have an understanding of what that number represents?

18    A.   Yes, I do.

19    Q.   And what is your understanding?

10:45 20   A.   It's my understanding that that number represents the

21    amount of time that CardiAQ spent in developing its TMVI device

22    from when it started in 2008 to the termination of the Neovasc

23    relationship in 2010.

24    Q.   And, in your opinion, is the time that CardiAQ spent

25    during that period a reliable proxy for assuming a wrongful
```

1   head start by Neovasc?

2   A.   No, absolutely not.

3   Q.   Are there factors that an economist, in your opinion,

4   should consider when assessing whether the time that it takes

5   one company to get from Point A to Point B would be equivalent

6   or roughly equivalent to the time it would take another company

7   to get from Point A to Point B?

8   A.   Yes.

9   Q.   Can you explain your opinion on that issue, Ms. Mulhern.

10:46 10   A.   Yes.  I think, first, it's important to remember that the

11   time spent by one party is not going to be the same.  One just

12   can't assume that that's equivalent to the time saved by

13   another party.  It can depend on -- before one makes that

14   assumption, one needs to investigate specific facts and

15   circumstances.

16   Q.   And what are some of the facts and circumstances that in

17   your view an economist ought to consider when thinking about

18   those types of assumptions?

19   A.   The one --

10:46 20         MR. HORNE:  Objection.  702, your Honor.  I apologize

21   for interrupting.

22         THE COURT:  On your last objection?

23         MR. HORNE:  Yes.

24         THE COURT:  Or is this a new objection?

25         MR. HORNE:  702 to this question.  Sorry.

1          THE COURT:  702 to this question.  Overruled.

2     Q.   Let me just ask it again, Ms. Mulhern.  What are some of

3     the facts and circumstances that in your opinion an economist

4     ought to consider when thinking about assumptions of head

5     start?

6     A.   So before assuming that the time spent by one party is

7     going to be exactly the same as the time spent by another

8     party, one should look at specific facts, such as how much

9     effort were the parties putting in, how many resources, did the

10:47 10  parties have different levels of resources devoted to the

11    project that would enable maybe one party to move faster?

12    Q.   Now, you've mentioned or you've described your reliance on

13    Mr. Leinsing with respect to his testimony about publication

14    dates of some patent documents from CardiAQ.  For that sort of

15    thing, if there's a disclosure of information that's claimed to

16    be a trade secret sort of after the fact, does that have any

17    implications when you're thinking about an assumption of a head

18    start?

19    A.   Yes, it does.

10:48 20  Q.   How so?

21    A.   So I think here, the fact of the public disclosure of the

22    trade secrets in 2010 and 2011 has important implications for

23    the head start because, as we heard earlier, as I mentioned

24    earlier, as of 2011, Neovasc had only spent about three months'

25    worth of time in developing the Tiara device.  So one needs to

1    consider the possibility that Neovasc could have made up that

2    time between then and 2015, or prior to market approval, which

3    would suggest then no head start or no impact on overall time

4    to market.

5    Q.   In your review of Mr. Wagner's work, did he consider any

6    of these types of factors that you've mentioned relative to his

7    assumption of an 18-month head start?

8    A.   No, he didn't.  Based on my review of Mr. Wagner's work,

9    he didn't consider whether there were differences in the amount

10   of resources that the parties had to spend on the project, as

11   in different numbers of people working on the development of

12   the CardiAQ device versus Neovasc device.  He didn't consider

13   the relative skills and experience of the parties, maybe

14   whether one party had more expertise in an area than another.

15   He didn't consider whether one party may have made some

16   mistakes in development, as in going down some dead ends or dry

17   holes.  And he didn't consider whether maybe one party would

18   have been constrained due to lack of funding for some periods

19   requiring interruptions in the development process.  As well,

20   he didn't consider, as we just discussed, the public disclosure

21   of information that could be relevant to the development

22   process.

23   Q.   Now, in your opinion, Ms. Mulhern, what impact, in your

24   view, does Mr. Wagner's failure to consider those types of

25   factors have on his 18-month assumed head start?

A.   This suggests to me that the 18-month head start

assumption is unreliable.

         MR. HORNE:   702 again, your Honor.

         THE COURT:   Overruled.

Q.   If Mr. Wagner had not assumed a head start rather than

assuming an 18-month head start, what effect would that have on

his calculation, his damages calculation in this case?

A.   As Mr. Wagner testified, if there's no 18-month head

start, there's no $90 million royalty.

Q.   I want to move on now, Ms. Mulhern, to the next opinion

that you described earlier.  You said something about a

one-size-fits-all royalty.  What do you mean by that?

A.   So Mr. Wagner's royalty opinion here is that the

$90 million figure applies to each of the claimed trade secrets

alone, as well as all of them together, or any subset of the

trade secrets.  This suggests from an economic perspective that

his methodology is not tied very closely to the intrinsic value

of the intellectual property at issue.

Q.   Well, understanding that you're not a technical expert,

can you give me an example of why the claimed trade secrets

shouldn't have the same price tag from a financial perspective?

A.   So, as I understand it, claimed Trade Secret 6 can be

thought of as a cumulative total of the other trade secrets.  I

think Mr. Wagner referred to it as the "kitchen sink."

Mr. Wagner's opinion is that that cumulative total of the

1    $90 million is worth the same as each individual part, which

2    just makes no economic sense.

3    Q.   In your review of Mr. Wagner's opinions, did he give an

4    opinion on the value of any sub-elements or subparts standing

5    alone out of those claimed trade secrets; by way of example, a

6    mushroom tab standing alone or a CAD file standing alone?

7    A.   No, he didn't.

8    Q.   So we've discussed now your opinions that Mr. Wagner's

9    $90 million number is excessive, that he used the wrong

10:51 10   starting point with that 2015 valuation, that his assumption of

11   an 18-month head start is unreliable, and that there's a

12   problem, in your opinion, with using what you call a

13   one-size-fits-all price tag for the various claims.  As a

14   result of all of these opinions, Ms. Mulhern, and again if

15   we're assuming liability here, what damages do you believe are

16   appropriate?

17   A.   Zero damages.

18   Q.   Why do you say zero damages?

19   A.   Given the substantial errors in Mr. Wagner's methodology

10:52 20   in conjunction with the early public disclosure of the claimed

21   trade secrets, it's my view that there's no evidence of

22   financial injury to CardiAQ or financial benefit to Neovasc

23   associated with the alleged use of the claimed trade secrets.

24   This means that even in the event of a liability finding, the

25   appropriate damages number is zero.

1   Q.   Let's imagine that someone disagrees with you and believes

2   that Mr. Wagner nonetheless did use the right framework in

3   putting together his calculations.  In that scenario, do you

4   believe that his $90 million number is the right result?

5   A.   No.  In my view, that number is still substantially

6   overstated.  So even using his methodology and correcting for

7   some of those errors, that would result in a revised reasonable

8   royalty number of no more than $2 million.

9   Q.   To get us situated, how did Mr. Wagner mathematically or

10:53 10   using calculations get to that $90 million number?

11   A.   So I provided a schematic that sort of shows a graphical

12   depiction of Mr. Wagner's methodology with his 2015 Tiara value

13   starting point, then how he arrives at the baseline royalty

14   that he talked about, the impact of his 18-month head start

15   assumption in his *Georgia-Pacific* factor analysis, and then the

16   remaining analysis of the *Georgia-Pacific* factors which

17   resulted in his number of $90 million.

18   Q.   Can you create an alternative royalty calculation using

19   this framework, again, Mr. Wagner's framework?

10:53 20   A.   Yes, I did.

21   Q.   And you also mentioned a moment ago that even if we used

22   Mr. Wagner's framework, you disagree with it.  Why is that?

23   A.   I have three primary concerns.  I think there are three

24   main types of errors.  The first is, he overstated the baseline

25   royalty.  The second is, he used an exaggerated and unreliable

1    estimate of the head start, and, third, he made errors in his

2    analysis of the *Georgia-Pacific* factors.

3    Q.   And big picture, what would be the impact, in your

4    opinion, of correcting those points of disagreement, again

5    using Mr. Wagner's framework?

6    A.   So using this framework, I prepared an alternative

7    schematic where I've just replaced the numbers that reflect my

8    corrections, and that would result in a royalty of $2 million.

9    Q.   Let's start with the first issue that you mentioned.  Do

10:54 10   you disagree with the way that Mr. Wagner calculated his

11   $125 million baseline royalty?

12   A.   Yes, I do.

13   Q.   Why?

14   A.   In calculating that number, Mr. Wagner starts with that

15   2015 valuation of Tiara.  That's the starting point we talked

16   about earlier.  As I mentioned, I think that's fundamentally

17   flawed.  But even setting aside that area of disagreement, even

18   assuming the 2015 valuation could be the appropriate place to

19   start, Mr. Wagner should have made a couple of adjustments to

10:55 20   that number to take into account the fact that the hypothetical

21   negotiation is five years earlier in 2010.

22   Q.   And what are those two points of adjustment, in your view?

23   A.   The first is, he fails to express that 2015 valuation in

24   2010 dollars; and the second is, he fails to account for

25   greater uncertainty about the risks associated with the Tiara

1    project in 2010 than in 2015.

2    Q.   Can you explain for us the first of those points, the idea

3    that a 2015 valuation should be expressed in 2010 dollars.

4    What does that mean?

5    A.   Sure.  As Mr. Wagner acknowledged, these devices aren't on

6    the market yet, and we don't expect, even assuming regulatory

7    approval, we don't expect any revenues or profits from these

8    devices until several years into the future.  So in doing his

9    analysis, Mr. Wagner had to discount those future cash flows to

10:56 10   2015 to do his 2015 valuation.  This discount factor was

11   designed to, as he testified, account for the time value of

12   money and the uncertainty associated with the cash flows in the

13   future.

14   Q.   If Mr. Wagner had discounted the 2015 Tiara valuation back

15   to 2010 dollars, what would have been the impact on his

16   baseline royalty?

17   A.   So if Mr. Wagner had carried through that exercise of

18   discounting the cash flows from 2015 all the way back to 2010,

19   the time of the hypothetical negotiation, which is more

10:56 20   appropriate, in my view, it would have resulted in a

21   substantially lower number.

22   Q.   You also mentioned as your second point of disagreement

23   that Mr. Wagner didn't account for what you described as

24   uncertainty between 2010 and the year 2015, over that five-year

25   period.  What do you mean by that?

1    A.   So this is a critical difference here, especially with

2    respect to the facts of this particular case.  In 2010, the

3    Tiara project was in its infancy in terms of they were just

4    getting started.  As I mentioned, there were only about a

5    week's worth of work on the project.  So the project was just

6    in its infancy.  In 2015, the project had already completed a

7    number of make-or-break type milestones, which failure at any

8    one of those junctures could have killed the whole project.  So

9    in 2010, the project was subject to much greater risk and

10:57 10   uncertainty than in 2015.

11   Q.   Is there a way to capture economically the impact of those

12   uncertainties that would have existed, in your opinion, in 2010

13   compared to 2015?

14   A.   Yes.  We economists would do that through the discount

15   factor.

16   Q.   Now, what discount factor or discount rate did Mr. Wagner

17   use in his own calculations?

18   A.   He used a 25 percent discount factor.

19   Q.   What rate do you think is appropriate?

10:58 20   A.   I think a discount factor of 40 percent is more

21   appropriate.  As Mr. Wagner acknowledged, a higher level of

22   risk is associated with a higher discount rate.

23   Q.   Now, with all of these factors that you've just discussed

24   accounted for, did you provide a corrected estimate, again, if

25   we think about Mr. Wagner's framework and his valuation of

1    Tiara?

2    A.    Yes, I did.

3    Q.    Can you explain this for us, please.

4    A.    Yes.  This chart just shows my correction of Mr. Wagner's

5    baseline royalty.  Here I'm just correcting for the errors I

6    just described.  The top panel shows Mr. Wagner's calculation

7    and how he arrived at the baseline royalty of $125 million, and

8    in the bottom panel I've corrected that showing the impact

9    of discounting the values back to 2010, and applying the higher

10:58 10   discount rate results in a 2010 value of Tiara of

11   $13.3 million.

12   Q.    In the middle of this slide it says something about an

13   allocation to trade secrets and 50 percent.  For that piece of

14   your chart, did you use the same values that Mr. Wagner used?

15   A.    Yes, I did.

16   Q.    And so if we accept the same 50 percent allocation to the

17   claimed trade secrets just as Mr. Wagner did, what does that

18   ultimately lead us to in your baseline royalty calculation?

19   A.    It results in a corrected baseline royalty of $6.7 million.

10:59 20   Q.    Now, you also mentioned as your second of three points of

21   disagreement with Mr. Wagner's calculations an unreliable head

22   start.  What were you referring to there?

23   A.    That refers to our discussion earlier about the 18-month

24   head start assumption.

25   Q.    And, again, had you seen any estimates about a head start

1    from any other experts in this trial?

2    A.   Yes.  Mr. Leinsing testified that from a technical

3    perspective, there was no head start, so that's zero months.

4    Q.   Now, earlier, Ms. Mulhern, you mentioned that when you

5    looked at the time entry records, the Neovasc employees had

6    spent somewhere around three months' worth of time in

7    developing the Tiara project up to that date of December, 2011.

8    From an economic perspective, is using employee time entry data

9    a way to think about structuring a potential alternative head

11:00 10   start?

11   A.   I think it could.  I think it could capture sort of a

12   value, an upper bound on the head start or a maximum head

13   start.  As I mentioned, as of the first disclosure date,

14   Neovasc had spent about one week worth of time on the Tiara

15   project.  As of the second, they'd spent about three months.  I

16   think in general, as I opined earlier, I think it's likely that

17   Neovasc could have made up that time without affecting the

18   overall development timeline.  But even for the sake of

19   argument, supposing that that time couldn't have been made up

11:00 20   in the intervening period, that suggests a shift in the

21   development timeline of no more than three months.

22   Q.   Now, and just to be clear here, when you're talking about

23   this three months of employee time entry that you looked at,

24   are you thinking about the December, 2011 date, the later of

25   the two patent publications that Mr. Leinsing discussed, or are

1    you doing this with respect to the first one in April, 2010?

2    A.   So this very conservatively uses the December, 2011 date.

3    If we acknowledge that many of the claimed trade secrets were

4    available as early as April, 2010, that would shrink that

5    window or shorten that delay period.

6    Q.   So, in other words, you're using the later date as the

7    basis of your corrected calculations here; is that right?

8    A.   Yes, in an attempt to just put an upper bound or arrive at

9    an estimate of a maximum head start.

11:01 10   Q.   Now, if there were a roughly three-month head start

11   assumption in Mr. Wagner's calculations instead of an 18-month

12   head start calculation as an input to his calculations, what

13   would the result be?

14   A.   Just flowing that through the numbers, using the revised

15   valuation I just described, takes the value of the head start

16   down from $134 million down to $2 million.

17   Q.   In your bubble here next to "Corrected," the text says

18   "Zero to three-month head start"?  Why is there a zero there?

19   A.   That zero-month head start corresponds to Mr. Leinsing's

11:02 20   technical opinion that there was no head start here.

21   Obviously, flowing that through the numbers results in zero

22   damages.

23   Q.   Now, you also mentioned as your third and final point of

24   disagreement of Mr. Wagner using his framework something about

25   *Georgia-Pacific* factors.  Can you remind us, what does

1    *Georgia-Pacific* refer to?

2    A.    So *Georgia-Pacific* is a landmark court case that set out

3    some case law that folks like us, me and Mr. Wagner, use in

4    analyzing reasonable royalty.  It sets out 15 factors that

5    we're supposed to consider in arriving at reasonable royalty

6    opinions.

7    Q.    And in your own analysis, did you agree or disagree with

8    the way Mr. Wagner weighed those 15 *Georgia-Pacific* factors?

9    A.    I agreed in part and disagreed in part.

11:02 10    Q.    And can you explain for us how that disagreement worked in

11    general.

12    A.    So, in general, Mr. Wagner opined that as a result of his

13    analysis of the *Georgia-Pacific* factors, two of the factors

14    pointed in the upward direction and one pointed in the downward

15    direction.  In my view, while I agree with him that two of the

16    factors point in the upward direction suggesting a higher

17    royalty, in my view, five of the factors point in the downward

18    direction.

19    Q.    Can you give us an example of one of the factors where you

11:03 20    believe, in your opinion, that there should be a downward

21    impact on the royalty?

22    A.    So Factor 7 is a good example here.  Mr. Wagner opined

23    that, in his view, that factor had a neutral impact on the

24    royalty; but, in my view, the term of the claimed trade secrets

25    suggests downward pressure.

1    Q.    So let's make sure we've worked through this Factor No. 7.

2    When you say "term of a trade secret," what does the phrase

3    "term of a trade secret" mean?

4    A.    So term asks us to think about the life of the

5    intellectual property.  In a patent case, this would be the

6    life of the patent.  Here it's a trade secrets case, so we're

7    thinking about the life of the trade secrets:  How long is that

8    information going to be useful?

9    Q.    And when does a trade secret die, if we're talking about a

11:04 10    life span?

11    A.    It dies when it's publicly disclosed.

12    Q.    And based again on your description of your reliance on

13    Mr. Leinsing's work, why exactly did you disagree with

14    Mr. Wagner on Factor No. 7?

15    A.    Well, as I understand it, based on Mr. Leinsing, the

16    claimed trade secrets were disclosed in this case by December,

17    2011, which is a relatively short period after the hypothetical

18    negotiation, so this would limit the amount of money that one

19    would be willing to pay for a license to those trade secrets.

11:04 20    Q.    Ms. Mulhern, I want to shift gears and ask you about a

21    different piece of Mr. Wagner's testimony.  In his list of, I

22    guess, considerations for the parties, he stated that it's

23    crucial to be first or second to market.  Do you agree with

24    Mr. Wagner that in this market, only the first or second

25    entrant in the market would be expected to make significant

1    profits?

2    A.    No, I don't.

3    Q.    Why do you disagree with him?

4    A.    Well, in general, I think there could be some advantage to

5    being a first mover, being first to a market.  My review of the

6    investment analyst reports and the public information about the

7    TMVI marketplace strongly suggests that the analysts expect the

8    market opportunity here to be big enough to support several

9    successful companies.

11:05 10   Q.    Now, to sum all these factors up, what is your corrected

11   royalty calculation?  Again, for the situation where we assume

12   that there's wrongdoing, we assume that Mr. Wagner's framework

13   is the right one, what is your corrected calculation?

14   A.    So in the top panel I show Mr. Wagner's key inputs to his

15   analysis -- his baseline royalty, the value of the head start,

16   and his *Georgia-Pacific* factor analysis, and how he arrived at

17   his $90 million number -- and in the bottom panel I provide my

18   corrected numbers.  The baseline royalty becomes $6.7 million.

19   The value of the head start ranges then from zero to

11:06 20   $2 million, and my analysis of the *Georgia-Pacific* factors,

21   which suggest that several point in the downward direction.  In

22   sum, I conclude that royalty damages would be $2 million.

23   Q.    So what is your bottom-line summary, Ms. Mulhern, for your

24   royalty analysis compared to that provided in this case by

25   Mr. Wagner?

A.   So my bottom-line summary, as shown on this chart, is that

Mr. Wagner's $90 million number is excessive, and that the

appropriate damages here is no more than $2 million.

Q.   On your chart here, there's a zero dollars and zero cents

in the middle of the chart.  What is that referring to?

A.   That zero just refers to or reflects the amount of money

that CardiAQ and Neovasc have made on these devices to date.

MR. GRAVES:  Thank you, Ms. Mulhern.  I have no

further questions.

11:07   THE COURT:  Yes, while they're switching places, feel

free to move around over there.

MR. BOEHM:  Your Honor, can I bring Ms. Mulhern

another bottle of water?

THE WITNESS:  Oh, actually, I've got one.

CROSS-EXAMINATION BY MR. HORNE:

Q.   Good morning, Ms. Mulhern.

A.   Good morning.

Q.   I'm Brian Horne.  I don't believe we've met yet.

A.   Nice to meet you.

11:08   Q.   Pleasure to meet you.  I believe, as you mentioned, your

area of expertise is economics?  That's right?

A.   That's right.

Q.   You're not an expert in medical device technology?

A.   No.

Q.   Can we look at your Slide 2, please.  I notice under your

1  professional experience you say "Expert in healthcare industry

2  litigation"?

3  A.   That's right.

4  Q.   That means you are a damages or economic expert in cases

5  involving healthcare, right?

6  A.   That's what it means, yes.

7  Q.   It doesn't mean that those cases qualify you as an expert

8  in the medical field, right?

9  A.   That's correct.

11:09 10  Q.   And you're not an expert with respect to TMVI technology?

11  A.   That's right.

12  Q.   You haven't visited Neovasc's facility?

13  A.   That's right.

14  Q.   And when you formed your opinions in the case, you hadn't

15  seen a physical specimen of any of the actual Tiara devices at

16  issue in the case?

17  A.   I'd seen many pictures, but I haven't seen an actual

18  device.

19  Q.   Okay.  You hadn't seen any physical devices that CardiAQ

11:09 20  provided to Neovasc?

21  A.   That's right.

22  Q.   There was some discussions about public disclosures.  You

23  haven't gone through CardiAQ's patent applications to determine

24  whether those applications disclose all of the details that

25  CardiAQ provided to Neovasc, right?

1    A.    No, I haven't.

2    Q.    That was Mr. Leinsing you were relying on?

3    A.    That's right.

4    Q.    So we heard you had some disagreements with Mr. Wagner?

5    A.    Yes.

6    Q.    But it's fair to say that in the community of experts that

7    value damages, Mr. Wagner is well respected, isn't he?

8    A.    That's fair to say.

9    Q.    And you're not challenging Mr. Wagner's opinions based on

11:10 10   the fact that he's chosen a lump-sum royalty, right?

11   A.    That's right.

12   Q.    And you're not saying as part of your opinions that the

13   people and the folks at Neovasc are inherently more trustworthy

14   than the people at CardiAQ, right?

15   A.    No, I'm not.

16   Q.    You're not making an assessment in this case that

17   Mr. Leinsing is more trustworthy than CardiAQ's expert,

18   Dr. Hillstead, right?

19   A.    That's right.

11:10 20   Q.    And you and Mr. Wagner, you each testified about a

21   hypothetical negotiation?

22   A.    That's right, we did.

23   Q.    And you both agree that it's appropriate to use a

24   hypothetical negotiation to determine the value of a reasonable

25   royalty, right?

A.   We do.

Q.   And you agree that it's proper to look at events that occur after the date of the hypothetical negotiation to factor into a reasonable royalty, right?

A.   Yes.

Q.   Now, you and Mr. Wagner both assume liability?

A.   Yes, we do.

Q.   And you don't take any issue with Mr. Wagner assuming liability, right?

A.   No.  We're damages experts.  We have to assume liability.

Q.   Exactly.  And you agree that if all of CardiAQ's trade secrets were publicly disclosed before the hypothetical negotiation, then there wouldn't be liability, right?

A.   That's right.

Q.   You also agreed that to suggest that CardiAQ lost no exclusivity would be inconsistent with concluding that there is liability in this case, right?

A.   My review of the evidence indicates that given the public disclosures, any exclusivity lost by CardiAQ is very limited in duration.

Q.   Okay, let me ask the question again.  To suggest that CardiAQ lost no exclusivity would be inconsistent with concluding there is liability; isn't that correct?

A.   I think it may be correct to say they had some short-term loss of exclusivity, based on my review of the evidence,

        1    assuming liability.

        2    Q.   So then to say they lost no exclusivity would be

        3    inconsistent with saying there's liability, right?

        4    A.   I think I can agree with that.

        5    Q.   Thank you.  If I understood you correctly, your opinions

        6    are basically a critique of Mr. Wagner, right?

        7    A.   That's right.

        8    Q.   In other words, you didn't do an independent analysis of

        9    damages in this case, right?

11:12  10    A.   My assignment was to analyze Mr. Wagner's damages

       11    opinions.  I did a bunch of independent analysis as part of

       12    that work, but it wasn't my assignment to arrive at a damages

       13    figure.

       14    Q.   So, in other words, you did not do an independent analysis

       15    of damages in this case, right?

       16    A.   I think that's right.

       17    Q.   And you didn't do an affirmative analysis of what a

       18    reasonable royalty would be in this case either, right?

       19    A.   That's right.

11:13  20    Q.   And you didn't do an independent analysis because based on

       21    your review of the evidence, you believed there was

       22    insufficient evidence in the record, right?

       23    A.   That's right.

       24    Q.   And I believe you testified on direct you didn't see any

       25    benefit to Neovasc of misappropriating CardiAQ's trade secrets?

```
  1    A.    That's right.

  2    Q.    Can we have Exhibit 384, please.  This is Neovasc's 2013

  3    Annual Information Form, right?

  4    A.    Yes.

  5    Q.    And this is one of the documents that you considered?

  6    A.    Yes, it is.

  7    Q.    Can we turn to Page 15 of Exhibit 384.  This is in your

  8    cross binder.  You can look on the screen, whatever is easier

  9    for you.

11:13 10    A.    Okay.

 11    Q.    And it's actually Page 15 of the exhibit, Page 12 labeled

 12    of the document.  That trips people up sometimes.

 13    A.    Okay.

 14    Q.    Let me know when you're there.

 15    A.    I just found the document.  You said Page 12?

 16    Q.    Yes, Page 15 of the exhibit, Page 12 of the document, so

 17    the page at the bottom is 15, the top is 12.

 18    A.    Okay.  Okay, I'm here.

 19    Q.    Okay.  In this document, Neovasc says that "The Tiara

11:14 20    program has benefited enormously from this pool of experience

 21    and talent that has evolved as we have worked with our

 22    partners," right?

 23    A.    I see that language.

 24    Q.    Okay.  The same paragraph, it says, "Neovasc has been able

 25    to move the product development forward rapidly with minimal
```

1    cost from the flexibility it has to draw on its staff and then

2    return them to revenue-generating activities when they are not

3    working on the Tiara project," right?

4    A.    I see that.

5    Q.    You considered that?

6    A.    Yes.

7    Q.    Could we go to Exhibit 608, please, Page 4.  This is a

8    presentation that Neovasc made to its board of directors,

9    right?

11:15 10    A.    Yes.

11    Q.    And you reviewed this document in your preparation?

12    A.    Yes.

13    Q.    And in this document, Neovasc told members of its board of

14    directors that it had a competitive advantage from a, quote,

15    "intimate understanding of what has and has not worked so far

16    in the development of percutaneous valves," right?

17    A.    Yes, I see that.

18    Q.    Now, one of the inputs -- we're moving on -- one of the

19    inputs to your analysis is the amount of time that Neovasc

11:15 20    spent on the Tiara from October, 2009, to December, 2011,

21    right?

22    A.    That's right.

23    Q.    In your calculation of that time, you include a time spent

24    by Randy Lane that wasn't in Neovasc's records, right?

25    A.    That's right.

```
 1   Q.   And you think that the estimate of Mr. Lane's time is
 2   important to your conclusions, right?
 3   A.   That's right.
 4   Q.   And you quantified Mr. Lane's unrecorded time by relying
 5   on a conversation with him, right?
 6   A.   That's right.
 7   Q.   And Mr. Lane told you that he had spent a total of 44.5
 8   hours that were not recorded, right?
 9   A.   That's right.
10   Q.   And you don't know how Mr. Lane was able to get that
11   precise total number of hours, right?
12   A.   I think, my understanding was that he checked some of his
13   personal records.
14   Q.   Okay, but when we deposed you in this case, you didn't
15   know how Mr. Lane was able to get that precise total number of
16   hours, right?
17   A.   I don't know with precision.
18   Q.   Say that again.
19   A.   I don't know with precision.
20   Q.   The question was, you didn't know how Mr. Lane was able to
21   get that precise number of hours when we deposed you, right?
22   A.   If that's what I said, that's possible.
23   Q.   And this conversation you had with Mr. Lane, this was
24   2015, right?
25   A.   That's right.
```

1    Q.    And he was recounting in 2015 that the time he spent

2    between 2009 and 2010 that he recorded, that he billed 44.5

3    hours?

4    A.    That's my understanding.

5    Q.    And you accepted his representation, right?

6    A.    Yes, I did.

7    Q.    Now, you also rely on Mr. Leinsing, right?

8    A.    Yes, I do.

9    Q.    And your report cites to Mr. Leinsing's report?

11:17 10    A.    Yes, it does.

11    Q.    You mentioned in your testimony you're relying on

12    Mr. Leinsing for some public disclosures and whether or not

13    there was a head start?

14    A.    Yes.

15    Q.    Now, prior to this case, you had never worked with

16    Mr. Leinsing, right?

17    A.    That's right.

18    Q.    And prior to this case, you did not know Mr. Leinsing by

19    his reputation, right?

11:17 20    A.    That's right.

21    Q.    And in fact, before this case, you didn't know

22    Mr. Leinsing at all, right?

23    A.    That's right.

24    Q.    And even when you signed your report in this case, you

25    hadn't even spoken to Mr. Leinsing at that time, right?

1    A.   That's right.  I relied on his expert report.

2    Q.   Okay.  And besides not speaking to him and not knowing his

3    reputation, you still relied on his written report, right?

4    A.   That's right.

5    Q.   Now, let's talk a little bit more about the investigation

6    that you did.  You had access to Neovasc's personnel in the

7    course of preparing your report, right?

8    A.   That's right.

9    Q.   And you or your staff spoke to Mr. Lane, Mr. Marko, and

11:18 10   Mr. Clark, right?

11   A.   That's right.

12   Q.   And the jury has heard from Mr. Marko and Mr. Lane.

13   Mr. Clark is the CFO, right?

14   A.   Yes.

15   Q.   Chief financial officer?

16   A.   Yes.

17   Q.   And there was no information that you wanted that these

18   gentlemen were unable to give you, right?

19   A.   That's right.

11:18 20   Q.   And you had a list of documents you considered.  I think

21   you discussed that you considered documents produced by the

22   parties?

23   A.   That's right.

24   Q.   And you considered depositions?

25   A.   Yes.

```
 1    Q.   And you considered actually the deposition of every fact

 2    witness that's testified at trial, right?

 3    A.   I think so.  I'm not sure I know of every witness that's

 4    testified at trial.

 5    Q.   Mr. Marko, Mr. Lane, you read their depositions, right?

 6    A.   Yes, I did.

 7    Q.   You read Mr. Bavaria's fact deposition?

 8    A.   I think so, yes.

 9    Q.   Mr. Ratz's depositions?

10    A.   Yes.

11    Q.   Mr. Wagner's expert deposition?

12    A.   Certainly.

13    Q.   You've reviewed some third-party analyst reports?

14    A.   Yes, I did.

15    Q.   You've reviewed websites?

16    A.   Yes.

17    Q.   And when you did your analysis in this case, you knew that

18    the TMVI market was expected to be pretty big, right?

19    A.   That's right.

20    Q.   And I think in your report you were aware that in 2015,

21    there was a stock analyst report that estimated the long-term

22    opportunity for the TMVI market in just the United States alone

23    is about $10 billion a year?  Am I right?

24    A.   I don't recall the specific figures, but I know it was in

25    the billions.
```

```
 1   Q.   Okay, but does it sound about right to you that in your
 2   report, you cited an analyst report that said $10 billion a
 3   year in the U.S. long term?
 4   A.   Long term, out many years from now is what we're talking
 5   about?
 6   Q.   Yes.
 7   A.   I think that's possible.
 8   Q.   But when you formed your opinions in this case, you didn't
 9   know whether in 2010 the overall market for TMVI products was
10   expected to be large, right?
11   A.   I didn't have any specific figures as to the size of the
12   market back in 2010.  I don't recall seeing any analyst reports
13   from that date.
14   Q.   Okay.  You didn't recall seeing any evidence about the
15   size of the market back in 2010, right?
16   A.   That's right.
17   Q.   And you didn't see any evidence that would help you
18   understand what Neovasc knew in 2010 regarding the size of the
19   market, right?
20   A.   That's right.
21   Q.   And you didn't make any assumptions about what Neovasc may
22   have known about the aortic marketplace, right?
23   A.   That's right.
24   Q.   But we heard Mr. Marko testify in his deposition video
25   that back in 2009, he was aware that the aortic market was
```

1   worth billions of dollars, right?

2   A.   I think that's right.

3   Q.   Okay.  And he also testified that he expected the TMVI

4   market to be as big or bigger, right?

5   A.   I recall that kind of testimony here at trial.  I'm not

6   sure I recall the deposition specifics.

7   Q.   Okay, but you reviewed that deposition, right?

8   A.   That's right.

9   Q.   And despite reviewing that deposition, you couldn't make

11:20 10   any assumption about what Neovasc knew about the market back in

11   2010, right?

12   A.   I think that's right.

13   Q.   Okay, let's go to Mr. Wagner's Slide 6.1, please.  This is

14   Mr. Wagner's slide.  You saw this when you were in court,

15   right?

16   A.   Yes, I did.

17   Q.   He opined that each trade secret or I guess 1 and 2

18   together and then 3, 4, 6 were $90 million apiece?

19   A.   That's my understanding.

11:21 20   Q.   Okay.  And you criticized Mr. Wagner for determining the

21   same royalty for each trade secret, right?

22   A.   That's right.

23   Q.   You haven't determined yourself that any one of the five

24   trade secrets that Mr. Wagner opined about is worth more or

25   less than the other, right?

```
 1   A.   No, I haven't.  I think they're all worth zero.

 2   Q.   Okay.  You don't have any technical opinions about which

 3   of CardiAQ's trade secrets are minor improvements, right?

 4   A.   No, I don't.

 5   Q.   You don't have an opinion on the relative value of the

 6   Trade Secret 3 versus Trade Secrets 1 and 2, right?

 7   A.   That's right.

 8   Q.   And you're aware that Mr. Ratz testified that CardiAQ's

 9   trade secrets do have equal value, right?

10   A.   I saw some -- I saw his trial transcript where he touched

11   on that.  I thought he said that some of them he thought had

12   equal value but not all.  I don't recall the specifics of that

13   testimony.

14   Q.   And you don't recall the specifics, but you're not

15   suggesting that the jury should disregard Mr. Ratz's testimony

16   regarding the equal value of the trade secrets, right?

17   A.   I don't think the jury should disregard Mr. Ratz's

18   testimony, no.

19   Q.   Okay, you can take that down.  Now, you criticized

20   Mr. Wagner for ignoring the cost approach, right?

21   A.   I don't think that's fair.  I criticize him for placing

22   such heavy reliance on the income approach in the way that he

23   has done it.

24   Q.   Okay, but you did talk about the cost approach in your

25   direct, right?
```

1    A.    I did.  I talked about my use of the cost approach, which

2    I think is appropriate.

3    Q.    I thought you said you didn't do a cost approach analysis.

4    A.    I used a cost-type approach to analyze the reasonableness

5    of Mr. Wagner's calculations.  I did not do a cost approach in

6    which I isolated the value of the intellectual property here

7    because sufficient records weren't available to me.

8    Q.    So just to be clear, you didn't value CardiAQ's trade

9    secrets based on the cost approach, right?

11:23 10   A.    Not specific trade secrets, that's right.

11   Q.    And to analyze the cost approach, you looked at the

12   evidence regarding the amount that CardiAQ invested to develop

13   its trade secrets, right?

14   A.    Among other things, yes.

15   Q.    And are you saying that the cost approach suggests that

16   CardiAQ's trade secrets are worth no more than $533,000?

17   A.    No.

18   Q.    Can we go to your report, please, Paragraph 58, and you

19   should have your report in the binder there.  Let me know if

11:23 20   you don't.  And did you say in your report this when talking

21   about the cost approach 53?

22   A.    That's right.

23   Q.    I'm sorry, Paragraph 58.  I apologize.

24   A.    I see that.

25   Q.    "This suggests a valuation of the CVT trade secret claims

```
  1  of no more than $533,000."

  2  A.   Yes, I see that.

  3  Q.   That's what you said in your report?

  4  A.   That's right.

  5  Q.   Now, you don't dispute that the market value of CardiAQ in

  6  early 2010 was a multiple of CardiAQ's R&D costs to that date,

  7  right?

  8  A.   That's right.

  9  Q.   And by the end of 2014, CardiAQ had spent about

11:24 10  $11.5 million in R&D, right?

 11  A.   That's right.

 12  Q.   And Edwards purchased CardiAQ the next year for

 13  $400 million, right?

 14  A.   That's right.

 15  Q.   Now, your introductory slide said that you're a frequent

 16  speaker on economic issues relating to damages, right?

 17  A.   Yes.

 18  Q.   And you said before that you have criticized the cost

 19  approach?

11:24 20  A.   Yes, I have.

 21  Q.   Okay, let's go to Exhibit 719.  This is a transcript from

 22  a talk that you gave, right?

 23  A.   Yes, it is.

 24  Q.   And when you were invited to give this talk at this

 25  symposium, you prepared in advance before giving your remarks,
```

1    right?

2    A.    Yes, I did.

3    Q.    In the course of making your presentation, you were trying

4    to accurately describe the work you did in economic valuation,

5    right?

6    A.    That's right.

7    Q.    And during that talk, you spoke about the cost approach to

8    value trade secrets, right?

9    A.    That's right.

11:25 10    Q.    Let's turn to Page 12 of Exhibit 719 and see what you

11    said.  You said, quote, talking about the cost approach, "These

12    measures often will understate the true value, and the example

13    we always use is the Coca-Cola trade secret.  Imagine how much

14    it must have cost to create that formula for Coca-Cola versus

15    the value of it today."  That's what you said, right?

16    A.    That's right.

17    Q.    The same page you said, quote, "I think one of the places

18    where the implementation of a cost approach goes wrong is that

19    people focus too much on just out-of-pocket costs, cash cost to

11:26 20    develop things," right?

21    A.    That's right.

22    Q.    And during that talk, you were also asked about R&D cost

23    as it relates to a hypothetical negotiation, right?

24    A.    That's right.

25    Q.    Okay, let's turn to Page 13 of Exhibit 719.  The question

1    was, "How much weight does the R&D factor really get in the

2    sort of hypothetical arm's length licensing factors test?"  And

3    your response was, "I have to say the one that we're least keen

4    on is the cost approach.  I think that one is most

5    problematic."  That's what you said, right?

6    A.    Yes, I did.

7    Q.    And then you said, "The income approach, I think, is where

8    we place a little more weight because that really looks at how

9    much money is at stake here.  How much money could the

11:26 10   defendant make from this?  How much money did the owner expect

11    that he or she could make from it?  That gives you a lot of

12    guidance as to how much money would someone be willing to turn

13    over, fork over in the term of a royalty payment.  I think that

14    is probably the one where we place the greatest emphasis,"

15    right?

16    A.    I think that's right, and it's especially true in cases

17    where products are actually being sold and revenue and profits

18    are being earned.

19    Q.    Okay.  Can we have Mr. Wagner's Slide 6.10, please.  Now,

11:27 20   Mr. Wagner relied on a 2015 internal Neovasc analysis, right?

21    A.    That's right.

22    Q.    And that analysis projected the sales that Neovasc would

23    make of the Tiara?

24    A.    Yes.

25    Q.    And that analysis projected sales of $4.4 billion to

 1   $8.5 billion?

 2   A.   That's right.

 3   Q.   Go back to your Slide 12.  When you talked about

 4   Mr. Wagner's royalty being excessive and you showed the big

 5   $90 million bar next to all these other data points, you didn't

 6   include the $4.4 billion to $8.5 billion in projected revenue,

 7   right?

 8   A.   No, I didn't.

 9   Q.   Take that down, please.  Mr. Wagner calculated the present

11:28 10   value of those projects, right?

11   A.   Yes, he did.

12   Q.   And he explained that he used a discount rate similar to

13   what other stock analysts use, right?

14   A.   That's right.

15   Q.   And those analysts use a discount rate of 8 to 13 percent

16   for the Tiara, right?

17   A.   Well, I think that actually mischaracterizes things.  I

18   think there's an apples-and-oranges problem with those numbers.

19   Q.   Those analysts use an 8 to 13 percent discount rate to

11:28 20   value the Tiara, right?

21   A.   Yes.  Those are the numbers that Mr. Wagner put up, but I

22   think the 8 percent number is a little bit misleading.

23   Q.   And these analysts, they used an even higher discount rate

24   when they valued Neovasc as an entire company rather than the

25   Tiara as a specific entity, right?

A.   I'm sorry.  Could you repeat that question.

Q.   Sure.  We talked about the 8 to 13 percent discount rates for the Tiara by itself.  Those analysts also used a higher discount rate of about 25 percent when they valued the entire Neovasc company?

A.   I don't recall seeing discount rates of 25 percent which were the basis for Mr. Wagner's opinion.  I don't recall the distinction between the product versus the company.

Q.   Now, you believe that an even higher discount rate of 40 percent is appropriate for the Tiara, right?

A.   Yes, I do.

Q.   And just to remind the jury, I think you said that the higher discount rate means lower damages, lower royalty?

A.   That's right.

Q.   I believe you criticized Mr. Wagner for two reasons.  On your slide, you said the first was that he failed to express the 2015 valuation in 2010 dollars?

A.   That's right.

Q.   But you're not saying that we should use a 40 percent interest rate to take 2015 dollars and put them in 2010 dollars, are you?

A.   That's not right.  I did use a 40 percent discount rate for the whole period.

Q.   So you're saying, if we wanted to take 2015 dollars -- and forget about the risk for a second -- I know that was your

1   second bullet -- if we want to take 2015 dollars and express

2   them in 2010 dollars, you would use a 40 percent rate for that?

3   A.   Yes, to account for both the time value of money and the

4   uncertainty.

5   Q.   I'm talking about just the time value of money right now.

6   Just the time value of money, you wouldn't use 40 percent to

7   take 2015 dollars and put them in 2010 dollars, would you?

8   A.   Well, you can't separate it out because the purpose of the

9   discount rate is to account for both things, both the time

11:30 10   value of money and the uncertainty.

11   Q.   If you were going to value 2015 dollars in 2010 dollars,

12   would you use a 40 percent rate?

13   A.   In this case, yes.

14   Q.   Just by itself without accounting for uncertainty?

15   A.   We're using the discount factor here to account for two

16   things, the difference in the time value of money and the

17   uncertainty, so in this case it's appropriate to use the

18   40 percent to discount the numbers back to 2010.

19   Q.   Okay, and I'm asking you as an economic expert that went

11:31 20   to the London School of Economics, do you have the ability to

21   separate out and do you have the ability to put 2015 dollars

22   into 2010 dollars?  Can you do by itself if asked?

23   A.   It would depend on the context of the exercise, but for

24   the purposes here, I'm trying to analyze the outcome of a

25   hypothetical negotiation in 2010 based on cash flows that are

1    six to ten years in the future, and the riskiness of those cash

2    flows affects the discount rate that one would use.

3    Q.   If I ask you to put aside risk and just tell me what 2015

4    dollars are in 2010 terms, if I'm looking at a price of

5    something, the value of something, and I want to see how much

6    that would have cost in 2010, could you do that?

7    A.   In general, yes, but that wasn't the exercise here.

8    Q.   Well, that's my question.  That's my question.  That's my

9    question.  Could you do that?

11:32 10  A.   You mean hypothetically speaking could I --

11    Q.   If I put an inflation calculator and I wanted to see 2015

12    dollars, what they were worth in 2010, would I use a 40 percent

13    rate for that?

14    A.   No.

15    Q.   Okay, thank you.  So let's talk about some of the

16    uncertainty.  You mentioned there was some uncertainty

17    concerning whether Neovasc would reach certain regulatory

18    milestones, right?

19    A.   That's right.

11:32 20  Q.   And those milestones included animal studies and a first

21    in-human implant, right?

22    A.   That's right.

23    Q.   And the hypothetical negotiation is a license to use

24    CardiAQ's technology in the Tiara, right?

25    A.   That's right.

1    Q.   And we're assuming liability, so we're assuming that the

2    Tiara is using CardiAQ's technology, right?

3    A.   That's right.

4    Q.   And when you discussed uncertainty, you didn't address the

5    fact that CardiAQ by the time of the hypothetical negotiation

6    had successful animal trials, right?

7    A.   I don't think I addressed that specifically.

8    Q.   And you didn't address that Neovasc knew that CardiAQ had

9    already had successful animal trials by the time of the

11:33 10   hypothetical negotiation, right?  You didn't address that?

11   A.   That's right.

12   Q.   And you didn't address that before March, 2010, CardiAQ

13   had already received investment money from Broadview Ventures,

14   right, and discussed that?

15   A.   I'm sorry, can you repeat that question.

16   Q.   Yes.  Before March, 2010, Broadview Ventures had already

17   invested in CardiAQ at that point in their technology, right?

18   A.   Excuse me.  I think that's right, yes.

19   Q.   And Broadview, they're being advised by Dr. Eric Rose,

11:33 20   right?

21   A.   I don't recall.

22   Q.   Do you recall Dr. Bavaria's testimony?

23   A.   No, I don't.

24   Q.   Have you been getting the daily transcripts?  I know a lot

25   of times the experts do that.

1      A.    Yes, I have.

2      Q.    Okay, and you mentioned earlier in your direct you read

3      some of the testimony from Dr. Quadri and Mr. Ratz, right?

4      A.    That's right.

5      Q.    Okay, but you missed Dr. Bavaria's testimony?

6      A.    I actually read his testimony.  I just don't remember the

7      specific fact you're pointing to.

8      Q.    Okay.  And do you remember Dr. Bavaria explaining that

9      Dr. Rose is a world-renowned cardiac surgeon?

11:34 10     A.    I didn't read the testimony.  I don't know.

11     Q.    Okay, so you obviously didn't take that into account in --

12     A.    I'm sorry.  I did read the testimony.  I don't remember

13     the testimony, so I don't know.

14     Q.    Okay, so it's fair to say then that you didn't take that

15     testimony into account when you were talking about the risk

16     factor and uncertainty factor, right?

17     A.    Are you asking me if I took into account the testimony at

18     trial when I was developing my opinions in my report?

19     Q.    You didn't mention in your report or on your direct when

11:34 20     you were talking about uncertainty that Dr. Rose before the

21     hypothetical negotiation had advised Broadview Ventures to

22     invest in CardiAQ, right?

23     A.    I didn't mention that, that's right.

24     Q.    And you didn't mention that before the hypothetical

25     negotiation Mr. Michiels had joined CardiAQ's board and

1    invested, right?

2    A.    That's right.

3    Q.    And Mr. Michiels we heard was a CEO of CoreValve, right?

4    A.    That's my understanding.

5    Q.    It sold for a lot of money to Medtronic, I think over

6    $600 million?

7    A.    I don't recall the numbers.  I do recall him testifying

8    about that.

9    Q.    You recall they were big numbers, right, on the aortic

11:35 10   side?

11    A.    I think that's right.

12    Q.    And Mr. Michiels was involved in other interventional

13    cardiology device companies, right?

14    A.    Yes.  That's my understanding.

15    Q.    Now, let's look at Exhibit 357.  Look at Neovasc's

16    reaction when they found out about Mr. Michiels becoming

17    involved with CardiAQ.  Do you see the URL at the bottom here?

18    It says "CoreValve-backers-see-next-heart-valve-hit-in-

19    CardiAQ"?

11:35 20   A.    I see that.

21    Q.    This is referring to the fact that Mr. Michiels is on

22    board now, right?

23    A.    I don't know.  Is this a document -- I don't recall this

24    document.  It may be included in the materials I considered,

25    but I don't recall.

```
 1    Q.   I'm pretty sure it is.
 2    A.   Okay.
 3    Q.   You read all the depositions, and when you read the
 4    depositions, you also said in your documents considered that
 5    you read the exhibits used in the depositions, right?
 6    A.   That's right.
 7    Q.   Okay.  So let's see what Neovasc's reaction was when they
 8    found out that Mr. Michiels joined CardiAQ.  The top here,
 9    Mr. McPherson, he's the COO, right?  We heard from him early in
11:36 10   trial?
11    A.   That's right.
12    Q.   He said, "It speaks to the value of the technology,"
13    right?
14    A.   I see that.
15    Q.   And you didn't mention that when you were talking about
16    uncertainty, did you?
17    A.   This is referring overall to the value of a TMVI device,
18    not the particular trade secrets here, right?
19    Q.   You don't know?  Well, he's talking about the value of the
11:36 20   CardiAQ technology.  No?
21    A.   Excuse me, the CardiAQ, but it's the overall technology
22    for the devices, not just the specific trade secrets.
23    Q.   And you don't know the difference between the overall
24    technology and the trade secrets, right?  You haven't analyzed
25    that, have you?
```

A.   I'm not a technical expert, but I have an understanding
that there are aspects of the device -- of the devices that are
not disclosed in the trade secrets.

Q.   But you don't know what that is and what that isn't, do
you?

A.   I don't have a technical understanding of that, that's
right.

Q.   You don't have much of any understanding, right?

        MR. GRAVES:  Objection.

        THE COURT:  Sustained.

Q.   Sorry.  And you also agreed earlier that it's proper to
look at events that occur after the date of the hypothetical
negotiation to factor into a reasonable royalty, right?

A.   In general, yes.

Q.   And we know now indeed that Neovasc did meet these
milestones that you talked about, right?

A.   Yes, that's right.

Q.   Now, despite this, you picked a 40 percent discount rate
based on the uncertainty at the hypothetical negotiation,
right?

A.   That's right.

Q.   And you didn't see any evidence that a 40 percent discount
rate should be used in the evaluation of a medical device
start-up, right?

A.   I think a lot of the information I reviewed was just to

1    start-ups generally or to biotech start-ups, but not specific

2    to medical device start-ups, but there was no reason to think

3    it would be different.

4    Q.   And the finance text and literature that you referred to

5    in your report to support the 40 percent discount rate, those

6    aren't specific to transcatheter medical devices, right?

7    A.   No, they're not, but that 40 percent was on the low end of

8    the numbers I saw.  I saw discount rates up to 70 percent or

9    so.

11:38 10   Q.   And none of those texts are medical device texts in

11   general, right?

12   A.   That's right.

13   Q.   And the discount rate is a critical input to your

14   analysis, isn't it?

15   A.   As it is for Mr. Wagner, yes.

16   Q.   And your calculations are very sensitive to the discount

17   rate, right?

18   A.   They are, that's right.

19   Q.   And if you would have used a smaller discount rate, you

11:38 20   would have gotten a larger number for the reasonable royalty at

21   the end of your analysis, right?

22   A.   If I had used a smaller discount rate, I would have gotten

23   a larger corrected baseline royalty, but the royalties also

24   informed -- yes, I think that is true.  It's also informed by

25   the head start, but I think that's true.

1    Q.   You calculated damages assuming that Neovasc did not get

2    an 18-month head start, right?

3    A.   In my corrected calculations, I assumed either a zero or a

4    maximum of a three-month head start.

5    Q.   So then you calculated damages assuming that Neovasc did

6    not get an 18-month head start, right?

7    A.   That's right.

8    Q.   And if the jury concludes that Neovasc did get at least an

9    18-month head start, that would impact your opinion, right?

11:39 10   A.   I don't have a number that associates with that.

11   Q.   But it would impact your opinion if the jury believed that

12   Neovasc got an 18-month head start, right?

13   A.   It could.  It could affect the damages.

14   Q.   You haven't done an analysis to quantify how much your

15   opinion would change assuming an 18-month head start instead of

16   the maximum three-month head start like you calculated, right?

17   A.   As I testified at my deposition, my calculations included

18   the possibility of a 12-month head start, which gave an

19   $8 million figure, but I didn't do a calculation with respect

11:39 20   to 18 months.

21   Q.   And you didn't present even the one-year head start in

22   your direct testimony either, right?

23   A.   No, because I don't see any evidence that that's

24   appropriate.

25   Q.   Now, I think we established early on and you established

1    in your direct that you're not a technical expert?

2    A.   That's right.

3    Q.   You're not an expert in the medical field?  Pardon me?

4    You haven't developed an opinion whether Neovasc gained a head

5    start from access to the information in dispute in this case,

6    right?

7    A.   No.  I don't have a technical opinion on this.

8    Q.   You're not weighing the evidence on whether Neovasc really

9    got a head start, right?

11:40 10   A.   That's right.

11    Q.   You're not saying as part of your opinions the individuals

12    at Neovasc are inherently more trustworthy than the people at

13    CardiAQ?  I think we discussed that earlier.

14    A.   We did.

15    Q.   Now, despite the fact that you haven't developed an

16    opinion on whether Neovasc obtained an 18-month head start, I

17    think you had a slide up that said you believe that the

18    18-month head start is unreliable?

19    A.   That's right.

11:40 20   Q.   I think you pointed out in a slide that Mr. Wagner does

21    not identify any assumption or reliance on actual review of

22    Neovasc development records?  You said that too?

23    A.   That's right.

24    Q.   You understand that Mr. Wagner is not opining, he's not

25    telling the jury whether or whether or not Neovasc got an

1    18-month head start, right?

2    A.   I do understand that.  He's relying on Mr. Ratz.

3    Q.   Okay, and we'll get there.  And you don't dispute that

4    it's up to the jury to determine Neovasc got an 18-month head

5    start?

6    A.   No, I don't.

7    Q.   And you don't dispute that the jury can consider the

8    entire record at trial to make that determination, right?

9    A.   I don't dispute that.

11:41 10   Q.   So the jury can rely on Mr. Ratz, anybody else, all the

11   information at trial the jury can use to come to the conclusion

12   to determine that Neovasc got at least an 18-month head start,

13   right?

14   A.   They can consider all of the information that's at trial,

15   that's right.

16   Q.   You put up a timeline.  That was your Slide 20 with the

17   normalized timelines.  You aren't purporting to give an expert

18   opinion that this timeline suggests that Neovasc did not obtain

19   an 18-month head start, are you?

11:42 20   A.   No.  I'm just pointing out that a review of the timelines

21   is inconsistent with an 18-month head start opinion.

22   Q.   And you're not giving an expert opinion that this timeline

23   undermines an 18-month head start, right?

24   A.   No.

25   Q.   Let's talk a little bit about the timeline.  I think you

1  pointed out that we have CardiAQ up top and Neovasc on the

2  bottom?

3  A.    Yes.

4  Q.    And we've got date one.  It's a little fuzzy for me.  Date

5  one up here is when CardiAQ began its development of its

6  technology, right?

7  A.    That's right.

8  Q.    And at the end we've got the first in human?

9  A.    That's right.

11:42 10  Q.    At the bottom, this is October, 2009, when Neovasc first

11  started, right?

12  A.    Yes.

13  Q.    And then Neovasc gets the first in human about five months

14  later?

15  A.    Five months after CardiAQ, yes.

16  Q.    And you're suggesting this shows that there's no head

17  start?

18  A.    Well, I just don't see any evidence.  It's not consistent.

19  As I said in my testimony, it's not dispositive.  It just is

11:43 20  not consistent with.  I don't see any big advantage here.

21  Q.    Okay, so just so we're straight, you're not using the

22  timeline to give an opinion that there's no head start.  You're

23  just saying that the timeline is inconsistent with a head

24  start?

25  A.    Right.  I examined the timeline because I was looking for

```
     1   evidence to assess the reliability of the assumption because it
     2   was an important input to the damages analysis.
     3   Q.   And that's because, if you normalize them and you look at
     4   the time they started, from the time they started, they got to
     5   first in human about the same time.  Maybe Neovasc was a few
     6   months later, right?
     7   A.   Right.
     8   Q.   But you said earlier, for the first five to six months,
     9   Neovasc had only put about 44 hours into this, right?
11:43 10  A.   That's right.
    11   Q.   And that's about the same as this gap where they're
    12   behind, right?
    13   A.   I'm sorry, 44 hours is one week?  I'm sorry.  I don't
    14   follow you.
    15   Q.   Okay, well, the period from October, 2009, to April, 2010,
    16   that period when Neovasc only billed about 44 hours to the
    17   Tiara, right?
    18   A.   That's right.
    19   Q.   About five to six months they didn't really do anything,
11:44 20  right?
    21   A.   That's right.
    22   Q.   And we see that they're about five months behind on the
    23   timeline, right?
    24   A.   I see that.
    25   Q.   You also mentioned that for about the first 20 months,
```

         1   Neovasc didn't really put a lot of effort in.  It only really
         2   became a project in June, 2011, right?
         3   A.   Yes.
         4   Q.   That's somewhere over here it became a project?
         5   A.   That's right.
         6   Q.   So Neovasc really doesn't put any effort till here, and
         7   then at the end of the game, they're not too far behind, right?
         8   A.   Yes, I see that.
         9   Q.   And you still think this timeline is inconsistent with
11:44   10   showing that Neovasc got a head start?
        11   A.   Yes.
        12   Q.   Now, you haven't made any quantitative assessment of the
        13   parties' relative capabilities, right?
        14   A.   That's right, I haven't.
        15   Q.   And you can't rule out that misappropriating CardiAQ's
        16   trade secrets allowed Neovasc to spend limited resources for
        17   the first 20 months of its program and still get to first in
        18   human in only a few more months than CardiAQ, right?
        19   A.   I'm sorry, could you ask the question again?
11:45   20   Q.   Sure.  You can't rule out that by misappropriating
        21   CardiAQ's trade secrets, that allowed Neovasc to spend limited
        22   resources for the first 20 months and still get to first in
        23   human at a similar time frame as CardiAQ, right?  You can't
        24   rule that out, can you?
        25   A.   Well, I don't know, and we know that a lot of the trade

         1    secrets were available just in April, 2010, very early on, so

         2    six months or so into the development.  So it's not clear

         3    whether it's use of the publicly disclosed information.  There

         4    is some fuzziness there.

         5    Q.   And you're not a technical expert, so you can't evaluate

         6    the value of that public information, right?

         7    A.   I'm not a technical speaker, that's right.

         8    Q.   And you don't know the extent to which Neovasc did or

         9    didn't use that public information, right?

11:46   10    A.   I think for my purposes, it's sufficient to know they had

        11    access to it.  The trade secret value terminates when the

        12    information becomes public.

        13    Q.   And you don't know how much of the trade secrets were in

        14    those public disclosures, right?

        15    A.   It's my understanding from Mr. Leinsing that virtually all

        16    of the trade secrets were public as of the April, 2010 patent

        17    application.

        18    Q.   But you haven't done an assessment as to how valuable that

        19    was to Neovasc, right?

11:46   20    A.   I'm not a technical expert, so I have no technical opinion

        21    on that.  I'm relying on Mr. Leinsing.

        22    Q.   I think you also relied on Mr. Leinsing's opinion that

        23    Neovasc's development time line for the Tiara was normal?  You

        24    relied on that in your report?

        25    A.   Yes, that's right.

1  Q.   Mr. Leinsing explained yesterday that he didn't compare

2  Neovasc's timeline to any other specific companies, right?

3  A.   That's right.

4  Q.   And Mr. Leinsing did not compare Neovasc's timeline to any

5  other specific products, right?

6  A.   That's right.

7  Q.   Instead, Mr. Leinsing only compared Neovasc's timeline to

8  CardiAQ's timeline, right?

9  A.   I don't recall.  I think Mr. Leinsing's opinion was based

11:47 10  on his experience in the industry, but I don't recall the

11  specifics.

12  Q.   It was your Slide 30, you said you calculated damages

13  based on a head start of zero to three months?

14  A.   That's right.

15  Q.   And the zero number, that comes from relying on

16  Mr. Leinsing's opinion that CardiAQ's trade secrets were public

17  as of March, 2010, right?

18  A.   No.

19  Q.   No?

11:47 20  A.   No.

21  Q.   Okay, let's look at your expert report.  Well, let me ask

22  the question again.  That zero number comes from relying on

23  Mr. Leinsing's opinion that CardiAQ's trade secrets were public

24  before the date of the hypothetical negotiation, right?

25  A.   No.  As I said in my direct testimony, I have to assume

```
  1   liability.  That comes from Mr. Leinsing's testimony and his

  2   opinion as expressed in his report that there was no head

  3   start.

  4   Q.   Okay, let's look at your report in Paragraph 85.  You say

  5   "Moreover, as described previously and opined by Mr. Leinsing,

  6   all of the CVT trade secret claims were disclosed publicly

  7   prior to the hypothetical negotiation.  Thus, there is no

  8   evidence of a Neovasc head start associated with the access to

  9   the CVT trade secret claims."  That was your report, right?

11:48 10   A.   Yes.

 11   Q.   Let me look at Paragraph 112.  You say, "Third, I note

 12   that the evidence shows that CVT's trade secret claims were

 13   disclosed publicly as early as March, 2010, and no later than

 14   December, 2011.  As described previously, this suggests a

 15   maximum potential head start ranging from zero to three

 16   months."  That was your report, right?

 17   A.   That's right.

 18   Q.   And, remember, we established earlier that if all of

 19   CardiAQ's trade secrets were publicly disclosed before the

11:49 20   hypothetical negotiation, there would be no liability, right?

 21   A.   That's right.

 22   Q.   And you're supposed to assume liability, right?

 23   A.   That's right.

 24   Q.   Can I have Slide 23, please, or 20 through 22 let's try

 25   it.  I'm not sure.  Yes, you talked about some of the things
```

1    that Mr. Wagner failed to consider for that 18-month

2    assumption?

3    A.    That's right.

4    Q.    Okay, but I think we established earlier, Mr. Wagner is

5    not giving an opinion on whether or not there's an 18-month

6    head start, right?

7    A.    That's my understanding.

8    Q.    And you mentioned a number of factors up here that

9    Mr. Wagner failed to consider?

11:50 10    A.    I think what I mean to say here is, these are -- these are

11    factors that one would need to consider before one assumed that

12    the timeline experienced by CardiAQ would be equivalent to the

13    timeline experienced by Neovasc, so whoever is going to make

14    this assumption would need to consider these things.

15    Q.    Okay.  And you didn't consider any of these things, right?

16    You're not offering an opinion on any of these elements?

17    A.    No.

18    Q.    And you're not saying that it's CardiAQ's position that

19    it's relying only on a one-to-one time ratio to establish that

11:50 20    Neovasc got at least an 18-month head start, right?

21    A.    I don't know.  My understanding is that Mr. Wagner is

22    relying on Mr. Ratz, and that Mr. Ratz said that that's where

23    he got the number.

24    Q.    You testified earlier in your direct, you talked about

25    some of the testimony you heard at trial, right?

```
 1   A.   That's right.
 2   Q.   That was after your report.  You understand the jury can
 3   rely on all of the testimony at trial to determine how much of
 4   a head start Neovasc got?
 5   A.   Yes, I do.
 6   Q.   I'd like to discuss your three-month head start.  You
 7   talked about there being a three-month head start that Neovasc
 8   may have gotten?  That was the maximum?
 9   A.   I talked about a maximum calculation, yes, of three
10   months.
11   Q.   Okay, and I think you started on your Slide DTX 7.  Can we
12   have that.  You assume that the Rev. E device published at
13   least by December, 2011?
14   A.   That's my understanding, yes.
15   Q.   Okay.  But you understand the actual device didn't
16   publish, right?
17   A.   My understanding, it was a patent application with
18   detailed drawings.
19   Q.   Yes, the device itself didn't publish, right?
20   A.   That's my understanding.
21   Q.   Okay.  So no one in the public could actually just go,
22   order up their own copy of a Rev. E prototype, right?
23   A.   That's consistent with my understanding.
24   Q.   And you don't know if there were enough details in the
25   patent to build a Rev. E device just like the one that CardiAQ
```

1   gave to Neovasc, right?

2   A.   I don't have an opinion on that.

3   Q.   The patent does not have dimensions, does it?

4   A.   This is getting into technical areas that aren't my

5   expertise.  I think I heard Mr. Leinsing testify about that

6   yesterday, but I can't opine on that.

7   Q.   And someone reading a patent doesn't just have the ability

8   to go speak with the inventor, right?

9   A.   I guess that depends on who's reading the patent.

11:52 10   Q.   But most people in the public and if CardiAQ wasn't

11   working with Neovasc, Randy Lane couldn't just dial up Mr. Ratz

12   and say, "Hey, I saw your patent.  Could you explain it the

13   me"?

14         MR. GRAVES:  Objection, your Honor.  This is getting

15   outside the scope of what she's here to do.

16         THE COURT:  Sustained.

17   Q.   Well, CardiAQ's patent doesn't have the results of the

18   animal tests that Mr. Ratz showed to Mr. Lane, right?

19         MR. GRAVES:  The same objection, your Honor.

11:53 20         THE COURT:  Sustained.

21   Q.   The patent doesn't have CardiAQ's entire design history,

22   right?

23         MR. GRAVES:  Your Honor, I object again and would like

24   to have a sidebar if these types of questions are going to

25   continue for scope reasons.

```
 1              THE COURT:  I'm going to sustain the objection.
 2              MR. HORNE:  Okay.
 3    Q.   Let's turn to your Demonstrative 14.  You determined that
 4    if eleven employees worked 473 hours, they could do about 5,200
 5    hours of work in 2.8 months, right?
 6    A.   That's right.
 7    Q.   And you're assuming that during this approximately
 8    three-month period, the Neovasc employees are not working on
 9    any other projects, right?
11:53 10  A.   This would assume full-time effort, that's right.
11    Q.   And when you formed this theory, you didn't discuss it
12    with anyone at Neovasc, did you?
13    A.   No.
14    Q.   And you didn't vet your theory with anyone with experience
15    in the TMVI industry, did you?
16    A.   No.
17    Q.   In fact, we know that you didn't talk to Mr. Leinsing
18    before your report and this opinion because you didn't -- and
19    you didn't discuss your theory with him then, right?
11:54 20  A.   That's right.
21    Q.   And no one from Neovasc has come to trial and testified
22    that it could or would have condensed the work, the two years
23    of work from October, 2009, to December, 2011, in the three
24    months, right?
25    A.   No, but I don't think I'm really saying that.  As I
```

1   testified on direct, this is kind of an artificial construct

2   just to think about, to illustrate really the level of effort

3   that Neovasc was undertaking in that time frame, to examine

4   whether it would have been feasible potentially for them to

5   catch up in the several-year period between the disclosure of

6   the trade secrets publicly and the valuation of Tiara that

7   forms the basis of Mr. Wagner's royalty analysis.

8   Q.   So your three-month maximum head start, is it artificial

9   construct?

11:55 10   A.   Yes.

11   Q.   And you're not saying that Neovasc could condense the two

12   years' worth of work into three months?

13   A.   I think we talked about this at length at my deposition.

14   I'm using this as an illustration of a potential maximum head

15   start as an upper bound, but I think what likely really would

16   have happened is that Neovasc would have started development

17   around April, 2010, when the first disclosures came out, and

18   then been able to continue working right along.  So I don't

19   think it's accurate or fair to characterize that as an

11:55 20   assumption that they wouldn't have done anything prior to --

21   that in the real world, they wouldn't have done anything prior

22   to 2011.

23   Q.   I want to just ask you some questions about your maximum.

24   You said the three months is the maximum, right?

25   A.   Yes, that's right.

1    Q.   And Neovasc has known for a long time that the potential

2    market for a TMVI device is worth billions of dollars, right?

3    A.   I think we talked about this earlier.  I think that there

4    was general knowledge that it was a large market, market

5    opportunity.  I don't know exactly what numbers Neovasc placed

6    on that early in the period.

7    Q.   They knew it was pretty big, right, a lot of money at

8    stake?

9    A.   I think that's fair.

11:56 10    Q.   And you agree that -- you may dispute on whether it's

11   essential, but you would certainly agree it would be beneficial

12   to be first to market, right?

13   A.   Yes.

14   Q.   And you would agree that that's a big economic incentive,

15   right?

16   A.   It could be an economic incentive, that's right.

17   Q.   And despite that incentive, you haven't cited any evidence

18   that Neovasc ever dedicated eleven employees full time to work

19   on the Tiara, right?

11:56 20    A.   As I understand it, in this early period, from Mr. Marko's

21   testimony, Neovasc was balancing its different corporate

22   objectives, its need to make money and revenue to sustain the

23   business versus developing or spending time on intriguing

24   potential new projects.

25   Q.   My question is a little bit different, though.  You're not

1    aware of any evidence, we haven't heard any evidence at trial

2    that ever before or after this December, 2011 time frame, that

3    Neovasc has ever dedicated eleven people to work on the Tiara

4    full time, right?

5    A.    I don't recall seeing evidence on that.

6    Q.    We're still on Slide 14.  So we're talking, this three

7    months assumes that the eleven employees would work 473 hours

8    over the 2.8 months, right?

9    A.    That's right.

11:57 10   Q.    And this is based on, I think you said, all of the work

11    that Neovasc did on the Tiara up through December, 2011?

12    A.    Yes, it is.

13    Q.    Okay.  And Randy Lane was the lead engineer on the Tiara,

14    right?

15    A.    That's right.

16    Q.    He was the primary inventor on the Tiara patent, right?

17    A.    That's my understanding.

18    Q.    And we heard testimony that this project, to be

19    colloquial, was pretty much -- I mean, this is Randy Lane's

11:57 20   baby, right?  This is his project?

21    A.    That's my understanding.

22    Q.    Okay.  And your expert report doesn't say anything about

23    running this three-month theory past Randy Lane, right?

24    A.    That's right.

25    Q.    And do you know how many hours Randy Lane billed on the

```
 1   Tiara up through December, 2011?
 2   A.   I have that information in my report.
 3   Q.   Do you know?
 4   A.   Not off the top of my head.
 5   Q.   Do you have an idea?
 6   A.   I looked at it, but I don't remember the number.
 7   Q.   Okay.  He billed about 1,319 hours, right?
 8   A.   I can check it if you'd like, but I'll be happy to take
 9   your representation.
10   Q.   Sure, it's on your schedule.  We can go to Exhibit 2251,
11   the last page.  This is an exhibit you prepared.  You looked at
12   Neovasc's time records, right, and then you prepared this
13   exhibit?
14   A.   That's right.
15   Q.   And the last page, I believe, it has the total time for
16   2010 and 2011?  It's got Randy Lane there at the bottom?
17   A.   I see that.
18   Q.   And on the right he billed about 1,300 -- well, about --
19   he billed 1,319 hours in 2010 and 2011 for the Tiara?
20   A.   I don't think so.
21   Q.   No?  It says "Tiara"?
22   A.   Excuse me.  I'm sorry.  I'm looking at the wrong number.
23   1,300 hours, yes, that's right.
24   Q.   And that doesn't include the 44 hours before April that
25   Mr. Lane didn't record, right?
```

```
 1   A.   That's right.
 2   Q.   So in order to get this project done in 2.8 months,
 3   Mr. Lane would have had to bill 1,363 hours in 2.8 months,
 4   right?
 5   A.   I'm sorry.  I can accept your math, I think.
 6   Q.   You can accept?
 7   A.   I think I can.
 8   Q.   Okay.  And that would be 486 hours per month, right?
 9   A.   That's right.
11:59 10   Q.   And that's more than 15, almost 16 hours a day seven days
11   a week billed to the Tiara, right?
12   A.   That's right.
13   Q.   And you don't think that you can necessarily assume
14   there's a one-to-one ratio between time billed and time in the
15   office, right?
16   A.   I'm not sure I know what you mean by that question.
17   Q.   Well, you're a time biller, right?
18   A.   Yes.
19   Q.   As am I.  You know that when you're billing an eight-hour
12:00 20   day, it doesn't mean you're necessarily in the office only
21   eight hours, right?  The phone rings, you want to talk to a
22   family member, you want to talk to a friend at the water cooler
23   about the hockey game, a TV show, you don't bill that time,
24   right?
25   A.   That's right.
```

1   Q.   So he's got to bill 15.7 hours a day every day seven days

2   a week, not accounting for talking to family, talking to a

3   friend, a doctor's visit, or anything like that, right?

4   A.   That's right.

5   Q.   And in all the time sheets that you reviewed, Mr. Lane had

6   never even come close to billing 486 hours in a month, right?

7   A.   I don't know the answer to that.

8   Q.   Would you accept my representation that that's true?

9   A.   Yes, I will.

12:00 10         MR. HORNE:  I have no further questions.

11         THE COURT:  Thank you.

12         MR. GRAVES:  Do you want me to follow up, or should we

13   take the break?

14         THE COURT:  How long do you think your follow-up is

15   going to be?

16         MR. GRAVES:  Two minutes, three minutes.

17         THE COURT:  Let's go ahead and do it.

18   REDIRECT EXAMINATION BY MR. GRAVES:

19   Q.   Ms. Mulhern, you were asked just a moment ago about what

12:01 20   would happen if Randy Lane worked pretty much every hour of

21   every day.  Did your review of the records show whether any

22   other Neovasc employees were working on the Tiara project in

23   the years 2010 and 2011?

24   A.   Yes.  There were quite a number of other employees working

25   on the Tiara project.

1    Q.   Is it fair to say that he wasn't the only one working on

2    that project during that period?

3    A.   Yes, that's right.

4    Q.   You were also asked about something that you had said in a

5    seminar about the Coca-Cola trade secret, and I just want to

6    ask you some questions about that too.  Do you have an

7    understanding of when the Coca-Cola formula trade secret was

8    developed?

9    A.   Actually, it was many, many years ago.  I don't remember.

12:01 10    Q.   Is it fair to say it was over 100 years ago?

11    A.   Yeah, I think that's probably right.

12    Q.   And as far as you understand it, is that still a trade

13    secret today, or has it been publicly disclosed?

14    A.   It's still a trade secret, absolutely.  They keep that

15    under lock and key.

16    Q.   Based on your reliance on Mr. Leinsing's testimony about

17    public disclosures, is there a difference in this context

18    between a 100-year-old Coca-Cola formula that's still secret

19    and the type of information we're dealing with in your

12:02 20    analysis?

21    A.   Absolutely.  This is information that was disclosed

22    publicly in patent applications within months.

23    Q.   You were also asked about the cost approach and your

24    differences with Mr. Wagner there.  Why is the cost approach,

25    in your view, as you described it earlier, the best way to do

1    it in this case?

2    A.   In this case, I think the cost approach is appropriate

3    because -- especially as I've used it, for a reasonableness

4    check on Mr. Wagner's methodology -- because, again, the income

5    approach relies on a study of revenues and profits from

6    products.  These products are not yet earning revenues and

7    profits, and there is substantial uncertainty over whether they

8    will.  In fact, some of the estimates I looked at before

9    putting in my report still say there's only a 50/50 chance of

12:03 10   the Tiara coming to market in the U.S. as of late 2015.

11   Q.   You were also asked a question about why you had used

12   $533,000 to talk about the information from CardiAQ at the time

13   of the hypothetical negotiation in March, 2010, instead of

14   using the $400 million that Edwards paid for CardiAQ some five

15   years later.  Can you explain for the jury, Ms. Mulhern, when

16   you were thinking about the hypothetical negotiation as of

17   March, 2010, why did you use that roughly half-a-million-dollar

18   number instead of plugging in the $400 million number from five

19   years later?

12:03 20   A.   Well, that $400 million number wouldn't be appropriate.

21   First of all, it's the value of the whole company, not just the

22   R&D.  That was valued substantially lower, I think, at

23   $190 million.  But even setting that aside, that valuation, of

24   course, doesn't account for the uncertainty that was applicable

25   as of March, 2010.  As I testified, the project was in its

1    infancy, and there's no one who would have paid that kind of

2    money for the company at that time.

3    Q.    So I want to ask you just one more question, and it kind

4    of gets to that same point.  You were asked whether it's okay

5    when you think about a hypothetical negotiation in March, 2001,

6    to take account of some things that happened later.  Do you

7    agree or disagree between you and Mr. Wagner on the degree to

8    which you're supposed to take things into account that happened

9    in the future when you think about these models?

12:04  10    A.    So I think I can generally agree that the courts do allow

11    us in considering the outcome of a hypothetical negotiation,

12    they do allow us to think about things that become known in the

13    future; for example, to look at what we now know about the

14    market opportunity or potential market shares of the products.

15    But the courts also specifically require us to set that

16    hypothetical negotiation at the time of misappropriation, which

17    means the value we come up with needs to be consistent with

18    that time frame.

19    Q.    And how do you differ with Mr. Wagner on that particular

12:05  20    piece of the analysis?

21    A.    So, in my view, I think he has completely ignored the fact

22    that the hypothetical negotiation would have happened in 2010;

23    whereas, in my view, it's an important consideration I've taken

24    into account along with some information that became available

25    subsequently.

1          MR. GRAVES:  Thank you, Ms. Mulhern.  I have no

2     further questions.

3          MR. HORNE:  No questions, your Honor.

4          (Witness excused.)

5          THE COURT:  All right, let's break for lunch.  We'll

6     see you back here in about 45 minutes, 12:50.

7          THE CLERK:  All rise for the jury.

8          (Jury excused.)

9          THE COURT:  All right, did you give them the new

12:06 10    draft, Jonathan?  We have a red-line version for you of the

11    first half of the instructions.  We can go over them now or

12    take a break and come back in half an hour and then go over

13    them.  The red lines are fairly minor.  Does anyone see any

14    big-ticket items in this that's going to require more than

15    15 minutes?

16          MR. SGANGA:  It may be better, your Honor, to come

17    back in half an hour.

18          THE COURT:  Okay, so do you want to come back, like,

19    around 12:30?

12:06 20          MR. SGANGA:  That would work, yes.

21          THE COURT:  12:35?  And no one sees any big items that

22    are going to take longer than 15 minutes to sort through on

23    this?

24          MS. BAL:  No, your Honor.

25          THE COURT:  Okay, so let's say 12:35 then, okay?

```
 1                    (Noon Recess, 12:06 p.m.)

 2                    (Resumed, 12:38 p.m.)

 3              THE COURT:  Okay, questions, comments, concerns?

 4              MS. LEA:  Yes, your Honor.  We have a friendly

 5        amendment, if we may.

 6              THE COURT:  I prefer the friendly to unfriendly, but

 7        I'll take either.

 8              MS. LEA:  Okay.

 9              So this would be on page 2, and I'm working off the
```
12:39
```
10        non-redline, but on page 2, there's a paragraph that starts

11        "CardiAQ bears the burden of proving."

12              THE COURT:  Yes.

13              MS. LEA:  And we would like to add at the beginning of

14        that sentence, "Unless I instruct you otherwise," and that's to

15        take into account the differing burden --

16              THE COURT:  I get it.

17              MS. LEA:  And one more.

18              THE COURT:  Yes.

19              MS. LEA:  At the end of that paragraph, we would like
```
12:39
```
20        to add, "Neovasc also bears the burden of proving some of its

21        defenses by a preponderance of the evidence, and I will

22        instruct you about that in the specific instructions."

23              THE COURT:  Are you talking about unclean hands and

24        duty to mitigate?

25              MS. LEA:  Well, we don't think those should be
```

1    instructed on at all, but, certainly, if they were.  But we are

2    talking about their burdens under the contract, it's their

3    burden to show the information was public or independently

4    developed.

5              THE COURT:  All right.

6              Before I get to that, it's not my intention to

7    instruct on unclean hands or duty to mitigate.  I don't

8    understand how either one of those play into this case.

9              MR. BOEHM:  Would you like me to speak to that right

12:40 10    now, your Honor?

11              THE COURT:  I would like to tell you that before we

12    amend the instruction today, I'm not going to be able to

13    resolve it now.

14              So tell me again what you wanted?

15              MS. LEA:  And I can hand up a written copy if that's

16    easier, but, "Neovasc also bears the burden of proving some of

17    its defenses by a preponderance of the evidence, and I will

18    instruct you about that in the specific instructions."

19              THE COURT:  That you'll get tomorrow.

12:41 20              I think that covers every eventuality, right?

21              MR. BOEHM:  Yes.

22              THE COURT:  Okay.

23              Anything else from either side?

24              MS. LEA:  Nothing from us.

25              MR. BOEHM:  We're good.

```
  1              THE COURT:  We've identified the defendants as Neovasc
  2    Inc. and Neovasc Tiara, Inc. and then lumped them together as
  3    Neovasc and we're intending to do those on the verdict form,
  4    too.  Any reason why they need to be separated out?  I don't
  5    think there's been anything in support of that.
  6              MR. BOEHM:  No, your Honor.
  7              THE COURT:  And what about -- any thought about do you
  8    want me to not tell or tell them there may be transcripts
  9    available in certain limited situations?
 10              MS. LEA:  We're okay with that, your Honor.
 11              MR. FLYNN:  Your Honor, we prefer not to.
 12              THE COURT:  Okay.  Then I won't.
 13              All right.  So we'll give them --
 14              MR. FLYNN:  Your Honor, may I raise just a procedural
 15    point?
 16              THE COURT:  Yes.
 17              MR. FLYNN:  I think we should rest in front of the
 18    jury.
 19              THE COURT:  I agree.
 20              MR. FLYNN:  We are then going to have some JMOLs that
 21    I think should be presented outside the presence of the jury.
 22              THE COURT:  Do you want to make those now?
 23              MR. FLYNN:  That's fine with me, if that's fine with
 24    you.
 25              THE COURT:  We sent them out at five past 12, so we
```

```
 1    have another eight or ten minutes.
 2            MR. SGANGA:  Your Honor, can we move in our remaining
 3    exhibits if we're going to keep the sequence here?
 4            THE COURT:  Yes.
 5            MR. HORNE:  From Ms. Mulhern's cross, we have
 6    Exhibit 358, 384, and 719.
 7            THE COURT:  Any objections to those?
 8            MR. BASKIN:  No objection.
 9            (Exhibits 358, 384, and 719 received in evidence.)
10            THE COURT:  Any other exhibits?
11            MR. BASKIN:  We still have three outstanding
12    objections from CardiAQ.
13            THE COURT:  Yes.  We'll get back to you on those.
14    He's working on the jury instructions.
15            Those don't need to be resolved before I give them a
16    preliminary charge.
17            Does anybody feel they need to be?  Procedurally they
18    should be, is anyone going to insist on that?
19            MR. SGANGA:  I don't think anything is going to happen
20    between now and then --
21            MR. BASKIN:  As long as we can reserve the right to
22    admit them for the jury to review.
23            THE COURT:  Yes.
24            Okay.  Do you want to go ahead and make your motions?
25            MR. FLYNN:  Yes, your Honor.
```

1          Defendants move for judgment as a matter of law on two

2    of plaintiff's claims for relief.  The first is the claim under

3    Chapter 93A, Section 11.  That motion is based on 50(a) and/or

4    50(c) to the extent any issues are presented to the jury for an

5    advisory verdict.

6          Second motion is based on 50(a), and it's with respect

7    to the claim for breach of the Canadian duty of honesty and

8    contractual performance under 50(a).  We have short briefs,

9    your Honor, that we'd be happy to file.  We can also make these

12:44 10   orally.

11          THE COURT:  If you want to file the briefs, you can.

12    I'll take a look at them now, and then -- I'm going to go ahead

13    and give them the preliminary charge because there's obviously

14    something that's going to go to the jury, so I'm not feeling

15    any huge pressure to sort these out before we let them go for

16    the day.

17          MR. FLYNN:  I think that's right, your Honor.

18          THE COURT:  And then my proposal -- so why don't you

19    pass those up.

12:45 20   My proposal for after that is we probably need another

21    I'm guessing like an hour to get our charges final.  So I'll

22    give you an hour off, and then come on up and give them to you

23    and take -- how much time do you think you'll need to look at

24    them once we --

25          MR. SGANGA:  I think an hour would be good, your

1    Honor.

2              MR. BOEHM:  Likewise.

3              THE COURT:  We'll take an hour and then take an hour

4    to reconvene.

5              MR. SGANGA:  Can we also put a Rule 50(a) motion on

6    the record, your Honor?

7              THE COURT:  Yes.

8              MR. SGANGA:  This is as to the contract defenses under

9    the non-disclosure agreement.  Plaintiffs move under Rule 50

12:45 10   that Neovasc has not met its burden of proving independent

11   development, and likewise failed to prove that the information

12   provided to Neovasc was available in the public domain or

13   already known to Neovasc.  And we also -- to the extent that

14   there's anything for the jury on the mitigation defenses or the

15   unclean hands defenses, we'd likewise move on those.  And we

16   can submit briefing on this as well.

17             THE COURT:  Okay.

18             Why don't you hand up all the briefs --

19             MR. BOEHM:  We're actually in the process of filing on

12:46 20   ECF right now.

21             MR. SGANGA:  If we could do that later, your Honor.

22             THE COURT:  That's fine.

23             Okay.

24             Do you want to go up and see if they're ready, Karen?

25             THE CLERK:  Sure.

```
 1              THE COURT:  Can we get copies of 2145, 161 and 2808?
 2      Or tell us where they are in these binders.
 3              MR. BASKIN:  Copies of 2145 and 24 -- sorry, just
 4      2145.  I can get the other two.
 5              THE COURT:  2145, 161, and 2808.
 6              2145, is that the interrogatories?
 7              MR. BASKIN:  2145 is a public domain presentation.
 8              THE COURT:  Okay.
 9              And 161 is --
12:47 10        MR. BASKIN:  Is an interrogatory response, as is 2808.
11              THE COURT:  All right.  Then we don't need copies if
12      they're just interrogatories.
13              MR. BASKIN:  Your Honor, I believe all three are in
14      Leinsing's direct binder.
15              (Pause.)
16              (Jury entered the courtroom.)
17              THE CLERK:  Court is back in session, please be
18      seated.
19              MR. FLYNN:  Your Honor, at this time Neovasc rests.
12:49 20        THE COURT:  Any rebuttal case?
21              MR. SGANGA:  No, your Honor.  Plaintiff rests.
22              THE COURT:  All right.
23              So, as we talked about, there will be closing
24      arguments tomorrow starting at 10:00, and then you'll be
25      charged on the specific elements of the claims alleged in this
```

 1    case.

 2         Doing all the closing arguments and all the jury

 3    instructions in one day is a lot.  I'm going to give you today

 4    the preliminary, not -- not the preliminary charge because

 5    they're all equally important but the part of the charge that

 6    comes before the specific charge on the claims in the case.

 7         So we try and give you copies -- we will give you a

 8    copy of these to have back with you in the jury room.

 9         The upside to that is you'll have them to look at in

12:50 10  the jury room, but the downside of that is I pretty much need

11    to read them to you to make sure what you hear today and what

12    you have with you in the jury room are largely the same.

13         So despite the fact that you're going to have a

14    written copy of these in the jury room, I'm going to ask you to

15    listen carefully as I give them now.

16    PRELIMINARY INSTRUCTIONS TO THE JURY:

17         THE COURT:  So the general rules of evaluating the

18    case.  In defining the duties of the jury, I must first explain

19    these general rules.

12:50 20       It is your duty to find the facts from all of the

21    evidence in the case.  I will describe the law to you, and you

22    must apply the law to the facts as you find them.  You must

23    follow the law as I describe it whether or not you personally

24    agree with the wisdom of the law.  This is a fundamental part

25    of our system of government by law.

1          In following my instructions, you must follow all of

2     them and not single out some and ignore others.  They are all

3     equally important even if I spend more time discussing some

4     points than others.  The lawyers are allowed to comment both on

5     the evidence and on the rules of law in the opening and closing

6     statements.  But if what they have said about the evidence

7     differs from your memory, it is your collective memory that

8     should control.  If what they have said about the law seems to

9     differ in any way from what I am telling you, you must be

12:51 10   guided by only my instructions.  You must not read into these

11     instructions or anything I may have said or done during the

12     course of trial any suggestion from me as to what verdict you

13     should return.  Whatever opinion I might have as to what your

14     verdict should be, if I even have one, is utterly irrelevant.

15     The verdict is yours and yours alone to decide as the finders

16     of the facts.  While I intend to be as helpful as I can in

17     providing you with the knowledge of the law that you will need

18     to render an intelligent and informed verdict, the law commits

19     this case to your sole determination as the judges of the

12:52 20   facts.

21          As you no doubt know by now, the plaintiff in this

22     case, the person or entity who brings the lawsuit, is CardiAQ

23     Valve Technologies, Inc. or CardiAQ for short.  The defendants,

24     the parties sued by the plaintiff, are Neovasc, Inc. and

25     Neovasc Tiara, Inc. or together Neovasc.

1          The plaintiff and the defendants are corporations.

2    Under the law, a corporation is considered a person, and all

3    persons, including corporations, are equal before the law.  The

4    corporation acts through its employees, officers, and

5    directors.  Corporations are entitled to the same fair and

6    conscientious consideration by you as any other person would

7    be.

8          Unless I instruct you otherwise, CardiAQ bears the

9    burden of proving its claims by what is called "a preponderance

12:52 10    of the evidence."  To prove its claims, CardiAQ must prove

11    certain elements which I will describe later, tomorrow, in

12    these instructions.  CardiAQ must prove each element of a legal

13    claim beyond a preponderance of the evidence.  If you find that

14    CardiAQ has failed to prove any element of a claim, you should

15    find for the defendants as to that claim.  Neovasc also bears

16    the burden of proving some of its defenses by a preponderance

17    of the evidence, and I will instruct you about that in the

18    specific instructions that you'll get tomorrow.

19          As I explained earlier in my preliminary instructions

12:53 20    at the beginning of this trial, a preponderance of the evidence

21    is a lower standard of proof than proof beyond a reasonable

22    doubt, which is the very high standard that we apply in a

23    criminal trial.  In a civil case like this one, the plaintiff

24    does not need to prove its case by any degree of mathematical

25    certainty.  Rather, the plaintiff must produce evidence which,

1    when considered in light of all of the facts in evidence in

2    this case, leads to you believe that each element of its claim

3    is more likely true than not.  To put it another way, if you

4    were to put the plaintiff's evidence and the defendants'

5    evidence on opposite sides of the scale, the plaintiff would

6    have to make the scale tip in its direction for to you find in

7    its favor on any claim.  On the other hand, if you find that

8    the credible evidence on a given issue is evenly divided

9    between the parties, that is, it is equally probable that one

12:54 10   side is right as it is that the other side is right, then you

11   must decide that issue against the party having the burden of

12   proof, in this case, generally speaking, against the plaintiff.

13       Your verdict must be based solely on the evidence and

14   the applicable law.  In reaching your decision as to whether

15   plaintiff has sustained its burden of proof, it would be

16   improper for you to consider anything that is not in evidence.

17   You may not base your verdict on bias, prejudice or sympathy.

18   While you might sympathize with one party or the other, your

19   verdict must not be based on that sympathy or influenced by it.

12:54 20   Again, you must decide the case solely on the evidence and

21   according to the law.

22       I am next going to briefly review for you what is and

23   is not evidence in a civil case.

24       First, what is evidence?

25       Evidence was presented at this trial in several ways.

         1              First, evidence was presented through the sworn

         2     testimony of witnesses on both direct and cross-examination.

         3              Some of the testimony before you is in the form of a

         4     deposition or deposition testimony that's been received into

         5     evidence.  The deposition is simply a procedure where prior to

         6     trial the attorney for one side may question a witness or an

         7     adverse party under oath.  This is part of pretrial discovery,

         8     and each side was entitled to take depositions.  You may

         9     consider the testimony of a witness given at a deposition and

12:55   10     submitted as evidence according to the same standard you would

        11     use to evaluate the testimony of a witness who was actually

        12     here during the trial.

        13              Evidence was also presented through exhibits, such as

        14     documents, photographs, objects, and videos that were

        15     identified by a witness or otherwise admitted into evidence

        16     during the trial.  The numbers assigned to the exhibits are for

        17     convenience in order to ensure an orderly procedure.  You

        18     should draw no inference from the fact that a particular

        19     exhibit was assigned a particular number or that there may be

12:55   20     gaps in the number sequence.

        21              The quality or strength of the proof is not

        22     necessarily determined by the sheer volume of evidence or by

        23     the number of witnesses or exhibits.  It is the weight of the

        24     evidence, its strength in tending to prove the issue at stake

        25     that is important.  You might find that a smaller number of

1    witnesses who testified to a particular fact are more

2    believable than a larger number of witnesses who testified to

3    the opposite.  The law does not require any party to call as

4    witnesses all persons who may have been present at any time or

5    place involved in this case or who may appear to have some

6    knowledge of the matters at issue in this trial, nor does the

7    law require any party to produce as exhibits all papers and

8    things mentioned by the witnesses in this case.  You should not

9    speculate about information that has not been placed before

12:56 10   you.

11           Now, just like there are things that are evidence,

12   there are certain things that are not evidence and should have

13   no influence on your verdict.

14           Arguments and statements by the lawyers are not

15   evidence.  What the lawyers have said over the course of the

16   trial you might find helpful, even persuasive, but the facts

17   are to be determined from your own evaluation of the testimony

18   of the witnesses and exhibits and from any reasonable

19   inferences that you choose to draw from the facts as you find

12:56 20   them.

21           Questions by lawyers to the witnesses are not evidence

22   and may only be considered to the extent that they give context

23   or meaning to a witness' answer.

24           Objections by lawyers are not evidence.  Attorneys

25   have a duty to their clients to object when they believe that a

1    question is improper under the rules of evidence.  You should

2    not be influenced by the fact that an objection was made.  If I

3    sustained the objection or the question was withdrawn, you

4    should ignore the lawyer's question and any assertion of fact

5    that it might have contained.  If I overruled the objection,

6    you should treat the witness' answer like any other.

7         Testimony that I excluded, struck or I instructed you

8    to disregard is not evidence.  If you heard an answer to a

9    question before my ruling sustaining an objection, you are to

12:57 10   disregard it, that answer is not evidence.  Over the course of

11   the trial I provided some limiting instructions indicating that

12   certain testimony should only be used for a specific purpose,

13   and it should only be used for that purpose.

14        You should also ignore editorial comments made by the

15   attorneys during their presentations, particularly those that

16   tended to characterize the testimony of a witness.  Whether or

17   not a witness' testimony was believable in any particular point

18   is a determination only you can make.

19        Notes, if you have kept them, are not evidence.  They

12:58 20   are a personal memory aid to be used to refresh your

21   recollection of the evidence during the deliberations.

22        Certain presentations and objects have been shown to

23   you as demonstrative exhibits.  These demonstratives, which

24   will not be provided to you during deliberations, are not

25   themselves evidence or proof of any facts.

1          Again, any labels on exhibits placed by attorneys

2     after the lawsuit started for procedural reasons are not

3     evidence.  Those labels include phrases such as "highly

4     confidential," "attorneys eyes only."  Again, you should

5     disregard and ignore these labels when you consider such

6     documents, because the labels were not part of the original

7     documents and those labels are not evidence.

8          Finally, anything you may have seen or heard outside

9     of the courtroom during the course of the trial is not

12:58 10   evidence.  You must decide the case solely on the evidence

11    received at trial.

12         There are two types of evidence:  direct and

13    circumstantial.  Direct evidence is direct proof of a fact

14    usually presented through the testimony of a witness who claims

15    to have been an eyewitness to an event or a participant in a

16    conversation.  When you evaluate direct testimony, your

17    decision is fairly straightforward.  Do you believe that what

18    the witness told you is accurate?  Circumstantial evidence, on

19    the other hand, is proof of a chain of circumstances or a set

12:59 20   of facts from which you could infer or conclude that another

21    fact is true, even though you have no direct evidence of that

22    second fact.  Although you may consider only the evidence

23    presented in the case, you are not limited to the plain

24    statements made by witnesses or contained in documents.  You

25    are also permitted to draw reasonable inferences from the facts

1    if you believe those inferences are justified in light of

2    common sense and personal experience.  An inference is simply a

3    deduction or a conclusion that may be drawn from the facts that

4    have been established.  Any inferences you draw must be

5    reasonable and based on the facts as you find them.  Inferences

6    may not be based on speculation or conjecture.

7         You all have experiences in your everyday affairs

8    drawing inferences based on circumstantial evidence.  For

9    example, if you woke up in the morning and saw that it was a

12:59 10   bright and clear day but you also saw puddles of water on the

11   street, you might draw the inference that it had rained during

12   the night even though you slept through it.  In other words,

13   the fact of rain is an inference that could be drawn from the

14   presence of the water on the street.  As I said, an inference

15   may only be drawn if it is reasonable and logical and not

16   speculative or based on conjecture.  If, for example, you saw

17   puddles of water on your street but not on any other street in

18   your neighborhood, then other facts, such as a broken water

19   main or a neighbor's non-functioning sprinkler system might

01:00 20   better explain the presence of water on your street and

21   therefore a more logical inference might be that a water main

22   had broken.  In deciding whether to draw an inference, you must

23   look at and consider all the facts in light of reason, common

24   sense, and your own life experience.

25         Neither type of evidence, direct or circumstantial, is

considered superior or inferior to the other.  Both types of
evidence may be considered in reaching your verdict and may be
given whatever weight you as finders of the fact deem that
particular evidence to be worth.

Most evidence received at trial is offered through the
testimony of witnesses.  As the jury, you are the sole judges
of the credibility of these witnesses.  If there are
inconsistencies in the testimony, it is your function to
resolve any conflicts and to decide where the truth lies.  You
are not required to believe the testimony of any witness simply
because that witness was under oath.  You may choose to believe
everything that a witness said, only part of it or none of it.
If you do not believe a witness' testimony that something
happened, that is not evidence that it did not happen, it
simply means that you must put that testimony aside and look
elsewhere for credible evidence before deciding where the truth
lies.

Often it may not be what a witness says but how he or
she says it that might influence whether or not to accept his
or her version of an event as believable or credible.  You may
consider factors such as:  a witness' character; his or her
demeanor on the witness stand; his or her frankness or lack of
frankness in testifying; whether the witness was contradicted
by anything that he or she said before the trial; whether his
or her testimony is reasonable or unreasonable, probable or

1    improbable in light of all the other evidence in the case; how

2    good an opportunity the witness had to observe the facts about

3    which he or she testifies; and whether his or her memory seems

4    accurate.

5            In deciding whether to believe a witness, you may

6    specifically note any evidence of hostility or affection which

7    the witness may have toward one side or the other.  Likewise,

8    you may consider evidence of any other interest or motive that

9    the witness may have in cooperating with a particular party,

01:02 10    including interest in the outcome of the case.  It is your duty

11    to consider whether the witness has permitted any bias or

12    interest to color his or her testimony.  In short, if you find

13    that a witness is biased, you should view that witness'

14    testimony with caution, weigh it with care, and subject it to

15    close and searching scrutiny.  Keep in mind, however, that it

16    does not automatically follow that testimony given by any

17    interested witness is to be disbelieved.  There are many people

18    who, no matter what their interest in the outcome of the case

19    may be, would not testify falsely.  It is for you to decide,

01:02 20    based on your own perceptions and common sense, to what extent,

21    if any, a witness' interest or bias has affected his or her

22    testimony.

23            In deciding whether or not to believe a witness, keep

24    in mind that people sometimes forget things, get confused or

25    remember an event differently.  Memory is not always reliable.

1    When someone recounts a story twice, it will seldom be

2    identical in every detail unless it is a memorized lie or the

3    witness is possessed with extraordinary memory and recall.

4    Even a truthful witness may be nervous and contradict him or

5    herself.  In considering how much significance to give a

6    discrepancy in testimony, you should consider whether a

7    discrepancy pertains to a fact of importance or only to a

8    trivial detail or if it is a willful falsehood which is always

9    a matter of importance and should be considered seriously.  It

01:03 10   is for you to decide, based on your total impression of a

11   witness, how to weigh any discrepancies in testimony.  You

12   should, as always, use common sense and your own good judgment.

13        The testimony of a witness may be discredited or

14   impeached by showing that he or she previously made statements

15   that are inconsistent with his or her present testimony.  If a

16   witness is shown to have given inconsistent statements

17   concerning any material matter, you have a right to distrust

18   that witness' testimony in other respects.  You may reject all

19   of the testimony of that witness or give it such credibility as

01:04 20   you may think it deserves.

21        Sometimes, of course, people make innocent mistakes,

22   particularly as to unimportant details.  Not every

23   contradiction or inconsistent statement is necessarily

24   important.  Again, you alone are the judges of the witness'

25   credibility.

1          If you find a witness has made inconsistent statements

2     under oath on earlier occasions, such as in a deposition, you

3     may also consider that earlier statement for its truth or

4     falsity, the same as any other testimony at trial.

5          A number of documents -- sorry, I missed a page.

6          In this case, I have permitted certain witnesses who

7     have been qualified as experts to express their opinion about

8     matters that are at issue.  Expert witnesses are permitted to

9     testify to an opinion on those matters about which they have

01:04 10   special knowledge, skill, experience, and training.  Such

11    testimony is presented to you on the theory that someone who is

12    experienced and knowledgeable in the field can assist you in

13    understanding the evidence or in reaching an independent

14    decision on the facts.

15         In weighing this opinion testimony, you may consider

16    the witness' qualifications, his or her opinions, their reasons

17    for testifying, as well as all the other considerations that

18    normally apply when you are deciding whether or not to believe

19    a witness' testimony.  You may give the opinion testimony

01:05 20   whatever weight, if any, you find it deserves in light of all

21    the evidence in this case.  You should not, however, accept

22    opinion testimony merely because I allowed the witness to

23    testify concerning his or her opinion.  Nor should you

24    substitute it for your own reason, judgment, and common sense.

25    You may reject the testimony of any witness, including expert

1    witnesses, in whole or in part if you conclude the reasons

2    given in support of an opinion are unsound or if you for other

3    reasons do not believe the witness.  Again, the determination

4    of the facts rests solely with you.

5              You have heard testimony from experts who have been

6    called by both sides to give their opinions.  The way you

7    resolve a conflict between expert witnesses is the same way

8    that you decide other fact questions and the same way you

9    decide whether to believe ordinary witnesses.  You should

01:05  10    consider the soundness of each opinion and the reasons for the

11    opinion.  You may give the testimony of each of these witnesses

12    such weight, if any, that you think it deserves in light of all

13    the evidence.

14             A number of documents, photographs, objects, and

15    videos have been received into evidence.  You will have all of

16    them with you in the jury room available for your review.  You

17    decide the weight, if any, to give any such document, video or

18    other evidence.  For example, your may credit all of a

19    document, a portion of a document or none of the document.  In

01:06  20    evaluating the believability of the statements or assertions in

21    a document, you should consider all the surrounding

22    circumstances.  Among other things, you may consider the author

23    of the document, the believability of the author, when the

24    document was created, the purposes for which the document was

25    created, whether the document was created in anticipation of

1 litigation, whether the statements in the document are

2 contradicted by anything else, and whether the statements in

3 the document are reasonable or unreasonable, probable or

4 improbable in light of all of the other evidence in the case.

5          So I'm going to stop there for the day.  The next set

6 of instructions will be much more specific to the claims in

7 this case.

8          Anything from either side before I release them for

9 the day?

01:07 10          MR. SGANGA:  No, your Honor.

11          MR. FLYNN:  No, thank you, your Honor.

12          THE COURT:  So we will see you back at 10:00 tomorrow.

13 We'll go right to closing arguments and then charge and then

14 the case will be yours.

15          Okay?

16          Thank you all, and have a good afternoon.

17          Oh, I should say, so now the evidence is over, but it

18 is still -- it is perhaps most critically important that you

19 not make any decisions or talk to anybody about this case.

01:07 20 Your decision in this case should be based on what you as a

21 group think about and talk about in that room upstairs.  So you

22 don't want to have any individual conversations or anybody

23 having any set opinions in their mind until those conversations

24 can start to take place.  So don't start making up your mind

25 just because the evidence is over.  Keep your open mind, don't

```
 1    talk to anyone about the case until tomorrow afternoon, and
 2    again, no social media.
 3            Thanks very much everyone.
 4            THE CLERK:  All rise for the jury.
 5            (Jury left the courtroom.)
 6            THE COURT:  All right.  So everyone file their motions
 7    for judgment.
 8            MR. BOEHM:  We have, your Honor, ECF 473 and 474.
 9            MR. SGANGA:  We will do so later.
10            THE COURT:  There's no rush, as long as you get them
11    in today.
12            We will spend some more time on these instructions.
13    If we get them done in less than an hour, which I guess is
14    possible, we'll just e-mail you, the e-mails that Jonathan has
15    been using are fine, you can come up and get them.
16            MR. GRAVES:  Should we come back one hour after we
17    receive them?
18            THE COURT:  Yes.  I'm pretty flexible.  If you need
19    more than an hour, take it; if you're done in less than an
20    hour, just let me know.  I don't have anything else scheduled
21    today except for this.
22            MR. GRAVES:  Thank you.
23            THE COURT:  Okay.  So let's leave it like this:  We'll
24    either see you at 10 past 2 up here, unless we e-mail you
25    sooner.  Okay.
```

01:08 (lines 10, 20)

                   1          (A recess taken at 1:09 p.m.)

                   2          (Resumed, 2:58 p.m.)

                   3          THE COURT:  All right.  A few things.  The three

                   4     exhibits, two of them are interrogatories, right?  161 and

                   5     2808.  I don't see any basis for excluding those.

                   6          MS. LEA:  The basis is that they should not be marked

                   7     as exhibits.  They can be read into the record, like they did,

                   8     but they shouldn't actually be marked as exhibits.

                   9          THE COURT:  Why?

02:58   10          MS. LEA:  Why?

                  11          THE COURT:  Yeah.

                  12          MS. LEA:  Well, simply there's no basis to mark them

                  13     as an exhibit.

                  14          THE COURT:  The rules allow them to be marked as an

                  15     exhibit and they used them for the witness.

                  16          MS. LEA:  We believe the rules are you can read them

                  17     into the record but not mark them as trial exhibits.

                  18          THE COURT:  That's not my recollection of the rule,

                  19     but I'll take another look at it.  Exhibit 2145, your basis for

02:58   20     keeping that out is that it wasn't included in his expert

                  21     disclosure?

                  22          MR. SGANGA:  Not in the body of the report where he

                  23     set forth his opinions.  It was something in a very large sack

                  24     of materials that had been sent to him.  But we never were able

                  25     to learn during discovery that it was the basis for the opinion

1    that he presented in his testimony here.

2            MR. CARSTEN:  Your Honor, in several paragraphs of

3    Mr. Leinsing's report he refers to CardiAQ disclosures and

4    presentations at a variety of conferences, including the TVT

5    conference, which is one of the presentations we're talking

6    about here.  So he does reference as a general class the

7    presentations in the body of his report.

8            MS. LEA:  Your Honor, I asked him at his deposition

9    whether he considered any documents that were not expressly

02:59 10   referenced in his report, and he said no.

11            THE COURT:  Okay.  All right.

12            MR. BOEHM:  I don't believe that's accurate.

13            MR. CARSTEN:  That is not accurate, Your Honor.

14            MR. BOEHM:  I think he said most of the documents but

15   not all.

16            MR. CARSTEN:  He said 99 percent of the documents that

17   he relied upon are referenced in the body of the report.  He

18   referenced classes of material, such as the presentations, such

19   as the development history materials.  He didn't call those out

03:00 20   specifically by Bates number, but he clearly said that he

21   relied upon them.

22            Moreover, following the deposition, counsel for

23   CardiAQ sent us an e-mail saying, "Let us know exactly what the

24   one percent are that are missing that he received but didn't

25   review."  And we identified three documents of that laundry

1    list that you saw spooled out in front of the jury before.

2    They never followed up.  You know, Your Honor, I would submit

3    that there's been no basis for an objection.

4         MS. LEA:  The three did not include this one, Your

5    Honor.

6         MR. CARSTEN:  So that means he reviewed it and

7    considered it in connection with his work in the case.

8         MS. LEA:  Right.  So three out of 1400 they did not

9    use.  He had a list of 1400 documents.  I said, "Which have you

03:00 10   reviewed?  Have you reviewed all of them?"  He said, "No.  I've

11   only reviewed the 100 expressly cited in my report."

12        We followed up with them, and they basically said,

13   "Oh, he reviewed all 1400," after he told me he had not done

14   that at his deposition.

15        MR. CARSTEN:  That's absolutely not true.  You saw the

16   man on the stand.  He said he spent hundreds of hours working

17   on the case.  He did review those documents.  And that's what

18   we told them and they refused and failed to follow up.

19        MR. SGANGA:  Your Honor, to put it in perspective, Dr.

03:01 20   Hillstead, our technical expert, had a report that said

21   developing a medical device is a time-consuming and expensive

22   process.  That was in the text of his report.  When I asked him

23   what kinds of dollar amounts that entailed, there was an

24   objection that it was beyond the scope of his report.  That was

25   sustained.  I feel like this is a comparable kind of issue.

```
 1              THE COURT:  Okay.  We'll go back and look at them
 2     again.
 3              MS. LEA:  Your Honor, if I may just say one more thing
 4     in marking the interrogatories as exhibits?
 5              THE COURT:  Yeah.
 6              MS. LEA:  We see those as like a stipulation or
 7     complaint that can be read into the record but should not be
 8     marked as an exhibit because they contain other things, like
 9     our objections and other things that should not go back to the
10     jury.  That's why it was appropriate for them to read it in but
11     not to mark it as an exhibit.
12              MR. BOEHM:  The rules we think that provide to the
13     contrary are Rule 33(c) and 801(b)(2), among others.
14              THE COURT:  Okay.  We'll take a look at that.
15              All right.  So I've read over -- you all haven't filed
16     your Rule 50 motions yet, right?
17              MR. SGANGA:  Correct.
18              THE COURT:  That's fine.  I looked over theirs.  Where
19     it's not -- I'm not going to rule on them now.  It's not going
20     to change what we send back to the jury.  But in particular,
21     the one about the Canadian law, the duty of honesty I think
22     goes beyond just an actual lie.  I think it can include
23     knowingly misleading.  So again, I'm not going to rule on it
24     now, but that's sort of my thinking on that one.
25              The other one, the Massachusetts one is more
```

1    problematic.  I want to give you all a chance to respond to

2    that.  It doesn't need to be today or tomorrow.  I'm still

3    going to send it out to the jury.  But what I did do in

4    response to reading your thing was to break out the damages

5    more so that if for some reason that 93A claim fails, we'll be

6    able to see exactly what the jurors did.  We originally --

7    we've had different permutations of it.  You can look at where

8    we ended up.  I'm happy to hear you on it.  We thought about

9    the lump sum, and then we broke it out just the breach claims

03:03 10   and 93A.  We've had different permutations of it.  But when you

11   look at it, the reason for where we settled out is that I want

12   to make sure if anything ends up failing, we know exactly what

13   the jury was doing.

14          I'm not going to go through exactly what we included

15   and what we didn't because I think you'll see it from the draft

16   instructions.  But on the verdict form, it's my intention that

17   the 93A be advisory.  We added one question about the

18   inventorship but not any sort of claim construction.  And

19   again, that's purely advisory.  I don't think there's a Seventh

03:04 20   Amendment right to that, and I think that the case you gave us

21   is distinguishable, but nonetheless we put in the question as

22   advisory, although I think in a way more limited way than you

23   wanted it.

24          So that's where we are.  I'm happy to give you as much

25   time as you want with this.  It's about 15 pages of text, plus

```
 1    the verdict form.  So how long do you think you'll need?
 2              MR. SGANGA:  We would like an hour.
 3              THE COURT:  Why don't we come back at 4:00.  If we
 4    need more time, you can -- I'm not trying to short anybody on
 5    this, but let's come back at 4:00 and see where we are.  We're
 6    also e-mailing them to you.
 7              MR. SGANGA:  Okay.
 8              THE COURT:  I think we've already e-mailed the
 9    instructions but not the verdict form.  We haven't e-mailed
10    anything, but we're going to.
11              So anyway, that's what we were thinking.  So I'll see
12    you all back in an hour.
13              MR. SGANGA:  Very good.  Thank you, Your Honor.
14              MR. CARSTEN:  Thank you, Your Honor.
15              MR. GRAVES:  Thank you, Your Honor.
16    (Recess 3:04 p.m.)
17              THE COURT:  All right.  On the two interrogatories,
18    again, I don't have these in front of me, but what we were
19    thinking was that the interrogatories that were highlighted on
20    the screen plus the signature page should go in but not the
21    entire packet.  Okay?
22              MR. CARSTEN:  Thank you, Your Honor.
23              THE COURT:  In terms of the expert disclosure, so we
24    were looking at the report.  He says that he's relying on
25    public information at TCT, TVT.  What's the total number of
```

1  those?  Like, if he said TCT and TVT, is that a discrete

2  number, or is that a big number?

3          MR. CARSTEN:  They started at TVT I believe in 2009,

4  and I think it was TCT was -- 2009 or 2010, excuse me.  I think

5  there's probably a grand total of four or five of those

6  presentations.  And then there were two presentations.  There

7  was a corporate presentation as well as a presentation directed

8  by CardiAQ.  So two -- so five conferences times two is about

9  ten for TVT.

04:04 10          THE COURT:  This one, who is this guy?  It's not a TVT

11  presentation.  Who is it?

12          MR. CARSTEN:  It's a fellow by the name of Fitzgerald,

13  and it was a slide that -- I believe Mr. Ratz testified on his

14  direct that he had presented or provided the information to

15  Doctor or Mr. Fitzgerald.  I believe there's an exhibit that's

16  been entered into evidence, 2488, which is a compilation of

17  public domain materials that Mr. Ratz testified he had done in

18  connection with his work.  One of the pages in that admitted

19  exhibit is the page that we displayed.  This one is in color.

04:04 20  That one is in black and white.

21          THE COURT:  I was just going to say I looked at the

22  exhibit.  I had seen that picture many times.  It can't be the

23  only place it's been admitted.

24          MR. CARSTEN:  It's not.  In fact, the demonstrative

25  that we used that had that image on, Your Honor, had the

        1   example of when it was disclosed in May 2010 and immediately

        2   underneath had the same image demonstrated for June 2010 twice

        3   at the TVT conference.  So part of the reason we're using it

        4   and like to have it in evidence is because it demonstrates that

        5   there was no secrecy.  This was an intentional act of providing

        6   and presenting this data, these images, which is their claimed

        7   Aha moment, to the world.

        8           THE COURT:  And when there's only such a limited

        9   number of these TCT and TVT presentations and he says he's

04:05  10   relying on those --

       11           MS. LEA:  His reliance wasn't limited to CardiAQ

       12   presentations.  So counsel has narrowed that category down to

       13   those ten presentations.

       14           THE COURT:  I mean, honestly, I don't think you need

       15   it, and I think the safer course is to keep it out.  I think

       16   it's a very close call, but it wasn't disclosed in the four

       17   corners of his report.  And, you know, I just think it's safer

       18   to keep it out.

       19           MR. CARSTEN:  May we just preserve our objection?

04:05  20           THE COURT:  You can definitely preserve your

       21   objection.  To some extent it seems like sort of much ado about

       22   nothing.  It's already in there.  So I just think it's the

       23   more -- we're at the end of the trial.  At least I think -- I

       24   know there's a lot of objections preserved, but I think it's

       25   been relatively clean, and I would just as soon keep it that

1    way.  It's not disclosed in the document.  I'm going to keep it

2    out.

3           MR. CARSTEN:  I understand, Your Honor.  So long as

4    our objection is preserved, that's terrific.

5           THE COURT:  So we are still going through these also.

6    And we just added one thing during the hour-long break, and we

7    basically added --

8              We haven't given this to them yet, right?

9              So what we basically added was CardiAQ's final jury

04:06 10   instruction number 17 with a corresponding entry on the verdict

11   form.  And it basically looks just like we did for the 93A.

12             So I think what I'll do is just read it to you when we

13   get there so you can see it in context, but we made that one

14   addition.  I think the easiest way to do this, unless somebody

15   has a better suggestion, is that we just march through this

16   page by page and you can let me know what your issues are with

17   it.

18             Anything on page 1?

19             MS. LEA:  Not from us.

04:07 20          THE COURT:  So I know going through this way, we can

21   do sort of a catchall at the end if there's anything that you

22   think is not in here at all that should be, or if you want to

23   raise it.  Either way, I just want to get through the whole

24   thing.

25             How about page 2?

1          MR. BOEHM:  You're talking about the jury

2     instructions?

3          THE COURT:  Yes.

4          MR. BOEHM:  With respect to the breach of contract,

5     which starts on page 1 and continues onto page 2, I think

6     before trial began -- is it all right if I sit while we work

7     through these?

8          THE COURT:  Sure.

9          MR. BOEHM:  Before trial began, Your Honor made two

04:08 10    legal determinations construing the contract, and we would want

11    to instruct the jury on those two points.  The first is that

12    there's no contractual duty to not compete or no noncompete in

13    the terms of the NDA.  Second, no contractual duty to disclose

14    any intention to compete.  We think it's important to include

15    that in the instructions with respect to the breach of contract

16    cause of action.

17         THE COURT:  I mean, we tell them to -- we tell them to

18    read the nondisclosure agreement and give all the words their

19    plain and ordinary meaning, and I think both of those things

04:08 20    are -- at least the duty not to compete is in there.  Right?

21         MR. BOEHM:  The absence of a duty to compete is,

22    hopefully, plain.

23         THE COURT:  Well, it says they can compete as long as

24    they develop the thing independently.

25         MR. BOEHM:  Right, right.  There's an expressed

1   allowance to compete by independent development, right.  We've

2   heard throughout trial a number of allegations through

3   questions and whatever else that --

4        THE COURT:  I mean, so I want to try and keep these

5   instructions as simple as we can and with as little sort of

6   argument in there as we possibly can.  And we say clearly that

7   there's only two issues related to the breach.  One is the use

8   of the information for its own benefit and two is the level of

9   care.  So I don't think either of those two concepts are really

04:09 10   implicated by what the jury is going to be thinking about.

11        MR. BOEHM:  That point is taken, Your Honor.  We would

12   still --

13        THE COURT:  That's fine.  You're welcome to preserve.

14   But I don't think that needs to be in here.  Do you have a view

15   on that?

16        MR. SGANGA:  We think -- we agree with Your Honor's

17   points.  There's a lot of things not in the contract and having

18   those enumerated provisions we think does focus the issues if

19   they need to be.

04:09 20        THE COURT:  Okay.  Anything else on that?

21        MR. FLYNN:  On that point, Your Honor, with respect to

22   closing arguments?

23        THE COURT:  Yeah.

24        MR. FLYNN:  May we incorporate into our argument the

25   notion that there's no noncompete?

```
  1            THE COURT:  Yes, yes.

  2            MR. FLYNN:  Thank you.

  3            THE COURT:  How about the breach of duty of honest

  4    performance?  I know there's a motion pending on that, but in

  5    terms of the instructions?

  6            MR. BOEHM:  Other than the pending motion and we need

  7    to get you the exhibit numbers.

  8            THE COURT:  Yes.

  9            MS. LEA:  I have the exhibit numbers, Your Honor.

 10            THE COURT:  Okay.

 11            MS. LEA:  The non-disclosure agreement is Exhibit 371.

 12    The purchase orders are Exhibit 156, 1170, 1195, 1211.

 13            THE COURT:  Okay.

 14            MR. BOEHM:  We'll double-check those on our end as

 15    well.

 16            THE COURT:  That's fine.  You can just let me know in

 17    the morning.

 18            All right.  I assume there's lots to talk about on the

 19    trade secrets.

 20            MR. GRAVES:  We have two points, Your Honor.  The

 21    first one may just be a typo.  On page 3, there's a list one,

 22    two, three, toward the bottom of the page.

 23            THE COURT:  Yeah.

 24            MR. GRAVES:  The third one reads, quote, "Neovasc has

 25    the trade secret through improper means."  I thought that that
```

might mean, "Neovasc has misused," or "has wrongfully used," or
some other verb like that.

THE COURT:  Yes, that's right.  I'm not sure it's a
typo but it's certainly a mistake.

MR. GRAVES:  Then I have just one substantive point on
the trade secret thing, which is, in our proposal we had
proposed an instruction to inform the jury in some way, shape
or form that a trade secret claim should be identified with
particularity while identified.  There's different ways to say
the same concept.  The wording doesn't matter so much.  It's
just the wording itself, that is a live issue in the case.  We
were hoping to get a sentence there about the idea that a trade
secret claim should be identified with reasonable detail,
reasonable particularity, whatever the right wording is.

THE COURT:  I get the idea.  I'm just not sure it
belongs in a jury instruction.  I'm not sure it's something
that the jury has to find.

MR. GRAVES:  Well, I think the courts here in
Massachusetts have ruled a number of times that it is something
that the plaintiff needs to do, and it is a live issue in this
case.  In other words, there is a dispute about that.

THE COURT:  Let me think about that.

MR. SGANGA:  Your Honor, we think we addressed that
with the motion in limine.

THE COURT:  I think that's right, but let me think

 1    about it.

 2              MR. SGANGA:  We think the missing verb there in

 3    section three is "used."

 4              MR. GRAVES:  That's fine with us.

 5              MS. LEA:  And I do need to add on the exhibit number,

 6    Your Honor, again, we believe the entire revised trade secret

 7    disclosure should be included, which would either be Exhibits

 8    1157 through 1219 or they're all together in Exhibit 573.

 9              THE COURT:  I'm sorry.  Give me those numbers again.

04:13 10    We have not made a decision on that.  I mean, I take your point

11    that it's all included, but it also seems -- I mean, the trade

12    secrets are defined as six different things.

13              MS. LEA:  It's Exhibit 1157 through 1219, or they're

14    in one exhibit as Exhibit 573.

15              THE COURT:  Okay.  We'll figure that out tonight, too.

16              MR. BOEHM:  Our position is unchanged on that.  I

17    would note there's a typo here, though.  It says 1057, and the

18    one that we had said was 1157.

19              THE COURT:  Okay.  Anything else on the trade secrets?

04:14 20              Unfair and deceptive conduct in trade or commerce,

21    93A.

22              MR. BOEHM:  We have a couple of things on that.  One

23    we'll probably get to later in the damages section, but the

24    first, on page 7 there's the instruction which I think comes

25    from, among other places, the *Lance* case that Your Honor cited

1    in one of the orders before trial.  At the end of that, "A

2    practice or act is unfair if it is immoral, unethical,

3    oppressive or unscrupulous;" semicolon.  We believe that should

4    be an "and" that comes after that.  We pointed that out in one

5    of our papers, the long line of cases that that's actually a

6    conjunctive requirement, not a disjunctive requirement, which

7    makes sense if you read that an injury element standing by

8    itself is far too broad for anything to be unfair.

9         THE COURT:  I think that's probably right, but let me

04:14 10   just go back and look at it.  What we added -- so we added

11   under Element III -- this didn't get sent to them?

12        I see.  I get it.  I get it.  Sorry.  I'm on the wrong

13   page.

14        On page 6, under Element III, Roman numeral III, about

15   Element III, there's a paragraph that says, "Examples of

16   improper means."  We'll get you a copy of this later, but we

17   added to that.  It's just like the 93A.  "The verdict form

18   includes an additional question about this claim.  If you find

19   that the three elements described above have been met as to any

04:15 20   alleged trade secret and that therefore Neovasc did in fact

21   misappropriate CardiAQ's trade secrets, you should indicate

22   whether CardiAQ proved by a preponderance of the evidence that

23   Neovasc's actions were willful, intentional or knowing."

24        MR. BOEHM:  Sorry, Your Honor.  You're going to add

25   that in?

```
 1            THE COURT:  Yeah.  We added that in.  It's really --
 2   it's to take up the gist of CardiAQ's instruction request 17.
 3            It's for the punitive damages on the trade secret.
 4            MR. BOEHM:  Sure.  I'll speak to that briefly.
 5            I don't believe punitive damages are possible in this
 6   case because they're only seeking a royalty measure.  The USM
 7   case, the cite on that is 392 Massachusetts 334.  It's a
 8   Supreme Court case from 1984.  And it construed the trade
 9   secret statute in a way that only the lost profits measure of
04:16 10   damages would entitle a plaintiff to enhanced damages.  It
11   excluded the possibility of unjust enrichment, and by extension
12   it also said this is meant to be construed narrowly, squarely
13   indicating that a royalty wouldn't work either, so there's no
14   basis for the instruction.
15            THE COURT:  Now I'm wondering if that's why we didn't
16   include it the first time.
17            What's your view on that?  Are they right?
18            MR. SGANGA:  Well, ultimately Your Honor can consider
19   a number of factors in deciding whether to enhance damages, so
04:17 20   we don't see why we shouldn't get that added input from the
21   jury about willfulness, and this is an issue -- those arguments
22   can be preserved and raised if and when we're dealing with the
23   enhancement issue before the Court after the verdict.
24            THE COURT:  Okay.  We'll look at that one tonight,
25   too, after you all have left.
```

1          MR. SGANGA:  Before we move on, Your Honor, if I may?

2          THE COURT:  Yes.

3          MR. SGANGA:  I just wanted to be clear on the proposal

4    about changing the "or" to the "and" because we've got a few

5    different clauses that use the "or" and it should be "and," and

6    it should be "or" in some places.

7          THE COURT:  So far the only place I've tentatively

8    changed it is right there.  I have to go back and look at the

9    case, but I did just read it during the break.  I'm pretty sure

04:17 10   what they just said is right.

11          MR. SGANGA:  So "and causes substantial injury."

12          MR. BOEHM:  That's where we're at, yeah.  I think the

13   *Lance* case you cited actually got that right also, but there's

14   a host of cases that have it as the conjunctive, and we put

15   that in one of our filings.

16          THE COURT:  So you want "and" between "oppressive" and

17   "unscrupulous"?

18          MR. BOEHM:  No.  "And" after the semicolon.

19          THE COURT:  Okay.

04:18 20          MR. SGANGA:  But to be clear now, three lines later

21   there's another "unscrupulous or otherwise unconscionable."  We

22   believe that should remain as an "or."

23          THE COURT:  Right.  I think that's right.

24          MR. BOEHM:  Yeah.  Also, just with respect to 93A

25   generally, in view of the JMOL, presenting this at all, even in

         1    advisory form, we think could be prejudicial.

         2            THE COURT:  Okay.

         3            I think the rule allows that motion to go unruled on

         4    until after the jury verdict, and I'm going to submit it to

         5    them advisory.  But I hear your objection.  It's preserved.

         6            Anything else before we get to damages?

         7            MS. LEA:  No, Your Honor.

         8            THE COURT:  All right.  How about damages?

         9            MR. BOEHM:  I can jump right into the 93A.  The 93A

04:19   10    damages are actually narrower in section 11.  It's defined in

        11    the statute as loss of money or property, real or personal.

        12    And the Massachusetts courts have construed that quite

        13    literally.  There's a model civil jury instruction about that

        14    and a number of cases and things.  And so to speak about it as

        15    if it were a broader loss, which would encompass more things

        16    than the loss of money or property, real or personal, we would

        17    want to cabin that in in accordance with the language in the

        18    statute and the case law.

        19            THE COURT:  All right.  We'll take a look at that.

04:20   20            What else?  Anything else on damages?

        21            MR. GRAVES:  Not from us, Your Honor.

        22            MR. BOEHM:  Not on our side, Your Honor.  Thank you.

        23            THE COURT:  The exhibit number on the patent

        24    referenced on "Additional Factual Determinations"?

        25            MR. SGANGA:  565 for that, Your Honor.

1           THE COURT:  You're welcome to check that tonight.

2      We'll give you another draft redline tomorrow morning.

3           MR. CARSTEN:  Your Honor, we don't believe that the

4      jury should be receiving an instruction on the inventorship

5      issue at all.

6           THE COURT:  Right.

7           MR. CARSTEN:  And I think, Your Honor, there are

8      several issues we have with this.  We have laid them out for

9      the most part in our papers.  I'll note certainly there's a

04:21 10      typo here.  It's "Mr. Ratz" and not "Dr. Ratz."

11           THE COURT:  Oh, yes.

12           MR. CARSTEN:  No offense if Mr. Ratz is in the

13      courtroom.

14           But there are also -- I think that your attempt here,

15      Your Honor, while appreciated, presents to us the real core of

16      the issue, which is the likelihood of confusion.  Today you

17      charged the jury with the burdens of proof -- the burden of

18      proof they're going to be applying in the case.  Now all of a

19      sudden out of left field we have an additional factual

04:21 20      determination, which is subject to a different burden of proof.

21           THE COURT:  They had me cover that this morning, so I

22      don't think it's out of left field.  It's just advisory.  I

23      take your point, but I don't think it's that confusing.

24           MR. CARSTEN:  Then, Your Honor --

25           THE COURT:  It's no more confusing than many of the

1    other issues they're going to be wrestling with in this, right?

2              MR. CARSTEN:  I think they have plates full without

3    adding anything more to it, frankly, Your Honor.

4              In addition there are deviations in here between what

5    the standard is.  So there's a section which says, "not

6    insignificant," and then later on it says "significant."

7              THE COURT:  Hold on.  Are you in --

8              MR. CARSTEN:  I'm in the "Additional Factual

9    Determinations" at page 12, Your Honor.  It's about eight or so

04:22 10   lines up.  It says, "Not insignificant."  Bridging the line

11   break down at the bottom, it says "significant."

12             In our papers, we identified that it has to be

13   significant to the contribution as measured against the full

14   scope of the invention.  For all the reasons we assert in our

15   paper filed last night or a day or so ago, you can't know the

16   full scope of the invention unless you actually construe the

17   claim.  The file history, for example, which is the back and

18   forth between the Patent Office, that's intrinsic evidence.

19   That's stuff that we need to consider.  The jury hasn't seen

04:23 20   any of that.  They haven't had any discussion of that.  All

21   they've had discussion of, Your Honor, is opinion testimony

22   from witnesses that is extrinsic evidence and disfavored under

23   the law.

24             In addition to that, there's the requirement that the

25   putative inventors to be named must have appreciated and

```
 1    recognized the importance of their contribution to the claimed
 2    invention at the time.
 3              THE COURT:  You're not really disputing that fact, are
 4    you?
 5              MR. CARSTEN:  Well, there's been testimony left and
 6    right about no rotation required and no targeting the
 7    trigones --
 8              THE COURT:  Doesn't inventorship just go to the
 9    conception of the idea?
10    MR. CARSTEN:  But this is an idea for using trigonal
11    tabs to hit upon --
12              THE COURT:  That's just one aspect of it.  The actual
13    idea encompasses something much broader than that.
14              MR. CARSTEN:  Well, Your Honor, there's been
15    conflicting testimony on that, I think.  I believe that
16    Mr. Lane testified that that was the core invention.  That was
17    really the heart of the invention here.  That's the inventive
18    aspect.  And really, by examining that, you need to -- the case
19    law in our view means that you need to appreciate what's
20    actually inventive here.
21              So in terms of being an inventor, if you just
22    contribute things which you've published and things which are
23    in the prior art, that's not an inventive contribution.  And
24    here we've provided ample evidence that what Mr. Ratz and Dr.
25    Quadri say they contributed to us, that is this between the
```

1    chords, behind the leaflets and touching the anchor -- touching

2    the annulus, excuse me, was well known in the prior art.  In

3    fact, they disclosed it themselves.

4         Even if we don't get that far, we have a May 2010

5    disclosure of that by virtue of the picture of that TVT, the

6    first TVT conference.  There's a question that's arisen about

7    the entitlement of the priority date.  So we have an

8    application that Neovasc filed in May, which Mr. Lane testified

9    to and said that that doesn't include the things I thought of

04:25 10    afterwards, which include this trigonal anchoring concept.  And

11    in October, there's a subsequent patent priority application

12    which is filed.

13         So whether these claims find complete support of

14    either of those documents is going to become relevant to

15    assessing whether the purported contribution that Mr. Ratz and

16    Quadri now say they now made to this invention is actually in

17    the prior art or not.

18         So I think for all these reasons, Your Honor, it's

19    confusing to the jury.  And we have very serious issues about

04:25 20    the way that the law is being provided to them here and

21    described to the jury here.

22         THE COURT:  I mean, we'll take a look at this again

23    tonight, although I'm inclined to leave it as it is.  We've

24    been back and forth about this a number of times.  It's only

25    advisory.  I take your point about it being confusing.  We're

1    trusting the jury with this.  Once I'm trusting them with this,

2    I do trust them with this as well.  But we'll take another look

3    at it tonight.  I'm happy to revisit it, but that is one we're

4    not likely to change our minds on.  We've been over it a number

5    of times already.  We'll make the corrections.  I see what

6    you're talking about.  One way or another we'll standardize

7    this, but I think we're going to leave it in as an advisory

8    question --

9         MR. CARSTEN:  Your Honor --

04:26 10       THE COURT:  -- in some form or another.  We may futz

11   with it tonight, but I think we're going to leave the factual

12   question in there.

13        MR. CARSTEN:  We'd like to preserve our objection,

14   Your Honor, to that.

15        Then I think also the way that -- if we get to that

16   and the manner in which this is presented in the jury verdict

17   form is also, we believe --

18        THE COURT:  Okay.  We'll get there in a minute.

19        Look, I may be wrong about this, and I'm happy to hear

04:26 20   you on it at the appropriate time.  You can brief it if you

21   want.  And it might be just my simple little mind.  But I don't

22   see how the inventorship and the trade secret claims go in

23   opposite directions, just as a matter of practicality.  I

24   understand the law is different and the scope of the two -- the

25   scope of the two statutes is different, but I just -- I just --

1    if they didn't steal the trade secrets, I don't think there's a

2    good claim for inventorship.

3              MR. CARSTEN:  I agree with that entirely.

4              THE COURT:  I'm shocked to hear that.  So I think the

5    two rise and fall together.  But you know, I'm -- I do think

6    the case that you've submitted is distinguishable.  But again,

7    I think the safer thing is to submit the factual determination

8    to the jury, but we'll look at it again.  Maybe we'll narrow it

9    down a little bit.

04:27 10          MR. SGANGA:  I do just want to note, Your Honor, we do

11   think there may be some situations where they don't rise and

12   fall together, but I don't think that changes the decision at

13   hand.

14             THE COURT:  An inventorship is for me to decide.

15   Again, I'm willing to be educated on this as we go.  It doesn't

16   have to have happen today.  But just my simple way of looking

17   at it -- I understand that there are circumstances.  I don't

18   see this case as encompassing those circumstances.

19             MR. SGANGA:  I think where we're in agreement is

04:28 20   certainly there's a lot of overlap that's part the Seventh

21   Amendment issue we've been raising.  So again, we'd like it to

22   go to the jury.

23             THE COURT:  The case that you gave, what was it

24   called?

25             MR. SGANGA:  *Shum*.

          1          THE COURT:  I see that case as going to the jury

          2     because it's almost like a res judicata effect on the question

          3     of fraud.  If the Court was deciding it first, then you had

          4     this strange sort of preclusion issue.  This is not so much the

          5     same as that.  But it is a factual determination.  We're

          6     sending the case to the jury anyway.

          7          But I'll take another look at it tonight.  I suspect

          8     at the end the day we may change this around a little bit.  We

          9     spent so much time making the decision about whether or not to

04:29    10     send it the jury that it's gotten less editing than anything

         11     else in here because it was the last thing written.  So I'm

         12     happy to take a look at it, but I think at the end of the day

         13     there will be some question that goes to the jury on it.

         14          But again, the decision is ultimately mine, and I just

         15     don't see myself going any differently than the jury goes on

         16     the trade secrets issue.  I don't know.  Either I'm very smart

         17     or very simple because -- I'm not sure my law clerk agrees with

         18     me on that interpretation, but that's as a practical matter how

         19     I see it coming down.

04:29    20          Is that everything other than the verdict form?

         21          All right.  The verdict form, we added -- the new

         22     question 7 largely mimics the old question 9.

         23          "Did CardiAQ prove by a preponderance of the evidence

         24     that Neovasc's misappropriation of trade secrets was

         25     intentional, willful or knowing."  We'll get you a copy of

1    that.

2           MR. BOEHM:  Again, the point that we brought up

3    earlier, that that's not a live issue since they're not seeking

4    lost profits damages.

5           MR. GRAVES:  We do have another comment on the trade

6    secret part of the verdict form, if that's where we are right

7    now.

8           THE COURT:  Yeah.

9           MR. GRAVES:  As it's written right now, there's sort

04:30 10   of a single vote:  Did they misappropriate, which sort of

11   encompasses everything.  We think there ought to be a separate

12   vote first on secrecy, meaning is there a trade secret, and

13   then on misappropriation, because one logically follows or

14   precedes the other one.  It's anecdotal, obviously, and doesn't

15   govern, but in other jury trials we've been involved with,

16   there's usually the split question.  So we would suggest

17   cutting and pasting the same chart but having a question about

18   secrecy and then about misappropriation.

19          MR. SGANGA:  In the instructions, Your Honor, you are

04:31 20   laying out those elements.

21          THE COURT:  Yeah.  I don't know why I would do that.

22   The fundamental difference between your verdict form is you

23   wanted it broken down way, way more than they did.  It's not my

24   inclination to do that, other than as we might need it broken

25   down to preserve the verdict depending on what happens on

         1    appeal of some of these outstanding issues.  But I think we've

         2    instructed in that if they find that you misappropriated a

         3    trade secret, then they have to find that there was a trade

         4    secret to misappropriate.

         5         MR. GRAVES:  Thank you, Your Honor.

         6         THE COURT:  Anything else?

         7         MR. SGANGA:  Minor typo in the heading, the Roman

         8    numeral II heading there.

         9         THE COURT:  Yes, you're right.

04:31   10         MR. BOEHM:  Sorry.  There's a "Dr. Ratz" going on in

        11    here, too.

        12         THE COURT:  Yes.  There's a "Dr. Ratz."

        13         So one other thing that I was sort of wrestling with

        14    and we don't have an answer to, I'm happy to have your input, I

        15    wondered if we needed to or should capture someplace in either

        16    the instructions or the verdict form that their maximum verdict

        17    was $90 million.  So if they gave you 90 million on everything,

        18    it would be easy.  We'd just give 90 million.  And if they

        19    gave, you know, zero on everything, that would be easy, too.

04:32   20    But I'm worried about if we get sums of money on some of these

        21    that are less than 90 million.  Like if there was a 20 million

        22    plus a 25 million.  At that point are we to add it up for 45

        23    million, or are we to leave it -- just pick the higher?  So I'm

        24    not sure how to capture that possibility in here.  We could

        25    give them the instruction that the amounts are not going to be

1    aggregated.

2         MR. HORNE:  Your question is regarding the trade

3    secret claims?

4         THE COURT:  Well, it's to all of them.  If they gave

5    you 90 million on each of them, you would get 90 million.  If

6    they gave you zero on everything, you'd get zero on everything.

7    But if they gave varying amounts that between them did not add

8    up to 90 million.

9         MR. HORNE:  I understand the question now.  I'd have

04:33 10   to mull this over for a few minutes before responding.

11        THE COURT:  Start mulling.

12        MR. SGANGA:  Your Honor's suggestion then is to give

13   some instruction to the effect of "Treat each one as standing

14   alone as if none of the causes of action resulted in any

15   damages"?

16        THE COURT:  I don't know.  You've presented it, for

17   better or for worse, with one lump sum figure.  So if they gave

18   45 million and 45 million, I would assume they were just

19   dividing it up to get to the 90.  What if they pick, you know,

04:33 20   20 million plus 25 million?

21        MR. SGANGA:  Well, the testimony from our damages

22   expert was that the number was not intended to be cumulative

23   across the causes of action.

24        MR. HORNE:  That's if they gave 90 on each one.

25        MR. SGANGA:  On each one.

 1            MR. HORNE:  I think it would be cumulative, unless it

 2       was at 90.

 3            MR. FLYNN:  We disagree.

 4            THE COURT:  I mean, we can -- what I thought was that

 5       we could either put something in the instructions themselves or

 6       we can put it into the verdict form.  But I think at some --

 7       because I know if we come back with a 20 and 25, right, you're

 8       going to say we should add them up and you're going to say take

 9       the higher.  So we're going to deal with it before we're in

04:34 10       that situation.

11            MR. FLYNN:  Your Honor, I think it's clear from the

12       evidence we would take the higher.  I think were the jury to

13       make a calculation error, you could deal with that on a

14       remittitur, but I think that's the state of the proof based on

15       the way the damages were presented.

16            MR. HORNE:  Your Honor, that's why we think maybe one

17       question on damages would be better so we don't run into this

18       situation.

19            THE COURT:  I'm definitely not doing that because then

04:34 20       what happens if the 93A claim doesn't exist or you want

21       enhanced damages on the 93A?  I have no way of figuring out how

22       much they contributed to the 93A.

23            MR. FLYNN:  Your Honor, I know you've already ruled on

24       this, and I'll be very brief.  But I think that precise issue

25       is a very good reason why the risk in complication of

       1   submitting 93A for advisory findings outweighs the utility
       2   here.  I think in light of the JMOL, that law respectfully is
       3   very strong.  I think it's a pretty clear issue.  There's a
       4   very high likelihood that ultimately that claim is not going to
       5   survive, and it's complicating.  And it's potentially
       6   prejudicial to have the jury be instructed on deceptive acts
       7   when we don't think ultimately that's going to be before them.
       8              MR. SGANGA:  Your Honor, I think we have that issue
       9   with the breach of contract claim already and the trade secret
04:35 10   claim already.  The fact that we have multiple causes of action
      11   and the 93A claim doesn't add any more complication.
      12              THE COURT:  I bumped into Judge Young in the hallway
      13   last night, and he thought I should include it as a binding
      14   jury finding and I disagree with that.  But I mean, I think
      15   there is enough of the 93A to get to the jury, but they've
      16   raised a significant issue on the Massachusetts nexus; they
      17   definitely have.
      18              So, you know, I don't want you to have to brief that
      19   overnight tonight and have anybody rush into a hurried decision
04:36 20   on it.  I know everybody likes the 93As in.  Juries rarely find
      21   them.  So do you want it to go to the jury?
      22              MR. SGANGA:  Yeah, we would like it to go to the jury,
      23   Your Honor, yes.
      24              THE COURT:  So then let's sort out how we're going to
      25   -- I'm not going to put in one number because if the 93A fails,

1    I'm not going to jeopardize this verdict.

2            MR. SGANGA:  Could we have a moment to confer?

3        (Plaintiff counsel confer.)

4            THE COURT:  Jonathan just pulled a case of a contract

5    in the 93A claim.  And you basically can't have duplicative

6    damages where the two claims are based on the same set of

7    facts.

8            So in this case, what saved -- the jury gave different

9    amounts for the two, and what saved the verdict was the fact

10   the judge had given some, although not very coherent,

11   instructions on duplicative damages.

12           THE CLERK:  They're all distinguishable.

13           THE COURT:  So either the jury -- well, the claims

14   were distinguishable?

15           THE CLERK:  Yes.

16           So the amounts were different but they made some

17   argument that the claims were distinguishable on different

18   factual bases.  So I think we have to do something on

19   duplicative, but I think what that means is that -- because

20   these two breaches are based on the same -- the 93A and the

21   contract claims would be based on the same conduct.  So if you

22   had a -- so I guess if you had one amount for 93A and one

23   amount for the breach of contract, you would just take the

24   higher.

25           MR. SGANGA:  That's the way we're viewing it as well,

1    Your Honor.  So an instruction to the effect that the

2    individual damage awards for the individual causes of action

3    are not to be viewed as added together, they're not to be

4    cumulative, that would be consistent with our view.  And I

5    think that's what Mr. Flynn was suggesting as well.

6              THE COURT:  He doesn't look like that was what he was

7    suggesting.

8              MR. FLYNN:  It was not.

9              THE COURT:  So we could lump together the -- I mean,

04:42 10   the contract and the 93A are really, it's a compensatory damage

11   theory and trade secret is a reasonable royalty theory.

12   They're not the same.  I think those two have to at least be

13   broken out.  I'm wondering if you could lump together the

14   contract claims and the 93A since the factual for basis for

15   both claims is the same.

16

17             THE COURT:  (To the clerk) There's a different damages

18   theory.  Is it the same law on duplicative damages?

19             THE CLERK:  I don't know, but it --

04:43 20             THE COURT:  Let us take a look at that.  If we find

21   the same law on duplicative damages with the trade secret

22   versus the contract when it's the same underlying basis, we go

23   back to one amount.  But I really want to make sure that if

24   something fails here that someone can go back and figure out

25   what this jury did.

1              MR. FLYNN:  Your Honor, I think another complicating

2      feature is we've cited authority and we intend to reserve our

3      objection on the idea that the 93A -- a theoretical 93A

4      violation can't be based on a failure to disclose when there's

5      no contractual or common law duty to disclose.  And as the

6      material we're working on now doesn't address that directly,

7      we've got other problems that might put the verdict in

8      jeopardy.  I think the sum of all these problems --

9              THE COURT:  Put the 93A verdict in jeopardy?  That's

04:43 10   advisory anyway.

11             MR. FLYNN:  But I think the failure to segregate them

12     and clearly delineate what might constitute a 93A violation as

13     opposed to what might constitute a breach of contract promotes

14     jury confusion and is prejudicial to the defendant.  I think

15     we're still in a situation where any utility from an advisory

16     finding is far outweighed by the complicating factors.

17             THE COURT:  All right.  We'll take a look at this all

18     tonight and let you know where we come down on it in the

19     morning.

04:44 20           MR. BOEHM:  Thank you, Your Honor.

21             THE COURT:  Anything else tonight?

22             We'll get you a redline in the morning.  The jury is

23     coming in at 10:00.  So whenever you want to come after 9:00,

24     we'll have a redline version for you.  And then I'll come back

25     out on the bench around 9:30 and we can sort out where we are.

1          MR. BOEHM:  Your Honor mentioned the possibility or

2    the protocol for post-trial briefing on inventorship or other

3    things.  Is that something where you would want the parties to

4    confer and propose something to you, or is this something you

5    want to give us guidance on?

6          THE COURT:  Let's wait.  I think we should wait to see

7    what the verdict is because those issues can -- we'll see what

8    happens.  I mean, we'll just see where the verdict is before we

9    decide what's left and what we're going to do with them.

04:45 10          MR. BOEHM:  Okay.  Thank you.

11          THE COURT:  I mean, if the jury doesn't find a

12   contract -- a breach, I'm not likely to find 93A.  And if they

13   don't find trade secrets, I'm not likely to find inventorship.

14   I just think those groups of claims rise and fall together.  I

15   know no one's going to comment on that now.

16          MR. BOEHM:  It seems like the conversation has

17   concluded, Your Honor.

18          THE COURT:  No, it's not that.  It's that everyone's

19   position on that is going to be grossly impacted by the

04:46 20   verdict, right?  So I'm not going to ask you to commit to it

21   now.  That's one of those examples of where you stand being

22   greatly influenced by where you sit.  I'm not saying I have a

23   closed mind to it, but those are going to be two uphill

24   battles, that you'll get inventorship without theft of trade

25   secrets or you'll get 93A without the contract breach.

1          All right.  We'll take a look at the issues that are

2     left.  We'll give you clean copies in the morning, and then

3     we'll have one more session.  You guys are still at two hours?

4     You'd like an hour 45 to two hours?  That's a long time to have

5     this jury sit.  You all know that, right?  All those studies

6     that show the human attention span is about an hour.

7          MR. SGANGA:  We'll work on editing tonight, Your

8     Honor.

9          THE COURT:  You can have the two hours.  You're both

04:46 10   well within your time limits as far as I can tell.  I'm just

11    saying it's a really long time to ask them to pay attention to

12    you.  So I'm glad I've already gotten half the charge out of

13    the way.  I don't need them to pay attention to me for that

14    long.

15         All right.  Thanks, everyone.

16         MR. SGANGA:  Thank you, Your Honor.

17         MR. GRAVES:  Thank you, Your Honor.

18         MR. BOEHM:  Thank you, Your Honor.

19         (Adjourned, 4:46 p.m.)

04:47 20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7            We, Lee A. Marzilli, Debra Joyce and Kelly Mortellite,

8  Official Federal Court Reporters, do hereby certify that the

9  foregoing transcript was recorded by us stenographically at the

10 time and place aforesaid in Civil Action No. 14-12405-ADB,

11 CardiAQ Technologies, Inc. v. Neovasc Inc., et al, and

12 thereafter by us reduced to typewriting, and is a true and

13 accurate record of the proceedings.

14            Dated this 17th day of May, 2016.

15

16

17

18            /s/ Lee A. Marzilli, RPR, CRR

19            /s/ Debra Joyce, RMR, CRR

20            /s/ Kelly Mortellite, RMR, CRR

21

22

23

24

25